# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CENTRA, INC.,

        Plaintiff,

vs.

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

        Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

Craig L. John (P27146)
Steven P. Cares (P68503)
Attorneys for Centra
Dykema Gossett PLLC
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800

---

## EXHIBIT A TO VERIFIED COMPLAINT [1]

Respectfully submitted,

DYKEMA GOSSETT PLLC


By: s/Steven P. Cares
    Craig L. John (P27146)
    Steven P. Cares (P68503)
    Attorneys for Centra
    400 Renaissance Center
    Detroit, MI 48243
    (313) 568-6800

Date: November 21, 2006

DYKEMA GOSSETT-A PROFESSIONAL LIMITED LIABILITY COMPANY-400 RENAISSANCE CENTER-DETROIT, MICHIGAN 48243

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

- Steven P. Cares

- Craig L. John

Defendants David Estrin and Gowling Lafleur Henderson LLP will receive a copy of this pleading via U.S. mail, sent to their last known address: 1 First Canadian Place, Suite 1600, 100 King Street West, Toronto, Ontario, Canada, M5X 1G5.

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: s/Steven P. Cares
Craig L. John (P27146)
Steven P. Cares (P68503)
Attorneys for Centra
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800

Date: November 21, 2006

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

2



Suite 1600
1 First Canadian Place
100 King Street West
Toronto, Ontario
Canada M5X 1G5
Telephone (416) 862-7525
Facsimile (416) 862-7661
www.gowlings.com

**David Estrin**
Direct (416) 862-4301
Direct Fax (416) 862-7661
Assistant 416-862-4360
david.estrin@gowlings.com

September 14, 2006

*Delivered by Overnight Courier*
Office of Commander (dpw-3)
Ninth Coast Guard District
1240 East Ninth Street
CLEVELAND, Ohio
44199-2060

Attention:   Mr. Robert W. Bloom, Jr.
             Bridge Program Manager

Dear Sir:

**Re:   Your Public Notice 09-03-06 – Detroit International Bridge Company/Canadian Transit Company**
**Application for Approval of Location and Plans for construction of a Second Fixed Highway Bridge Over a Navigable Waterway of the United States (Detroit River) Adjacent to the Existing Ambassador Bridge**

### SUBMISSION ON BEHALF OF THE CORPORATION OF THE CITY OF WINDSOR, CANADA

**Introduction – The City of Windsor's Direct and Substantial Interest in This Matter**

We are attorneys for the Corporation of the City of Windsor, Ontario, Canada. This letter, and the various attachments to it which are separately bound in two volumes and which are also enclosed with this letter, constitute the comments on behalf of the City of Windsor to your agency objecting to the grant of the requested permit as well as the objection of the City to the preliminary determination by the U.S. Coast Guard that this application is properly processed as a "categorical exclusion" (CE) from the *National Environmental Policy Act* (NEPA). We ask that this letter and the attachments enclosed form part of the record in this matter.

The application proposes a new international vehicle bridge across the Detroit River between Detroit Michigan and the City of Windsor, Ontario ("Windsor" or "the City").

The proponent describes this as a "new six-lane structure" to be built to the west of the existing 76 year old Ambassador Bridge. As submitted below, in fact this bridge will accommodate eight lanes of traffic and should be considered and environmentally assessed as such.

Montréal   |   Ottawa   |   Toronto   |   Hamilton   |   Waterloo Region   |   Calgary   |   Vancouver   |   Moscow   |

The proposed second bridge will be partially located within the United States, but a significant portion of the proposed bridge will be located within Canada, and in particular, within the City of Windsor.

The City of Windsor's northern boundary begins at the International Boundary line between Canada and the United States, which is essentially the mid-point of the Detroit River.

Approximately 50 percent of the proposed second bridge structure will be located in Canada and specifically within the City of Windsor.

The current Ambassador Bridge has a structural length within the City of Windsor of about 3,600 feet. Of that length, approximately 2,700 feet cross over the land area of the City of Windsor, not below the river.

The proposed second bridge will have approximately equal horizontal presence within the City of Windsor.

The proponent has filed plans with you for the second bridge which demonstrates that the proposed second bridge would pass over the following City of Windsor streets: Riverside Drive West, University Avenue West, Peter Street, Victoria Street and Wyandotte Street (in fact the proposed bridge would not pass over Victoria Street but instead would pass over Donnelly Street).

For an accurate plan view of how the proposed second bridge would be related to City streets and to the existing Ambassador Bridge within the land area of the City of Windsor, please refer to the enclosed aerial photograph entitled "City of Windsor Zoning By-law 8600 – Existing Zoning Adjacent to the Ambassador Bridge". This aerial photograph has been prepared by City engineering/planning staff from information taken from the plans provided by the proponent to the Coast Guard. **Attachments Vol.1, Part A, Tab 5**

As is clearly illustrated in the above-referenced aerial photograph, the second bridge will pass directly over four blocks of houses on the west side of Huron Church Road. There are approximately 218 dwellings shown on the aerial photograph in the 250 metre area to the west of Huron Church Road illustrated on the aerial photograph. These dwellings house approximately 650 people.

Also within a short distance west of the proposed second bridge, closer to the Detroit River, at 2856 Riverside Drive West, is a 145-unit building which houses almost 200 University of Windsor students.

Within 60 – 180 metres to the east of Huron Church Road, immediately opposite portions of the proposed second bridge, there are three University of Windsor residences. These provide housing for over 800 students.

We are attaching to this submission a letter dated September 13, 2006 from Robert Hayes, MCIP, RPP, City Planner for the Corporation of the City of Windsor addressed to David Estrin,

Gowling Lafleur Henderson LLP, Attorneys for the City of Windsor. **Attachments Vol.1, Part A, Tab 2**

In the letter from Mr. Hayes, the City Planner details the land use conflicts and impacts that would be caused to the City and its residents by this proposed second bridge. That letter provides significant details corroborative not only of the direct interest of the City in this matter but, also, substantiation of the City's concern that this proposed second bridge will have significant adverse environmental and community impacts within the City.

A previous study carried out by the Detroit River International Crossing Project (DRIC) – the so-called "Bi-National Environmental Assessment" being undertaken by the U.S. Federal Highways Administration, the Government of Canada through Transport Canada, the State of Michigan and the Province of Ontario examined the potential environmental and land use impacts of a second Ambassador Bridge as is now being proposed by the proponent to you.

In his September 13th letter, Mr. Hayes quotes directly from the findings of the DRIC "Generation and Assessment of Illustrative Alternatives Report" (November 2005) which is also a report referenced by the proponent in its material submitted to you. **Attachments Vol.1, Part A, Tab 7**

The DRIC study rejected the viability of a second Ambassador Bridge after having carried out an assessment of traffic impacts, potential noise impacts, impacts to community cohesion and character and displacement of population.

The following quotation is taken directly from the DRIC report:

*The expansion of the existing plaza at the Ambassador Bridge will have a highly negative impact on the community, particularly the neighbourhood of Sandwich. This area of Sandwich is densely populated and a mature residential area. Over 215 households will be displaced and almost 1000 households disrupted (i.e. within 200m of the plaza) within the established urban neighbourhood. Area businesses are forming an economic development corporation to promote new growth and development opportunities in the Sandwich area. The loss of over 215 households from the immediate vicinity would have a negative effect on the local businesses serving this community.*

*Other impacts associated with this plaza include: 2 schools displaced (J.L. Forster Secondary School and St. Francis Separate School); 4 institutional uses disrupted, including a day care centre and business school; and 5 social features disrupted, including the University of Windsor, Assumption Church and the Riverfront Park. The plaza would be situated in a residential neighbourhood (highly undesirable from the perspective of border agencies) with little opportunity for expansion to meet future needs without additional community impacts.*

*The twinning of the Ambassador Bridge will also have impacts on Sandwich community: approximately 75 households displaced and over 310 households disrupted; a student residence would be displaced and the riverfront part would be disrupted.*

*Overall, the crossing X12 alternative would have a highly negative impact to community and neighbourhood characteristics. (p.108-9)*

...

*Expanding Huron Church/Talbot Road from Highway 401 to the plaza at Ambassador Bridge will displace approximately 135 homes and over 85 businesses, while over 2100 households and approximately 25 businesses will be disrupted (i.e. are within 250m of the centerline).*

*Protect Cultural Resources*

*The crossing X12 alternative has a high negative impact to cultural resources. The community of Sandwich includes one of the oldest settlements in Canada. The original town of Sandwich retains a number of buildings of the pre-confederation era that are of historical significance and/or which exemplify the Neo-classical and Georgian styles of architecture, which were in vogue during the first half of the nineteenth century.*

*A number of designated heritage properties can be found along the following streets: Russell Street, Sandwich Street, Peter Street, Detroit Street, Mill Street, Brock Street, Chippewa Street, South Street, Watkins Street, Prince Road. The Ambassador Bridge, built in 1929, is listed in the Ontario Heritage Bridge List. Expanding the plaza at the Ambassador Bridge to accommodate a twinning of this structure will affect over 40 built heritage features (disruption impacts) and 3 known archaeological sites. The alternative also impacts a sizeable area of high archaeological potential. (p.109-110)*

Moreover, the City Planner's September 13, 2006 letter further documents how the proposed second bridge will conflict with the City of Windsor Official Plan as well as the City of Windsor Zoning By-law.

As the Chief City Planner's letter indicates, the second bridge is proposed to be located west of the current bridge. "This land, west of Huron Church Road, is residential and is designated as such in the City of Windsor Official Plan." Also, the Windsor Official Plan "designates portion of land near the Detroit River around the existing and proposed second bridge as Waterfront Recreation and Waterfront Residential.

Please refer to the attached map – Excerpt from Schedule D "Land Use" from City of Windsor Official Plan which shows, in yellow, how the area proposed for the second bridge and the lands to the west thereof are all designated in the Official Plan as "Residential" except for a small portion at the river which is designated as "Waterfront Recreational". **Attachments Vol.1, Part A, Tab4**

A complete copy of the City of Windsor Official Plan is being filed as an attachment to this submission (on disc). **Attachments Vol.1, Part A, Tab 3**

With respect to zoning, as the Chief City Planner's letter indicates, (page 5) the entire area of the proposed second bridge is currently zoned for residential uses.

Please refer to the above-referenced aerial photographs "City of Windsor Zoning By-law 8600 – Existing Zoning Adjacent to the Ambassador Bridge".

Filed with this submission are a binder of photographs illustrating some of the land uses in close proximity to the proposed second bridge. These photographs illustrate parks,

culturally/historically significant properties, including some from Olde Sandwich Towne and the University of Windsor. **Attachments Vol.1, Part A, Tab 6**

With specific reference to impacts on City parks and recreational and cultural facilities, please refer to the letter dated September 11, 2006 from Mr. Don Sadler, Executive Director, Parks and Facility Operations, City of Windsor, Parks and Recreation Department to Gowling Lafleur Henderson, which is one of the enclosed and attached documents to this submission. **Attachments Vol.1, Part A, Tab 10**

The letter from the Executive Director of the City's Parks and Recreation Department establishes that there are four City parks that are directly located adjacent to or very close to the proposed second bridge.

Contrary to the proponent's assertion in its application to you that parks will not be impacted, Mr. Sadler points out how the second bridge would have negative environmental impacts on the park in that area as well as on the recreational use and capacity of the recreationway easement under the existing and proposed bridge.

Please refer to the enclosed aerial photograph entitled "Proposed River Front Recreation Way Easement Extension". **Attachments Vol.1, Part A, Tab 18**

To quote Mr. Sadler, this area under the bridge is "vital to create a safe, continuous recreation way from Assumption Park to McKee Park to the west. This portion of recreationway is an integral part of our bicycle use Master Plan which connects Windsor by pathway from north, south, east and west ... Our estimate of usage ranges from 100 – 500 per hour past this point dependant on season."

Mr. Sadler indicates that the "increased traffic of six – eight new lanes compared to the existing four will increase the noise and air contaminants in the adjacent parkland space, which is designed for passive and active use by the neighbourhood. Clearly it is not reasonable to conclude that there will be 'no impact' on neighbourhood parkland. Clearly, there will be impacts in the form of landscape growth patterns, increase of noise and air contamination and lack of consideration for historical and cultural significance in the area of the proposed bridge expansion."

He concludes that it is the City Park Department's opinion "that approval of the project will have a significant potential impact on parks, recreation and cultural features in Windsor and we strongly advise that before any approvals are processed for this project, it is vitally important that appropriate studies of these potential impacts are carried out".

Please note that Mr. Sadler's letter has some attached pages providing further details with respect to the history and features of the nearby parks.

Also referenced in the September 13, 2006 letter from the Chief City Planner is a Memo dated September 12, 2006 to the City Planner from the Senior Policy Planner – Heritage of the City (Nancy Morand, MA, MCIP, RPP). **Attachments Vol.1, Part A, Tab 9**

That September 12th memo substantiates "there are a number of properties in the shadow of the Ambassador Bridge that are important heritage resources".

These various heritage resources are depicted on the accompanying map entitled "Heritage Properties: Sandwich Area" – a map which is enclosed with and forms part of this submission. **Attachments Vol.1, Part A, Tab 17**

Ms. Morand's memo points out that "the land in the vicinity of the Ambassador Bridge was the site of the earliest European settlement of the south shore of the Detroit River. It is the site of the Mission of the Our Lady of the Assumption Among the Hurons, established at Detroit in 1728 and moved to this location in 1747. The Hurons established a village adjacent to the Mission and the church also attracted French and British settlers".

She also points out that:

> "Assumption Park bounded by Riverside Drive East, Huron Church Road, University Avenue and Vista Place is designated under the *Ontario Heritage Act* (in 1991) as an archaeological site. The present day church, the magnificent Gothic-style cathedral located just to the south across University Avenue, was built in 1845 … It was designated under the *Ontario Heritage Act* in 1978."

Her memo references many other designated heritage buildings in the immediate vicinity of the bridge. **Attachments Vol.1, Part A, Tab 6**

Please see the file of photographs being submitted with this submission which include pictures of heritage designated and historical buildings in close proximity to the proposed second bridge.

Ms. Morand's memo also points out that the City of Windsor, Archaeological Master Plan (2005) "the land in the vicinity of the Ambassador Bridge has more potential to contain archaeological resources than any other land in the City. That is because of its close proximity to a major waterway (Detroit River), historic transportation routes, (Huron Church line and Riverside Drive) and the former Huron Village. It is also adjacent to known archaeological sites and unregistered burial sites.

Please note and consider the complete City of Windsor Archaeological Master Plan Study Report (October 2005). **Attachments Vol.1, Part A, Tab 14**

Also, for ease of reference, we have separately enclosed Figure 4 from the Windsor Archaeological Master Plan "Archaeological Potential" which demonstrates that all of the lands on either side of the proposed second bridge are concluded to have "high potential" in respect of archaeological significance. **Attachments Vol.1, Part A, Tab 15**

As well, please see another map which is included in the Archaeological Master Plan entitled "Windsor Archaeological Master Plan – Cultural Factors". This coloured map provides details with respect to the location of the "original Huron reserve" directly in the area proposed for this

second Ambassador Bridge, as well as the same area also being the site of the "Huron Village and Jesuit Mission" as well as "unregistered burial sites". **Attachments Vol.1, Part A, Tab 16**

There will also be potentially significant noise impacts caused by the new bridge and associated increased traffic associated with it.

Please refer to the enclosed letter report dated September 12, 2006 from Dr. A. Lightstone, P. Eng., Acoustical Engineer and President of Valcoustics Canada Limited. **Attachments Vol.1, Part A, Tab 8**

Dr. Lightstone's letter substantiates that there would be a significant and unacceptable increase in noise levels as a result of the operations intended to be carried out on the new bridge. Residential properties and residents residing in proximity of the proposed second bridge would be subjected to noise levels greatly in excess of permitted noise level exposure criteria established by the Ontario Ministry of the Environment.

Dr. Lightstone's letter points out how the proponent has carried out no noise studies and concludes no noise mitigation is required because in its view "noise levels will not substantially increase over the existing volume as a result of the proposed bridge".

Dr. Lightstone finds that:

> "These conclusions are nonsensical. The projected future traffic volumes are understood to be future traffic demands and would materialize at any particular facility providing the capacity is made available. Clearly if the demand exists, an increased number of lanes would result in higher volumes of traffic."

Dr. Lightstone's letter also points out how the proponent's consultant's statement in the materials filed with you that "the closest noise receptor is approximately 1,000 feet away" is erroneous as is the statement "businesses and vacant land immediately surround the project".

Dr. Lightstone points out that "the closest existing homes on Indian Road are about 280 feet from the centre line of the existing bridge and will be about 165 feet from the centre line of the proposed new bridge. The closest facades of the University residences are about 135 feet from the centre line of the existing bridge and will be about 200 feet from the centre line of the new bridge".

In preparing his noise assessment Dr. Lightstone took into account the projected traffic data and demand forecasts carried out for the DRICP in their study entitled "DRIC Study Travel Forecasts, Working Paper, September 2005, prepared by the IBI Group. Please note that this travel forecast Working Paper is one of the enclosures with this submission (on disc). **Attachments Vol.1, Part A, Tab 13**

Dr. Lightstone concludes that by averaging the yearly projected volumes over 365 days to obtain 24 hour volumes, the sound exposures at the row of houses fronting on Indian Road (west side)

will be increased by about 7 dBA, from a projected 66 dBA to about 73 dBA with the new bridge in place. As he states:

> "The result is a relatively significant increase and the resulting sound exposures are well above the normal outdoor criteria 55 dBA for residential uses."

He also points out that current conditions on the bridge are often congested which results in lower travel speeds which produce reduced noise emissions. "That is, current sound exposures at the houses on the west side of Indian Road will be less than 66 dBA." Increasing the traffic speed, which would likely be the result, at least for some time, of the proposed new bridge, which would allow traffic to flow at higher speeds, would therefore increase sound exposures from <u>current conditions</u>.
As he puts it:

> "In such a case, the increased (traffic) volume capacity can result in increases in sound (noise) exposure beyond current conditions by at least 10 dBA. This change is considered very significant."

According to the MOE reference attached to Dr. Lightstone's letter, a 6 to 10 dBA increase above recommended sound levels would produce a "definite noise impact".

Dr. Lightstone concludes that:

> "The proponent's conclusions, that detailed noise studies are not required, are not supported by the evidence (some of which is incorrect) and thus are not warranted."

He further concludes that:

> "Detailed noise studies should be required to address potentially significant increases in sound exposure as is the case for all major projects in Ontario with the potential to impact neighbouring land uses; examining existing, actual traffic flow conditions, as well as future projections and the need for potential noise mitigation is part of the design of the proposed new bridge."

In conclusion with respect to the interest of the City in this matter, the above-referenced documentation clearly and unequivocally demonstrates that the City of Windsor has a substantial and direct interest in the permit application filed with the Coast Guard.

### The Coast Guard is Required to Consider the Potential Environmental Effects of its Action on the City of Windsor

The Coast Guard has recognized the obligation to assess the environmental impacts of its actions on the environment of other countries. Pursuant to U.S. Coast Guard Commandant Instructions M16475.1D, "National Environmental Policy Act Implementing Procedures and Policy for Considering Environmental Impacts" (November 29, 2000) it is noted that pursuant to Executive Order 1214, "Environmental Effects Abroad of Major Federal Actions", the requirements of the

Case 2:06-cv-15185-NGE-RSW  Gowling Lafleur Henderson LLP  Barristers & Solicitors  Patent & Trade Mark Agents  Filed 12/18/06  Page 24  Page 11 of 37

Page 9

Commandant's Order applies to "...(2) major federal actions significantly affecting the environment of a foreign nation not participating in the action or otherwise involved in the action".

The environment of the City of Windsor, located in a "foreign nation", will be affected by the proposed second Ambassador Bridge. The Coast Guard's obligation in addressing NEPA therefore must include an assessment of effects on the environment in Canada and in particular within the City of Windsor.

We also refer you, on this issue, to the letter dated September 14, 2006 from the law firm of Thompson Hine, LLP, American counsel for the City of Windsor. In that letter, authored by attorney Andrew Kolesar, it is further pointed out why the Coast Guard is required under NEPA to include analysis of reasonable foreseeable trans-boundary affects in its analysis of proposed actions in the United States. Those submissions are incorporated by reference in this submission. **Attachments Vol.1, Part A, Tab 1**

We refer you on this issue to the Coast Guard's own "Environmental Procedure Pertaining to Bridge Permit Applications" contained in the U.S. Coast Guard "Bridge Permit Application Guide", COMDTPB P16591.3B".

Among the Coast Guard policies are the following:

1.  "Coast Guard policy ensures that efforts are made to improve the relationship between man and his environment and to preserve the natural beauty of the countryside, coastal areas and natural and cultural resources. <u>Coast Guard investigations include consultations with local, state and federal agencies and the public.</u> Recommendations and decisions are based on providing for the reasonable needs for navigation and consideration of these social, economic and environmental goals.

2.  <u>Coast Guard environmental considerations extend beyond the bridge and approaches to include causally-related primary and secondary environment impacts of the proposed bridge project.</u> When the Coast Guard is the lead agency in a project involving a bridge, <u>the NEPA jurisdiction extends to the logical terminae on both sides of the bridge</u> or the bridge and road sections having independent utility." (See page 22)

It is clear that the Coast Guard policy requires "investigation" of actual facts (not just acceptance of the proponent's submissions) and "consultation" with the public and local government such as the City of Windsor about such facts and the potential environmental consequences of the proposed action at both sides of the bridge in processing an application pursuant to its own environmental policy.

The City acknowledges that in Canada, pursuant to the *Canadian Environmental Assessment Act*, a form of environmental assessment is to be carried out. In Canada, however, there are only a minimal prescribed requirements for this type of environmental examination. Under the Canadian legislation the examination is called a "screening". While a much more rigorous

Case 2:06-cv-15185-NGE-VMM  Document 21-3  filed 11/21/06  Page 12 of 37
Gowling Lafleur Henderson LLP    Barristers & Solicitors • Patent & Trade Mark Agents

Page 10

"comprehensive study" of a project is a defined term, this "comprehensive study" cannot jurisdictionally be applied to the proposed new bridge and therefore only the minimal "screening" level environmental examination will occur.

A screening level environmental review in Canada is not required to consider the purpose of the project, nor is it required to consider alternative means of carrying out the project that are technically and economically feasible, nor is it required to examine environmental effects of any such alternative means.

A further limitation in Canada is that potentially affected parties such as the Corporation of the City of Windsor and its residents have no ability to determine the "scope of the project" in relation to which a screening level environmental assessment is to be carried out. That decision is entirely a discretionary one in the hands of Canadian federal agencies.

Similarly, as indicated above, the scope of the assessment i.e. factors to be considered, are entirely discretionary and again, the City of Windsor and its residents have no assurance that anything but a very narrow, technically based, environmental screening will be carried out.

**There is a Fundamental Factual Error in the Submission by the Proponent and in the Preliminary Determination by the Coast Guard that this Proposed Second Bridge Meets the Criteria of Categorical Exclusion No.32(a) on Figure 2 – 1 of the NEPA Implementing Instructions**

This issue is substantially addressed in Andrew Kolesar's September 14, 2006 letter (Thompson Hine LLP). **Attachments Vol.1, Part A, Tab 1**

Further important facts and analysis of this issue having regard to the Coast Guard's checklist for analyzing environmental impacts for their significance are contained in the September 13, 2006 letter from the City of Windsor Chief Planner to Gowlings, which is enclosed with this submission. **Attachments Vol.1, Part A, Tab 2**

See in particular Mr. Hayes' analysis of the 10 issues on the U.S. Coast Guard Environmental Checklist Criteria.

However, one matter not addressed that this relevant to this issue either in Mr. Kolesar's letter or Mr. Hayes' letter is the assertion of the proponent, seemingly accepted by the U.S. State Department in its correspondence filed with you, that there is an alleged "existing corridor" in which the second bridge would be built, thereby supposedly substantiating the conclusion that the second bridge would be "on essentially the same alignment or location".

Gowlings has commissioned extensive historical and archival research with respect to the statutory and executive approvals granted by the Congress of the United States and the Parliament of Canada to the Ambassador Bridge, as well as in respect of the specific plans, drawings and rights-of-way approved by officials of the federal government in the United States and Canada for the current Ambassador Bridge.

We are enclosing with this submission certified copies of original documents obtained from the National Archives of the United States and the National Archives of Canada, as well as documents filed in the Land Registry Office in the City of Windsor, all of which documents demonstrate that the original Congressional approval for the Ambassador Bridge as well as the original Parliamentary approval in Canada are confined to a single bridge. There is no contemplation in the legislation either approved by Congress or by the Parliament of Canada that there would be more than one bridge at this location. The Congressional legislation as well as the Canadian legislation both refer to "a bridge" or "the bridge". There is no contemplation of multiple bridges: See in particular **Attachments Vol.2, Part C, Tab 1** containing the 1921 Act of the Canadian Parliament "to incorporate the Canadian Transit Company" and which authorizes the company to construct and maintain a railway and general traffic bridge across the Detroit River from, at or near Windsor in the province of Ontario to the opposite side of the river in the State of Michigan".

Further, see documents listed in **Attachments Vol.2, Part E, Tabs 1 and 2** i.e. the Acts of Congress originally authorizing the Ambassador Bridge passed in 1921 and the subsequent Acts extending the time for its construction. Note that all of these Acts of Congress refer to "a bridge" across the Detroit River within or near the city limits of Detroit Michigan".

Further, both in the United States and Canada the specific plans for the Ambassador Bridge were required to be approved by senior officials in both countries.

In Canada, pursuant to the Act Incorporating the Canadian Transit Company, the Canadian Cabinet was required to approve the specific plans for the Ambassador Bridge. That approval was finally granted on August 11, 1927 by Order in Council PC1601 which approved "the annexed set of plans of a bridge and of the site thereof" which are then described further in the documents accompanying the Order in Council. Please refer to **Attachments Vol.2, Part B, Tabs 1 -- 11** which list the various plans approved by the Canadian Cabinet and provide surveys and Crown leases from the Province of Ontario and the current lease between the Windsor Harbour Commissioners to the Canadian Transit Company in respect of the strip of land which the Ambassador Bridge is entitled to occupy for the purposes of its bridge.

The various materials being filed with you clearly and unequivocally substantiate that the Canadian Transit Company is entitled to use only a 70-foot wide right-of-way under the Detroit River within the City of Windsor to the International Boundary for the purposes of its bridge. It has no other land under the Detroit River within the City of Windsor or in Canada (except for a slightly wider 100-foot portion near the Canadian shoreline on which a supporting pier for the existing bridge has been erected).

This 70-foot wide strip of land which is leased to the Canadian Transit Company for the purposes of the existing bridge in Canada is most clearly shown on the following documents and plans annexed to them which are found in Part B of our attachments:

- Licence of occupation issued by Province of Ontario, April 30, 1927 for a 70-foot wide strip of land under the Detroit River to the international boundary **Attachments Vol.2, Part B, Tab 8**

- Crown lease from the Province of Ontario to the Canadian Transit Company signed October 7, 1932 in respect of a 70-foot right-of-way under the Detroit River for the purposes of the Ambassador Bridge. **Attachments Vol.2, Part B, Tab 9**

- 1962 Lease between the Windsor Harbour Commissioners of the City of Windsor to the Canadian Transit Company in respect of the 70-foot strip of land and a second smaller parcel under the Detroit River previously leased by the Province of Ontario to the Canadian Transit Company, the major piece of property being a parcel comprising "a strip of land under water 70 feet in width, having a distance of 750 feet more or less from the first parcel to the international boundary". There is a survey/sketch attached illustration these two parcels. **Attachments Vol.2, Part B, Tab 10**

- Plan of survey prepared by Verhaegen Stubberfield Hartley et al, Ontario Land Surveyors (1994) illustrating lands on the Canadian shoreline and under the Detroit River that are leased to the Canadian Transit Company and substantiating that the corridor of the leased lands under the Detroit River have a width of 70 feet to the international boundary. **Attachments Vol.2, Part B, Tab 11**

- Letter report dated September 12, 2006 from Heritage Research Associates (David McConnell), confirming that, as an expert archivist and research historian, his full search of the Library and Archives of Canada and the certified copies of documents and plans from the Archives of Canada and Orders in Council (included in the City Attachments) approving the plans of the Ambassador Bridge confirm that there is only a "70-foot wide corridor of land" under the river that was approved for occupancy by the Ambassador Bridge. **Attachments Vol.2, Part B, Tab 12**

Any second bridge would also require specific approvals and easements for a new corridor within the City of Windsor.

Please see the Canadian Act of Parliament from 1921 found in Part C in the documents/attachments being filed with the Coast Guard "An Act to Incorporate the Canadian Transit Company" which in Section 10 provides that:

> "The company shall not construct or operate any of the works mentioned in section 8 of this Act along any highway, street or public place without first obtaining the consent, expressed by by-law of the municipality having jurisdiction over such highway, street or other public place, and upon terms to be agreed upon with such municipality …"

In other words, before construction can begin for any bridge in this area, the consent of the City of Windsor is expressly required by this Canadian Act of Parliament.

No application has been made to the City of Windsor for such consent and of course no such consent has been granted.

When the original bridge was constructed the Canadian Transit Company did apply to the then Towne of Sandwich (now incorporated into the City of Windsor) for the specific approvals that it was required to obtain by the Act of Parliament.

Please see the documents/attachments filed with you under Part D of our document book which provides the specific by-law approval of the Towne of Sandwich and granting permission to the Canadian Transit Company to cross over a number of streets within the then Towne of Sandwich, (now the City of Windsor) for the specific structure then being built.

Those documents again corroborate that the Towne of Sandwich Council was approving a very specific structure, having certain specified heights above City streets and that certain very specific locations for anchors and piers were also being approved by Town Council.
Further, the agreement reached between the Canadian Transit Company and the Towne of Sandwich provided for the legal protection and indemnification of the municipality from materials that might fall off the bridge as well as damages caused by smoke and other emissions from the bridge.

The Canadian Transit Company/Detroit International Bridge Company have not applied to the City of Windsor, or even discussed their second bridge proposal with the City of Windsor and therefore until such applications are received and considered by City Council it is again clear that the proponent has no required statutory approvals under which it can assert it would be able to construct a second bridge at any specific location, let alone the location proposed and in respect of which the Coast Guard is being asked to give an approval.

In short, the application pending in front of the Coast Guard is premature. Until the proponent can demonstrate it has obtained the necessary approvals of the City of Windsor to pass through the air space of the City of Windsor and occupy lands within the City of Windsor, it cannot formulate plans for which the Coast Guard should be providing approval.

The City of Windsor asks that the Coast Guard suspend processing of the application made by the Detroit International Bridge Company/Canadian Transit Company until such time as these companies have sought and obtained specific approval for such a bridge both from the Parliament of Canada as well as from the City of Windsor.

In the United States, the specific plans for the Ambassador Bridge were approved both by the Assistant Secretary of War and the Acting Chief of Engineers on March 4, 1921 as well as by an ordinance.

We include in the Attachments to this submission the March 4, 1921 approval issued by the U.S. Assistant Secretary of War and the Acting Chief of Engineers approving the "plans and specifications" for the bridge between Detroit and Windsor "together with such drawings and map of locations thereof as may be required for a full understanding of the subject", which approval was issued pursuant to "an Act to Regulate the Construction of Bridges Over Navigable Waters". This approval was issued to the American Transit Company of Detroit Michigan.

The enclosed document is certified under the seal of the National Archives of the United States.
**Attachment Vol.2, Part E, Tab 3**

The document consists of a two-page order approving the location and plans of the bridge and attached general plan, as well as this more specific plan and profile of the proposed bridge.

While no plan of the land area under the river is specifically shown on this plan, the plan does illustrate that the distance between supporting piers on either side of the proposed bridge was approximately 100 feet.

It is clearly beyond doubt that the proposed second bridge could not be constructed within the 1921 approval granted by the Assistant Secretary of War and Acting Chief of Engineers.

Further, the Ordinance passed by the City of Detroit in 1927 approved the construction of the approaches to the Ambassador Bridge within the City of Detroit. That ordinance specifically gave approval for the bridge to pass over certain streets within the City of Detroit and refers specifically to a right-of-way width of 75 feet. **Attachments Vol.2, Part E, Tab 4**

In conclusion on this issue, the specific plans approved by federal officials in Canada and the United States by the City of Windsor, as well as by the City of Detroit do not authorize land to be occupied for a second bridge. The approved corridor in Canada under the river is no wider than 70 feet and in Detroit is 75 feet.

Clearly the proponent will be required to obtain federal, state, City of Windsor and City of Detroit approvals for a second corridor before it is entitled to build a new bridge. It has offered no proof that it has even applied for, let alone obtained, such approvals.

There is therefore no "existing corridor" and certainly no "existing approved corridor" for a second bridge.

Clearly this is another reason why a "categorical exclusion" cannot be processed in this matter.

Accordingly, it is imperative that the full rigour of the *National Environmental Policy Act* be applied to this project in order to ensure that, both in Canada and the United States, the full environmental implications of this proposal are examined and to ensure that an alternatives analysis i.e. an analysis and study of alternative locations and the environmental effects of alternative locations, is carried out.

**Why an Environmental Impact Statement (EIS) is Required in this Matter**

NEPA places an obligation on the USCG to consider every significant impact of its proposed action. *Baltimore Gas and Electic v. NRDC*, 462 U.S. 87, 97 (1983). NEPA and the CEQ regulations unambiguously require the Coast Guard and other federal agencies to prepare an EIS or environmental assessment/finding of no significant impact ("FONSI") for all major federal actions that are not categorically excluded as in this case as discussed above. *Anacostia Watershed Society v. Bobbit*, 871 F.Supp. 475, 481 (D.D.C. 1994). In this case, where there are

clear environmental impacts and the action will generate significant controversy, an EIS is necessary. COMDTINST M16475.1D, Section B, Para. 5, pg. 2-8. *See, also*, USCG, Office of Civil Engineering, "Tools for Decision-making: Environmental Considerations" (undated), p.21 (generally should proceed to an EIS if know or suspect proposed action will have significant impacts); *Audubon Soc. of Cent. Arkansas v. Dailey*, 977 F.2d 428 (8th Cir. 1992) (affirming district court's order of EIS for bridge project where increased traffic and impacts on parks could not support the issuance of an environmental assessment/FONSI); *Mullin v. Skinner*, 756 F. Supp. 904 (D.N.C. 1990) (bridge replacement project had significant environmental effects that required an environmental impact statement, not just an environmental assessment).

As you are aware, when Congress passed NEPA, it determined that one of the primary functions of the legislation was to ensure that "alternatives to the proposed action" be studied and considered.

The proponent's submission would clearly avoid the need for alternatives to a second Ambassador Bridge to be considered. That, however, is clearly inappropriate, particularly given the specific role of U.S. federal agencies, including U.S. Coast Guard, in respect of the on-going Detroit River International Crossing Project Study (DRIC). That Bi-National Environmental Assessment has examined various alternative crossings of the Detroit River and already determined that it would be inappropriate from an environmental and community impact perspective for a second Ambassador Bridge to be pursued.

While it is acknowledged that the Ambassador Bridge as a private company is not strictly speaking bound by that determination of the DRIC study process, nevertheless the Coast Guard, as a federal agency which is required to address the requirements of NEPA, is bound to ensure that alternatives to the proposed action <u>are</u> studied, examined and considered.

Obvious alternatives to constructing a second Ambassador Bridge include the construction of a bridge somewhat downriver from the current Ambassador Bridge in areas of both the City of Detroit and of the City of Windsor where approach roads and traffic accessing that location would cause substantially less environmental and community impact than at the proposed second Ambassador Bridge location.

It is incumbent upon the Coast Guard to ensure that this downriver location identified by the DRIC study, which is similar to the location identified by a study carried out by an internationally renown transportation engineer, Sam Schwartz for the City of Windsor identified as a preferred location for a new crossing. We are enclosing in that regard the Schwartz report (Border Crossing Issues) January 2005 (on disc). **Attachments Vol.1, Part A, Tab 20**

Clearly, this downriver crossing location, sometimes referred to as the "central crossing" area, is required to be examined by the Coast Guard as a reasonable alternative. Another obvious reasonable alternative that must be considered is the rehabilitation of the current bridge for the purposes of extending its life and its continued use in conjunction with a bridge at another location.

**The Coast Guard Should Ensure that it Has Carried Out an Independent and Rigorous Examination of Facts in this Matter Before Making any Final Determination as to Whether or Not a Categorical Exclusion is Applicable**

The Coast Guard has stated in its public notice that it has made a preliminary determination that a Categorical Exclusion is appropriate based on "the information presented by the proponents". Unfortunately that information is in some cases clearly erroneous, and in other places misleading and inaccurate. (We are referring to the proponent's document "Project Description and Type II Categorical Exclusion Environmental Documentation, Ambassador Bridge Enhancement Project" prepared for the Detroit International Bridge Company and Canadian Transit Company, March 31, 2006.)

Pursuant to the Coast Guard's "Bridge Permit Application Guide" the Coast Guard District Commander is required to make a "rigorous, independent examination to determine the possible impacts of the proposed project on navigation and the human environment". (Page 14) Similarly, the Coast Guard Bridge Administration Program Policy provides that "the Coast Guard is also required by law to ensure that environmental considerations are given careful attention and importance in each bridge permitting decision". (*ibid* Page 4) That careful attention cannot be provided if the Coast Guard relies only on information presented by the proponent, especially where that information is seriously misleading.

The most fundamentally inaccurate and misleading aspect of the proponent's material is its argument that this proposed second bridge is really only an "enhancement" or a "modification" of the current bridge. That argument is clearly specious in that no "modification" of the present structure is in any way proposed in the plans filed with you. Rather, what has been proposed is a completely new structure with a completely different architectural design on a completely new right-of-way (although at either end of the structure the new bridge would connect with the plazas that now exist).

For the reasons indicated elsewhere in this submission, there is no existing "approved corridor" for that second bridge and a completely new right-of-way must be acquired in Canada and the United States for it. This alone substantiates why a second bridge cannot be considered a mere "modification" or "enhancement" of the existing bridge.

A careful reading of the August, 2005 State Department letter in your file that pertains to this issue indicates that the State Department itself was relying on information provided to it by the proponent. There has apparently been no research carried out by the State Department, such as that provided to you with this letter, substantiating that the Act of Congress approving the Ambassador Bridge referred only to the current bridge and that the approval issued subsequently by the Secretary of War approved only a very specific plan and not any expanded corridor. The same situation pertains to the Canadian approvals as indicated elsewhere in this submission.

In short, approvals given by Congress and Parliament, as well as by the City of Detroit and the City of Windsor (former Town of Sandwich) are very site specific. They authorize very specific plans and engineering drawings by which the current structure exists. Therefore the legal approvals pertaining to the Ambassador Bridge allow it only to be built and only to exist as it is today. There is no "approved corridor" other than the existing bridge as it currently exists.

Any widening of the current bridge and certainly any new bridge, requires an approval in the United States under U.S. Code Title 33, Section 535, referencing the *International Bridge Act* of 1972, under which Congress delegated its consent to the construction of such bridges subject to conditions, including "the approval of the proper authorities in the foreign country concerned".

The Parliament of Canada has not been asked to grant nor has it granted consent to a second bridge across the Detroit River between Detroit and Windsor.

**Other Misleading and Erroneous "Facts" Submitted by the Proponent to You**

The proponent describes its proposed second bridge as having six lanes. In fact, the proposed new bridge will have a total width of 102 feet. Each of the six lanes would have a 12-foot width. However, there would be two outside shoulders, each with a six-foot width, and two inside shoulders, again each with a six-foot width. It can quickly be appreciated that in fact the new bridge could carry eight lanes of traffic, even assuming all lanes were 12 feet in width.

Therefore it is clear that the proposed second bridge is for a structure that is twice as wide than the current bridge (which has a 55-foot wide deck) and will provide twice as many lanes as the current Ambassador Bridge.

Our opinion in this regard is substantiated by the U.S. Department of Transportation, Federal Highway Administration, June 7, 2006 letter to you on this matter, specifically in **Attachment No.2, Item E** to that letter, where it is stated that:

> "The document cross-section shows six through lanes with shoulders, but the shoulders could potentially be converted by the owner to through lanes at some point in the future thereby resulting in an eight-lane cross section. What impact does this have on capacity of the inter-state system at the bridge location?"

Moreover, the proponent does not commit to ensuring that the new eight-lane bridge will be its ultimate goal. It has not committed to taking the existing Ambassador Bridge out of service. As such, what the proponent is proposing is to add a new bridge, having the capacity of ultimately eight lanes to the four lanes on the existing bridge for a total capacity of 12 lanes of bridge traffic.

Although the proponent states that once the new structure is completed the existing bridge would be taken out of service "for some period of time" to effect repairs that are deemed necessary, it goes on to state that: "Once any necessary repairs are completed, the existing structure will be used to provide redundancy and back-up support when necessary to ensure the free flow of traffic between Windsor and Detroit at all times."

This means that the City of Windsor is faced with the proposition that instead of four lanes of international truck traffic on the Ambassador Bridge, with the proposed second bridge in service, there may well be a total of 12 lanes of traffic passing through the City of Windsor.

This is of obvious concern to the City. The Coast Guard needs to ensure that its Environmental Impact Statement considers the project as having that significant capacity and associated environmental impacts.

Another misleading aspect of the proponent's submission to you is that there is no need to be concerned about traffic that will be generated and associated with the new bridge because that is not a matter over which the private sector proponent has jurisdiction.

Of course, that proposition is preposterous. It would be arbitrary and capricious for the Coast Guard to purport to carry out an environmental analysis of this proposal with the blinders suggested by the proponent. This private sector proposal could only be financed based on the tolls from the substantial increase in vehicle traffic that has been projected to use a second crossing in this area when such is built. That additional traffic will in turn create significant adverse environmental effects within the City of Windsor. The addition of eight new lanes would obviously and necessarily exacerbate the critical congestion problems that exist on City of Windsor streets as documented in the Schwartz report (see copy of which is enclosed) as well as documented by the DRIC in its needs assessment for a new crossing. **See Photo, Attachments Vol.1, Part A, Tab 12.**

### Other Information Provided to you by the Proponent Which is Misleading and Unreliable

- In the March 31st covering transmittal letter from American Consulting Engineers of Florida LLC addressed to Robert Bloom at the United States Coast Guard and Cathy Hainsworth at the Canadian Environmental Assessment Agency, the statement is made that the new structure "will connect directly to the existing plazas in both Windsor and Detroit without the need for modification to these recently-enhanced plazas".

  However, that is not the case.

  Please find as an Attachment to this submission a letter dated June 6, 2006 from the Director General of the Canada Border Services Agency to Mr. Dan Stamper, President, Canadian Transit Company regarding "Ambassador Bridge Development Plans". **Attachments Vol.1, Part A, Tab 19**

  In this letter the Canada Border Services Agency expresses substantial concerns that new infrastructure will be required on the Canadian side of the border in order to accommodate the proposed Ambassador Bridge second bridge.

  The CBSA points out its concern that:

  > "There are few details around the plans to provide adequate and functional installations for the port of entry functions over an appropriate long-term planning horizon. Implementing the plans as described will result in immediate additional capacity at this location: from the existing four lanes to six lanes with dedicated lanes for trusted travelers, up to possibly ten lanes should you decide to rehabilitate the existing structure rather than demolish it.

  > ....

  > The port of entry facilities are integral to the transportation system and its planning must be integrated in the systems overall planning. Otherwise, as you pointed out, the port of entry and not the bridge company becomes the system's

bottleneck and capacity constraint with related impacts of trade. <u>Consequently it would be short sighted to plan enhancements to the international crossing in abstraction of the port of entry installations necessary to support it.</u>" (emphasis added)

The CBSA letter goes on to point out that it sees it necessary for the proponent to incorporate "a strategy to secure the necessary land and zoning changes" for the further port of entry facilities it requires.

The CBSA also points out it has security concerns with respect to Huron Church Road "dissecting the proposed plaza expansion". As it is put in the letter:

"This compromises the security and the sterility in the point of entry.... . It is essential that adequate measures be taken to secure the plaza and ensure that all traffic from the U.S. cannot co-mingle with local traffic. Further, it splits our operations within the port, an undesirable feature, complicating our management of the site."

The Canadian government's letter also states:

"There are significant security problems with the current off-site arrangements that jeopardize our ability to discharge adequately the border management mandate.

...

This issue will be exacerbated in the future with the advent of the additional bridge capacity and the traffic growth at the gateway.

...

Consequently, the importance that the bridge's enhancement plans incorporate the provision of functional secondary commercial examination installations integral to the port of entry."

Fourthly, the Canadian government's letter points out its concerns in respect of the adequacy of current travelers secondary examination installations.

"We have concerns over the capacity of the facility and the configuration of the traffic flows around this element of the existing installations."

The letter ends with the observation that:

"The Windsor-Detroit Gateway is the busiest trade corridor in North America. The aggregate capacity of the transportation system within the gateway has a significant impact on the trade between both partners and their economies. <u>It is crucial that in improving an element of the system, such as the Ambassador</u>

Bridge, that an end-to-end solution be formulated and implemented such that system-wide improvements are realized." (emphasis added)

The letter concludes that the Canada Border Service Agency is "unable to fully support enhancement plans for the Ambassador Bridge that do not fully integrate the minimum essential operational requirements necessary to discharge the agency's mandate at the border now and in the future". (emphasis added)

These comments must be critically considered by the U.S. Coast Guard in that they indicate that the proponent's plans are again premature. They must change before they are finalized. This again substantiates why the Coast Guard should put processing of this application on hold. This letter also refutes the statement made by the proponent that the proposed construction of the second bridge can proceed "without the need for modification" to the plaza, particularly that in Canada.

- Another highly misleading statement made by the proponent in its March 31st transmittal letter is that:

  "The property required by this project is owned entirely by the Canadian Transit Company and the Detroit International Bridge Company."

However, as indicated elsewhere in this letter and as substantiated by the various plans, leases, title deeds and other documentation attached, the proponent has no property rights under the Detroit River allowing it to occupy any area above the river for the proposed second bridge.

Moreover, the proponent will be required to obtain property easements from the City of Windsor over five City streets, and no application has been made to the City for that purpose. The bridge cannot exist without those property easements.

Similarly, there will be 14 support piers/abutments located within the City of Windsor as drawn on Sheet 8 of the plans submitted to you. The proponent will require permission from the City of Windsor in order to install such piers/abutments even if they are located entirely on private property (which is not clear). Building permits and zoning approvals will be required before any such piers/abutments can be erected.

Although it is not stated, the proponent's plans would require the demolition of a large number of houses to the west of Huron Church Road in order for this proposal to proceed. Again, the proponent has no approval to demolish such houses, which approval must be sought from the City of Windsor. No application has been made.

At page 7 of its submission the proponent makes the statement that it has determined that:

  "The Ambassador Bridge enhancement project is a preferred alternative. Conceptual designs have been completed in accordance with the long-term needs of the Region and consistent with ongoing initiatives in both countries." (Page 7)

This misleadingly implies that the Ambassador Bridge project is consistent with the DRIC study and that it meets "long-term needs of the Region" consistent with that study. However, a careful consideration of the November 2005 Alternatives Analysis Report by the DRIC (excerpted in Mr. Hayes' letter of September 13th enclosed with this submission) makes clear that a second Ambassador Bridge at this location is clearly not consistent with the DRIC analysis and is not consistent with the "long-term needs of the Region" or with "ongoing initiatives in both countries".

- The proponent has also made misleading submissions to you in respect of land use issues. For example, in its discussion of "land use" at pages 8 – 9 of its submission to you, there is no statement acknowledging that the land on which the proposed second bridge would be built is designated for residential use only in the City of Windsor Official Plan and is also zoned residentially in the Windsor Zoning By-law. (Further elaboration and substantiation of this is contained in the September 13th letter from the Chief Planner, Robert Hayes, filed with this submission and the various zoning maps and Official Plan documentation filed with this submission.)

- Further, a highly misleading and inaccurate statement is made at page 9 of the proponent's submission that:

    "The neighbouring parks, schools and neighbourhoods or industries will not be affected by the project." (Page 9)

As demonstrated by the letters from the Chief Planner of the City of Windsor, from the Executive Director of the City of Windsor's Parks and Recreation Department and the documents referenced in their letters, that statement by the proponent is entirely misleading and wrong. There is a university, schools, parks, historic and cultural amenities as well as the neighbourhood of Sandwich that all will be significantly affected by the second bridge.

- Another misleading statement by the proponent is:

    "The land use of the area would not change by the proposed action because the location is within the existing corridor of the similar facility, the Ambassador Bridge." (Page 9)

Again, that is entirely misleading for the reasons already set out: There is no "existing corridor" that is approved or exists beyond the actual structure of the current Ambassador Bridge. Any widening or addition to that existing corridor would require approval by the Parliament of Canada, approval under U.S. statutes, as well as the approval of the City of Windsor and likely also the City of Detroit.

Moreover, land use will in fact be changed by this proposed second bridge. A large number of houses will necessarily be demolished in order to accommodate the new bridge and its supporting structures. Land use in the remaining residential part of the area would indeed be affected by noise, emissions and hazards associated with the second

bridge. The demolition of houses will obviously have a negative effect on neighbourhoods and housing stock within the City of Windsor.

- Another misleading statement is made by the proponent under the sub-heading 3.2 "Neighbourhoods":

  "Neighbourhoods will not be negatively impacted by the proposed action".

In fact, quite the opposite is obviously going to occur. Houses will necessarily be required to be demolished in order to accommodate the new bridge. Instead of four lanes of traffic there will be a potential total twelve lanes of traffic which would cause much greater air and noise pollution as well as exposing nearby residents to higher accident rates and spills of toxic contaminants from the aerial right-of-way associated with the new lanes of traffic over their houses.

The proponent acknowledges there is existing congestion on Huron Church Road but it is not proposing to improve that situation nor is any other level of government considering doing so north of the E C Row Expressway. Therefore to add up to eight new lanes to the bridge crossing, linked to wider facilities in the United States, all of which would allow more trucks to funnel through the City of Windsor, would only increase the amount of congestion and therefore increase the amount of air pollution and noise pollution in the surrounding Windsor neighbourhoods as well as exacerbate safety and planning issues.

At page 31 of the Proponent's submission to you, the Proponent further attempts to mislead you and the public about the benign nature of its undertaking.

In addressing a check list question "Is the action likely to have results that are inconsistent with locally desired social, economic or other environmental conditions" the response provided is that:

  "No... . The proposed action would not change traffic patterns or increase traffic volumes. The proposed action is consistent with future land use plans in both Detroit and Windsor."

The September 13, 2006 letter from the Windsor City Planner demonstrates this conclusion is clearly wrong.

Again, the Proponent misleads in answering check list question (e) "Is the action likely to adversely affect a significant aspect of the socio-cultural environment?"

The answer to that question provided is:

  "No. The proposed action consists entirely of a bridge... no churches, or cultural institutions will be affected. ... The university would be materially unaffected. ...The proposed action would not cause changes in the way members in the surrounding community or neighbourhoods live, work and play." (pages 32-33)

Again, this is an incredible misapprehension and speculation on the part of the proponent which has no semblance of reality.

Similarly, in Sections 3.5 "Cumulative Impacts", 3.6 "Visual Quality and Aesthetics", 3.7 "Parklands" and 3.9 "Cultural Resources and Other Protected Areas" the Proponent makes further misleading statements which ignore both fact and statutory requirements. For example, it purports to speculate that "cumulative impacts are not expected to be significant" as the proposed action "is enhancing an existing transportation facility rather than adding a new facility in a new area". (Page 10)

Again, that is a completely improper way of addressing cumulative impacts and fundamentally undermines the whole rationale for how that issue is to be addressed in the carrying out of an environmental assessment, as pointed out by the U.S. EPA on page 6 of its August 30, 2006 letter to you.

Moreover, it ignores the way a cumulative effects analysis is to be done under the *National Environmental Policy Act* and under the *Canadian Environmental Assessment Act*.

As pointed out in the handbook published by the U.S. Council on Environmental Quality: "Considering Cumulative Effects Under the *National Environmental Policy Act*" (January 1997):

> "Although past environmental impact analyses focus primarily on project-specific impacts, NEPA provides a context and carries the mandate to analyze the cumulative effects of federal actions. ... The range of actions that must be considered include not only the project proposal but all connected and similar actions that could contribute to cumulative effects. For example, the expansion of an airport runway that will increase the number of passengers travelling must address not only the effects of the runway itself, but also the expansion of the terminal and the expansion of the roadways to provide access to the expanded terminal. If there are similar actions planned in the area that will also add traffic or require roadway extensions (even though they are non-federal) they must be addressed in the same analysis." (Pages 1-2)

This whole aspect of cumulative effects has been totally ignored in the submission filed with you. The proponent seeks to ignore the fact that roads will have to be widened and neighbourhoods destroyed in order to accommodate the functioning of its proposed new bridge.

Similarly with respect to its "Parklands" analysis the proponent admits that it must address compliance with so-called Section 4(f) of the *DOT Act* providing that the Secretary of Transportation shall not approve any program or project which requires the use of publicly-owned land from a public park, recreation area or land of an historic site of a national, state or local significance unless there is no feasible and prudent alternative for the use of such land. (Page 10)

The proponent admits that two parks exist along the Detroit River in Canada: The Ambassador Park and Assumption Park, both are pedestrian/bicycle parks that follow the river.

The proponent argues that neither of these parks will be impacted by the proposed project as the piers will not be placed within the parks.

However, this is clearly contradicted by the September 11, 2006 letter from Don Sadler, Executive Director, City of Windsor Parks and Recreation, previously referenced and attached.

Case 2:06-cv-15185-NGE-RSW Gowling Lafleur Henderson LLP filed 1/16/2007 Barristers & Solicitors Page 33 Patent & Trade Mark Agents 37

Page 24

In Section 3.9 of its submission "Cultural Resources and Other Protected Areas" the proponent refers to the Section 106 of the *National Historic Preservation Act* and the Executive Order "Protection and Enhancement of the Cultural Environment", which require that impacts of federal licensed projects be examined for their impact, particularly on historic districts and structures, particularly and specifically those included in the National Register of Historic Places.

The proponent acknowledges that in 1980 the Ambassador Bridge was added to the National Register of Historic Places but goes on to argue that "the existing Ambassador Bridge will be slightly impacted by the proposed project, but not negatively impacted".

However, the proponent has not complied with the requirements of the *National Historic Preservation Act* or the Commandant Instructions issued by the United States Coast Guard in respect of addressing NEPA which, as you know, requires very specific findings and facts on this issue before you are in a position to authorize any permit having regard to the stringent requirements of that national historic preservation legislation.

In Section 3.12 "Traffic and Circulation" again, an incredible statement is made that "the proposed project would not have a negative impact on traffic and circulation ... the vehicle hours of cars and trucks should likewise decrease with the addition of additional capacity over the river. Pedestrian safety and circulation would not be negatively impacted." [page 15]

Again, this ignores the fact that no new access roads are to be built as part of the proposed Ambassador Bridge project and therefore congestion will be obviously increased with horrifically negative impacts on traffic and circulation, as well as severely negative impacts on pedestrian safety.

**The discussion offered by the proponent in conjunction with the Categorical Exclusion checklist contains erroneous and misleading statements.**

For example, in response to checklist question (a) "Is the action likely to be consistent with any applicable ... local law, regulation or standard designed to protect any aspect of the environment?" the proponent answers "No" but offers absolutely no reference to Ontario laws or Windsor laws. Both of these regulate air quality and noise as well as land use planning which, as you are aware, is considered part of the "environment" considerations.

Again, with respect to check list question (b) "Is the action likely to have results that are inconsistent with locally desired social, economic or other environmental conditions?"; the Proponent answered the question: "No, ... the proposed action would not change traffic patterns or increase traffic volumes. The proposed action is consistent with future land use plans in both Detroit and Windsor."

We have earlier commented on the incredibly misleading nature of that response.

Checklist question (c) reads: "Is the action likely to result in the use, storage, release and/or disposal of toxic, hazardous or radioactive material, or in the exposure of people to such materials?"

The proponent answers: "No ... the proposed action would not cause people to be exposed to hazardous or toxic materials."

Again, this is a misleadingly untrue statement. There are toxic and hazardous substances carried in vehicles every day in many vehicles across highways and these will include the proposed bridge, an elevated structure over and near many houses and institutions, therefore posing the potential for exposing a wide segment of the population to such toxic/hazardous materials in the event of an accident.

We are attaching a CD ROM containing a Detroit TV new program in which Dan Stamper, President of the Canadian Transit Company, acknowledges his company permits hazardous materials to be transported over the Ambassador Bridge contrary to Michigan laws, in that he takes the position "private property" is not subject to such laws. **Attachments Vol.1, Part A, Tab 21**

Check list question (i) reads: "Is your action part of an ongoing pattern of actions (whether under the control of GSA or others) that are cumulatively likely to have adverse effects on the human environment?

The Proponent answers:

> "No. The proposed action is not part of an ongoing pattern of actions that are expected to have adverse effects on the human environment. The proposed action is in response to, but not a contributor to, on ongoing pattern of increased traffic, population and development in the Detroit – Windsor area and increased trade between the United States and Canada. The proposed projects is meant to alleviate traffic congestion on the existing bridge itself, aid in trade between the United States and Canada and create safer driving conditions in the Detroit – Windsor area."

Obviously the above answers are far from reality. The proposed action will indeed contribute to increased congestion, safety hazards and pollution in the City of Windsor, absent any appropriate new infrastructure required to connect the new bridge to Highway 401. The proposed project will not "alleviate traffic congestion" but rather exacerbate it and exacerbate safety and hazardous driving conditions in the Windsor area.

The proponent, however, continues to have blinders on this issue. In its correspondence dated March 13, 2006 addressed to Kaarina Stiff at Transport Canada, on page 2, item 3, where Transport Canada raises the issue that the documentation submitted, while identifying access road capacity as a key issue, indicates that access to the Ambassador Bridge from Huron Church Road:

> "is expected to reach capacity in the next five years. To establish the scope of the project, we [Transport Canada] need to determine what other physical works are likely to be carried out in relation to your proposal. In particular, we require information concerning any other infrastructure work that may be planned to address these access and capacity issues, or that may be required as a result of the project modifications to bridge access on Huron Church Road will be proposed or considered necessary because of the proposed second span."

Incredibly, the Proponent makes the response that:

> "This project simply involves the connection of two plazas that have already been permitted and approved… Additional lanes across the river are expected to have no negative impact on the approach roadways. … The new six-lane bridge over the river will ensure the traffic can continue to flow clearly across this vital border crossing. No additional work is anticipated to be required as a result of this project. Huron Church Road currently has and will continue to have more capacity than the proposed bridge crossing."

As you will recognize, this conclusion is patently absurd.

<u>Approval Under U.S. *International Bridge Act* is Required Before Coast Guard Processes Navigable Waters Permit</u>

Chapter 2 of the Coast Guard Bridge Permit Application Guide states that a proponent must include in its application package the legislative authority for international bridge construction.

Specifically, with respect to "international bridges" the following requirement is stated under Section A3E "International Bridges":

> "1. The *International Bridge Act* of 1972, or a copy of the *Special Act of Congress* if constructed prior to 1972, should be cited as the legislative authority for international bridge construction.
>
> 2. Presidential approval should be obtained from the State Department prior to issuing a Coast Guard bridge permit under the *International Bridge Act* of 1972.
>
> **NOTE**: A copy of State Department approval for international bridges must be included in your application package for a Coast Guard permit."

The City of Windsor submits that should the proponent wish to build a second bridge it must present a Presidential approval to the Coast Guard under the *International Bridge Act* of 1972 -- and without such approval being presented, it is contrary to the Coast Guard's own procedure for the Coast Guard to be processing any permit application under the *Rivers and Harbours Act*.

<u>The Coast Guard Permitting Guide Requires that Section 4(f) of the *Department of Transportation Act* of 1966 as Amended, Now 49 USC303 be Addressed</u>

Your own Guide states that:

> "A special effort must be made to preserve the natural beauty of the country side, public parks and recreational lands, wildlife and water fowl refuges, and historic sites."

Section 4(f) further states that a project requiring the use of Section 4(f) lands shall not be approved unless:

> "1.    There is no feasible and prudent alternative to the use of such lands; and

2. Such use includes all possible planning to minimize harm to such lands resulting from the project."

Pausing here, the proponent has submitted no information whatsoever as to what alternatives, if any, have been canvassed and certainly not substantiated or even attempted to document "no feasible and prudent alternatives to the use of such lands" or that the use "includes all possible planning to minimize harm to such land resulting from the project.

Moreover, the proponent has failed to acknowledge that it will in fact require "taking land" from such protected areas within the City of Windsor, which is prohibited under that legislation unless feasible alternatives have been carefully examined and none have been shown to exist.

Moreover, your guidance document reiterates that "all bridge actions also require compliance with the *National Historic Preservation Act* of 1966, Section 106 – again, the impacts of the new bridge on the historically protected and designated Ambassador Bridge have not been complied with.

Moreover, the requirements Item (k) of Chapter 3 state that with respect to air impacts "the Coast Guard must ensure that projects under its jurisdiction meet the National Ambient Air Quality Standard before issuing a bridge permit".

It goes on to state that:

"During the bridge permitting process, early coordination and consultation with the state and local air quality agencies is important to determine whether your project is consistent with an approved federal state implementation plan governing the ambient air quality of the proposed bridge project location."

Pausing here, the proponent has not demonstrated it has had any such consultation and has carried out no studies, taking the somewhat incredible position that this project will not increase air pollution.

Similarly, Item (l) of Chapter 3 requires that the Coast Guard ensure that appropriate noise studies be undertaken. As your own guidance document puts it:

"All authorized bridge construction work must comply with the provisions of the *Noise Control Act* of 1972. Under the *Noise Control Act*, the adverse impacts on existing activities for land uses that may result from the bridge, its related highway sections, or its construction must be considered."

Your guidance document indicates that the information package regarding noise must include such matters as:

"(a)   The anticipated design noise levels for the proposed project;

(b)   A description of all possible measures to minimize noise impact if there is no alternative to avoid the adverse effects."

Pausing here, the proponent has taken again the incredible position that it is not required to do any noise studies – a complete flaunting of the requirements of the Coast Guard and of U.S. federal legislation.

Finally, it is relevant to note in considering the requirements of the Coast Guard Bridge Permitting Guidance requirements that the term "bridge", as found in the "glossary" is defined as including "approaches":

> "The term "bridge" includes all integral bridge elements: approaches and appurtenances, regardless of materials used, whether natural or manufactured, or the construction methodology."

**Further Elaboration as to Why a "Categorical Exclusion" Cannot be Applicable**

In Commandant Instruction M16475.1D, November 29, 2000, being NEPA Implementing Procedures and Policy for Considering Environmental Impacts, Chapter 2 is entitled U.S. C.G. Implementing Instructions, indicates in Part B "Environmental Documentation", indicates that this instruction "applies to all U.S. C.G. actions including the decision to … grant permits … ." [page 2 – 4]

It then proceeds to discuss "Categorical Exclusions" (CEs). It states that a "CE" is meant to be a "category of actions which do not individually or cumulatively have a significant effect on the human environment and for which, therefore, neither an EA nor an EIS is required.… A list of current CEs can be found in Figure 2 – 1".

Pausing here, we have reviewed Figure 2 – 1 entitled "Coast Guard Categorical Exclusions".

There are 35 items listed.

The only one which could possibly be relevant to an application to construct a new international bridge would be Item 32 "Bridge Administration Program Actions" as specifically described as one of the following:

> "(a) modification or replacement of an existing bridge on essentially the same alignment or location. Excluded are bridges with historic significance or bridges providing access to undeveloped barrier islands and beaches."

It is, however, obvious that the application to build a new six-lane bridge while leaving up the current existing four-lane Ambassador Bridge is neither a "modification" nor a "replacement" of an existing bridge.

Nor is it a proposal to do a modification or replacement "on essentially the same alignment or location".

As we have pointed out earlier, the Ambassador Bridge has been given specific approval as it exists today and there is no further alignment or other location for it that has been approved.

Moreover, the Categorical Exclusion, even if it were for a "modification" or "replacement" of an existing bridge, excludes "bridges with historic significance". That certainly applies to the National Register Designated Ambassador Bridge.

Accordingly, the proposed new Ambassador Bridge cannot qualify as a CE in accordance with the Coast Guard's own regulations and policies.

Moreover, Chapter 2 of the Commandant Instructions for Implementing NEPA specifically indicates that there are "limitations on using Categorical Exclusions" even if one was applicable.

Your own policy requires that "responsible personnel should be alert for circumstances that dictate the need to prepare an EA or EIS" or some actions that would be normally categorically excluded in Figure 2 – 1.

Your policy states that:

> "The potential environmental consequences must be evaluated in their context (whether local, state, regional, national or <u>international</u>) and in their intensity by considering whether the action is likely to involve one or more of the following: …
>
> 2.    a site that includes or is near a unique characteristic of the geographic area, such as a historic or cultural resource … or property requiring special consideration under 49 USC 303(c ) [commonly referred to as Section 4(f) of the *Department of Transportation (DOT) Act* which includes any land from a public park … or historic site.
>
> 3. The quality of the human environment that is likely to be highly controversial in terms of scientific validity or public opinion ….
>
> 7. A district, site, highway, structure or object that is listed in or is eligible for listing in the National Register of historic places …
>
> 9.   A potential or threatened violation of federal, state or local law or requirement imposed for the protection of the environment."

Your policy requires that "the determination of a CE is inappropriate and more environmental analysis is needed, or that an EA or EIS is needed, must be based on the potential significance of the proposed actions affect on the environment. The proposed action must be evaluated in its context (whether local, state, regional, tribal, national or <u>international</u>) and in its intensity by considering the level of possible effects as listed in (1) – (10) above". [page 2-5]

Your policy also states that:

> "However, a CE <u>may not be used</u> if the proposed action is likely to involve any of the circumstances set forth in Section 20.B(2) of DOT Order 5610.1 (enclosure 1). The 10 listed circumstances and those in the DOT Order are addressed in the Environmental Analysis Checklist (enclosure 2). If a CE is not appropriate, an EA or an EIS must be prepared."

Accordingly, your own Commandant Instruction requires that a CE may not be used if the proposed action is likely to involve one of the circumstances set forth in that Environmental Analysis Checklist.

The Environmental Analysis Checklist which is enclosure 2 to the Commandants Order is a different checklist from the one used by the DIBC/CTC in its March 31, 2006 submission to you.

On that "Checklist" there are a number of relevant questions which, if the appropriate facts are addressed, would have to be answered "yes" which in turn would mean that even if there was a CE applicable to this proposed project (which there is not) a CE cannot be used in this particular situation.

In particular, we refer you to Question 1 of the Checklist: "Is there likely to be a significant effect on public health or safety?"

The guidance document requires addressing potential release of toxic materials, accidental spills of oils, hazardous or toxic materials and compliance with the *Clean Air Act* and the *Noise Control Act*.

In this case the Proponent has chosen to ignore the fact that the new bridge would carry vehicles containing hazardous and toxic materials over and adjacent to numerous houses and institutions, and has carried out no noise or air studies.

However, in the absence of such studies indicating no impacts, it is prudent to assume there will be impacts and therefore "there is likely to be significant effect on public health or safety".

Question 2 reads: "Does a proposed action occur on or near a unique characteristic of the geographic area such as a historic or cultural resource, parkland … or property requiring special consideration under 49 USC 303?"

This in turn requires a consideration of whether or not it is located near a "national historic landmark" or "designated open space, or a designated conservation area, or potentially have "adverse visual, social, atmospheric, traffic or other effects on such a critical area even though it is not located at or near the area; or change the use of parklands.

Again, it is clear from the Proponent's own materials that the proposed bridge is located adjacent to a national historic landmark, that it will have adverse visual, atmospheric and traffic effects in the area, that it will change the use of parklands by putting a new eight-lane bridge through parkland etc. and therefore the answer to that question again is "yes".

Checklist Question 3 reads: "Is there a potential for effects on the quality of the environment that are likely to be highly controversial in terms of scientific validity or public opinion?"

The guidance document indicates that:

> "Environmental controversies can be about a host of things: impact on historic buildings, archaeological sites, and other cultural resources; impacts on traffic or parking on a

community or neighbourhood; ... to avoid missing a controversial issue that should be addressed under NEPA be sure not to interpret the word "environmental" too narrowly."

Again, the answer to Question No. 3 must be "yes". **See Attachments Vol.1, Part A, Tab 11.**

This project is <u>very</u> controversial.

Question 6 reads: "Are the actions, impacts individually insignificant, but cumulatively significant when considered along with other past, present and reasonably foreseeable future actions?

The guidance on this question states that in order to accurately respond to the checklist the Coast Guard must consider "whether the action is related to other actions (by USCG or others) with impacts that are individually insignificant but that may, taken together, have significant effects.

A specific example provided is relevant:

"For example, is the action part of an ongoing pattern of pollutant discharge, traffic generation (vehicle or vessel) economic change or land use change in its locality that could collectively affect human health or the condition of the environment?"

Again, the answer to question 6 would be "yes".

Question 7 on the Checklist is: "Is the proposed action likely to have a significant impact on a ... structure ... that is listed in ... the National Register of Historic Places...?"

Clearly, the new bridge will have an impact on the existing historically designated Ambassador Bridge, and therefore the answer to question 7 is "yes".

Similarly it has the potential to have impact on "a place with traditional cultural value in the eyes of a native American group or community" as well as on "the historic/cultural character of communities or neighbourhoods".

Again, the answer to this question must be "yes".

The Proponent acknowledges that there are likely to be native Indian burial sites in the area where the piers and support structures for the new bridge are to be located and that it is to be located nearby the historic old Sandwich part of the City of Windsor.

Again, the answer to question 7 on the Checklist must be "yes".

Question 9 is also relevant: "Is there a potential or a threatened violation of federal, state or local law or requirement imposed for the protection of the environment?"

The guidance on this requires that issues that need to be considered include whether the project is or action is likely to:

- adversely affect the ambient air quality due to dust, vehicle or equipment emissions ...

- result in toxic or unusual air emissions

- adversely affect the ambient air quality due to the operation and/or maintenance of vehicles …

- significantly increase the ambient noise levels of the area."

Again, clearly the answer to question 9 is "yes".

Finally, Question 10 on the Checklist is as follows: "Is the action likely to have other significant effects on public health and safety or on any other environmental media or resources that are not specifically identified in this checklist?"

The additional concern under question 10 is "socio-economic impacts and environmental justice".

The guidance on this indicates that if the action is likely to:

- change traffic patterns or increase traffic volumes

- require the re-routing of roads, waterways or traffic

- be located near any existing bottleneck in vehicle or vessel traffic (e.g. a bridge intersection …)

- have access constraints

- affect a congested intersection

- be inconsistent with existing zoning, surrounding land use or the official land use plan for the specific site and/or the delineated area

- be inconsistent with surrounding architecture or landscape

- relocate private residences or businesses

- intrude on residential or business uses in the affected area

- be regarded by burdensome by local or regional officials

then it may well have significant impacts on the socio-economic environment and issues of environmental justice.

Again, in this situation the answer to the question is the action "likely to have other significant effects on public health and safety and on any other environmental media or resources i.e. environmental justice and socio-economic impacts as set out, is "yes".

Please see for substantiation of why "yes" is correct the September 13, 2006 letter from City of Windsor Planner, Robert Hayes at pages 9 – 20. **Attachments Vol.1, Part A, Tab 2**

For all of the above reasons it is clear that the Coast Guard cannot grant a Categorical Exclusion even if the proposed bridge was on the CE list, which it is not.

We refer you also to enclosure 3 to COMDTINST M16475.1D, this enclosure being the form entitled "USCG Categorical Exclusion to Termination".

This form requires certification that the action is "not expected to result in any significant adverse environmental impacts as described in NEPA". Further, it further requires you to certify that the proposed action":

"..has been thoroughly reviewed by the USCG, and the undersigned have determined this action to be categorically excluded under the current USCG CE(s) No._____. **[indicate specific CE number]** from further environmental documentation in accordance with Section 2.B.2 in Figure 2.1 of NEPA Implementing Procedures and Policy... Since implementation of this action will not result in any:

    1.    significant cumulative impacts on the human environment

    2.    substantial controversy or substantial change to existing environmental conditions

    3.    impacts which are more than minimal on properties protected under 4F of the *DOT Act*, and Section 106 of the *National Historic Preservation Act; or*

    4.    inconsistent with any federal, state or local laws or administrative determinations relating to the environment.

The City of Windsor submits that it would be clearly arbitrary and capricious if such a Categorical Exclusion determination was to be made by the USCG at this time based on the information presented by the proponent for the reasons set out above.

With respect to the certification that is required with respect to a "4(f) statement", enclosure 10 to the Commandant Instruction, Document M16475.1D elaborates that under Section 4(f) "the Secretary of Transportation (Commandant) shall not approve any program or project which requires the use of 4(f) lands unless:

    (a)    there is <u>no feasible and prudent alternative to the use of such lands;</u> and

    (b)    such program includes <u>all possible planning</u> to minimize harm to 4(f) plans resulting from such use."

In other words, it is incumbent upon the Commandant not to approve any program or project unless the proponent has demonstrated it has objectively met these criteria. These criteria clearly have not been met in this case as there have been no studies of feasible and prudent alternatives.

It is noted that Section 4(f) lands include "any publicly owned land from a park" and that publicly-owned land includes "fee simple or land subject to public easement or other interest in the land by a federal, state or local agency or entity".

Further, "use of land" under Section 4(f) generally means the acquisition of title to "or an easement in land for a transportation program or project".

Further, in unusual circumstance, serious adverse impacts such as severe increases in noise or air pollution, or access disruption may constitute a "constructive use, even where no acquisition is involved and Section 4(f) would apply".

Under the material required to properly address Section 4(f), the proponent must, "include the acreage needed for permanent surface easements, aerial easements, drainage and utility easements etc." – none of which has been done in this particular case by the Proponent DIBC/CTC.

Furthermore, adverse impacts of the project on 4(f) lands must be discussed and should include "detailed information concerning the effects of the project on natural views, local historical values, pedestrian and other access, recreational use, vegetation, wildlife, etc. Care should be undertaken to include a rigorous analysis of aesthetic, air and water pollution and noise impacts on 4(f) lands near and adjacent to the project."

Again, none of this has been submitted by the proponent and therefore the USCG is not in a position to make any determination that Section 4(f) has been complied with.

Further, in order to properly address 4(f) requirements:

"A statement of the local, state or national significance of the 4(f) lands should be presented. This statement should come from the officials having jurisdiction over the lands when at all possible and should address the significance of the entire area involved and the actual land affected or taken by the project ... Any statement of insignificance from whatever source is subject to review by the USCG for caprice."

Further, Section 10 of this guidance document regarding 4(f) requires:

"Evidence of concurrence, or a description of efforts to obtain concurrence of officials having jurisdiction of Section 4(f) lands regarding the proposed action and plan to minimize harm should be presented."

In this case there has been no consultation let alone concurrence obtained from the City of Windsor with respect to the impacts and use in taking of the City of Windsor park lands.

Finally, the City submits that the required certification to comply with Section 4(f) cannot be granted by the Coast Guard in this case as set out in Section 11 of the guidance document which requires that the certification provide that:

"Based on this 4(f) statement, I have determined no feasible and prudent alternative to the use of this 4(f) land(s) and that all possible planning to minimize harm to this land(s) has been accomplished."

## Closing

The Corporation of the City of Windsor has provided as much documentation, reports and other information as well as legal analysis as it could in the time available to respond to the Coast Guard Public Notice in respect of the application filed by the proponent for a second bridge permit.

Obviously the City of Windsor considers the proposed bridge to be a proposal fraught with significant and adverse environmental consequences for the City and its residents. We believe the materials submitted substantiate that concern.

We close by emphasizing both the desirability and necessity of the Coast Guard ensuring that full consideration of all these facts and information are carefully considered so that its initial preliminary determination is reversed: This project must be processed not by a categorical exclusion but rather only following a full Environmental Impact Statement.

However, for the reasons set out above, it is premature for the Coast Guard to process this application at all, and we ask that its processing be suspended.

We would be please to respond to any supplementary questions you may have.

Yours sincerely,

GOWLING LAFLEUR HENDERSON LLP

David Estrin
Certified Environmental Law Specialist

DE:tp

TOR_LAW\ 6390735\1