## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation

        Plaintiffs,

-vs-

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

        Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

**Attorneys for Plaintiffs:**
Craig L. John (P27146)
Thomas J. Murray (P56331)
Joseph A. Doerr (P66109)
Dykema Gossett PLLC
400 Renaissance Center
Detroit, MI 48243
Phone: (313) 568-6800
Email: cjohn@dykema.com

**Attorneys for Defendants:**
Sharon M. Woods (P22542)
Kevin Kalczynski (P57929)
Melonie M. Stothers (P65344)
Barris, Sott, Denn & Driker, PLLC
211 West Fort Street, 15th Floor
Detroit, Michigan 48226
Phone: (313) 965-9725
Email: kkalczynski@bsdd.com

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56, Defendants move for summary judgment on all claims in the First Amended Complaint.

Pursuant to L.R. 7.1, Defendants' counsel sought concurrence from Plaintiffs' counsel in this Motion, and explained the nature of this Motion and its legal basis.  Plaintiffs' counsel did not concur in the relief sought by this Motion.

<div style="margin-left: 40%;">

Respectfully Submitted,

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.


By:   /s/ Kevin Kalczynski
      Sharon M. Woods (P22542)
      Kevin Kalczynski (P57929)
      Melonie M. Stothers (P65344)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725
Email: kkalczynski@bsdd.com

</div>

Date:  January 12, 2007

f:\docsopen\kkalczynski\l-mot\0329442.01

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation

          Plaintiffs,

-vs-

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

          Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

**Attorneys for Plaintiffs:**
Craig L. John (P27146)
Thomas J. Murray (P56331)
Joseph A. Doerr (P66109)
Dykema Gossett PLLC
400 Renaissance Center
Detroit, MI 48243
Phone: (313) 568-6800
Email: cjohn@dykema.com

**Attorneys for Defendants:**
Sharon M. Woods (P22542)
Kevin Kalczynski (P57929)
Melonie M. Stothers (P65344)
Barris, Sott, Denn & Driker, PLLC
211 West Fort Street, 15th Floor
Detroit, Michigan 48226
Phone: (313) 965-9725
Email: kkalczynski@bsdd.com

---

# DEFENDANTS' BRIEF IN SUPPORT OF
# THEIR MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF QUESTION
## PRESENTED AND CONTROLLING AUTHORITIES

Should this Court grant summary judgment against Centra and its subsidiary, Detroit International Bridge Company's ("DIBC") on their claim against Gowlings, a 700-lawyer, multi-office Canadian law firm, for conflict of interest, where Dan Stamper, Centra's President, having actual knowledge that a Gowlings' partner was representing two clients in opposing Centra's efforts to expand its bridge crossings to Canada, nevertheless engaged Gowlings' tax specialists to provide Canada Transit Company ("CTC"), a different Centra subsidiary, with tax and corporate advice, and where:

- Stamper did not reveal to the Gowlings' personnel that one of its partners was opposing Centra's interests and they did not know of that representation until informed about it by Centra just before its filing of this suit;

- The Gowlings' personnel who performed services for CTC disclosed no information about that client to any other personnel within the law firm;

- Plaintiffs have alleged no facts to show they have suffered any damages; and

- Gowlings immediately withdrew from representing CTC when CTC disclosed the potential conflict of interest to it.

     Plaintiffs answer:    No

     Defendants answer:   Yes

### Controlling or Most Appropriate Authority

*Cleveland v. Cleveland Electric Illuminating Co., et. al.*, 440 F. Supp. 193, 212 (N. D. Ohio 1976), *aff'd without opinion*, 573 F.2d 1310 (6th Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S. Ct. 1648, 56 L. Ed. 2d 85 (1978).

*In re Alumco Industries Corp.*, 12 B.R. 7 (Bankr. N.D. Ohio 1981).

*Colbert v. Conybeare Law Office,* 239 Mich. App. 608 (2000).

*Lear Corp. v. Butzel Long, P.C.*, 2006 Mich. App. LEXIS 1697 (May 18, 2006).

*Borlack v. Mackler Bros*., 1996 Mich. App. LEXIS 1498 (August 20, 1996).

i

**DISCLOSURE OF CORPORATE AFFILIATES AND FINANCIAL INTERESTS**

Gowling LaFleur Henderson LLP is not a subsidiary of a publically-traded company.  No publically-held company, not a party to this case, has a financial interest in the case's outcome.


/s/ Kevin Kalczynski
Kevin Kalczynski
Attorney for Defendants

Dated: January 12, 2007

ii

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      The Parties and Their Past Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      In 2003, Gowlings and Estrin Were Representing a Client Adverse to
                Centra's Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      In 2004, Gowlings Opposed Centra, DIBC and CTC's Bridge Plan . . . . . . . . . . . 6

        D.      In 2005, CTC Retained Gowlings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        E.      Gowlings Continued To Represent Windsor's Interests Adverse to
                Centra's Bridge Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        F.      Plaintiffs File Suit Against Estrin and Gowlings . . . . . . . . . . . . . . . . . . . . . . . 12

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      Centra's Claims Should Be Dismissed Because Centra Consented to the
                Conflict When it Retained Gowlings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      Plaintiffs' Claims Should Also Be Dismissed Because Plaintiffs Have
                Suffered No Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## I.   INTRODUCTION

The simple legal issue presented by this motion is: when a party engages a law firm with actual knowledge that the law firm currently represents other clients with interests adverse to that party, has that party consented to the conflict of interest?  Because the answer to that question is yes, this motion should be granted.

The Plaintiffs, Centra, Inc. ("Centra") and Detroit International Bridge Company ("DIBC") (collectively "Centra"), and their affiliate, Canadian Transit Company ("CTC"), are sophisticated entities that own or are affiliated with the Ambassador Bridge and are attempting to expand it (the "Bridge Plan").  The Defendants are Gowling LaFleur Henderson LLP ("Gowlings"), a nearly 700-lawyer Canadian law firm, and David Estrin ("Estrin"), a partner at Gowlings.

Plaintiffs allege that Gowlings and Estrin engaged in a conflict of interest when they represented the City of Windsor in opposition to Centra's Bridge Plan while other Gowlings lawyers were representing Centra at the same time.  The key factual allegation in Centra's First Amended Complaint is found at Paragraph 33:

> Until DIBC received the Estrin Letter [dated 9/14/06 and opposing the Bridge Plan], **it was unaware of the relationship between Gowlings and Windsor.** [Emphasis added].[1]

This factual allegation – the linchpin of Centra's claims against Estrin and Gowlings – is demonstrably false.  This brief and the undisputed facts supporting it will show that Centra knew that Gowlings, and specifically Estrin, represented not only Windsor, but other clients adverse to Plaintiffs well before CTC retained Gowlings.  In fact, before CTC retained Gowlings, Estrin and Gowlings sent letters opposing DIBC and CTC's Bridge Plan to DIBC and CTC, on behalf of

---

[1]Ex. 1, ¶ 33 [First Amended Complaint].

Windsor. **Despite this knowledge of Estrin's actions on behalf of Windsor, CTC itself decided to retain Gowlings**. In light of these facts, Plaintiffs' claims against Gowlings and Estrin fail because Plaintiffs and CTC were fully aware of – and consented to – the potential conflict that could arise by virtue of Gowlings' representing Windsor and Centra at the same time.

In addition, even if Centra did not consent to the conflict when it retained Gowlings with knowledge that Gowlings was representing other clients adverse to Centra, Centra has not suffered any damages because as yet, its Bridge Plan has not been rejected. The fate of Centra's Bridge Plan will not be known for years. Since the Bridge Plan has not been rejected, Centra has suffered no damages, and its claims fail as a matter of law. Finally, this Court does not have personal jurisdiction over Estrin, who has only the most attenuated contacts with Michigan. Accordingly, Estrin has simultaneously filed a separate motion to dismiss the First Amended Complaint for lack of personal jurisdiction.

## II.     FACTS

### A.     The Parties and Their Past Relationship

Centra is a "diversified holding company,"[2] describing itself as "among the largest 500 private companies in America."[3] Centra's wholly-owned subsidiary, DIBC, is the owner of the Ambassador Bridge on the American side of the Detroit River and CTC, a wholly-owned subsidiary of DIBC, is the owner of the Ambassador Bridge on the Canadian side.[4] Centra's primary owner is Manuel "Matty" Maroun and its President is Dan Stamper.

———————————

[2]Ex. 1, ¶ 8 [First Amended Complaint].

[3]www.centraltransportint.com/companyinfo/whoweare.aspx.

[4]Ex. 10, ¶ 6 [Wach Declaration].

Gowlings is one of Canada's largest law firms, with eight offices throughout Canada and one in Moscow.[5]  Gowlings is organized into three separate departments,  business law, intellectual property and advocacy, and each department is further divided into several different subspecialties.[6] Estrin is a partner in Gowlings' Toronto office and is certified by the Law Society of Upper Canada as a Specialist in Environmental Law.[7]

Plaintiff's First Amended Complaint implies that Gowlings and Centra have had a continuous attorney-client relationship for 30 years.[8]  That is untrue.  Before Centra retained Gowlings in 2005, Gowlings has not represented Centra, CTC, Central Cartage Co., or DIBC since at least before 1998.[9] Prior to 1998, the Gowlings attorney in charge of the Centra representation left the firm.[10]  Before 2005, the last work that Gowlings performed for Centra, CTC, Central Cartage Co., or DIBC occurred before 1998.[11]

### B.      In 2003, Gowlings and Estrin Were Representing a Client Adverse to Centra's Interests

In the late 1990s and early 2000s, Centra affiliates began purchasing property near the "Peace Bridge" that links Buffalo, New York and Fort Erie, Ontario in connection with a plan to use the

---

[5]http://www.gowlings.com/profiles/firmProfile.asp

[6]Ex. 3, ¶ 3 [Byrne Declaration].

[7]Ex. 2, ¶ 2 [Estrin Declaration].

[8]Ex. 1, ¶¶ 9-15 [First Amended Complaint].

[9]Ex. 3, ¶¶ 6-8 [Byrne Declaration].

[10]Ex. 3, ¶ 7 [Byrne Declaration].

[11]Ex. 3, ¶ 8 [Byrne Declaration].

property to build a new bridge.[12]   The Buffalo and Fort Erie Public Bridge Authority ("Bridge

Authority") retained Gowlings and Estrin to oppose Centra's plan.[13]

In connection with that representation, Estrin, on Gowlings' letterhead, drafted letters on

behalf of the Bridge Authority threatening litigation against Centra over its plans.  The first letter was

sent to the "Ambassador Bridge" on May 22, 2003 to the attention of Dan Stamper:

> We are the solicitors for The Buffalo and Fort Erie Public Bridge Authority (the "Bridge Authority") which owns and operates the Peace Bridge connecting these cities.
>
> Recently information has come to the attention of the Bridge Authority to the effect that your companies or others associated with you are purchasing or contemplating the purchase of properties . . . with the intention . . . to facilitate either the use of the International Railway Bridge for vehicular traffic or the construction of a new vehicular bridge in this area.
>
> We are writing at this time to advise you and your associates that the Bridge Authority holds an exclusive franchise in respect of vehicular bridges within six (6) miles upstream and downstream from the location of the Peace Bridge . . . and that no other bridge for like purpose may be constructed or located at any point nearer than six (6) miles from the location of the Peace Bridge.
>
> <div align="center">***</div>
>
> In summary, please regard this letter as notice from our client that the Bridge Authority fully intends to protect its franchise **and will take appropriate legal proceedings to restrain interference with its franchise rights, should that occur.**[14]

Thus by the end of May 2003, Dan Stamper and Centra had been given actual notice that

Gowlings and Estrin were representing the Bridge Authority in a matter that was directly adverse to

---

[12]Ex. 2, ¶ 4 [Estrin Declaration].

[13]Ex. 2, ¶¶ 4-6 [Estrin Declaration].

[14]Ex. 4, [5/22/03 Letter] (emphasis added).

<div align="center">4</div>

Centra's interests. Centra did not then or thereafter complain that Gowlings was ethically prohibited from representing a client adverse to Centra.[15]

Gowlings and Estrin's representation of the Bridge Authority continued well into 2004. On September 9, 2004, Estrin wrote a second letter to the "Ambassador Bridge" and Dan Stamper on Gowlings' letterhead again warning them not to build a bridge near the existing Peace Bridge:

> We are the solicitors for the Buffalo and Fort Erie Public Bridge Authority which owns and operates the Peace Bridge connecting these cities.
>
> We previously wrote to you by our letter dated May 22, 2003 advising you and your associates that the Bridge Authority holds an exclusive franchise in respect of vehicular bridges within six miles upstream and downstream from the location of the Peace Bridge and that no other bridge for like purpose may be constructed or located at any point nearer than six miles from the location of the Peace Bridge.
>
> ***
>
> We understand that recently your companies filed a "Terms of Reference and Project Description" with the Canadian Environmental Assessment Agency and the Ontario Ministry of the Environment, which project description includes several alternative bridge crossings within six miles of the Peace Bridge and that indeed your preferred alternative is within six miles of the Peace Bridge.
>
> Consistent with our previous correspondence, we advise that your companies ought to be refraining from taking steps that would lead to the establishment of a new bridge within six miles of the Peace Bridge . . . Obviously, our client takes the position that any monies you have spent, are spending, or spend in [the] future for such purposes cannot validly be claimed by you as expenses, investment or losses of any kind **which would mitigate against a claim by our client for an injunction and/or damages** . . .[16]

Thus, in September 2004 Centra and Dan Stamper were again put on notice that Gowlings was representing clients directly adverse to Centra's interests. But again, Centra made no claim that

---

[15]Ex. 2, ¶ 7 [Estrin Declaration].

[16]Ex. 5 [9/9/04 Letter] (emphasis added).

5

Gowlings was engaging in a conflict of interest.[17]

**C.      In 2004, Gowlings Opposed Centra, DIBC and CTC's Bridge Plan**

Since the early 2000s, the City of Windsor has been attempting to solve traffic problems

created by the heavy volume of border-crossing truck traffic.[18]  In late 2002, Windsor engaged Estrin

and Gowlings to assist Windsor in evaluating competing proposals for solving the traffic problems.[19]

Around that same time, CTC proposed using a train/ hydro-electric corridor in southwest Windsor

to provide new truck access to the Ambassador Bridge.[20]  Estrin and Gowlings then began

representing Windsor in opposition to CTC's proposal in 2003.[21]

In June 2004, CTC applied to Windsor for site plan approval for more toll booths as well as

a "bridge deck extension" (the "Site Plan Application") for the existing Ambassador Bridge.[22]  A

month later, CTC filed a Preliminary Review Permit Application (the "Preliminary Bridge

Application") with the United States Coast Guard for "twinning" the Ambassador Bridge (the

"Bridge Plan").[23]  When Windsor and Estrin reviewed CTC's Preliminary Bridge Application to the

Coast Guard, it became clear that the additional toll booths and bridge deck extension called for in

CTC's Site Plan Application to Windsor were not simply improvements for current traffic but were

---

[17]Ex. 2, ¶ 7 [Estrin Declaration].

[18]Ex. 2, ¶ 8 [Estrin Declaration].

[19]Ex. 2, ¶ 8 [Estrin Declaration].

[20]Ex. 2, ¶ 8 [Estrin Declaration].

[21]Ex, 2, ¶ 8 [Estrin Declaration].

[22]Ex. 2, ¶ 9 [Estrin Declaration].

[23]Ex. 2, ¶ 9 [Estrin Declaration].

6

in fact central components of CTC's Bridge Plan.[24]

CTC's Bridge Plan and Windsor's opposition to it were no secret. In fact, Plaintiffs allege that "[f]or years, Windsor has opposed and hindered the development, maintenance and operation of the Ambassador Bridge . . ."[25] Estrin's representation of Windsor with respect to Plaintiffs and CTC's Bridge Plan has also been well known for years. For example, on August 8, 2004, the *Windsor Star* carried an article indicating that DIBC had filed an application for building a new bridge and that Windsor had retained Estrin to represent it on the application:

> Mayor Eddie Francis said the city's lawyer for the border situation, David Estrin, has been asked to examine the bridge's move.
>
> 'Just because an application has been filed for twinning the bridge, it doesn't mean it's the best place or the right plan,' Francis said.[26]

Windsor, through Estrin, took several steps to oppose the Bridge Plan and the Site Plan Application, including the following:

- In June, 2004 Estrin contacted Leon Paroian, a lawyer for Centra and CTC, and orally advised him that the Site Plan Application did not comply with Windsor's zoning requirements.

- On September 14, 2004, Estrin wrote to Dan Stamper, Centra's President, confirming that Gowlings was representing Windsor.[27] The letter, on Gowlings' letterhead, advised Stamper that Estrin and Gowlings "are the solicitors for the City of Windsor" concerning the Site Plan Application. The letter also enclosed an agreement (the "Proposed Agreement") whereby Windsor would consider the Site Plan Application if CTC agreed that an approval was not an endorsement of CTC's Bridge Plan.

---

[24]Ex. 2, ¶ 10 [Estrin Declaration].

[25]Ex. 1, ¶ 34 [First Amended Complaint].

[26]Ex. 6 [8/6/04 *Windsor Star Article*].

[27]Ex. 14 [9/14/04 Letter].

7

- On September 16, 2004, Matty Maroun telephoned the Chief of Staff to Windsor's Mayor, and complained about the Proposed Agreement. The Chief of Staff advised Mr. Maroun that she would pass along his comments to the Mayor and to Estrin.

- On September 28, 2004, Dan Stamper telephoned the Chief of Staff to Windsor's Mayor, and complained about the Proposed Agreement and suggested further negotiations.

- On September 30, 2004, Estrin and Windsor officials met in Warren, Michigan with Matty Maroun, Dan Stamper and Centra's lawyer regarding the Proposed Agreement. The parties negotiated for three hours, but no settlement was reached.

- Subsequently, Estrin continued to negotiate the Proposed Agreement with the Laing Michener firm, which was representing CTC.[28]

Eventually, on February 14, 2005, the Windsor City Council approved a "Site Plan Control" Agreement signed by Windsor and CTC.[29] The Site Plan Control Agreement that Estrin drafted and negotiated on behalf of Windsor against Centra and CTC made it clear that Windsor's approval of CTC's Site Plan Application would not prevent Windsor from opposing CTC's Bridge Plan:

> [Windsor] confirms and [CTC] acknowledges that [Windsor's] approval of the development contemplated by the subject site plan application does not constitute an endorsement by [Windsor] of the proposal by [CTC] to twin the existing Ambassador Bridge as proposed in [CTC's] July 14, 2004 Preliminary Review Permit Application, or a waiver by [Windsor] of [Windsor's] right to require an Official Plan/Zoning By-law amendment or otherwise object to or deny [CTC's] approval for a second Ambassador Bridge span or twinning (including any works or undertakings required or to be used for that purpose), nor shall [Windsor's] approval of the development contemplated by the subject site plan application or any associated or corollary approval or agreement be pleaded as an estoppel of [Windsor] in that regard.[30]

These negotiations and the signed Site Plan Control Agreement are important because they

---

[28]Ex. 2, ¶¶ 10-17 [Estrin Declaration].

[29]Ex. 7 [2/14/05 Site Plan Control Agreement].

[30]*Id.* at ¶ S-21.

show that, contrary to the allegations on the First Amended Complaint, Plaintiffs, CTC and Dan

Stamper had actual knowledge that Gowlings and Estrin were representing Windsor adverse to the

Bridge Plan. Even with that knowledge, CTC decided to retain Gowlings in June 2005, three months

**after** the Site Plan Control Agreement had been approved.

### D.    In 2005, CTC Retained Gowlings

Despite the actual knowledge of Plaintiffs, CTC and Dan Stamper that Gowlings represented

Windsor adverse to the Bridge Plan, CTC retained Dale Hill, a Gowlings accountant based in

Gowlings' Ottawa office, in June, 2005, to provide advice regarding Canadian tax issues (the "Tax

Representation").[31]  The Tax Representation is confirmed in a June 27, 2005 engagement letter sent

by Hill to Stamper.[32]    The engagement letter makes clear that Gowlings was not providing legal

advice to CTC ("[t]he advice you receive from me, and from other members of the Transfer Pricing

Group, will not be legal advice and the service that we provide directly to you will not be legal

services.")  The Tax Representation was unrelated to the Bridge Plan.[33]  Instead, it relates to the

amount of income from the Ambassador Bridge's operations that should be allocated to CTC for

Canadian tax reporting purposes.[34]  Centra and DIBC were represented by Deloitte & Touche in

dealing with allocating income for American tax reporting purposes.[35]

When Hill opened the CTC file, he initiated Gowlings' standard conflict search, which

---

[31]Ex. 8, ¶¶ 5-6 [Hill Declaration].

[32]Ex. 9 [6/27/05 Letter].

[33]Ex. 8, ¶ 14 [Hill Declaration].

[34]Ex. 8, ¶ 9 [Hill Declaration].

[35]Ex. 8, ¶ 9 [Hill Declaration].

involved searching Gowlings' client-matter database.[36]  The search, using the terms "Dan Stamper,"

"Canadian Transit Company," and "Detroit International Bridge Company," revealed that CTC and

DIBC were either current or former clients of the firm.[37]  The search did not reveal that Gowlings

was representing any clients adverse to Stamper, CTC or DIBC.[38]  In fact, CTC and DIBC were not

current clients, but were former clients when Hill initiated his conflict check.[39]  The search did not

reveal Estrin's representation of Windsor adverse to CTC because, when Estrin's general

representation of Windsor on border crossing matters gradually turned adverse to CTC in 2003, he

did not amend his initial conflict filing to add CTC as an adverse party.[40]

Later, in December 2005, CTC retained Tim Wach, a Gowlings tax attorney based in

Toronto, to assist with CTC's plan to issue bonds secured by the Ambassador Bridge and a related

reorganization of DIBC and CTC (the "Bond Representation").[41]  One of several potential purposes

of the bond issue included obtaining financing for the Bridge Plan.[42]  Wach did not initiate a new

conflict search because his representation of CTC, like Dale Hill's, was adverse to the Canadian

Revenue Authority.[43]

---

[36]Ex. 8, ¶ 7 [Hill Declaration].

[37]Ex. 8, ¶ 7 [Hill Declaration].

[38]Ex. 8, ¶ 7 [Hill Declaration].

[39]Ex. 3, ¶ 8 [Byrne Declaration].

[40]Ex. 2, ¶ 8 [Estrin Declaration].

[41]Ex. 10, ¶¶ 7-8 [Wach Declaration].

[42]Ex. 10, ¶ 8 [Wach Declaration].

[43]Ex. 10, ¶ 9 [Wach Declaration].

10

The undisputed facts set out above confirm that Plaintiffs and CTC were fully aware that Estrin and Gowlings were representing Windsor at the time CTC retained Wach for the Bond Representation.[44]   Moreover, until a few days before Plaintiffs filed this lawsuit, Estrin was completely unaware of Hill and Wach's work on either the Tax Representation or the Bond Representation.   Importantly, Estrin has had no communications with any one associated with Gowlings about their work related to those two representations.[45]   In fact, Estrin has never spoken with Hill or Wach about any professional matters, including their representations of Centra and CTC.[46]   And Estrin has never seen any documents related to the Tax Representation or the Bond Representation.[47]   Likewise, Hill and Wach were completely unaware that Estrin was representing Windsor, they had no communications with him about his work for Windsor and, they had never seen any documents that Estrin drafted on behalf of Windsor.[48]   In fact, for reasons unrelated to this lawsuit, Estrin's documents related to his representation of Windsor were electronically encypted so that he controlled access to his files.[49]

In sum, CTC's President, Dan Stamper, had actual knowledge that the law firm his company had engaged for tax and bond work was representing Windsor in opposing the Bridge Plan.  But neither Estrin, who was acting for Windsor, nor the Gowlings' personnel who were working on the

---

[44]*See* II.C, above.

[45]Ex. 2, ¶ 20 [Estrin Declaration].

[46]Ex. 2, ¶ 21 [Estrin Declaration].

[47]Ex. 2, ¶ 22 [Estrin Declaration].

[48]Ex. 8, ¶ 13 [Hill Declaration] and Ex. 10, ¶ 11 [Wach Declaration].

[49]Ex. 2, ¶ 23 [Estrin Declaration].

11

tax and bond work, knew of the other's involvement in CTC's affairs.

**E.    Gowlings Continued To Represent Windsor's Interests Adverse to Centra's Bridge Plan**

After CTC retained Gowlings to provide tax and bond advice, Gowlings continued to represent Windsor adverse to Bridge Plan.  In early 2006, CTC submitted an "Application for Approval of Location and Plans for Construction of a Second Fixed Highway Bridge Over a Navigable Waterway of the United States (Detroit River) Adjacent to the Existing Ambassador Bridge" (the "Second Application") to the United States Coast Guard.[50]

The Coast Guard asked for public comment on the Second Application and, on September 14, 2006, Estrin filed comments on behalf of Windsor.[51]  Since that time, the Coast Guard has taken no action, and CTC's Second Application remains pending.[52]  In addition to the approval of the United States Coast Guard, CTC still needs approvals from several other governmental authorities before it can begin implementing its Bridge Plan.  Those authorities include: the Canadian Environmental Assessment Agency, the City of Detroit, the City of Windsor and the State of Michigan.[53]  In short, ultimate approval or rejection of Plaintiffs and CTC's Bridge Plan is years away.

**F.    Plaintiffs File Suit Against Estrin and Gowlings**

On November 20, 2006, Centra filed this lawsuit against Estrin.[54]  Centra then filed a First

---

[50]Ex. 2, ¶ 24 [Estrin Declaration].

[51]Ex. A to Ex. 1 [First Amended Complaint].

[52]Ex. 2, ¶ 25 [Estrin Declaration].

[53]Ex. 2, ¶ 26 [Estrin Declaration].

[54]Ex. 11 [Complaint].

Amended Complaint, in which DIBC was named as an additional plaintiff.[55]  On December 8, 2006, Gowlings sent Centra and CTC a letter identifying the matters that Gowlings was handling and advising that, in light of this lawsuit, Gowlings was withdrawing from its representation of CTC.[56]

The First Amended Complaint alleges that Estrin and Gowlings have engaged in a conflict of interest by representing Windsor in opposition to the Bridge Plan while Gowlings simultaneously represented CTC on the bond issue.[57]  The key allegation is that before Estrin sent his September 14, 2006 letter opposing the Second Application, Plaintiffs were unaware of the relationship between Gowlings and Windsor.[58]  The second key allegation, made "upon information and belief," is that confidential information was shared between Estrin and the other Gowlings professionals representing CTC and DIBC.[59]  The First Amended Complaint is utterly silent as to the facts upon which this "information and belief" is based.  The evidence supporting this brief shows that Plaintiffs' allegations are demonstrably false.

## III.   ARGUMENT

### A.   Standard of Review

When a party files a motion for summary judgment, courts determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

---

[55]Ex. 1 [First Amended Complaint].

[56]Ex. 12 [12/8/06 Letter].

[57]Ex. 1, ¶¶ 43, 50, 57 [First Amended Complaint].

[58]Ex. 1, ¶ 33 [First Amended Complaint].

[59]Ex. 1, ¶ 44 [First Amended Complaint].

one party must prevail as a matter of law."[60]  A fact is "material" if its resolution affects the outcome of the lawsuit.[61]  An issue is "genuine" if a reasonable jury could return a verdict for the nonmoving party.[62]  The party bringing the summary judgment motion has the initial burden of informing the court of the basis for the motion and identifying the portions of the record that demonstrate the absence of a genuine dispute over material facts.[63]  The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion.[64]

In this Brief, Gowlings and Estrin have presented admissible and conclusive evidence that (1) Plaintiffs and CTC had actual knowledge given to them by Gowlings that Gowlings and Estrin were representing a client in a matter adverse to CTC at the time CTC retained other Gowlings attorneys, (2) there was no sharing of confidential information related to Estrin's representation of Windsor and Wach and Hill's separate representation of CTC, and (3) Centra's Second Application for a second bridge is still pending and will not ultimately be decided for years.  Based on these undisputed facts, summary judgment on Centra's claims should be granted.

---

[60]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[61]*Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).

[62]*Anderson*, 477 U.S. at 248.

[63]*Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

[64]*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

14

**B.    Centra's Claims Should Be Dismissed Because Centra Consented to the Conflict When it Retained Gowlings**

Plaintiffs' claims are premised on the allegation that Gowlings engaged in an impermissible conflict of interest when it simultaneously represented Windsor and CTC.[65]  But the evidence attached to this brief shows that Plaintiffs and CTC knew Gowlings was representing Windsor adverse to the Bridge Plan when CTC retained Gowlings to provide tax and bond advice.  By retaining Gowlings with full knowledge that Gowlings was representing Windsor in opposition to the Bridge Plan, Plaintiffs consented to the conflict of interest.

For example, in *Cleveland v. Cleveland Electric Illuminating Co., et. al.*, the Northern District of Ohio found such a consent, where the City retained Squire, Sanders & Dempsey ("SS&D"), knowing that SS&D was representing the City's current adversary, Cleveland Electric Illuminating Company ("CEI").[66]  In that case, the City owned a utility called MELP that was in direct competition with CEI.  SS&D was CEI's outside general counsel.  Despite the relationship between SS&D and CEI, from time to time, the City retained SS&D to perform bond work for MELP, CEI's competitor.

In 1971, the City intervened in a proceeding against CEI before the Nuclear Regulatory

---

[65]Ex. 1, ¶¶ 43-44, 51-52, and 57. [First Amended Complaint].  Plaintiffs also allege, "upon information and belief," that Gowlings used "confidential and privileged information provided by Plaintiffs in its representation of Windsor against DIBC."  This allegation is false. Estrin never received any confidential information from Hill or Wach regarding their representation of Centra.  Since Estrin never received such information, he could not have used it.  Ex. 2, ¶ 27 [Estrin Declaration].

[66]*Cleveland v. Cleveland Electric Illuminating Co., et. al.*, 440 F. Supp. 193, 212 (N.D. Ohio 1976), *aff'd without opinion*, 573 F.2d 1310 (6th Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed. 2d 85 (1978).  Ex. 16.

Commission ("NRC"), alleging unfair competition by CEI against MELP.[67]  SS&D represented CEI

adverse to the City in the NRC proceeding.[68]  SS&D had also represented CEI adverse to the City

on other matters in the past.[69]  While the NRC case was still pending, and notwithstanding SS&D's

current representation of CEI in the NRC proceeding, the City retained SS&D to perform bond work

for MELP.[70]

The City later sued CEI in the Northern District of Ohio alleging that CEI was unfairly

competing with MELP.  SS&D appeared for CEI in that suit (the "Federal Court Litigation").[71]  The

City began to informally seek SS&D's withdrawal from its representation of CEI in the Federal

Litigation.[72]  SS&D then withdrew from representing the City.  Subsequently, the City filed a motion

to disqualify SS&D from representing CEI in the Federal Court Litigation.[73]

In defense to the City's motion, SS&D argued that the City "knowingly and voluntarily

consented to SS&D's role as bond counsel for the City, thereby waiving any right to pursue its

Motion to Disqualification [sic]."[74]  **The Court agreed with SS&D because the evidence showed**

**that City had retained SS&D with the full knowledge that SS&D was representing CEI**

_____

[67]*Id.* at 195.

[68]*Id.* at 197 and 202.

[69]*Id.* at 198.

[70]*Id.* at 201.

[71]*Id.* at 195.

[72]*Id.* at 202.

[73]*Id.* at 202-203.

[74]*Id.* at 205.

16

adverse to the City.[75]

Similarly, in *In re Alumco Industries Corp.*, the court held that a party had waived its right to claim a conflict of interest when that party knew of the conflict for three months before moving to disqualify the law firm that had allegedly engaged in the conflict.[76] In that case, the Brown Baker law firm represented the debtor at the time of the initial bankruptcy filing. Later, a trustee was appointed and he pursued claims against officers of Alumco. Brown Baker appeared on behalf the officers and actively litigated the case for three months before the trustee filed a motion to disqualify Baker Brown. The court denied the motion, holding that the trustee had waived the right to raise the conflict:

> In the case of *City of Cleveland v. Cleveland Elec. Illuminating* [citation omitted], Judge Krupansky stated that a client's right to object to an attorney's allegedly adverse representation may be waived. The facts in that case indicated that the City had prior knowledge that the law firm representing Cleveland Electric Illuminating Company had previously represented the City and thereby had consented to that law firm's present representation of Cleveland Electric Illuminating . . . [In this case] the trustee has known since December 30, 1980, that the firm of Brown, Baker, Schlageter and Craig was representing, or was going to represent, several of the Defendants and in fact has dealt with this firm in several pretrials without comment.
>
> Therefore, this Court's conclusion is that the length of time having passed between the institution of the suit, together with the prior knowledge of the Trustee of Brown, Baker, Schlageter and Craig's representation of the Debtor, the officers, directors and employees, and the filing of the Motion to Disqualify constitutes a waiver by the Trustee and a consent to the continuing representation of the Defendants by Brown, Baker, Schlageter and Craig.

The court in *In re Alumco Industries* found that the trustee had waived the right to claim a conflict when it knew about the alleged conflict for three months, yet did nothing. Here, the case for waiver

---

[75]*Id.*

[76]*In re Alumco Industries Corp.*, 12 B.R. 7, 9 (Bankr. N.D. Ohio 1981).

is even stronger since Plaintiffs and CTC knew about the potential conflict for more than a year **before it retained Gowlings.**

The same reasoning that applied in *Cleveland v. Cleveland Electric Illuminating Co.* and *In re Alumco Industries* applies here. In the *Cleveland* case, the court held that the City could not claim a conflict of interest when the City knowingly and voluntarily retained a law firm that the City knew was representing a client adverse to it. In this case, when CTC retained Wach and Gowlings in December 2005, CTC knew that (1) in 2003 and 2004, Gowlings and Estrin had represented the Buffalo-Fort Erie Bridge Authority in matters adverse to Centra, and (2) in 2004 and 2005 Gowlings and Estrin were acting for Windsor in opposing Plaintiffs and CTC's Bridge Plan. In light of these undisputed facts, Plaintiffs have waived their right to challenge the representation of Windsor by Gowlings or to raise a damage claim as a result of the waived conflict. Therefore, Plaintiffs' claims should be dismissed.[77]

### C.   Plaintiffs' Claims Should Also Be Dismissed Because Plaintiffs Have Suffered No Damages

Damages are an element of each of Plaintiffs' claims (breach of contract, breach of fiduciary duty and legal malpractice).[78] But Plaintiffs have not suffered any damages because their application

---

[77]Canadian law compels the same result. For example, in *Bank of Montreal v. Dresler*, N.B.J. No. 324, ¶¶ 68-69 [2002] (Ex. 15), the New Brunswick Court of Appeals denied the Bank of Montreal's disqualification motion when the Bank sat on its hands for ten months after an attorney who had been representing it in a matter was hired by a firm representing the defendant in the same matter. If the Bank waived its right to raise the conflict issue by doing nothing for ten months after it knew about the potential conflict, then Plaintiffs have waived their right to raise a conflict when they knew of the conflict **before** they engaged Gowlings to perform work for CTC.

[78]*Colbert v. Conybeare Law Office,* 239 Mich. App. 608, 620 (2000) ("A claim of malpractice further requires a showing of actual injury caused by the malpractice, not just the potential for injury."), *Borlack v. Mackler Bros.*, 1996 Mich. App. LEXIS 1498, *6 ("a showing

to twin the Ambassador Bridge remains pending and has not been denied.[79]   Accordingly, Centra's

claims fail as a matter of black-letter law.

In *Lear Corp. v. Butzel Long*, the Michigan court of appeals held that the plaintiffs failed to

state a claim for breach of fiduciary duty because "plaintiff never provided any specific description

of any damages suffered as a result of this breach."[80]  In that case, Butzel represented Lear on various

matters.   Butzel then filed a lawsuit on behalf of Johnson Controls against a third party

("TwisThink").   In that lawsuit, Butzel and Johnson Controls alleged that TwisThink was sharing

confidential information with Lear.  Butzel then withdrew from its representation of Lear.  Lear filed

suit against Butzel, claiming it had breached fiduciary duties.  Lear sought to enjoin Butzel from

representing Johnson Controls in the case against TwisThink.

Butzel's motion for summary disposition on Lear's claim was granted.  The court of appeals

affirmed the trial court on two grounds.  First, Lear's complaint attempted to establish that Butzel

breached its fiduciary duty solely by alleging violations of the Michigan Rules of Professional

Conduct ("MRPC").  Since Lear could not base a cause of action solely on violations of the MRPC,

Lear's claim was properly dismissed.  Secondly, Lear did not adequately plead how the alleged

breach caused harm or damage.  Unsupported conclusions that Lear suffered damages as a result of

the breach were inadequate to state a breach of fiduciary duty claim upon which relief could be

---

of damages is a necessary element of claim for breach of contract") *citing Lawrence v. Will Darrah & Assoc., Inc.*, 445 Mich. 1, 6-8 (1994), *Lear Corp. v. Butzel Long, P.C.*, 2006 Mich. App. LEXIS 1697, *8-9 citing Travelers Ins. Co. v. Guardian Alarm Co.*, 231 Mich. App. 473, 479 (1998) (damages are an element of a breach of fiduciary duty claim).

[79]Ex. 2, ¶¶ 25-26 [Estrin Declaration].

[80]*Lear Corp, supra* at *13.

19

granted.[81]

Michigan courts regularly dismiss legal malpractice claims and breach of contract claims when the damages alleged are speculative.[82]   Here, the damages alleged are purely speculative. Plaintiffs claim that Estrin's representation of Windsor has "significantly damage[d] and impede[d] DIBC's interests not only with respect to the Ambassador Bridge and the Span, but in all of DIBC's business interests, holdings, and endeavors throughout the United States and Canada."[83] But Centra makes no factual allegations that support these conclusory allegations.   It is undisputed that the Ambassador Bridge is operating in the same manner as it was before Estrin responded to Centra's Second Application to the U.S. Coast Guard.   It is undisputed that Centra's Second Application is still pending.[84]  And it is undisputed that Centra's Bridge Plan still requires numerous governmental approvals before Centra can begin constructing a second bridge.[85]  In fact, Manuel Maroun, Centra's owner, candidly admitted in a January 29, 2006 interview that "[s]ometime in three, five or seven years, we ought to be sticking a shovel in the ground (for a twinned bridge)."[86]  At the end of the day,

---

[81]*Lear Corp. v. Butzel Long, P.C.*, 2006 Mich. App. LEXIS 1697 at *10-13 (May 18, 2006).

[82]*Colbert v. Conybeare Law Office,* 239 Mich. App. 608, 620 (2000) (Affirming summary disposition of legal malpractice claim because plaintiff relied "solely on speculation and the potential for injury to support his claim."), *Borlack v. Mackler Bros.*, 1996 Mich. App. LEXIS 1498 (August 20, 1996) ("a showing of damages is a necessary element of claim for breach of contract"), *Aron Alan, LLC v. Tanfran, Inc.*, 2006 U.S. Dist. LEXIS 7139 (W.D. Mich. 2006) (same).

[83]Ex. 1, ¶ 39 [First Amended Complaint].

[84]Ex. 2, ¶ 25 [Estrin Declaration].

[85]Ex. 2, ¶ 26 [Estrin Declaration].

[86]Ex. 13 [January 28, 2006 *Windsor Star* article].

20

the fact is that Estrin and Gowlings' actions have caused Centra no damages whatsoever. Accordingly, Centra's claims should be dismissed.

## IV.    CONCLUSION

CTC engaged Gowlings fully knowing that it was representing other clients with interests adverse to Centra. Therefore, Plaintiffs have waived any conflict of interest claim. Plaintiffs and CTC's Bridge Plan is still pending and, by their owner's admissions, is years away from approval. Therefore, Plaintiffs have suffered no injury. For those reasons, summary judgment should be entered in favor of Gowlings and Estrin.

Respectfully submitted,

Barris, Sott, Denn & Driker, PLLC

By:   /s/ Kevin Kalczynski
    Sharon M. Woods  (P22542)
    Kevin Kalczynski (P57929)
    Melonie M. Stothers (P65344)
211 W. Fort Street, 15th Floor
Detroit, Michigan 48226
Phone:  313-965-9725
Email:   kkalczynski@bsdd.com

DATE:    January 12, 2007

f:\docsopen\kkalczynski\l-brf\0328086.03

21

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2007, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Joseph A. Doerr (doerr@dykema.com); and Craig L. John (cjohn@dykema.com).   There are no manual recipients.

Parties may access this filing through the Court's system.

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By:     /s/ Kevin Kalczynski
        Sharon M. Woods (P22542)
        Kevin Kalczynski (P57929)
        Melonie M. Stothers (P65344)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725
Email: kkalczynski@bsdd.com

f:\docsopen\kkalczynski\l-cert\0329890.01