SEP-28-2006 17:51 FROM-CITY OF WINDSOR Building & Development 519 2557170 T-479 P.001 F-299



**CORPORATION OF THE CITY OF WINDSOR**
**PUBLIC WORKS**
**Building And Development Department**
350 City Hall Square West ◆ Windsor, ON N9A 6S1
Tel: (519) 255-6267 ◆ Fax: (519) 255-7170

# fax transmission

date: **Sept 29 2006**                                        fax no: 416-369-7250

to: **Gowlings**

attention: **Mr David Estrin**

from: **Mario Sonego, P. Eng.**
          **Chief Building Official**

subject: **Bridge Plaza Site Plan Agreement**          # of pages 30

---

**Notes:**       .

   Per your Request

   Mario Sonego

---

*Communicate any comments/problems in receiving this fax to:*
*Louise Hayes, Building and Development*
*Tel: (519) 255-6267 ext 6458*

SEP-28-2006 17:52   FROM-CITY OF WINDSOR Building & Development   519 2557170        T-479   P.002   F-299

## SITE PLAN CONTROL

### Basic Provisions

**B-1.** The following are certain basic provisions of this Agreement, which are part of this Agreement, and which are correspondingly referred to in the General Provisions and Special Provisions of this Agreement:

| | Item | Provision |
|---|---|---|
| (a) | Name & Address of Corporation: | The Corporation of the City of Windsor<br>Att'n:  City Solicitor<br>350 City Hall Square West<br>P.O. Box 1607<br>Windsor, Ontario, N9A 6S1 |
| (b) | Name & Address of Owner: | Firstly:<br>**THE CANADIAN TRANSIT COMPANY**<br>Secondly:<br>**608261 ONTARIO INC.**<br>780 Huron Church Road<br>Windsor, Ontario, N9C 2K2<br>Secondly: |
| (c) | Approval Date: | February 14, 2005 and<br>January 16, 2006 |
| (d) | Description of Lands:<br>hereinafter referred to as<br>the subject lands | as per Schedule "A" attached hereto<br>municipally known as<br>710, 711, 721, 737, 765, 775 and 780 Huron Church<br>Road, Windsor, Ontario |
| (e) | Map Number/Date: | **SPC063/04-1A, -1B and -6 dated December, 2005**<br>**SPC063/04-2, -3, -4 and -5 dated January, 2005**<br>**being pages 1 to 7**<br>hereinafter referred to as Schedule "C" attached |
| (f) | Interpretation Schedule: | Schedule "B" attached |
| (g) | Authorization: | Council Resolution 104/2005<br>adopted on February 14, 2005 and<br>Council Resolution 29, 2006<br>adopted on January 16, 2006 |
| (h) | Commencement Date: | January 16, 2006 |
| (i) | Legal Department file number: | 12-3412-04 |

**B-2.** This Agreement consists of these Basic Provisions, the attached General Provisions and Special Provisions, as well as any schedules or other attachments referred to herein or therein, and all such material forms part of this Agreement together with all things, terms and provisions so incorporated.

**B-3.** In the event of any inconsistency or conflict in this Agreement between the Basic Provisions, Special Provisions and General Provisions, then the terms, covenants and conditions of this Agreement shall prevail in the following order:

- 2 -

    (a)    Basic Provisions

    (b)    Special Provisions

    (c)    General Provisions

Amendments bearing later dates shall prevail within each of the above noted categories of this Agreement.

**B-4.**      Any reference in this Agreement to all or any part of any manual, statute, regulation, By-law or Council Resolution shall, unless otherwise stated, be a reference to that manual, statute, regulation, By-law or Council Resolution or the relevant part thereof, as amended, substituted, replaced or re-enacted from time to time.

**IN WITNESS WHEREOF** the Parties hereto have hereunto affixed their corporate seals duly attested by the hands of their proper signing officers in that behalf respectively.

SIGNED, SEALED and DELIVERED    )    THE CORPORATION OF THE CITY OF
    )    WINDSOR:
    )
    )
    )
    )    EDDIE FRANCIS    (Mayor)
    )
    )
    )    GARY CIAN    (Clerk)
    )
    )    THE CANADIAN TRANSIT COMPANY:
    )
    )    Per:
    )    Name:  THOMAS L. McMAHON
    )    Office:  Executive Director, External Affairs
    )    I have the authority to bind the Corporation
    )
    )
    )    608261 ONTARIO INC.:
    )
    )    Per:
    )    Name:  THOMAS L. McMAHON
    )    Office:  Executive Director, External Affairs
    )    I have the authority to bind the Corporation

## SITE PLAN CONTROL

### Special Provisions

**S-1.**     **PERFORMANCE SECURITY** - The Owner agrees to deposit with the Corporation *at the time a construction permit* is issued to it, a Performance Security in the form of a certified cheque, cash or an Irrevocable Letter of Credit which is automatically extended, or other security in form satisfactory to the City Solicitor in the sum of **THREE HUNDRED AND FIFTY-SIX THOUSAND EIGHT HUNDRED AND FORTY-ONE DOLLARS ($356,841.00)** to guarantee the due performance as contained in paragraphs **G-3(4), G-5, S-5(1), S-6(1), S-7, S-9, S-10, S-13, S-17(2),** and **S-18** in this Agreement, within the time period specified in paragraph **S-20** hereof. No Performance Security, or other security shall be released until the Owner has filed a Maintenance Security, in accordance with paragraph S-2 herein.

**S-2.**     **MAINTENANCE SECURITY** - The Corporation agrees to return the said Performance Security to the Owner upon the completion and final inspection of the works specified in paragraph **G-3(4), G-5, S-5(1), S-6(1), S-7, S-9, S-10 S-13, S-17(2) and S-18** in this Agreement, on condition that the Owner concurrently provide the Corporation with a Maintenance Security in the form of a certified cheque, cash or an Irrevocable Letter of Credit which is automatically  extended, or other security in form satisfactory to the City Solicitor in the amount of **SEVENTY-TWO THOUSAND, FIVE HUNDRED DOLLARS (72,500.00)** to guarantee that any and all of the works referred to in paragraph **G-3(4), S-7, S-9, S-10 and S-11** in this Agreement, have been maintained to the satisfaction of the Chief Building Official. The said Maintenance Security shall  be returned to the Owner at the end of **two (2) years** from the date of its delivery provided the Owner has maintained the works to the satisfaction of the Chief Building Official.

**S-3.**     **STORM WATER QUANTITY AND QUALITY MANAGEMENT MEASURES**

     1.     The Owner further agrees to obtain, at its entire expense and *prior to the issuance of any construction permit*, an engineering **analysis** determining storm water quantity and quality and obtain approval thereof from Essex Region Conservation Authority (ERCA) and from the City Engineer. The said study shall determine the effects of increased storm water runoff due to the development of the subject lands and identify storm water management measures necessary to control any increases in flow in downstream watercourses up to and including the 1:100 year design storm.

     2.     The Owner further agrees to undertake, at its entire expense, the approved storm water management measures in accordance with the approved study and to the

- 2 -

satisfaction ERCA and the City Engineer.

       3.    The Owner further agrees to obtain the necessary permits from ERCA prior to undertaking construction activities and/or site alterations.

**S-4.**    For the purpose of this Agreement, paragraph *G-17.* with respect to *Parkland Conveyance* of the *General Provisions,* may be fulfilled by the Owner conveying, *prior to the issuance of a construction permit,* a nine (9) metre wide permanent easement between the Detroit River and Riverside Drive West and being located beneath the Ambassador Bridge, for a public pedestrian walkway/bicycle pathway, to the satisfaction of the Executive Director of Parks. Notwithstanding the said location of the easement, any safety, security and maintenance issues are to be addressed in the terms of the wording of the easement, to the satisfaction of the Owner and the Executive Director of Parks.

**S-5(1).**    <u>SIGNS, SIGNAGE AND PAVEMENT MARKINGS</u> - In addition to the provisions of G-10 of the said General Provisions attached hereto, the Owner further agrees to provide a Signage and Pavement Markings Plan (pedestrian and vehicular) for the public highway adjacent to the subject lands, to the satisfaction of the Executive Director of Operations, *prior to the issuance of any construction permit,* and to re-imburse the Corporation, on demand, for the installation of the same within the public highway.

**S-5(2).**    The Owner further agrees to submit drawings for a mid-block signal across Huron Church Road, south of Wyandotte Street West, and north of College Avenue, for review and approval by the Executive Director of Operations. In the event that the mid-block signal is appropriate, then the Owner further agrees to re-imburse the Corporation, on demand, for the installation and on-going maintenance of such mid-block signal.

**S-5(3).**    In the event that the mid-block signal referred to in S-5(2) herein, is not appropriate, then the Owner further agrees to provide an alternative means of safe pedestrian access across Huron Church Road, prior to the commencement of any operations on the development contemplated by the subject site plan application, to the satisfaction of the Executive Director of Operations and Chief Building Official.

**S-6(1).**    The Owner further agrees to construct sidewalk improvements (minimum six feet (6') wide) on the north side of Mill Street (east of Indian Road), and south side of Wyandotte Street West between Huron Church and Indian Road, all to the satisfaction of City Engineer and Chief Building Official.

- 3 -

**S-6(2).**     The Owner further agrees to deposit with the Corporation *prior to the issuance of any construction permit,* cash in the amount **TWENTY SIX THOUSAND ONE HUNDRED AND FIFTY NINE DOLLARS ($26,159.00),** which represents the Owner's contribution to the sidewalk improvements on the east side of Indian Road between Wyandotte Street West and Mill Street.

**S-7.**     The Owner further agrees to provide a screening feature along the north and south sides of Wyandotte Street West and custom fencing along the west side of Huron Church between Donnelly Street and the proposed retaining wall south of Wyandotte Street West, to the satisfaction of the Chief Building Official and City Planner.

**S-8.**     **LANDSCAPING PLAN** - In addition to the provisions of G-3 of the said General Provisions attached hereto, the Owner further agrees to provide a Landscape Plan, showing the upgrading of off-site areas, all to the satisfaction of Chief Building Official, *prior to receiving a construction permit.*

**S-9.**     The Owner further agrees to remove, at its entire expense, the existing sidewalk on the west side of Huron Church Road, between Wyandotte Street West and the pedestrian walkway on Mill Street, and install landscaping in accordance with the Landscape Plan identified in S-8 herein, to the satisfaction of the City Engineer and Chief Building Official.

**S-10.**     The Owner further agrees to provide landscape improvements along the west side of Huron Church Road between Donnelly Street and the limit of the ETR right-of-way, Wyandotte Street West between Huron Church Road and Indian Road, and the east side of Patricia Road between Wyandotte Street West and College Avenue, including portions on University of Windsor property subject to consent by the University of Windsor, in accordance with the Landscape Plan identified in S-8 herein to the satisfaction of the City Planner and the Chief Building Official.

**S-11.**     The Owner further agrees to maintain the landscape improvements in the public highway along the east and west sides of Huron Church Road between Wyandotte Street West and the limit of the ETR right-of-way in accordance with the specifications setout in Schedule "D" attached hereto, and to the satisfaction of the Executive Director of Parks.

**S-12.**     The Owner further agrees to enter into an encroachment agreement with the Corporation regarding any encroachment in the Corporation's public highway, and if required, a

—4—

temporary encroachment agreement during demolition and/or construction.

S-13.    The Owner further agrees to provide, during construction, temporary directional signs redirecting pedestrian traffic on Wyandotte Street West, and temporarily relocating the Transit Windsor bus stop, to the satisfaction of the City Engineer and Transit Windsor.

S-14.    The Owner further agrees to submit, *prior to the issuance of a construction permit*, a drainage plan for the bridge structure, demonstrating that storm water runoff will not drip from the bridge onto the sidewalk on Wyandotte Street West, to the satisfaction of the City Engineer.

S-15.    The Owner further agrees to submit, *prior to the issuance of a construction permit*, a noise & vibration study and air quality study and undertake all recommended attenuation measures, to be certified upon completion by a consultant Engineer to the satisfaction of the Chief Building Official.

S-16.    The Owner further agrees to obtain, by means of an application to the Street & Alley Committee, closure of the Corporation's alley between Huron Church Road and Indian Road.

S-17(1).    The Owner further agrees to provide, *prior to the issuance of a construction permit*, detailed lighting design drawings to the satisfaction of the Chief Building Official and Director of Planning & Physical Resources (Windsor Police), demonstrating sufficient illumination, full cut-off lighting fixtures, and additional shielding of light fixtures where required.

S-17(2).    The Owner further agrees to install and maintain all lighting in accordance with the approved lighting design drawings and in a manner satisfactory to the Chief Building Official.

S-18.    The Owner further agrees to construct, at its entire expense, a noise attenuation barrier located in accordance with Schedule "A" to the satisfaction of the Chief Building Official.

S-19.    The Owner further agrees to register the following warning clause on title of each dwelling fronting onto the east side of Indian Road and also include the following warning clause in all Leases and Offers/Agreements of Purchase and Sale of the said lots:

"Purchasers/tenants/occupants are advised that due to increasing road traffic in the Ambassador Bridge Plaza West, noise levels may occasionally interfere with some activities of the dwelling occupants."

- 5 -

**S-20.**      The Owner hereby further agrees as follows:

a)      To indemnify the Corporation and save it harmless, with respect to the Corporation's fees and costs in relation to any hearing or court proceeding instituted by a third party which may occur in respect of this application for the subject lands, and

b)      To indemnify the Corporation and save it harmless in respect of any fees, costs or expense incurred by the Corporation with respect to all claims for loss, damage, costs or expenses whatsoever directly arising by reason of the carrying out of the said works or the maintenance or use thereof or their connection and use with Corporation's highways and also from any claims arising from any cause whatsoever for loss, damage, costs or expense made by the agents, servants or contractors of the Owner or by persons owning vehicles or driving on or passing along the said works whether the same relates to persons or property; the risk and responsibility arising therefrom or because of the said work or construction or maintenance or use thereof being assumed by the Owner,

c)      To indemnify the Corporation and save it harmless from all claims for damage, loss, costs and expense arising from loss of life or injury or damage to persons or destruction of, injury to or loss caused to property of persons on or passing along any highway or street by reason of the emission, spilling or depositing of contaminants as defined under and regulated by the *Environmental Protection Act*, R.S.O. 1990. c. E.19 or any successor legislation, from vehicles, machinery or other objects allowed on or passing over the works and structures appurtenant thereto and also by reason of objects or articles falling, spilling, emitted or projected onto the highways or property of the Corporation or private property from any part of the works or structures constructed pursuant to this Agreement; and

d)      Nothing contained in this Agreement shall be deemed to constitute an amendment to or detract or derogate from the provisions of the 1927 By-law Number 1641 of the former Town of Sandwich except as specifically provided in this agreement and as it pertains to the development contemplated by the subject site plan application.

**S-21.**      The Corporation **confirms** and the Owner **acknowledges** that the Corporation's approval of the development contemplated by the subject site plan application does not constitute an endorsement by the Corporation of the proposal by the Owner to twin the existing Ambassador Bridge as proposed in the Owner's July 14, 2004 Preliminary Review Permit Application, or a waiver by the Corporation of the Corporation's right to require an Official Plan/Zoning By-law amendment or otherwise object to or deny the Corporation's approval for a second Ambassador Bridge span or twinning (including any works or undertakings required or to

SEP-28-2006 17:55 FROM-CITY OF WINDSOR Building & Development 519 2557170 T-479 P.009/030 F-299

- 6 -

be used for that purpose), nor shall the Corporation's approval of the development contemplated by the subject site plan application or any associated or corollary approval or agreement be pleaded as an estoppel of the Corporation in that regard.

S-22.      **Construction permit** - The Owner further agrees that the Chief Building Official shall not be required to issue a construction permit for the said development until the following paragraph(s) have been complied with:

> **Paragraphs G-3(1), G-3(2), G-4(1), G-10(2), G-16, G-18 and S-1, S-3, S-4, S-5(1), S-6(2), S-8, S-14, S-15 and S-17(1).**

## SCHEDULE "A"

**Firstly:**

Lots 8 and 9, Registered Plan 1144 and
Part of Park Lot 1, Registered Plan 54
as in instrument numbers 19859 T.S. and 19367 T.S.
P.I.N. 01237 - 0395 (R)

Lots 38 to 40, all inclusive, Registered Plan 1139
P.I.N. 01237 - 0221 (LT)

**Secondly:**

Lots 3, 4, 6 and 7, Registered Plan 1144
PART OF P.I.N. 01237 - 0351 (LT)

Lot 5, Registered Plan 1144
P.I.N. 01237 - 0219 (LT)

Part of Park Lot 2, Registered Plan 54
as in instrument numbers R248088, R248104, R803618 and R1160688
P.I.N. 01237 - 0306 (LT)

Lot 41, Registered Plan 1139
P.I.N. 01237 - 0057 (LT)

Lots 1 and 2, Registered Plan 1144 and
Part of Park Lot 2, Registered Plan 54
as in instrument number R1415232
P.I.N. 01237 - 0346 (LT)

Lot 44, Registered Plan 1139
P.I.N. 01237 - 0060 (LT)

Lots 42 and 43, Registered Plan 1139
subject to easements as in instrument number R1251821
P.I.N. 01237 - 0226 (LT)

All in the City of Windsor, County of Essex and Province of Ontario

## SCHEDULE "B"

December 1, 2004

Notwithstanding the foregoing paragraphs of this Agreement, the following shall be used in interpreting compliance or non-compliance with the terms of the Agreement:

**1.    Dimensions**

Indicated dimensions on any plan or drawing attached to this Agreement may be increased or decreased by a factor of 0.02 or by 0.5 metres, whichever is greater.

**2.    Building Detail**

Whether or not the following features are illustrated on any plan or drawing attached to this Agreement, nothing in this Agreement shall be deemed to prohibit the erection or installation of the following:

a)    Horizontal projections including cornices, eaves, belt courses, awnings, canopies, sills, bays, fire hose connections and similar building, architectural or safety features which do not project more than 0.5 metres away from the maximum permitted building envelope shown on any plan or drawing attached to this Agreement.

b)    Vertical projections not illustrated on attached building elevations which are required by the Ontario Building Code or are necessary mechanical or venting appurtenances including fire exits, vents, air conditioning sleeves, exhaust fans.

**3.    Freestanding Structures**

Unless otherwise specified in this Agreement, nothing shall prohibit the erection, installation or location of lamp standards, utility vaults, traffic direction and fire route signs.

**4.    Minor Change to an approved Plan or Drawing**

A minor change(s) to any plan or drawing attached to this Agreement may be approved by the City Planner where the general intent of the approved plan or drawing is maintained and after consultation with the Chief Building Official, the City Engineer and the Fire Chief, as applicable.

The minor change, if approved, will be implemented by means of a signature of the City Planner on a revised plan or drawing without the necessity of an amendment to this Agreement.

**5.    Phasing**

In the event that the development of any building(s) or parking area(s) as shown on any approved plan or drawing is staged, nothing in this Agreement shall prohibit the landscaping treatment of the future development provided that the landscaping treatment is to the satisfaction of the Chief Building Official.

Deleted: Executive Director of Development Processing Services



Schedule "C"
page 10 A 7



SITE PLAN CONTROL AGREEMENT

FILE NO.8PC-083/04-1B (Site Plan Detail)

APPLICANT: THE CANADIAN TRANSIT COMPANY

Building & Development Department

DATE:DEC. 2005
SCALE: N.T.S.

Schedule "C"
page 2 of 7

SEP-28-2006  17:56    FROM-CITY OF WINDSOR Building & Development    519 2557170        T-479  P.014/030  F-289



## SITE PLAN CONTROL AGREEMENT

**FILE NO.SPC-063/04-6 (Customs Elevations)**

**APPLICANT: THE CANADIAN TRANSIT COMPANY**

Building & Development Department

DATE:DEC.,2005
SCALE: N.T.S.

*Schedule "C"*
*page 3 of 7*

SEP-28-2006  17:57   FROM-CITY OF WINDSOR Building & Development   519 2557170   T-479  P.015/030  F-299



SITE PLAN CONTROL AGREEMENT

| FILE NO. SPC-063/04-2 (Sections) | |
| --- | --- |
| APPLICANT: THE CANADIAN TRANSIT COMPANY | |
| Development Processing Services Division | DATE:JAN.,2005<br>SCALE:N.T.S. |

Schedule "C"
page 4 of 7



FIGURE 7

EAST WALL ELEVATION
FROM HURON CHURCH ROAD

## SITE PLAN CONTROL AGREEMENT

FILE NO. SPC-063/04-3 (Elevations)

APPLICANT: THE CANADIAN TRANSIT COMPANY

Development Processing Services Division

DATE:JAN.,2005
SCALE:N.T.S.

Schedule "C"
page 5 of 7

SEP-28-2006 17:57  FROM-CITY OF WINDSOR Building & Development  519 2557170  T-479  P.017/030  F-299



FIGURE 8

PLAN

WEST WALL ELEVATION
FROM INDIAN ROAD
(BRIDGE DESK EXTENSION)

## SITE PLAN CONTROL AGREEMENT

**FILE NO. SPC-063/04-4 (Elevations)**

**APPLICANT: THE CANADIAN TRANSIT COMPANY**

Development Processing Services Division

DATE:JAN.,2005
SCALE:N.T.S.

*Schedule "C"*
*page 5 of 7*

SEP-28-2006  17:57    FROM-CITY OF WINDSOR Building & Development    519 2557170    T-479  P.018/030  F-299



WEST WALL ELEVATION
FROM INDIAN ROAD
(RETAINING / NOISE BARRIER WALL)

FIGURE 9

## SITE PLAN CONTROL AGREEMENT

**FILE NO. SPC-063/04-5 (Elevations)**

**APPLICANT: THE CANADIAN TRANSIT COMPANY**

Development Processing Services Division

DATE:JAN.,2005
SCALE:N.T.S.

Schedule "C"
page 7 of 7

SEP-28-2006 17:57   FROM-CITY OF WINDSOR Building & Development   519 2557170   T-479  P.019/030  F-298

1

## Schedule D

**Work Site**

The subject site for all work described below shall be the entire public highway along the east and west sides of Huron Church Road between Wyandotte Street West and the limit of the Essex Terminal Railway right-of-way.

**Work Schedule and Performance**

The Owner shall be responsible for providing sufficient personnel, materials, and equipment to perform all work in accordance with the specifications set out below, entirely at the expense of the Owner.

The Owner and any contractor employed by the Owner shall adhere to all provincial and federal health and safety standards.

The Owner shall report any deterioration or unsafe conditions in any element of the site to the Executive Director of Parks in addition to any other proper authority.

The Owner shall provide City with a monthly work schedule describing when work will be performed, in accordance with the specifications set out herein.

The Owner shall submit a written report each month stating all work completed with regards to the specifications contained herein. The report shall include documentation of irrigation checks and chemical applications. The report shall also note any areas that are not in conformity with these specifications and the Owners's plans for bringing the areas into conformance with the specifications.

Clippings, cuttings, trash and debris shall be removed each time work is performed or at least once per week.

The Executive Director of Parks through a designated representative shall make inspections on a monthly basis, or as often as necessary to insure that complete and continuous maintenance is fulfilled. In addition, the City may obtain the services of an approved horticultural specialist to inspect plantings and make recommendations for improvements in the maintenance program.

Where the work referred-to in these specifications is not found to be acceptable to the Executive Director of Parks, the Contractor shall be advised in writing and upon receipt of such written notification shall begin the work within five (5) working days or as agreed-to between the Owner and the Executive Director of Parks. If in the judgment of the Executive Director of Parks, the Owner has failed to perform any of its duties or obligations pertaining to these specifications, the City, at its option, in addition to, or in lieu of, any other remedies set forth in these specifications, may require payment by the Owner of the total cost, as determined by the Executive Director of Parks, for work not

SEP-28-2006 17:58   FROM-CITY OF WINDSOR Building & Development   519 2557170       T-479  P.020/030  F-289

2

performed after providing Owner with the said written notice identifying the duty(ies) or obligation(s) not performed and the time period Owner may have to perform the said duty(ies) or obligation(s).

The Owner hereby agrees to pay to the City, upon receipt of a written invoice, the total cost of work not performed with regards to the specifications contained herein to the satisfaction of the Executive Director of Parks.

The Owner shall designate one person as the representative of Owner authorized to act on its behalf with respect to the work specified herein.

## Other Standards

The latest edition of each of the following publications and legislation shall be used in conjunction with the specifications contained herein:

ANSI A300 (Part 1)-2001 for Tree Care Operations, Pruning
ANSI A300 –1995- for Tree Care Operations, Standard Practices
ANSI Z133.1-1994-for Tree Care Operations, Safety Requirements
OMAFRA Publication 505 Ontario Weeds
OMAFRA Best Management Practices, Integrated Pest Management
OMAFRA Publicaton 75, Guide to Weed Control.

The Pest Control Products Act
The Food and Drug Act
The Weed Control Act
The Canadian Fertilizer Act
Ontario Pesticide Act and Regulation 914.
Ontario Health and Safety Act
The Ontario Ministry of the Environment

## Specification Interpretation

Should any misunderstanding arise, the Executive Director of Parks shall interpret the specifications contained herein.

## Personnel Qualifications

All landscape maintenance personnel or contractors engaged by the Owner in connection with landscape maintenance within the work site shall be skilled, knowledgeable and competent in the executing the work as specified herein.

Supervisors for maintenance personnel of contractors should be a horticulturist holding a recognized horticultural diploma or degree, or Canadian Certified Horticultural Technician (CCHT) certification.

SEP-28-2006 17:59   FROM-CITY OF WINDSOR Building & Development   519 2557170   T-479  P.021/030  F-289
3

Pesticide handling and application of chemicals as defined by pesticide requirements shall be done only by applicators holding current and applicable class Exterminator Licenses or Technician Certificates under the Ontario Ministry of the Environment.

## Shrubs

Shrubs shall be pruned as necessary to encourage healthy, natural growth patterns for each specific variety. Pruning shall include thinning, shaping, and removing dead or diseased branches. Shrubs which may restrict visibility, such as those immediately adjacent to the travelled portion of the roadway or those within 20 feet of an intersection shall be kept within the height range of 24"-36" as measured from the roadway surface at the nearest curb.

All shrubs shall be pruned back to clear the roadway, curbs, gutters and sidewalks. Shrubs shall not block signs, utilities, utility meters or any other facilities located within the work areas. Shrubs shall not block access to controllers or electric valves and shall be pruned so as to minimize blockage of irrigation head spray patterns.

Shrubs shall be fertilized a minimum of twice per year, once in October and once in April, with a complete fertilizer. Shrub fertilizer shall be of a formulation to keep shrubs in a vigorous and healthy condition.

## Trees

All trees shall be pruned by qualified personnel using horticulturally sound methods and approved techniques. Trees shall be pruned to develop a structurally sound shape and a healthy, natural appearance. No excessive pruning or stubbing back will be allowed. Sucker growth originating at the crown or below shall be removed. Trees shall be fertilized a minimum of twice per year, once in October and once in April, with a complete fertilizer formulated for use on trees. The fertilizer shall be injected into the soil.

Trees knocked down by vehicular accidents or trees and large limbs blown down and blocking traffic lanes shall be immediately reported to the City, which shall have responsibility for cleanup of such trees and large limbs. Any time personal property of a motorist or pedestrian is damaged due to falling trees or limbs, the Owner shall notify the City Police Dept. immediately. Any small branches which fall or are blown from boulevard plantings, causing no damage, shall be removed and disposed of by the Owner.

## Groundcovers

Groundcovers such as ivy, ice plant, etc., shall be kept trimmed behind top of curb lines at all times, kept off of pedestrian walkways and out of gutters, kept out of trees, trimmed to keep all signs, poles, guardrails, and utility meters clear.

Ivy falling from walls shall be trimmed or re-attached to the walls.

In addition to maintenance described elsewhere in these specifications, ivy shall be permitted to grow upon the retaining walls and fences along the east and west side of Huron Church Road.

**Mulch**

Inorganic mulch shall be maintained over all shrub beds at a minimum 8" depth. All replacement mulch shall inorganic, consisting of 1"diameter (min.) to 3" diameter (max.) river wash stone and shall be placed on an approved landscape fabric such that no part of the landscape fabric is visible.

**Watering**

Water shall be supplied by an automatic irrigation system which the Owner shall install and maintain entirely at the expense of the Owner. The Owner shall be responsible for the cost of all water and electricity usage. Automatic controllers shall be programmed for watering prior to 7:00 A.M. or after 10:00 P.M.

Automatic controllers' programs shall be adjusted to compensate for changes in the weather and site conditions. Excessive run-off of water shall be avoided. Water shall not be allowed to pond or create a water-logged soil condition.

Precautions shall be taken to prevent water from wetting pedestrians, vehicles and pavement. Any soil washed onto pavement shall be cleaned up and any eroded areas shall be filled in by the Owner at their expense.

**Irrigation System Maintenance**

The Owner shall be responsible for general maintenance of the irrigation system including piping, wiring, spray heads, electric valves, and automatic controllers. All irrigation parts and materials which are damaged or broken shall be repaired or replaced by the Owner at their own expense.

The irrigation system shall be inspected by the Owner on a weekly basis during the irrigation period. It is the Owner's responsibility to insure that the system is operating correctly and that there is adequate coverage. All spray heads shall be kept cleaned and adjusted to maximize coverage and minimize overspray onto the roadway. Adjustments shall include raising or lowering spray heads to avoid obstructions to the flow of water, and shall be done at the Owner's expense.

All electric valves shall be kept flushed clean of sediment and debris and shall be maintained in proper working order. Valves shall be kept well adjusted to insure efficient operation of the irrigation system. The Owner shall also keep the controllers clean and free of insects and dust, and shall make any necessary repairs or replacements.

SEP-28-2006  17:59   FROM-CITY OF WINDSOR Building & Development   519 2567170          T-479   P.023/030   F-299

5

No modifications may be made to the existing automatic irrigation system without express approval of the Executive Director of Parks. Any changes so approved shall be noted by the Owner on a copy of an Irrigation Plan and submitted to the City within five working days of the completion of the work.

In the event of a drought condition, the City shall have the authority to modify the watering requirements described in these specifications.

**Weed-Control**

All areas within the work sites are to be kept free of weeds and volunteer tree growth. This includes but is not limited to all bare dirt areas and any weed growth within ground cover and shrub plantings. Any and all paved areas are to be kept weed-free at all times; this includes the area that extends two feet from face of curb into the asphalt road surface area. Volunteer tree growth shall also be removed by the Owner.

The Owner shall comply with all rules, regulations, and license requirements of the Ontario Ministry of Health, Ontario Ministry of the Environment, and all other agencies which govern the use of pesticides required in the performance of work specified herein.

All chemical applications are to be made with the Owner's Contractor furnished Written Recommendations. Contractor is to supply City with copy of Recommendations All pesticide materials shall be of the highest quality and brought to the work site in the original manufacturer's containers, clearly labelled with the guaranteed analysis. Spray containers and equipment shall not be emptied or cleaned out at the site. Spray materials shall be non-staining.

Level of weed control shall be at least adequate to eliminate all visible weed, either by herbicide applications, hand-weeding, or alternative methods as approved by the Executive Director of Parks. Any weeds that are removed by hand shall be removed in a manner that leaves the ground surface level. Such weeds shall be disposed of properly.

**Disease/Insect Control**

All landscaped areas shall be maintained free of disease and harmful insects. Insects shall be controlled either by approved chemical pesticides or alternate methods as approved by the Executive Director of Parks.

**Litter and Leaves**

Litter, trash, leaves, and other debris shall be removed from the work site a minimum of once per week or more often as needed to maintain a neat and clean appearance. Organic waste shall be properly disposed of, and litter that is recyclable shall be recycled.

SEP-28-2006  18:00    FROM-CITY OF WINDSOR Building & Development    519 2557170    T-479  P.024/030  F-200

6

**Disposal Fees**

All excess material consisting of cuttings, weeds, and refuse, shall become the responsibility of the Owner to be legally disposed-of.

**Traffic Control**

Traffic control including the use of delineation , barricades, advance warning signs, Traffic Control Personnel, lights, etc., shall comply with the  Ontario Traffic Manual, Book 7. Layout, set-up and take down shall also conform to the guidelines of the Ontario Traffic Manual, Book 7. Any traffic or pedestrian control layout must be approved by the Public Works department (Transportation Division) prior to implementation.

Traffic lanes shall be kept open at all times except when maintenance work may require temporary closing of the lane immediately adjacent to the work area. At no time shall there be less than one traffic lane open.

The Owner shall conduct maintenance operations so as to offer the least possible obstruction to the public.  Whenever the Owner's operations create a condition hazardous to traffic or to the public the Owner shall, at his own expense and without cost to the City, furnish, erect and maintain such barricades, lights, signs, and other devices and take such other precautions as are necessary to prevent damage or accidents or injury to the public and his employees. The Contractor shall also furnish qualified Traffic Control Persons  as  necessary to give adequate warning to traffic or to the public of any dangerous conditions to the public. All flagging costs shall be borne solely by the Owner.

If a hazardous condition is observed and the City notifies the Owner either directly or by telephone, the Owner shall correct the condition immediately. If the Owner fails to correct the hazardous condition immediately, the City reserves the right to install or have installed the necessary lights, barricades, etc., with the owner to bear all costs.

No material or equipment shall be stored on City property. Any materials or equipment brought to the site for use during any one day shall be placed where it will not interfere with the free and safe passage of traffic and pedestrians. Such materials and equipment shall be removed at the end of each day or when maintenance operations are suspended for any reason.

The Owner shall adhere to all Ontario Ministry of Transportation standards and requirements and take all necessary safety precautions to insure that maintenance work does not endanger the health and safety of the public or cause hazards to the safety of the Owner's own employees or contractors.

SEP-28-2006  18:00    FROM-CITY OF WINDSOR Building & Development    519 2557170    T-479  P.025/030  F-299

**Material**

The Owner shall supply entirely at the Owner's own expense all new replacement plants, mulch, and other material as necessary according to the specifications contained herein. All replacements, whether due to disease, pest infestation, vandalism, natural decline, accident or negligence on the part of the Owner's contractor(s) shall be responsibility of the Owner.

All replacements shall be installed in accordance with the *Landscape Standards* manual, 2004 Edition, of the *Landscape Ontario Horticultural Trades Association*.

Fertilizers shall conform to Federal and Provincial Codes and Regulations. Commercial fertilizers shall be complete fertilizers furnishing the required percentages of nitrogen, phosphoric acid, potash, and other necessary micronutrients as needed to keep plants in a healthy and vigorous growing condition.

Any tree stakes, tree ties, and/or guy wires needing replacement shall be replaced by the Owner with new materials as per City standards.

## SITE PLAN CONTROL

Revised November 2, 2005

### General Provisions

**G-1.** The City Planner approves the Owner's proposed development of the subject lands as indicated on Map Number(s) referenced in paragraph B-1(e) herein and Schedule(s) attached hereto as indicated.

**G-2.** The Owner agrees to provide and maintain for the life of this development, at the Owner's entire expense all buildings, landscaping, parking and access areas in accordance with the Schedule referenced in paragraph B-1(e) herein.

**G-3.** **Landscaping Plan**

(1) The Owner further agrees to submit a landscaping plan to the Chief Building Official for his approval, *prior to the issuance of a construction permit*. The said landscaping plan shall provide for landscaping of the subject lands, in the areas shown on Schedule referenced in paragraph B-1(e) herein to a standard which meets or exceeds the minimum requirements described in the Corporation's Manual of Landscaping Requirements.

(2) The Owner further agrees to retain the services of a landscape architect registered with the Ontario Association of Landscape Architects for the preparation of the landscape plan and the implementation of all features included on the landscape plan approved by the Chief Building Official.

(3) The Owner further agrees to preserve those existing trees on the subject lands and/or adjacent public right-of-way on the approved landscaping plan and include preservation guidelines on the approved landscaping plan for the protection of the said trees during demolition and for construction of the proposed development all to the satisfaction of the Chief Building Official.

(4) The Owner further agrees to install and maintain all landscaping features in accordance with the approved landscaping plan and in a manner satisfactory to the Chief Building Official.

**G-4.** **Storm Detention Scheme**

(1) *Prior to the issuance of a construction permit*, if required by the City Engineer, the Owner further agrees to retain a consulting engineer for the design and preparation of drawings satisfactory to the City Engineer and the Chief Building Official for an internal storm water detention scheme to service the subject lands. The purpose of the said storm water detention scheme will be to ensure that storm drainage being directed to the Corporation's storm, combined sewer or ditch, from the subject lands in their improved state

SEP-28-2006  18:01    FROM-CITY OF WINDSOR Building & Development    519 2557170         T-479  P.027/030  F-299

- 2 -

shall be restricted to no greater than the present flow from the subject lands.

(2)    Upon approval of the drawings by the City Engineer and the Chief Building Official, the Owner further agrees to construct at the Owner's entire expense the said storm detention scheme in accordance with the approved drawings and to the satisfaction of the Chief Building Official.

**G-5.**    **Curbing** - The Owner further agrees to provide curbing on the subject lands in accordance with the Corporation's Zoning By-law (Parking Area Requirements) and to the satisfaction of the Chief Building Official.

**G-6.**    **Fencing**- The Owner further agrees to provide and maintain a screening fence as shown on the Schedule referenced in paragraph B-1(e) herein, in accordance with the Corporation's Zoning By-law, and in a manner satisfactory to the Chief Building Official.

**G-7.**    **Lighting**

(1)    The Owner further agrees to provide, *prior to the issuance of a construction permit,* a photometric plan and lighting product specifications, prepared by a qualified lighting consultant in accordance with CR228/2005 to the satisfaction of the Chief Building Official.

(2)    The Owner further agrees to install and maintain all lighting in accordance with the approved exterior lighting design and in a manner satisfactory to the Chief Building Official. All lighting of the site shall be oriented and its intensity controlled so as to prevent glare on adjacent roadways and residential properties to the satisfaction of the Chief Building Official.

**G-8.**    **Refuse Facilities** - The Owner further agrees to provide appropriate on-site facilities and containers for refuse and recycling collection.  Such facilities shall be screened from view in accordance with the requirements of the Corporation's Zoning By-Law and Fire Code (O. Reg. 388/97), if located outside of a building. In the event municipal collection is requested, the Owner, through consultation with the Manager of Environmental Services, further agrees to locate and design all refuse and recycling storage facilities to the satisfaction of the Manager of Environmental Services.

**G-9.**    **Sampling Manhole** – The Owner further agrees that for all non-residential uses, to install a sampling manhole accessible to the City Engineer at all times.  The determination of the requirement or interpretation if a sampling manhole exists or exceptions to such, will be to the satisfaction of the City Engineer.

- 3 -

**G-10.**     **Signs**

(1)     The Owner acknowledges that all signs proposed to be erected or placed on the subject lands are subject to the provisions of the Corporation's Sign By-Law, as may be amended.

(2)     *Prior to the issuance of a construction permit*, the Owner further agrees to provide on site traffic signage and pavement markings plan to the satisfaction of the Executive Director- Public Works, Operation.

**G-11.**     **Firefighting Equipment** - The Owner further agrees to provide a water supply and fire hydrant, fire access routes, and other facilities (for firefighting purposes), if required by the Building Code (O. Reg. 403/97), and at a minimum in accordance with Insurance Service Office Guidelines and Tables, to the satisfaction of the Fire Chief and the Chief Building Official.

**G-12.**     **Dirt and Debris** - The Owner further agrees to keep the public highways adjacent to the subject lands free from dirt and debris caused by the construction on the subject lands. The Owner further agrees that, within twenty-four (24) hours of being notified by the Corporation, to clean-up the streets adjacent to the subject lands and/or take dust control measures at the Owner's entire expense, failing which, the Corporation may carry out or cause to have carried out the said work at the entire expense of the Owner.

**G-13.**     **Repair of Highway** - The Owner further agrees that any curbs, gutters, pavements, sidewalks, or landscaped areas on the public highway which are damaged during construction on the subject lands shall be restored by the Owner at the Owner's entire expense, and to the satisfaction of the City Engineer.  Any driveway approaches which become redundant following the development of the subject lands shall be closed and this area restored to the satisfaction of the City Engineer.

**G-14.**     **Driveway Approaches** - The Owner further agrees:

(1)     To construct driveway approaches in such width and location as shown on Schedule referenced in paragraph B-1(e) herein, and approved by the City Engineer;

(2)     To provide straight flare driveway approaches and to terminate the raised curbs at the property line, to the satisfaction of the City Engineer.  Raised curbs shall not extend into the driveway approaches, outside the subject lands.

- 4 -

**G-15.** **Street Opening Permits** - The Owner further agrees to obtain street opening permits for sewer taps, drain taps, curb cuts and driveway approaches from the City Engineer, prior to the commencement of any construction on the public highway.

**G-16.** **Development Charges** - The Owner further agrees to pay the appropriate development charges in accordance with the Corporation's Development Charges By-law.

**G-17.** **Parkland Conveyance** - The Owner further agrees to gratuitously convey to the Corporation, in fee simple and without encumbrance, *prior to the issuance of any construction permits*, lands for park purposes to the satisfaction of the City Planner and the Executive Director of Parks, pursuant to Section 42 of the Planning Act, R.S.O. 1990, C.P. 13.

**G-18.** **Lot Grading Plan** - The Owner further agrees to submit to the satisfaction of the Chief Building Official, the City Engineer, and Essex Region Conservation Authority (ERCA) in regulated areas throughout, a lot grading plan covering the subject lands for their approval *prior to the issuance of any construction permit* for the subject lands. The Owner also agrees to have the approved elevation as per this lot grading plan verified by an Ontario Land Surveyor at the following stages of construction:

       (a)   Prior to the pouring of footings (top of forms elevation); and

       (b)   Following completion of construction.

Where the finished grade of the subject lands deviates from the original lot grading plan presented to and accepted by the Chief Building Official and City Engineer, and ERCA in regulated areas throughout, the Owner shall either submit a new lot grading plan to the satisfaction of the said Chief Building Official, City Engineer and ERCA or regrade the lands to the elevations indicated on the original lot grading plan.

**G-19.** **Commencement Date** - The Owner further agrees to commence construction of the required buildings, parking, access areas, landscaping areas and all other required facilities as set out in this Agreement on or before the Commencement Date referenced in paragraph B-1(h) herein or this Agreement shall be considered null and void.

**G-20.** **Completion Date** - The Owner further covenants and agrees that all the buildings, parking, access areas, fencing, landscaping areas and all other required facilities required by this Agreement shall be completed on or before **one (1) year** after the Chief Building Official has issued a construction permit for the said development or subject to any further

- 5 -

extension as may be approved by the City Planner.

G-21.        The Owner further agrees that in the event the Owner fails to comply in due course with the requirements of paragraph G-20 herein, the Corporation, its agents, servants, workmen and employees may enter upon the subject lands if necessary, and carry out the said works referred to in paragraph G-20 herein; the costs of which shall be recovered by the Corporation out of the Performance Bond referred to in paragraph S-1 herein, and any additional costs incurred by the Corporation in excess of the said Performance Bond referred to in paragraph S-1 herein, shall constitute a debt owing by the Owner to the Corporation and may add such costs to the tax roll and collect them in the same manner as taxes.

G-22.        It is further agreed that notwithstanding any other terms and conditions of this Agreement Schedule "B" shall be used in interpreting whether there is compliance or non-compliance with the terms of this Agreement.

G-23.        This Agreement and everything contained herein shall enure to the benefit of and be binding upon the Parties hereto and their respective heirs, administrators, executors, successors and assigns.

G-24.        The City Engineer, the Chief Building Official, the City Planner, the Fire Chief, the City Solicitor, the Manager of Environmental Services, Landscape Architect and Executive Director –Public Works, Operation, which may be set out in this Agreement, are those of the Corporation.

G-25.        It is further agreed this Agreement may be registered against the subject lands described herein.

G-26.        **Removal of Snow** - The Owner further agrees to remove snow from access ramps and driveway, parking and loading areas and walkways, within twenty-four (24) hours of snowfall.