Case Name:

# Bank of Montreal v. Dresler

Between
Heinz Freyn (defendant), appellant, and
Bank of Montreal (plaintiff), respondent, and
Reinhold L. Dresler and Gunter Dresler (defendants),
respondents

[2002] N.B.J. No. 324
2002 NBCA 69
No. 26/02/CA

**New Brunswick Court of Appeal**
Larlee, Deschênes and Robertson JJ.A.

Heard: May 21, 2002.
Judgment: October 3, 2002.
(98 paras.)

THE COURT: The appeal is allowed, the order of the Motions Judge is set aside and the respondent's motion is dismissed with costs of $2,500 to the appellant.

Appeal from judgment of the New Brunswick Court of Queen's Bench, Garnett J., January 23, 2002.

**Counsel:**

Edwin G. Ehrhardt, Q.C., for the appellant.
John D. Townsend, Q.C., for the respondent Bank of Montreal.
Max W. Richardson, for the respondents Reinhold L. Dresler and Gunter Dresler.

Reasons for judgment by: Robertson J.A. Concurred in by: Larlee and Deschênes JJ.A.

**ROBERTSON J.A.:**—

I. INTRODUCTION

¶ 1   The generic facts underscoring this appeal are not complicated. During the course of litigation, the plaintiff's lawyer "transfers" to the defendant's law firm. No one disputes that the transferring lawyer possesses confidential information that, if disclosed, would prejudice the plaintiff's case. As the duty of confidentiality survives the professional relationship, the transferring lawyer is automatically disqualified from acting for either party. What remains problematic is whether a disqualification order should issue against the transferring lawyer's new law firm. That issue is tied to the inference that lawyers working together share confidences. But it is a rebuttable inference and, thus, if it can be shown that the new law firm adopted effective and timely screening mechanisms, commonly referred to as Chinese walls and cones of silence, disqualification may be avoided. Such institutional mechanisms are designed to prevent inadvertent disclosure of client confidences. Only a conscience informed by

professional standards of conduct and a sense of personal integrity can safeguard against deliberate disclosure.

¶ 2   The test for evaluating the sufficiency of these institutional mechanisms was formulated in two ways in MacDonald Estate v. Martin, [1990] 3 S.C.R. 1235, commonly indexed as Martin v. Grey. The first is whether the public, represented by the reasonably informed person, would be satisfied that no use of confidential information would -occur. The second asks whether all reasonable measures have been taken to rebut the "strong inference of disclosure". A third formulation is found in the Law Society of New Brunswick's "Rules Respecting Conflicts Arising As A Result of Transfer Between Law Firms". Those rules permit the new law firm's continuing representation of its current client if two conditions precedent are satisfied:

> (1) it is in the interests of justice; and (2) all reasonable measures have been taken to guard against inadvertent disclosure. As well, the Law Society's rules are supplemented by twelve guidelines. The latter are a mirror image of those promoted by the Federation of Law Societies. Equally relevant is the 1993 Report prepared by the Canadian Bar Association Task Force: "Conflict of Interest Disqualification: Martin v. Grey and Screening Methods". That Report remains, in my view, the most comprehensive Canadian work on the disqualification issue: see also K. Lysyk & L. Sossin, Barristers & Solicitors In Practice, looseleaf (Markham, Ont.: Butterworths, 1998) c. 10 by Simon Chester.

¶ 3   In the present case, the Motions Judge disqualified the law firm that had been representing the defendant, Heinz Freyn, for two reasons: (1) failing to comply with one of the Law Society's guidelines; and (2) the "assurances" given against disclosure of confidential information were "insufficient". With leave of this Court, Mr. Freyn, appeals the issuance of the disqualification order. This is a case of first impression. It requires the development of an analytical framework that recognizes both the courts' supervisory jurisdiction in legal proceedings and the relevance of professional standards of conduct when ruling on disqualification motions. Eventually, I shall outline the screening mechanisms adopted in this case and, as well, the Motions Judge's reasons for issuing the disqualification order. For the moment, only a brief recitation of the essential facts is required.

II. FACTUAL INTRODUCTION

¶ 4   The plaintiff, the Bank of Montreal, has been represented in the underlying action by Allen Dixon Bell, later known as Allen Dixon, and currently known as Allen Dixon Smith Townsend (hereafter "Allen Dixon"). That firm is situate in Fredericton. The defendant Freyn had been represented by McInnes Cooper, an Atlantic law firm with offices in Fredericton. The remaining defendants expressed no interest in the disqualification motion.

¶ 5   Until May 2000, Ann Marie McDonald was an associate with Allen Dixon and the lawyer with carriage of the Bank's action against the three defendants. They are sued for failing to pay on a promissory note and defend on the basis that it was extracted under duress and unsupported by consideration. Ms. McDonald acted for the Bank from the fall of 1999 until April 2000 when she moved to the McInnes Cooper firm. By that date the litigation had advanced no further than an exchange of pleadings. Ms. McDonald acknowledges that she drafted the statement of claim and had corresponded with the two lawyers at McInnes Cooper, David Duncan Young and Patrick Windle, who represented the defendant Freyn until the disqualification ruling.

¶ 6   Prior to Ms. McDonald's transfer to McInnes Cooper, potential conflicts were identified,

including the one in issue. The conflict was discussed with Allen Dixon and it was agreed that that law firm would retain the Bank as client. [Presumably after consultation with the Bank.] Once Ms. McDonald left Allen Dixon the Bank's file was entrusted to Patrick Hurley. From May to November 2000, Mr. Hurley and Mr. Windle advanced the litigation to the point where affidavits of documents were exchanged and an examination for discovery scheduled for March 2001. On February 23, ten months after the conflict arose, Mr. Townsend, of Allen Dixon, wrote to Mr. Windle to the effect that Mr. Townsend had assumed responsibility for the file and the Bank objected to McInnes Cooper's continuing representation of the defendant Freyn because of the conflict generated by Ms. McDonald's transfer to that firm.

III. THE COMMON LAW FRAMEWORK

¶ 7    Stare decisis dictates that the issue of law firm disqualification focus on the Supreme Court's decision in MacDonald Estate v. Martin. The facts of that case are as uncomplicated as those before this Court. A junior lawyer working on a litigation file on behalf of a defendant moves to a law firm with no involvement in the litigation. Eventually, the junior lawyer's new law firm merges with the firm acting for the plaintiff. The defendant now moves to disqualify the plaintiff's chosen law firm and succeeds at trial and in the Supreme Court.

¶ 8    Writing for the majority, Justice Sopinka observed that there are three competing values that inform the formulation of the test for evaluating disqualification applications: (1) a concern to maintain the high standards of the legal profession and the integrity of the justice system; (2) the countervailing value that a litigant should not be deprived of his or her choice of counsel without good cause; and (3) the desirability of permitting reasonable mobility in the legal profession. The seven justices of the Supreme Court hearing the appeal were unanimous that the proper test to be applied is whether the public, represented by the reasonably informed person, would be satisfied that no use of confidential information would occur. As Justice Sopinka observed, at 1260: "That, in my opinion, is the overriding policy that applies and must inform the court in answering the question: Is there a disqualifying conflict of interest?" The answer to that question was held to involve two further questions. Did the transferring lawyer receive confidential information attributable to a solicitor-client relationship relevant to the matter at hand? If so, is there a risk that the confidential information will be disclosed?

¶ 9    On the first question, Justice Sopinka rejected, as "too rigid", the American test which dictates that if there is a "substantial relationship" between the matter out of which the confidential information arises and the matter at hand, there is an irrebuttable presumption that confidential information was imparted to the lawyer. Rather, he held that once the former client demonstrates that a previous relationship existed which is sufficiently related to the retainer held by the new law firm, there is an inference that confidential information was imparted and also that its disclosure would be prejudicial to the former client. It falls on the new law firm to rebut that inference without revealing the specifics of the privileged communication. A burden that Justice Sopinka described as "difficult" to discharge.

¶ 10    Justice Sopinka reaffirmed the proposition that a transferring lawyer, in possession of relevant confidential information, cannot act for either party in the same matter. Disqualification is automatic. Despite personal disqualification, what remains problematic is the public perception that the transferring lawyer might share client confidences with the new law firm. This gives rise to the second question: is there a risk that confidential information will be disclosed?

¶ 11    Accepting that there is a strong inference that lawyers who work together share confidences, Justice Sopinka held that the inference prevails in the absence of: "clear and convincing evidence that all reasonable measures have been taken to ensure that no disclosure will occur by the 'tainted' lawyer to the member or members of the firm who are engaged against the former client". Justice Sopinka opined that

reasonable measures could include institutional mechanisms such as Chinese walls and cones of silence. Acknowledging that these concepts were not familiar to Canadian courts, he invited the Canadian Bar Association to take the lead in determining whether institutional devices are available that would satisfy the need to maintain public confidence in the integrity of the legal profession. In the absence of such screening mechanisms being adopted by governing bodies, Justice Sopinka did not foresee courts accepting such devices, except in exceptional circumstances.

¶ 12    On the facts, Justice Sopinka held that the transferring lawyer was in receipt of confidential information. As to the risk of disclosure, the only evidence to rebut the inference of shared confidences was contained in affidavits. Those affidavits deposed that there had been no discussion of the file as between the transferring lawyer and members of the firm working on the tainted file. The lawyers also provided undertakings that disclosure would not occur in future. The Supreme Court held that evidence insufficient as it did not establish that all reasonable measures had been taken to rebut the "strong" inference that lawyers working together share confidences. At page 1263 Justice Sopinka held:

> A fortiori undertakings and conclusionary statements in affidavits without more are not acceptable. These can be expected in every case of this kind that comes before the court.

¶ 13    Justice Sopinka observed, that without additional guarantees, it was unlikely that the public would be satisfied that there would be no disclosure of confidential information.

¶ 14    The minority opinion, authored by Justice Cory, held that in cases where a lawyer in possession of confidential information joins a firm acting against the interests of his or her former client, there should be an irrebuttable presumption that lawyers working together share each other's confidences. In short, the minority held that there is no room in the law for screening devices. Disqualification should be automatic.

IV. THE DEVELOPMENT OF PROFESSIONAL STANDARDS OF CONDUCT

¶ 15    In response to Justice Sopinka's invitation, the Canadian Bar Association established a Task Force, in January 1991, to study the issues raised in MacDonald Estate v. Martin. In October of that year, a draft discussion paper was released.

¶ 16    In May 1992, the Federation of Law Societies established a committee to address the issues raised by the Supreme Court. In 1992, that committee produced a draft "Model Rule" to deal with conflict issues identified in the Supreme Court decision. In the interim, the Task Force continued with its work.

¶ 17    The Task Force published its final Report in 1993. It acknowledged that no matter how sturdy or high the screen, nothing can prevent deliberate disclosure. Yet on policy grounds, it decided in favour of screening mechanisms as a means of rebutting the inference that lawyers working together share confidences. The Task Force commented on the Federation's proposed Model Rule and, as well, offered 13 guidelines that would inform decisions relating to the hiring of another firm's lawyers; the wisdom of adopting screening mechanisms and evaluating their effectiveness. In my opinion, the Task Force's Report is mandatory reading for counsel intent on pursuing a disqualification motion and those who must respond to it.

¶ 18    The Task Force agreed with the Supreme Court that the values identified could not be accorded equal weight. The paramount concern is "maintaining the high standards of the legal profession and the

integrity of our system of justice". The standards referred to include the duties of client confidentiality and loyalty. With respect to maintaining the integrity of our justice system, the Task Force reasoned that this interest encompasses two separate goals: justice must be done (vis à vis the former client) and justice must be seen to be done (vis à vis the public). In this vein, it reasoned that to survive judicial scrutiny a screen must be unimpeachable in two respects: its components and its implementation. These are all matters that the Task Force addressed when formulating its guidelines. For the most part those guidelines are directed at creating cones of silence and Chinese walls. Cones of silence are the personal assurances given by the transferring lawyer and members of the new law firm working on the tainted file that no disclosure of confidential information has taken place and undertakings that none will occur. Chinese walls seek to physically segregate the transferring lawyer from those working on the tainted file, including support staff. The objective is to ensure that they work independently of one another, thereby eliminating or reducing the risk of inadvertent disclosure of confidential information.

¶ 19    In addition to formulating guidelines, the Task Force identified several factors that influence a firm's ability to erect an effective screen. Specifically, the Task Force identified four factors relating to the viability of the screen and three tied to the nature and quality of information for which screening is required. Some of those factors are discussed below.

¶ 20    In February 1994, the Federation promulgated its "Model Rule" together with guidelines. Though there are striking similarities between the Federation's and Task Force's guidelines, I was able to isolate three substantive differences. As well, the Federation did not specifically deal with factors that touch on the viability of a screen, nor on the nature and quality of the confidential information possessed.

¶ 21    Finally, in 1998 the Law Society of New Brunswick adopted, with some modifications, the Federation's Model Rule. With respect to guidelines, the Law Society plagiarized those offered by the Federation. As to the Law Society's conflict rules, only Rules 4 and 8 are relevant to this appeal. They read as follows:

> 4    If the transferring member actually possesses confidential information relevant to a matter referred to in paragraph 2(a) respecting the former client that may prejudice the former client if disclosed to a member of the new law firm the new law firm must cease its representation of its client in that matter unless:
>
>> (a)    the former client consents to the new law firm's continued representation of its client, or
>> (b)    the new law firm establishes, in accordance with section 8, that:
>>
>>> (i) it is in the interests of justice that its representation of its client in the matter continue, having regard to all relevant circumstances, including:
>>>
>>>> a) the adequacy of the measures taken under subparagraph (ii),
>>>> b) the extent of prejudice of any party,
>>>> c) the good faith of the parties,
>>>> d) the availability of alternative suitable counsel, and
>>>> e) issues affecting the national or public interest, and
>>>
>>> (ii) it has taken reasonable measures to ensure that there will be no disclosure of the former client's confidential information to any member of the new law firm.

...

    8   Anyone who has an interest in, or who represents a party in, a matter referred to in these Rules may apply to a court of competent jurisdiction for a determination of any aspect of these rules.

¶ 22   In summary, Rule 4(a) provides that if the transferring lawyer possesses confidential information, the new law firm is disqualified unless one of two conditions precedent is satisfied. One option is to have the former client consent to the new firm's continuing representation of the opposing party. The other option is to establish, in accordance with Rule 8, two criteria: (1) it is in the "interests of justice" that the new firm's representation of its client should continue; and (2) the new law firm has taken reasonable measures to ensure that no disclosure of confidential information will occur. With respect to the first criterion, all relevant circumstances are to be examined including those expressly set out in Rule 4(b)(i). The factors outlined in clauses (A) to (D) are covered below. Clause (E) addresses the concerns of government lawyers respecting issues of national security. Rule 8 provides that any interested person may apply to a court of competent jurisdiction for a determination of any aspect of the rules.

¶ 23   In truth, the Law Society's conflict rules lack specificity and, thus, are of little assistance when determining whether a disqualification order should issue. This is not so when attention focuses on the Law Society's guidelines.

    GUIDELINES

1. The screened member should have no involvement in the new law firm's representation of its client.
2. The screened member should not discuss the current matter or any information relating to the representation of the former client (the two may be identical) with anyone else in the new law firm.
3. No member of the new law firm should discuss the current matter or the prior representation with the screened member.
4. The current client matter should be discussed only within the limited group that is working on the matter.
5. The files of the current client, including computer files, should be physically segregated from the new law firm's regular filing system, specifically identified, and accessible only to those lawyers and support staff in the new law firm who are working on the matter or who require access for other specifically identified and approved reasons.
6. No member of the new law firm should show the screened member any documents relating to the current representation.
7. The measures taken by the new law firm to screen the transferring member should be stated in a written policy explained to all lawyers and support staff within the firm, supported by an admonition that violation of the policy will result in sanctions, up to and including dismissal.
8. Affidavits should be provided by the appropriate firm members, setting out that they have adhered to and will continue to adhere to all elements of the screen.
9. The former client, or if the former client is represented in that matter by a member, that member, should be advised:

    a) that the screened member is now with the new law firm, which represents the

        current client, and
- b) of the measures adopted by the new law firm to ensure that there will be no disclosure of confidential information.

10. The screened member should not participate in the fees generated by the current client matter.
11. The screened member's office or work station should be located away from the offices or work stations of those working on the matter.
12. The screened member should use associates and support staff different from those working on the current client matter.

¶ 24  As noted earlier, the above guidelines are a mirror image of those circulated by the Federation of Law Societies. In turn, those guidelines follow closely those crafted by the Canadian Bar's Task Force. I was able to identify three substantive differences.

¶ 25  First, the Task Force Report offers a thirteenth guideline. It requires that "every effort" be made to obtain the former client's informed consent to the new firm's continuing representation of the opposing party. This guideline suggests that the former client's consent should be sought as a matter of course. By contrast, the Law Society guidelines speak in terms of an option to obtain consent or of establishing that an effective screen has been erected. However, little may turn on this distinction. All three professional bodies agree that the former client should be advised of the conflict of interest and of the screening measures taken to prevent the inadvertent disclosure of confidential information. If there is to be compliance with Guideline 9, this is a convenient opportunity to seek the former client's consent. Even if consent is not expressly requested, disclosure of the conflict has the advantage of putting the former client on notice: see discussion infra para. 61.

¶ 26  The second difference between the two sets of guidelines is tied to Guideline 9, reproduced above. It speaks only of the transferring lawyer's former client being informed of the transfer and of the measures adopted by the new law firm to guard against inadvertent disclosure. The Task Force guideline requires that the new firm's current client also receive the same information.

¶ 27  Finally, the Task Force did not deal with the matter set out in Guideline 10 reproduced above. That guideline dictates that the transferring lawyer should not participate in the fees generated by the current client matter.

V. THE REMAINING FACTUAL CONTEXT - THE SCREEN

¶ 28  Having outlined the ambit and scope of the Law Society's rules and guidelines, I turn to the measures adopted by McInnes Cooper.

¶ 29  Prior to commencing her new employment, Ms. McDonald agreed to abide by the "Confidentiality Policy on Lateral Hires" that McInnes Cooper had earlier adopted. That policy incorporated the Law Society's guidelines respecting conflicts arising as a result of a transfer between law firms. The essential aspects of that policy warrant replication:

    CONFIDENTIALITY POLICY ON LATERAL HIRES

1. The purpose of this policy is to ensure that McInnes Cooper complies with Chapter 6A of Legal Ethics and Professional Conduct, a Handbook for Lawyers in Nova Scotia and the Rules Respecting Conflicts Arising as a result of transfer