Get a Document - by Citation - 440 F. Supp. 193                     Page 1 of 29

Service: **Get by LEXSEE®**
Citation: **440 f supp 193**

*440 F. Supp. 193, \*; 1976 U.S. Dist. LEXIS 13805, \*\**

CITY OF CLEVELAND, Plaintiff v. THE CLEVELAND ELECTRIC ILLUMINATING COMPANY, et al.,
Defendants

Civil Action No. C75-560

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN
DIVISION

440 F. Supp. 193; 1976 U.S. Dist. LEXIS 13805

August 3, 1976

**SUBSEQUENT HISTORY: [\*\*1]**

Affirmed December 12, 1977.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff filed a motion to disqualify defendants' legal firm for conflict of interests with plaintiff resulting from an action by plaintiff against defendants for violations of the Sherman Act, 15 U.S.C.S. § 1, 2.

**OVERVIEW:** Plaintiff sued defendants. Plaintiff filed a motion to disqualify defendants' legal firm and charged that a conflict of interest had arisen due to earlier legal retainers between plaintiff and the law firm. Plaintiff had previously retained the law firm to handle its municipal bond issues. On review, the court held that estoppel and waiver barred plaintiff's claims because plaintiff had full knowledge of the scope and depth of the law firm's representation of defendants when it retained the law firm to work on its bond issues. Further, the court held that when there was proof of a former attorney client relationship concerning substantially related matters, the presumption that confidences were disclosed was rebuttable. Moreover, with the specialization of legal fields, knowledge could not be imputed to other firm members unless they practiced in that specialized area. Therefore, the court denied plaintiff's motion to disqualify defendants' counsel.

**OUTCOME:** The court denied plaintiff's motion to disqualify defendants' legal representation because plaintiff was fully aware of the depth and scope of the law firm's representation of defendants when it hired the firm, and was estopped from asserting that a conflict of interest existed between the law firm and plaintiff.

**CORE TERMS:** disqualification, law firm, confidence, ordinance, partner, antitrust, ethical, attorney-client, disclosure, substantial relationship, secret, conflict of interest, legal counsel, retainer, largest, Law Department, Law Director, public law, confidential, consultation, memorandum, withdraw, presumed, issuance, confidential information, bond issue, estoppel, differing, legality, electric

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Counsel > General Overview 🔳

*HN1* ⬆ Issues of disqualification of counsel for conflicts arising as a result of former

representation present the acutely sensitive dilemma of protecting the confidentiality of the client-attorney relationship without needlessly interfering with a litigant's freedom to proceed with legal counsel of choice. An equitable balance of these competing interests is essential if the public's trust in the integrity of the Bar is to be preserved. Assignment of this delicate factual and policy-making decision is delegated with increasing exclusivity to the district court. More Like This Headnote |
*Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN2* The district court bears the responsibility for the supervision of the members of its bar. The dispatch of this duty is discretionary in nature and the finding of the district court will be upset only upon a showing that an abuse of discretion has taken place. More Like This Headnote | *Shepardize:* Restrict By Headnote

Criminal Law & Procedure > Counsel > Right to Counsel > General Overview

Evidence > Judicial Notice > Adjudicative Facts > Verifiable Facts

Legal Ethics > General Overview

*HN3* In approaching the issues of disqualification, the court must be mindful of its paramount obligation of maintaining the highest standards of professional conduct and the scrupulous administration of justice. This obligation stands in contrast to the secondary consideration of ensuring the right of the public to legal counsel of its own choice. Ethical problems, however, cannot be resolved in the abstract. Rather the court must rely upon a thorough consideration of the facts. Nor can judges exclude from their minds realities of which fair decision could call for judicial notice. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview

Governments > Courts > Judicial Precedents

*HN4* When dealing with ethical principles it is apparent that a court cannot paint with broad strokes. The lines are fine and must be so marked. Guide-posts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent. More Like This Headnote

Governments > Courts > Rule Application & Interpretation

*HN5* Rules appropriate in guiding lawyers of several decades ago must be applied in light of current realities. More Like This Headnote

Contracts Law > Defenses > Equitable Estoppel > General Overview

*HN6* Equitable estoppel or estoppel in pais is the principal by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right

to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed.  More Like This Headnote

Contracts Law > Defenses > Equitable Estoppel > General Overview

*HN7* Equitable estoppel is a rule of justice that in its proper field prevails over all other rules.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Appeals > Dismissals of Appeals > Involuntary Dismissals

Contracts Law > Defenses > Equitable Estoppel > General Overview

Governments > Local Governments > Claims By & Against

*HN8* While the doctrine of estoppel is sparingly invoked against municipal corporations, there is no doubt that a municipality can be estopped to prevent a manifest injustice, where positive action or representation by the municipal corporation, acting within the scope of its authority, has induced another to act in good faith, and it would be inequitable to permit the retraction of such acts. The application of the estoppel doctrine to attorney disqualification proceedings has been recognized.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Defenses > Equitable Estoppel > General Overview

*HN9* Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation

Criminal Law & Procedure > Counsel > Right to Counsel > General Overview

Governments > Courts > Judges

*HN10* A client's right to object to an attorney's allegedly adverse representation may be waived.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Contracts Law > Defenses > Equitable Estoppel > General Overview

*HN11* Waiver and estoppel are legal terms which are frequently used interchangeably. Although the legal consequences of each are often the same, the requisite elements are different. Waiver refers to the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor. On the other hand, estoppel is any conduct, express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law. It is grounded not on subjective intent but rather on the objective

impression created by the actor's conduct. It is in the area of implied waiver that the two doctrines are closely akin. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview 🔳

Legal Ethics > Client Relations > Appearance of Impropriety 🔳

*HN12*⬇ Model Code of Professional Responsibility Canon 9 should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules. More Like This Headnote | *Shepardize:* Restrict By Headnote

Legal Ethics > Client Relations > Confidentiality of Information 🔳

*HN13*⬇ See Model Code of Professional Responsibility DR 4-101. *Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview 🔳

*HN14*⬇ Disqualification should be ordered where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview 🔳

Evidence > Procedural Considerations > Burdens of Proof > General Overview 🔳

*HN15*⬇ Since the party moving for an order of disqualification of an opponent's counsel charging alleged conflict of interest must overcome the burden imposed by several interrelated evidentiary hurdles, the party is thus required to prove that: (1) A past attorney-client relationship existed between the party and the attorney that was adverse to attorney's concurrent and subsequent representation of another party; (2) The subject matter of those relationships was/is substantially related; and (3) The attorney acquired knowledge of confidential information from or concerning party bringing the motion. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview 🔳

Legal Ethics > Client Relations > General Overview 🔳

*HN16*⬇ Once the existence of an attorney-client relationship is acknowledged, the court must affirmatively find it to have been an adversary relationship. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview 🔳

Legal Ethics > Client Relations > Accepting Representation 🔳

Legal Ethics > Client Relations > Conflicts of Interest 🔳

*HN17*⬇ See Model Code of Professional Responsibility EC 5-15. *Shepardize:* Restrict By Headnote

Legal Ethics > Client Relations > Conflicts of Interest 🔳

*HN18* See Model Code of Professional Responsibility EC 5-19. *Shepardize: Restrict By Headnote*

Civil Procedure > Counsel > General Overview 📑

Legal Ethics > Client Relations > Conflicts of Interest 📑

*HN19* Representations are sufficiently adverse to warrant a disqualification when, on behalf of one client, it is the attorney's duty to contend for that which duty to another client requires him to oppose. More Like This Headnote

Civil Procedure > Counsel > General Overview 📑

Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion 📑

*HN20* In the event that a party carries its burden of proof by initially demonstrating the requisite adversity between the two representations, it is confronted next with the burden of affirmatively showing, as the second element of the test, that the former attorney-client relationship involved matters substantially related to the latter. Absent such affirmative showing, it is axiomatic that no ethical problem results. In confronting the conflicts issue, this element is not one whose dimensions are delineated with mathematical precision. Disqualification is ordered only under circumstances where the relationship between subsequent and former representations is "patently clear." More Like This Headnote | *Shepardize: Restrict By Headnote*

Civil Procedure > Counsel > General Overview 📑

Legal Ethics > Client Relations > Confidentiality of Information 📑

*HN21* The general rule in disqualification cases has been that, upon proof of a former attorney-client relationship concerning substantially related matters, disclosure of confidences is presumed. The United States District Court for the Northern District of Ohio, Eastern Division concludes that equity demands, and the pragmatics of emerging specialization inherent in contemporary legal practice dictates, that this presumption be rebuttable. More Like This Headnote | *Shepardize: Restrict By Headnote*

Civil Procedure > Counsel > General Overview 📑

Governments > Courts > Judicial Precedents 📑

Legal Ethics > Client Relations > Conflicts of Interest 📑

*HN22* In instances where courts have found disclosure of information by the client to one member of a law firm, such knowledge has traditionally been imputed to all members of his firm. It should, however, be noted that recent prevailing legal precedent has rejected the harsh, hard-line approach of irrebuttably imputing confidential disclosures, actual or presumed, received by one member of a law firm to all members of that law firm in favor of the more realistically equitable logic, attuned to contemporary legal practices common to emerging law firms of substantial size. More Like This Headnote | *Shepardize: Restrict By Headnote*

Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Fiduciary Responsibilities > General Overview 📑

Civil Procedure > Parties > Self-Representation > General Overview ⓘ

Civil Procedure > Counsel > General Overview ⓘ

*HN23* Only where an attorney himself represented a client in matters substantially related to those embraced by a subsequent case he wishes to bring against the former client, is he irrebuttably presumed to have benefitted from confidential information relevant to the current case. In such limited situations there is no necessity to demonstrate actual exposure to specific confidences which would benefit the present client. But, in a case where the attorney may be vicariously disqualified (as by virtue of his former membership in a law partnership), the inference is treated as rebuttable. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Counsel > General Overview ⓘ

Criminal Law & Procedure > Counsel > Right to Counsel > General Overview ⓘ

Legal Ethics > Client Relations > Conflicts of Interest ⓘ

*HN24* The doctrine of vertical responsibility is relevant to the private sector of legal practice in view of the increasing numbers of law firms that equal the size of many legal subdivisions of government. Imputing to an attorney in the private practice all confidential information obtained, or presumed to have been obtained, by other members of his law firm may severely limit the scope of the private attorney's future career and the effective operation of his firm, as well as the individual's right to legal counsel of choice. The rule in the private practice of law should therefore limit the imputation of confidential disclosures to only those lawyers practicing in the attorney's area of concentration. Absent direct proof to the contrary, the attorney would not be deemed to have shared confidential information relating to matters and services exclusively within the sphere of representation of another department or section of his firm. More Like This Headnote | *Shepardize:* Restrict By Headnote

Legal Ethics > Client Relations > Accepting Representation ⓘ

Legal Ethics > Client Relations > Appearance of Impropriety ⓘ

Legal Ethics > Client Relations > Conflicts of Interest ⓘ

*HN25* See Model Code of Professional Responsibility DR 9-101 (B). *Shepardize:* Restrict By Headnote

**COUNSEL:** Malcolm Douglas, Acting Law Director, Cleveland, Ohio, For City of Cleveland.

John Lansdale, Squire, Sanders & Dempsey, Cleveland, Ohio, The Cleveland Electric Illuminating Company.

John D. Leech, Calfee, Halter & Griswold, Cleveland, Ohio.

David McNeil Olds, Edmund K. Trent, John T. Tierney, Joseph A. Relser, Reed, Smith, Shaw & McClay, Pittsburgh, Pennsylvania, Duquesne Light Company.

Carl L. Steinhouse, Joseph L. McEntee, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Ohio Edison Company and Pennsylvania Power Company.

Leslie Henry, Fuller, Henry, Hodge & Snyder, Toledo, Ohio The Toledo Edison Company.

Michael R. Gallagher, Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, Representing Squire, Sanders & Dempsey For Defendants.

**JUDGES:** Krupansky, J.

**OPINION BY:** KRUPANSKY

**OPINION:** [*195] ORDER

KRUPANSKY, J.

This is an action instituted by the plaintiff City of Cleveland (City) against defendants Cleveland Electric Illuminating Company (CEI), Duquesne Light Company, Ohio Edison Company, Pennsylvania Power Company, and Toledo Edison Company charging a conspiracy to violate Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and [**2] 2. Jurisdiction is properly invoked pursuant to Sections 4 and 16 of the Clayton Act, as amended, 15 U.S.C. §§ 15 and 26.

The Complaint, alleging certain acts of conspiracy to monopolize and restrain trade, was filed on July 1, 1975. Collateral to the substantive counts of the Complaint, the City, on December 15, 1975, filed its Motion to Disqualify the Cleveland law firm of Squire, Sanders and Dempsey (SS&D), legal counsel for defendant CEI. This Motion, charging a conflict of interest arising as a result of earlier legal retainers between SS&D and the City, seeks to foreclose SS&D from further participation in these proceedings.

The pending action before this District Court climaxes protracted litigation initiated by the City against CEI and others as early as May 13, 1971, before the Federal Power Commission (FPC) in a proceeding styled *City of Cleveland v. CEI*, Docket No. E7631. Litigation was thereafter pursued by the City with its Petition to Intervene before the Nuclear Regulatory Commission (NRC) filed on July 6, 1971, wherein the City pressed its antitrust charges against CEI and others. n1

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 *In the Matter of the Toledo Edison Company and the Cleveland Electric Illuminating Company* (Davis-Besse Nuclear Power Station, Units 1, 2 and 3) Docket Nos. 50-346A, 50-500A and 50-501A; *In the Matter of the Cleveland Electric Illuminating Company, et al.* (Perry Nuclear Power Plant, Units 1 and 2), Docket Nos. 50-440A and 50-441A.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [**3]

By order dated July 12, 1972, the FPC concluded that the City's allegations of anti-competitive practices by CEI were unsupported by the facts. This conclusion was subsequently affirmed on January 9, 1976, by the United States Court of Appeals for the District of Columbia Circuit. The proceeding before the NRC is still pending.

*HN1* Issues of disqualification of counsel for conflicts arising as a result of former representation present the acutely sensitive dilemma of protecting the confidentiality of the client-attorney relationship without needlessly interfering with a litigant's freedom to proceed with legal counsel of choice. *See*, Note, *Attorney's Conflict of Interests: Representation of Interest Adverse to That of Former Client*, 55 B.U.L. Rev. 61, 65 (1975). An equitable

balance of these competing interests is essential if the public's **[*196]** trust in the integrity of the Bar is to be preserved. _Redd v. Shell Oil Co._, 518 F.2d 311 (10th Cir. 1975). Assignment of this delicate factual and policy-making decision is delegated with increasing exclusivity to the district court. As recognized in _HN2_ _Hull v. Celanese Corporation_, 513 F.2d 568, 571 (2d Cir. 1975): **[**4]**

> The district court bears the responsibility for the supervision of the members of its bar . . . . The dispatch of this duty is discretionary in nature and the finding of the district court will be upset only upon a showing that an abuse of discretion has taken place.

See also, _Richardson v. Hamilton International Corporation_, 469 F.2d 1382 (3d Cir. 1972), cert. denied, 411 U.S. 986, 36 L. Ed. 2d 964, 93 S. Ct. 2271 (1973); _Greene v. Singer_, 461 F.2d 242 (3d Cir.), cert. denied, _HN3_409 U.S. 848, 34 L. Ed. 2d 89, 93 S. Ct. 54 (1972).

In approaching the issues of disqualification, the Court is mindful of its paramount obligation of "maintaining the highest standards of professional conduct and the scrupulous administration of justice." _Hull, supra_ at 569; _Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp._, 518 F.2d 751, 757 (2d Cir. 1975). This obligation stands in contrast to the secondary consideration of ensuring the right of the public to legal counsel of its own choice. Ethical problems, however, cannot be resolved in the abstract. Rather the Court must rely upon a thorough consideration of the facts. "Nor can judges exclude from their **[**5]** minds realities of which fair decision could call for judicial notice." _Silver Chrysler_, 518 F.2d at 753.

Thus, _HN4_when dealing with ethical principles it is apparent that a court, in the words of Judge Irving R. Kaufman in _United States v. Standard Oil Company_, 136 F. Supp. 345, 367 (S.D.N.Y. 1955),

> cannot paint with broad strokes. The lines are fine and must be so marked. Guide-posts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent.

Accordingly, the dynamics of time have resulted in evolving modification of the practitioner's ethical, social and political roles in society. Patterson and Cheatham, The Profession of Law 19-23, 65-67 (1973). _HN5_Rules appropriate in guiding lawyers of several decades ago must be applied in light of current realities. As one commentator perceptively points out, the rigid rule of total disqualification

> is premised in the day when firms, when they existed, were very small -- also a day when attorneys most frequently could think of their activities in terms of discreet "matters." Increasingly, **[**6]** neither condition maintains. Note, _Unchanging Rules in Changing Times: The Canons of Ethics and Intra-firm_

*Conflicts of Interest*, 73 Yale L.J. 1058 (1964), *quoted in Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.*, 370 F. Supp. 581, 589 (E.D.N.Y. 1973).

Since the largest legal firms represent the largest corporations within all sectors of the economy, it is practically impossible for a firm to ensure against some form of legal relationship between its clients at some time. The pragmatics of modern day legal practice assume greater significance and magnitude when a firm such as SS&D, a prominent authority in a highly specialized area of the law, is pursued to provide expert services for the economic benefit of the public interest.

THE PARTIES

Since 1905, the City has owned and operated the Municipal Electric Light Plant (MELP) which has generated and distributed electric energy in keen competition with CEI for residential, commercial and industrial consumers within Cleveland, Ohio. MELP is a proprietary interest of City and is financed by the issuance of revenue bonds payable from the revenues of the system. MELP, as all other city departments, both governmental **[**7]** and proprietary, is represented legally by the City's Law Department. The City Law Department is administered by the Law Director assisted **[*197]** by a Chief Counsel and staffed by innumerable Assistant Law Directors.

John Lansdale, Jr. (Lansdale), against whom the Motion to Disqualify is primarily lodged, is a partner in the law firm of Squire, Sanders & Dempsey (SS&D) which practices in Washington, D.C. under the name of Cox, Langford & Brown. Martindale-Hubbell Law Directory (1975) identifies SS&D as having 79 partners and 80 associates. Cox, Langford & Brown is listed as having an additional seven partners and five associates. SS&D is the largest and one of the most prestigious law firms in Ohio.

SS&D is structured into five sections, i.e., Litigation, Public Law, Estate & Taxes, Labor and Corporate. Incorporated into its Public Law Section is SS&D's municipal bond department, perhaps the largest in the entire United States and nationally recognized as the most reputable and prestigious legal authority in this highly specialized area of consultation. Its unique expertise in municipal bond law is unquestioned in the bond market: the firm's imprimatur assures the bond **[**8]** market that a proposed issue has underlying legal validity, thereby affording it greater public acceptability and more favorable marketability.

In Ohio, SS&D performs virtually all state, county and municipal bond work. The firms of Peck, Shaffer & Williams (Peck) and Bricker, Evatt, Barton & Eckler (Bricker) of Cincinnati and Columbus, Ohio, respectively, also offer reputable bond consultation and services nationally on a lesser scale than SS&D.

SS&D has represented CEI since the company's incorporation in 1890, and has openly, notoriously and without interruption, served CEI as outside general counsel for 65 years.

In accordance with the pronouncement of the Sixth Circuit Court of Appeals in *Melamed v. I.T.T. Continental Baking Co.*, 534 F.2d 82 (6th Cir. 1976), an evidentiary hearing was accorded the parties to this proceeding, in which the following facts were disclosed.

FACTS

It is conceded that CEI is and has been one of SS&D's major corporate clients. The total commitment of SS&D to the legal and business affairs of CEI is further reflected by the service of Ralph M. Besse, a partner in SS&D who left the firm in 1948 to become Vice President and General Counsel and **[**9]** later President and Chief Executive of CEI; upon

his retirement in 1970 he rejoined SS&D as a partner but continued as a Director of CEI.

Lansdale also has been a Director of CEI since 1964 and has, since at least 1948, been the partner of the firm who advised and counseled the Company in rate and service matters as its chief legal counsel, not only before the Public Utilities Commission of Ohio (PUCO), but in all other litigation save those proceedings before the FPC.

During the intervening 29 years between 1947 and the present, SS&D has, without exception, represented CEI in opposition to the City in each instance where the interest of CEI and the City were in conflict. Moreover, during this same period SS&D represented CEI in adversary proceedings against the City involving the Company's rate and service practices before the PUCO in 1947, 1961, 1964, 1965 and 1974 (Deft.'s Exh. 29). For the City to now feign ignorance of the complete and intimate legal commitment of SS&D to CEI, its client for 65 years, as against all adverse interests including those of the City, and to disclaim knowledge of the scope and depth of the continuing legal relationship in total disregard of the **[**10]** innumerable direct adversary confrontations experienced by the City during at least the 30 years reflected by the evidence herein (Deft.'s Exh. 29), presents a naive absurdity.

MELP, CEI's chief competitor for the electric consumer market within Cleveland, is one of the utilities owned and operated by the City. The other is the Water Division (Water). MELP and Water are self-supporting and financed by revenue bonds. These utilities theoretically generate funds from their own separate operations similar **[*198]** to profit-oriented, privately owned business ventures, in contrast to non-reimbursable governmental functions (police, fire, courts, etc.) and service functions (garbage collection, parks, building inspection, etc.) which are supported by general fund tax receipts.

In all general respects, MELP is considered to be similar to a privately owned and regulated electric utility, except that as a city owned enterprise, it pays no federal, state or local income, real estate or personal property taxes. n2 It is structured as an independently operating, self-contained proprietary entity, and maintains an independent system of audits and accounts.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Cleveland Little Hoover Commission Project No. 12 -- Division of Light and Power -- The White-Becher-Pjevach Report on Light and Power City of Cleveland commissioned by the Mayor and President of Cleveland City Council to conduct an in-depth study of all City of Cleveland operations commenced in December 1965 and concluded on February 1, 1967.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**11]**

Pursuant to the Charter of the City of Cleveland, Ch. 15, § 83 *et seq.*, MELP is legally represented and counseled by the City's Law Department. Indeed, the Law Department's representation of MELP is analogous to SS&D's representation of CEI.

A number of Cleveland's major law firms including SS&D have, during the last 30 years or more, served the City on an ad hoc basis as special counsel representing the City's legal interests in selected controversies.

The selective arrangement provides the City access, as its requirements demand, to the services of the area's, and in many instances the nation's, most respected and talented legal practitioners generally not available within the City's relatively limited salary-structured Law Department. In most instances retainers are accepted as a public service, albeit upon a fee



basis generally more moderate than the expertise commands in the private sector.

It is conceded that apart from the services performed by its bond department, SS&D's ad hoc legal representation of the City had no substantial relationship to the case at hand although the City urges that by some undefined process of legal osmosis, unsupported by evidence, SS&D **[**12]** acquired an insight into the City's affairs which is in itself an impermissible conflict, a charge of the type prompting Judge Moore to comment in _Silver Chrysler, supra_ at 754: "The mere recital of such a proposition should be self-refuting."

MELP's limited relationship with SS&D since 1963 has been with John Brueckel (Brueckel), a partner assigned to the bond department of the Public Law Section. It is noteworthy, however, that although SS&D accepted ad hoc retainers from the City, it scrupulously avoided any relationship with MELP, apart from its bond consultations, except to openly oppose it as advocate for its client CEI in rate and service controversies and other adversary proceedings before the PUCO and the courts.

Accordingly, if the City is to prevail upon its Motion to Disqualify it must do so upon the relationship that existed between the parties as a result of SS&D's role as bond counsel for the City generally and, more particularly, in the financing of MELP.

It is in this context of dual representation that the alleged conflict must be considered. Absent evidence to the contrary, SS&D's capacity as bond counsel for City departments other than MELP, lacks, in the **[**13]** Court's view, the requisite adverse interest implicit in controversies of this nature. Vague and general assertions by the City that SS&D's relationship with City departments in general is comparable to SS&D's general representation of CEI is clearly a distortion of its ad hoc relationship with the City as special counsel and ignores the diverse structure inherent in municipal government.

In this context an exploration of the function of bond counsel is helpful. The record, however, is limited in defining the work product of this commission. The only evidence directed to the subject is the testimony of Brueckel who frequently characterized his role in the following terms:

> We address ourselves to legality to make sure that the proceedings are legal so that people can have faith in their [the bond issue] legality.
>
> **[*199]** So we are not in the advocacy position. We are not selling wares; we are selling legality . . . . I think that a bond attorney, this is his or her lot. I think you can destroy your credibility and the trust in you if you take an advocate's position and depart from the strict legal aspects. (Record at 305-307).

In substance the primary **[**14]** responsibility of this employment is to certify that the transcript of proceedings relating to any given bond offering has been examined in conjunction with the law under authority of which said bonds are issued and executed and such examination supports a legal opinion that the bonds constitute valid and legal obligations of the issuing governmental political subdivision. (Pltf.'s Exh. AA at B-1).

As closely as the Court can determine from the fragmented testimony elicited at the hearing, the genesis of a bond issue is enabling legislation, in this case, an ordinance which fixes the amount and defines the purposes and the manner in which the issue is to be amortized. It is supported by a transcript or manuscript which emphasizes various factors and characteristics significant to the security; an analysis of the political subdivisions' debt structure; various financial factors; governmental operations and economic characteristics of the issuing entity.

Included in the documentation of any bond issue is the Bond Certificate, Notice of Sale and Bid Forms.

From time to time bond counsel may be called upon to draft, exclusive of financial statements, one or more of these documents, **[**15]** somewhat as a scrivener drafts instruments.

Initially the information is, in whole or in part, documented by the appropriate governmental agency and presented to bond counsel for examination and certification as to accuracy, authenticity and legality. Meticulous attention to detail, exactness and veracity coupled with sagacious pedantic legal acumen are the hallmark of successful bond counsel in an astutely discriminating financial community. Eminence is not achieved by accepting, at face value, the presentments of the subscriber, nor does perfunctory approbation effectuate and maintain probity.

Accordingly, primary and secondary source references "bottomed on public knowledge and what is in the public domain" (Record at 310) are the tools of verification and the keystone of legal opinion attesting any offering. Integral to such comparative analysis is examination of state and local law, both constitutional and legislative; the reports of the Ohio Municipal Advisory Council incorporating a compendium of indebtedness of every political subdivision in the state, debt payment record, operating expenses, tax collections, assessed valuations, millage limitations, and debt limitations, **[**16]** median family income, largest employers (Deft.'s Exhs. 23-27); primary records of the state and county auditors; reports of various bond rating agencies such as Moody's and Standard & Poor, and other information bottomed in the public domain and utilized by the financial community in evaluating fiscal responsibility of a political subdivision. (Record at 310-334).

Historically the competitive relationship between MELP and CEI is demarcated by two periods, with 1971 being the watershed year. Prior to that time, the relationship, although competitive, was one in which the City sought, and CEI offered advice on the MELP operation. Moreover, throughout the 1960's the parties without success negotiated at various levels the sale of MELP to CEI.

In the pre-1971 era, the record discloses that SS&D served as bond counsel for MELP-related bond issues on five separate occasions: 1954, 1960, 1963, 1966 and 1968. The latter two, in 1966 and 1968, were general obligation bonds for street lighting rather than MELP mortgage revenue bonds. As such, their relationship to MELP is so attenuated as to render them irrelevant to this proceeding.

As to the three earlier issuances, the record reveals **[**17]** little beyond their mere existence. It does appear, however, that the manuscript for the 1948 MELP issuance **[*200]** was prepared by the Cleveland law firm of Jones, Day, Cockley and Reavis (now Jones, Day, Reavis & Pogue) in conjunction with the New York firm of Wood, Dawson, Love & Sabatine (Wood, Dawson), and was the progenitor of the 1954, 1960 and 1963 parity issuances. The City Finance Department prepared the latter issuances, while SS&D merely certified the proceedings. The City has failed to present probative material evidence as to the role assumed by SS&D in these issuances, detailing neither the identity of the SS&D attorney serving as bond counsel, nor the nature or extent of information conveyed to the firm in the course of this ad hoc relationship. The paucity of evidence in this regard compels the Court to conclude that these issuances are simply too remote in point of time and relevance to be of any legal significance to the present inquiry.

The City's conclusory assertion of confidential disclosure arising from the Lansdale-Hauser memorandum dated October 26, 1966, (Pltf.'s Exh. E), is equally remote and, more importantly, unsupported by evidence and completely **[**18]** misconceived. n3

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 In December of 1965, the Cleveland Little Hoover Commission was activated by the Mayor and President of Cleveland City Council by the appointment of 24 business and community leaders to conduct a 12-part, in depth study of all City operations. The Commission was charged "to analyze the above operations, determine their adequacy, and make specific recommendations for improvements and/or financial savings." (Deft.'s Exh. 4a). Project No. 12 of the study project styled Municipal Light -- The White-Becher-Pjevach Report -- Financial Aspects of the Utilities -- Division of Light and Power was under the directorship of Carl White (White) of Ernst & Ernst and G. George Becher (Becher). White was appointed by the Mayor and President of Council and, at all times in question, was acting in his representative capacity for the City. He voluntarily consulted CEI to discuss the legality of his memorandum styled "Thoughts on the Use of Electric Light and Power Plant Utility (MELP) Funds for Alleviation of Critical Situation in General Fund of the City of Cleveland" dated February 21, 1966, incorporating his thoughts on the use of MELP funds as they impacted the City's general fund. Presumably, he was referred to CEI's legal counsel Lansdale (Pltf.'s Exh. F). Lansdale, pursuant to the instructions of his client CEI, agreed to meet with White on October 26, 1966. White appeared at the designated time with his associate Becher, also of Ernst & Ernst, and duly identified themselves to Lansdale and Brueckel, who was also present. The tabulations and calculations included in the White memorandum had been developed by White from sources known only to himself. During the course of the conference White also produced a legal opinion that Lansdale had prepared for CEI concerning the validity of relieving the City's general fund in which he recommended a reduction of charges by MELP for street lighting. Although not developed by the evidence it appears that Lansdale's legal opinion to CEI predated the White memorandum. White's possession of Lansdale's CEI memorandum is unexplained, except to the extent that it had not been supplied by either Lansdale or Brueckel. All data and information, financial and otherwise, concerning MELP which was discussed during the course of the meeting was produced by White, as a representative of the City. It is quite clear that neither Lansdale, Brueckel nor any other member of SS&D produced any evidence whatsoever concerning MELP or CEI. The subsequent letter and memorandum styled the Lansdale memorandum (Pltf.'s Exh. E), addressed to Donald Hauser (Hauser), house counsel for CEI, is a sequential report of the meeting with White and a reaffirmation of Lansdale's legal opinion to CEI.

Taken in proper context, it is obvious that there is no substance to the City's charge of confidential disclosure by members of SS&D arising from this incident. Disclosure, if any in fact occurred, was by the City through its representative White.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**19]

Mounting equipment breakdowns resulting in widespread service failures and an increasing self-realization by MELP of its incapability to provide reliable service to its customers prompted the City to file a Complaint against CEI before the FPC on May 13, 1971. Pursuant to this action, and a Motion to Consolidate filed December 6, 1971, the City demanded of CEI a permanent synchronous interconnection between their respective transmission systems and an investigation of CEI's alleged anti-competitive practices. CEI was represented before the FPC by the law firm of Reid and Priest of New York.

In the 1971 time frame, the City engaged Wood, Dawson, as bond counsel in conjunction with a $5 million second mortgage revenue bond issue for MELP. Wood, Dawson authored Ordinance No. 1187-71 (the 1971 ordinance), adopted by Cleveland City **[*201]** Council on June 28, 1971, which authorized the City to issue and sell to its sinking fund $5 million in anticipatory notes to be liquidated from proceeds of future public bond sales. On or about June 6, 1972, Howard Holton (Holton), Assistant Secretary of the City's Sinking Fund

Commission and the public official primarily responsible for the [**20] City's bond work, approached Brueckel with a request to review and approve the issuance of $3 million available for sale pursuant to the 1971 ordinance. Brueckel, aware of the action before the FPC and the potential for the concomitant charge of conflict of interest arising as a result thereof, declined the offer pending a review of the request with his partners at SS&D. Thereafter, SS&D internally decided to forego the tendered retainer pending consultation and approval by its client, CEI, upon full disclosure of the possible consequences arising as a result of the undertaking. Carl Rudolph, President of CEI, subsequently authorized SS&D to act upon the City's request.

Concurrently, the incumbent Law Director for the City, Richard Hollington, Jr. (Hollington), was discussing with Daniel O'Loughlin (O'Loughlin), a partner of SS&D and former Chief Counsel for the City, the same potential for conflict arising from the FPC action. It should also be noted that, on July 6, 1971, the City moved to intervene in the NRC action to which CEI was already a party.

Before SS&D communicated to Holton the approval of CEI to SS&D's review of the City bond issue, Hollington telephonically advised [**21] O'Loughlin of the City's decision to seek other bond counsel for the pending proposed issue. Hollington advised O'Loughlin that the decision was prompted by the intense competition between the City and SS&D's client, CEI, the adversary posture of the parties resulting therefrom, and opposition voiced by City Director of Utilities Raymond Kudukis (Kudukis) in consultation with administrative and operational personnel of MELP. Upon Hollington's direct request O'Loughlin suggested the names of two reputable Ohio law firms that offered bond services analogous to those performed by SS&D, i.e., William Chadeayne of the Bricker firm in Columbus, and the Peck firm in Cincinnati.

The City thereupon tendered its retainer to the Bricker firm. By letter dated July 18, 1972, (Deft.'s Exh. 10), Chadeayne declined the proffered employment, noting certain complications and implying a questionable interpretation of Ohio law by Wood, Dawson as it applied to the initial bond proceedings. For reasons known only to itself and not disclosed by the evidence, the City, upon Bricker's refusal of its retainer, failed to approach the Peck firm of Cincinnati for employment on this particular issue.

Citing [**22] the critical press of time, the City importuned SS&D, literally as a public service, to undertake the assignment. However, before a reluctant acceptance of the retainer, SS&D insisted upon the written assent (in Hollington's request to SS&D) of Kudukis. That concurrence was provided by the Hollington letter of July 24, 1972 (Deft.'s Exh. 11). The Court is here constrained to interject that, from the evidence taken in its entirety, reasonable minds can arrive at but one conclusion: from the open, notorious and continuous legal representation provided by SS&D as general outside legal counsel to CEI, adversary to the entire world including the City for 65 years, viz., that the City was fully cognizant of the scope and depth of any potential conflict of interest that could attach to SS&D's services to the City as a bond consultant.

The classic attorney-client relationship between laymen and lawyer is here significantly absent. Confronting the Court in the case at bar is a relationship between an attorney seeking consultation services for a client from another attorney. The Charter of the City of Cleveland, Ch. 15, § 83, mandates that the Director of Law shall be

the legal [**23] advisor of and attorney and counsel for the City, and for all officers and departments thereof, in matters relating to their official duties. He shall . . . prepare all contracts, bonds, and other instruments in writing in which [*202] the City is concerned and endorse on each his approval of the form and correctness thereof. No such bond, contract or instrument shall become effective without such endorsement by the Director of Law thereon.

In accordance with the requirements of the foregoing concise language, the Law Director has historically, in his official capacity, either reviewed the legality of all proposed bond issues or, in the alternative, delegated the duties to private lawyers or law firms as special counsel for the City. Accordingly, in instances when the Law Director elected to delegate these duties, he has, within his discretion, assigned these duties to private bond counsel. Aware of the potential for conflict implicit in SS&D's simultaneous representation of CEI and the City and having openly discussed the subject with Kudukis and O'Loughlin it is presumed that the decision of the Law Director to persist in his demands upon SS&D to act as bond counsel **[**24]** was, under the prevailing circumstances, knowledgeably rendered with a full understanding of the impact that such insistence could have upon the ethical issues evolving from the undertaking.

Brueckel's services, as they related to the 1972 MELP bond issue, were limited to drafting Ordinance No. 2104-72, authorizing purchase of the issue by the City's sinking fund. Thereafter City Council enacted an amended version of the ordinance directing the issue to be sold publicly or, in the alternative, to be purchased by the sinking fund only upon enactment of an authorizing resolution by City Council. SS&D did not prepare the amended form of the ordinance (Deft.'s Exh. 1d). Brueckel did, however, at the insistence of the City, continue his consultations on a number of other bond issues, including the 1974 note to provide general obligation financing for street lighting improvements.

During September of 1974, before the NRC, the City for the first time interjected the issue of conflict of interest arising as a result of dual representation. Thereafter, on July 1, 1975, the City initiated the instant antitrust action against CEI and others in this Court.

Commencing on August 5, 1975, **[**25]** the City, under the direction of James B. Davis (Davis), incumbent Director of Law, embarked upon an unusual, and perhaps questionable, campaign. On the one hand, the City was demanding that SS&D continue as bond counsel for the City under penalty of violating DR 2-110, Code of Professional Responsibility, n4 while on the other hand demanding that SS&D withdraw as legal counsel for CEI both before the NRC and this Court, under penalty of violating Canons 4, 5, and 9 of the Code of Professional Responsibility. Notwithstanding its charges of conflict leveled against SS&D, the City again retained SS&D as bond counsel in mid-November of 1975, at which time Davis assured Ralph Gibbon (Gibbon), the SS&D partner in charge of the Public Law Section, that the bond work currently undertaken would be considered as a matter separate and apart from the instant litigation. However, on December 5, 1975, mounting tension between the parties prompted Gibbon to notify Davis of SS&D's decision to withdraw as the City's bond counsel. (Pltf.'s Exh. M). On December 15, 1975, the City filed the instant Motion to Disqualify. As late as December 15, 1975, when its formal Motion to Disqualify and enjoin **[**26]** SS&D from further participation in the pending action before this Court was filed, the City, in its **[*203]** Brief supporting said motion, continued to press SS&D to continue as bond counsel for the City:

> SS&D is the largest law firm in the State of Ohio, with approximately 180 lawyers in 1975. It has one of the largest sections specializing in public law and public finance of any major law firm in the United States. SS&D has a virtual monopoly on public finance law in Northern Ohio. Only two other firms in Ohio, one in Columbus and one in Cincinnati, do any significant amount of public bond legal work. Neither has ever worked for the City. Cleveland has four other firms with in excess of 80 lawyers each and a number of other firms of substantial size, but none has ever attempted any significant amount of bond work in the public sector. The opinion of SS&D is widely accepted by financial institutions in Ohio

and elsewhere as authoritative for the sale of public notes and bonds.

The City of Cleveland, in order to conduct its business and survive financially, must each year issue millions of dollars of notes and bonds. Over the last several decades, virtually all of such **[**27]** notes and bonds have been prepared by SS&D and sold because of its opinion letters. No other law firm in Ohio or elsewhere has the great and detailed familiarity with the City's affairs, the legal skills in dealing with Ohio municipal law, and the staff necessary to prepare the City's bonds and notes and give the necessary opinions for their sale as does SS&D. For the City to arrange to transfer a part of its bond business to other firms would be very difficult and time consuming. It is much more cumbersome and expensive to deal with law firms not located in Cleveland. The other large firms in Cleveland are reluctant, for a variety of reasons to even enter the field. Of the five large law firms in Cleveland, only Jones, Day, Reavis & Pogue has done any bond work for the City in recent years, having prepared an issue of Sewer Bond Anticipation Notes in 1974 and again in 1975. This firm is not currently available as a source of bond work for the City because it now seeks to represent the Ohio Edison Company in this present case.

The City Law Department, with a constant problem of low pay and heavy turnover, has not managed to develop lawyers with the skills necessary to handle **[**28]** its own bond work. It is totally incapable of doing such work at the present time.

The practical consequence of the virtual monopoly of skills possessed by SS&D in the field of public finance is that the City must and does totally rely upon it for the daily conduct of its financial affairs.

With the recent financial crisis in New York City, it is common knowledge that purchasers of municipal obligations across the country have become extremely cautious. With regard to the purchase of the current obligations of the City of Cleveland, it is now more necessary than ever to have authoritative opinion letters from a law firm on its bonds and notes. At present, only SS&D is readily available to provide such opinions. (Pltf.'s Br. at 2-4).


- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n4 DR 2-110 Withdrawal from Employment.
(A) In general.

    (1) If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employment in a proceeding before that tribunal without its permission.
    (2) In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules.
    (3) A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*\*29]**

ESTOPPEL

The alleged conflict of interest, if any in fact exists, arises as a result of actions induced by the party seeking disqualification. SS&D's asserted defense of equitable estoppel is therefore appropriately urged.

In defining the doctrine of equitable estoppel in *State v. Dayton Power & Light Co.*, 170 F. Supp. 722, 725 (S.D. Ohio 1957), *aff'd*, 263 F.2d 909 (6th Cir.), *rev'd on other grounds*, 359 U.S. 552, 3 L. Ed. 2d 1035, 79 S. Ct. 1151 (1959), the court stated:

HN6 Equitable estoppel or estoppel in pais is the principal [sic] by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts  **[\*204]**  and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed.

Generally speaking, however, HN7 equitable **[\*\*30]**  estoppel is a rule of justice which in its proper field prevails over all other rules.

\* \* \*

The doctrine of estoppel in pais is founded upon principles of morality and fair dealing and is intended to subserve the ends of justice. (Citations omitted).

HN8 While the doctrine is sparingly invoked against municipal corporations, there is no doubt that a municipality can be estopped to prevent a manifest injustice, where positive action or representation by the municipal corporation, acting within the scope of its authority, has induced another to act in good faith, and it would be inequitable to permit the retraction of such acts. *Haba v. Cuff*, 28 Ohio Op. 2d 266, 201 N.E. 2d 343 (1963), *appeal dismissed*, 176 Ohio St. 374, 199 N.E. 2d 736 (1964), *cert. denied*, 379 U.S. 964, 13 L. Ed. 2d 558, 85 S. Ct. 656 (1965). The application of the estoppel doctrine to attorney disqualification proceedings was recognized in *Consolidated Theatres, Inc. v. Warner Bros. Circuit Mgt. Corp.*, 216 F.2d 920 (2d Cir. 1954), as well as in *Informal Opinion 1323*, (April 21, 1975), wherein the American Bar Association Committee on Ethics and Professional Responsibility stated:

[Giving]  **[\*\*31]**  credence to the statement by Lawyer X that when he was engaged by counsel for Company B to represent the latter in its dispute with Company C, he was advised by the lawyer for Company B that there would be no conflict in his continued representation of Company A, then it would be improper

for Company B to urge disqualification of Lawyer X now that Company A and Company B have become embroiled in separate litigation. *Id.* at 3.

The criteria for invoking the doctrine were succinctly delineated in *United States v. Georgia-Pacific Corp.*, 421 F.2d 92, 96 (9th Cir. 1970) wherein it was stated:

HN9 Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. (citation omitted).

From the evidence educed at the hearing, the City cannot, in good conscience, deny a full understanding of the scope and depth of SS&D's long standing general representation of CEI, if only **[**32]** from a review of the 49 legal actions in which SS&D represented CEI as an adversary to the City's interests (Deft.'s Exh. 29); the Hollington-O'Loughlin telephone conversations on July 24, 1972; the Holton-O'Loughlin discussions of 1972 and the open, notorious and continuous legal representation afforded CEI by SS&D for a period of 65 years.

The Hollington letter of July 24, 1972 (Deft.'s Exh. 11), communicating the Kudukis concurrence in the appointment of SS&D as special bond counsel for the 1972 MELP issue, with Hollington acting within the scope of his authority as Law Director, certainly satisfies the second criteria. The Hollington-O'Loughlin discussion, coupled with the Hollington-Kudukis letter of July 24, 1972, conveyed with explicit clarity the City's intention to waive any ethical objections that could arise as a result of SS&D's performance as bond counsel, and SS&D had every right to believe from the facts that the City so intended. Moreover, it is apparent from the facts that SS&D was, at that time, completely ignorant of any intention on the part of the City to press the ethical issues at a future date; and, in satisfaction of the fourth criteria set forth by *United* **[**33]** *States v. Georgia-Pacific Corp., supra*, SS&D, did in fact rely upon the City's conduct to its own detriment by reluctantly undertaking the City's induced retainer.

**[*205]** Accordingly, the Court concludes that the facts herein catalogued warrant the imposition of the doctrine of equitable estoppel against the City, thereby foreclosing the City from prosecuting its Motion for Disqualification, and it is on this account denied.

The Court's inquiry does not, however, end here. Further analysis of the disqualification issue is prompted by a number of other asserted charges and defenses.

WAIVER

As a corollary to the doctrine of equitable estoppel, SS&D argues that in the event of an affirmative finding by the Court of ethical conflict as alleged by the City, the City has knowingly and voluntarily consented to SS&D's role as bond counsel for the City, thereby waiving any right to pursue its Motion for Disqualification.

It is axiomatic that the HN10 client's right to object to an attorney's allegedly adverse representation may be waived. *E.g., Marketti v. Fitzsimmons*, 373 F. Supp. 637 (W.D.Wisc. 1974);* Note, *Attorney's Conflict of Interests, supra* at 81. *See also In re* **[**34]** *Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89 (5th Cir. 1976). The defense of consent

and waiver is predicated, in large part, upon the same evidence supporting the Court's invocation of the doctrine of estoppel. As noted in *HN11* *Matsuo Yoshida v. Liberty Mutual Insurance Co., 240 F.2d 824, 829 (9th Cir. 1957):*

> Waiver and estoppel are legal terms which are frequently used interchangeably. Although the legal consequences of each are often the same, the requisite elements are different. Waiver refers to the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor. On the other hand, estoppel is any conduct, express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law. It is grounded not on subjective intent but rather on the objective impression created by the actor's conduct. It is in the area of implied waiver that the two doctrines are closely akin. (footnotes omitted).

The Court, accordingly, focuses upon those facts evidencing the City's subjective intent manifested by the events surrounding the 1972 bond ordinance **[**35]** representation.

Again the Hollington-Kudukis letter of July 24, 1972, when taken in context with the Hollington-O'Loughlin telephone conversations that preceded it, leaves no room for doubt that the City did indeed waive any and all objection to SS&D's continued representation of CEI:

> I would greatly appreciate SS&D assisting the City as bond counsel in connection with this matter. I have discussed this with Ray Kudukis who concurs with my referral of this matter to your firm.

Accordingly, on this account the City's Motion to Disqualify is dismissed.

SUBSTANTIAL RELATIONSHIP TEST

Analogous to the City's broad brush treatment of the facts is the cavalier manner of its treatment of the law governing the issue of disqualification. Interchangeably, and without recognition of the distinct and definitive nature of each of the relevant Canons, the City charges SS&D with violating Canons 4, 5 and 9 of the Code of Professional Responsibility. Although case authority does recognize a certain interrelationship between Canons 4 and 5, recent legal precedent distinguishes Canon 9 from the others and proscribes its indiscriminate application to issues of disqualification. *Silver* **[**36]** *Chrysler Plymouth Inc., 518 F.2d at 757. See generally*, Note, *The Second Circuit and Disqualification -- Silver Chrysler Steers in a New Direction*, 44 Fordham L. Rev. 130 (1975). That the "appearance of impropriety" doctrine of Canon 9 should not be given an overbroad application was recently reaffirmed in *International Electronics Corp. v. Flanzer, 527 F.2d 1288, 1295 (2d Cir. 1975)* wherein the court stated:

> We caution, as the Connecticut Bar Association urges us to do, that *HN12* Canon 9, though there are occasions when it should be applied, should not be used promiscuously **[*206]** as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules.

n5

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Canon 9 as applied to Daniel O'Loughlin's former employment as Chief Counsel for the City Law Department will be discussed more fully hereinafter.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Judicial notice is taken of the standards of professional conduct proclaimed in the Code of Professional Responsibility. **[**37]** Canon 4, "A Lawyer Should Preserve the Confidences and Secrets of a Client ", n6 promotes the sound policy of confidentiality of communication inherent in the attorney-client relationship by insuring, in the first instance, fundamental fairness in the judicial process by shielding the client from his attorney's use of confidential information against him. Secondly, it encourages full disclosure by a client, thereby enabling the attorney to function more effectively on the client's behalf. Note, *Attorney's Conflict of Interests, supra* at 64. Canon 5, "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client ", also provides guidance for attorneys in conflict situations arising from multiple client representation. n7

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 DR 4-101 Preservation of Confidences and Secrets of a Client.
(A) *HN13*⚓"Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
(B) Except when permitted under DR 4-101 (C), a lawyer shall not knowingly:

    (1) Reveal a confidence or secret of his client.
    (2) Use a confidence or secret of his client to the disadvantage of the client.
    (3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

(C) A lawyer may reveal:

    (1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.
    (2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.
    (3) The intention of his client to commit a crime and the information necessary to prevent the crime.
    (4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct.

(D) A lawyer shall exercise reasonable care to prevent his employees, associates, and others whose services are utilized by him from disclosing or using confidences or secrets of a client, except that a lawyer may reveal the information allowed by DR 4-101 (C) through an employee. **[**38]**


n7 DR 5-105 (A) -- (D) Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.
(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).
(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).
(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.
(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5-105, no partner or associate of his or his firm may accept or continue such employment.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**39]**

In determining the existence of a conflict of interest herein, the Court's attention is directed to the test first advanced in _T. C. Theatre Corp. v. Warner Bros. Pictures, Inc._, 113 F. Supp. 265, 268 (S.D.N.Y. 1953), subsequently adopted by the Second Circuit Court of Appeals, in _Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp., supra_, and now generally applied in nearly all circuits, to wit: the "substantial **[*207]** relationship" test. n8 _Redd v. Shell Oil Co., supra; Richardson v. Hamilton Internat'l Corp., supra; Uniweld Products, Inc. v. Union Carbide Corp._, 385 F.2d 992 (5th Cir. 1967), _cert. denied_, 390 U.S. 921, 19 L. Ed. 2d 980, 88 S. Ct. 853 (1968); _Chugach Elec. Ass'n v. United States District Court_, 370 F.2d 441 (9th Cir. 1966), _cert. denied_, 389 U.S. 820, 19 L. Ed. 2d 71, 88 S. Ct. 40 (1967); _Cannon v. U.S. Acoustics_, 398 F. Supp. 209 (N.D.Ill. 1975); _Marketti v. Fitzsimmons, supra_. As Judge Weinfeld initially formulated the test in [HN14] _T.C. Theatres Corp., supra_ at 268, disqualification should be ordered


where any substantial relationship can be shown between the subject matter of a former representation **[**40]** and that of a subsequent adverse representation . . ..


- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n8 The City asserts that the "substantial relationship" test is not applicable herein, relying on

the recent case of *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976), wherein the Second Circuit held that said test "does not set a sufficiently high standard" for disqualification where the "relationship is a continuing, adverse representation ". The Court concludes that the instant case is distinguishable therefrom, as detailed *infra*. Unlike *Cinema 5*, Brueckel's ad hoc relationships with the City had fixed parameters, were non-litigious and inherently non-adverse, and, with the exception of the 1972 ordinance, were unrelated to MELP matters.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

*HN15* Since the party moving for an order of disqualification of an opponent's counsel charging alleged conflict of interest must overcome the burden imposed by several interrelated evidentiary hurdles, the City is thus required to prove that:

> 1. A past attorney-client relationship **[**41]** existed between the City and Brueckel which was adverse to Lansdale's concurrent and subsequent representation of CEI;
> 2. The subject matter of those relationships was/is substantially related; and
> 3. Lansdale, as attorney for CEI, acquired knowledge of confidential information from or concerning the City, actually or by operation of law.

Initially, within the context of the Code of Professional Responsibility, the existence of any attorney-client relationship, arising as a result of SS&D's role as bond consultant for the City, is questionable. The role of bond counsel is not that of an "advocate." Bond counsel merely examines and attests to the legal validity of proposed bond issues. Indeed, Brueckel's services in 1972 in drafting an ordinance for the $9.8 million bond issue are analogous to that of a scrivener, a role that does not create the relationship. W. McCormick, Law of Evidence § 88 at 180 (2d ed. 1972). However, viewing the relationship in a light most favorable to the City, the Court concludes that an attorney-client relationship did exist between the City and SS&D as its bond counsel. The existence of an attorney-client relationship between CEI and Lansdale **[**42]** is conceded.

Having acknowledged *HN16* the existence of an attorney-client relationship, the Court must also affirmatively find it to have been an adversary relationship. In this context it should be noted that Canon 5, construed in conjunction with ethical consideration EC 5-15 and 5-19, approves certain limited multiple-client representations.

EC 5-15:

> *HN17* A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially. On the other hand, *there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation*. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment **[**43]** on **[*208]** behalf of each client; and if the interests become differing, withdrawal is less likely to have a disruptive effect upon the causes of his clients. (emphasis added).

EC 5-19:

*HN18*⚓A lawyer may represent several clients whose interests are not actually or potentially differing. Nevertheless, he should explain any circumstances that might cause a client to question his undivided loyalty. Regardless of the belief of a lawyer that he may properly represent multiple clients, he must defer to a client who holds the contrary belief and withdraw from representation of *that* client. (emphasis added).

*HN19*⚓Representations are sufficiently adverse to warrant a disqualification

when, in behalf of one client, it is [the attorney's] duty to contend for that which duty to another client requires him to oppose. Canon 6, ABA Canons of Ethics (now Canon 5, CPR).

Notwithstanding the intense competition existing between CEI and MELP, the Court, in viewing the nature of the legal representation afforded each of the parties hereto by SS&D, finds that in this posture SS&D's role as the City's special bond counsel in each ad hoc instance reflected by the record herein, **[**44]** and more particularly for the 1972 $9.8 million MELP issue, did not give rise to potentially differing interests between the City and CEI. SS&D's representation of the City as bond counsel was not litigious. SS&D's representation of the City in bond matters was not as advocate. Each retainer was arranged by the City's legal counsel, namely the Law Director, acting with full realization of SS&D's relationship as advocate for CEI in its capacity of general counsel, all in keeping with the objectives of EC 5-15 and 5-19.

In view of the foregoing, the Court is unable to find the required adversity of representation necessary to support disqualification.

*HN20*⚓In the event that the City had carried its burden of proof by initially demonstrating the requisite adversity between these two representations, it would have been confronted next with the burden of affirmatively showing, as the second element of the test, that the former attorney-client relationship involved matters substantially related to the latter. Absent such affirmative showing, it is axiomatic that no ethical problem results. *Cannon v. U.S. Acoustics, supra* at 222.

In confronting the conflicts issue, this element is **[**45]** "not one whose dimensions are delineated with mathematical precision ", *Silver Chrysler, 518 F.2d at 758* (Adams, J. concurring), and "[unfortunately], the cases furnish no applicable guide as to what creates a 'substantial' relationship." *United States v. Standard Oil Co., 136 F. Supp. 345, 355 (S.D.N.Y. 1955).* A survey of cases cited in *Silver Chrysler* disclosed that disqualification was ordered only under circumstances where the relationship between subsequent and former representations was "patently clear." *518 F.2d at 754.*

The gravamen of the City's antitrust action reflected by the pleadings is that of anti-competitive practices, engaged in by the parties in the generation, transmission and sale of electric energy in the Cleveland, Ohio area, as demonstrated by the City's charges that the

defendants combined and conspired: to refuse to wheel or to allow the transmission of electric power and energy to MELP from other power and energy suppliers, or from MELP to any other electric utility system which is an actual or potential competitor of any of the defendants, over transmission lines owned or controlled by the defendants or any of them; to boycott and refuse to **[\*\*46]** deal with plaintiff and others in the power exchange market, except on terms that would maintain domination and exclusive control by the defendants over electric bulk power supply in the area served by each, and upon conditions that would be harmful to the interest of the plaintiff and other actual and potential competitors at wholesale or retail; to refuse to admit plaintiff to membership in the Central Area Power Coordinating Group (CAPCO) or to otherwise permit plaintiff to have access to the benefits of **[\*209]** coordinated operations and development or any other benefit of power pooling or power exchange services; and to engage in other activities for the purpose and with the effect of restraining and eliminating competition in the sale of electric power and energy.

The Court concludes that there exists no substantial relationship between the pending antitrust action and SS&D's services to the City on an ad hoc basis as special bond counsel attesting the veracity of proposed bond offerings.

No "patently clear" relationship exists between Brueckel's bond representation in 1972 and Lansdale's representation of CEI in this pending antitrust action. The Court is unable to discern **[\*\*47]** any commonality of issues, *see Fleischer v. A.A.P., Inc.*, 163 F. Supp. 548 (S.D.N.Y. 1958), *appeal dismissed*, 264 F.2d 515 (2d Cir.) *cert. denied*, 359 U.S. 1002, 3 L. Ed. 2d 1030, 79 S. Ct. 1139 (1959), particularly in view of the non-litigious nature of Brueckel's bond consultations. Thus, the instant case is distinguishable from precedent such as *Emle Industries, Inc. v. Patentex*, 478 F.2d 562 (2d Cir. 1973), where the matters in controversy were identical, and *Motor Mart, Inc. v. Saab Motors*, 359 F. Supp. 156, 157 (S.D. N.Y. 1973), where the suit was "essentially the same type of suit."

Moreover, the Court finds the City's reference to *Chugach Elec. Ass'n v. United States District Court, supra*, does not support its contention of substantial relationship. In *Chugach*, substantial relationship was patently clear and the disqualification was predicated upon the challenged attorney's former position, for 14 years, as General Counsel for the movant. That the City would compare Brueckel's limited, ad hoc representation to that of a general counsel relationship reflects the City's failure to perceive the subtleties, or the "fine lines" to which Judge Kaufman **[\*\*48]** referred in *United States v. Standard Oil Co., supra* at 367, that must be carefully considered in applying ethical principles.

Furthermore, it is inconceivable that Brueckel's authorship of Ordinance No. 2104-72 would provide him with confidential knowledge disclosing the City's antitrust strategies or motives such as those available to the disqualified attorney in *Chugach*.

The Court necessarily concludes that the City has failed to meet its burden of proving a substantial relationship between the instant representations.

*HN21* The general rule in disqualification cases has been that, upon proof of a former attorney-client relationship concerning substantially related matters, disclosure of confidences is presumed. *T.C. Theatres Corp., supra* at 268.

This Court concludes that equity demands, and the pragmatics of emerging specialization inherent in contemporary legal practice dictates, that this presumption be rebuttable. Thus, upon proof of the attorney-client relationship arising from Brueckel's employment as special bond counsel, and of an adverse and substantial relationship between that employment and SS&D's representation of CEI (which the City failed to provide), **[\*\*49]** the disclosure of confidential information would have been initially presumed in favor of the City.

However, the record in the instant case reflects that SS&D successfully and conclusively

produced substantial probative, material evidence affirmatively showing that no confidential disclosure in fact occurred and that the very mechanical procedure integrant to the services of bond counsel for the City foreclosed such manifestation. In the first instance, the document composite of any proposed City bond issue is, by law, a matter of public record. Secondly, preliminary to any attestation of legality by City's bond counsel, verification of such documentation is premised upon public record, and information within the public domain, e.g., legislative enactments of state and local political subdivisions, records of the State and County Auditors, and Municipal fiscal officers, Ohio Municipal Advisory Council Reports, Moody's Reports, Standard & Poor.

HN22⇲In instances where courts have found disclosure of information by the client to one [*210] member of a law firm, such knowledge has traditionally been imputed to all members of his firm. _Consolidated Theatres, Inc. v. Warner Bros._ [**50] _Circuit Management Corp., supra_ at 928. The Court, having found no disclosure of confidential information in the proceeding at bar, is not confronted with resolving this issue. It should, however, be noted that recent prevailing legal precedent has rejected the harsh, hard-line approach of irrebuttably imputing confidential disclosures, actual or presumed, received by one member of a law firm to all members of that law firm in favor of the more realistically equitable logic, attuned to contemporary legal practices common to emerging law firms of substantial size. This more intellectually sound treatment is demonstrated in _Silver Chrysler_:

> HN23⇲Only where an attorney himself represented a client in matters substantially related to those embraced by a subsequent case he wishes to bring against the former client, is he irrebuttably presumed to have benefitted from confidential information relevant to the current case. In such limited situations there is no necessity to demonstrate actual exposure to specific confidences which would benefit the present client. But, as Judge Herlands noted in _Fleischer_ [_supra_ at 552], in a case "where the attorney may be 'vicariously [**51] disqualified' (as by virtue of his former membership in a law partnership), the inference is treated as rebuttable." 370 F. Supp. at 587. (citations omitted).

In affirming the lower court's departure from precedent, the Second Circuit, citing _Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures_, 224 F.2d 824, 827 (2d Cir. 1955), _cert. denied_, 350 U.S. 932, 100 L. Ed. 814, 76 S. Ct. 300 (1956), has cautioned:

> It will not do to make the presumption of confidential information rebuttable and then to make the standard of proof for rebuttal unattainably high. This is particularly true where, as here, the attorney must prove a negative, which is always a difficult burden to meet. _Silver Chrysler_, 518 F.2d at 754.

As Judge Weinstein had noted in the lower court decision in _Silver Chrysler_, 370 F. Supp. at 588:

Since the larger firms represent the largest corporations with interests in all sectors of the economy, it is almost impossible to have an important client or its subsidiary avoid some kind of legal relationship with another client at some time. *Cf.* E. O. Smigel, the Wall Street Lawyer 234 (1964). "Where a firm represents concurrently **[\*\*52]** conflicting interests, the practice is sometimes followed of 'splitting up' the firm into separate teams of lawyers, each of which represents one of the antagonistic clients." Note, Unchanging Rules in Changing Times: The Canons of Ethics and Intra-firm Conflicts of Interest, 73 Yale L.J. 1058, 1071 (1964). *Cf.* J.C. Goulden, The Superlawyers 53 (1972) (Covington and Burling "isn't really a law firm. . . . Actually, it's a conglomeration of fifty law practices."). The fact that attorneys within the firm are effectively insulated from exposure to the confidences of other clients where necessary demonstrates the inappropriateness of an invariable mechanical imputation of knowledge.

Nor does this departure from traditional interpretation of Canons 4 and 5 diminish the force of existing decisions

which hold that the right of the public to counsel of its choice or the possibility of a reduction of "both the economic mobility of employees and their personal freedom to follow their own interests" must be secondary considerations to the paramount importance of "maintaining the highest standards of professional conduct and the scrupulous administration of justice." *Silver* **[\*\*53]** *Chrysler, 518 F.2d at 757.* (citations omitted).

Thus, it is appropriate to reject a mechanistic approach herein. Alternatively, the doctrine of vertical responsibility, classically invoked for disqualifying former government attorneys upon termination of government service was, and is, limited in application to imputing confidential disclosures, presumed or actual, of subordinates serving within the same subdivision or section **[\*211]** of service of the former government attorney. *See, United States v. Standard Oil, supra* at 362.

*HN24* This doctrine of vertical responsibility is relevant to the private sector of legal practice in view of the increasing numbers of law firms that equal the size of many legal subdivisions of government. Imputing to an attorney in the private practice all confidential information obtained, or presumed to have been obtained, by other members of his law firm may severely limit the scope of the private attorney's future career and the effective operation of his firm, as well as the individual's right to legal counsel of choice. The analogous rule in the private practice of law should therefore limit the imputation of confidential disclosures, **[\*\*54]** actual or presumed, to only those lawyers practicing in the attorney's area of concentration. Absent direct proof to the contrary, the attorney would not be deemed to have shared confidential information relating to matters and services exclusively within the sphere of representation of another department or section of his firm. This vertical responsibility rule is more acutely dramatized in the large, departmentalized law firms characteristically more prevalent in an era of evolving legal specialization. *See also* Kaufman, *The Former Government Attorney and the Canons of Professional Ethics,* 70 Harv. L. Rev. 657, 666-67 (1957); Note, *Attorney's Conflict of Interests, supra* at 77-78.

Without question SS&D is the largest law firm in Ohio and perhaps one of the larger law firms in the nation, with approximately 180 partners and associates. It is departmentalized into

five sections as hereinbefore described. Brueckel is, and has been during his legal career with SS&D, assigned to the highly specialized bond division of the Public Law Section of that firm; Lansdale is, and has been during his legal career with SS&D, assigned to the Litigation Section of the firm. Each **[**55]** is a separate and distinct section of the firm pursuing specialized areas of endeavor. The Litigation Section has, without exception, pursued in adversary proceedings the interests of CEI. In no instance has it represented MELP, and under the circumstances of cross-interest between the parties the litigation section has been the advocate for CEI.

The record is barren of evidence of actual confidential disclosure between Brueckel of the Public Law Section and Lansdale of the Litigation Section. The Lansdale-Hauser memorandum resulting from the White-Little Hoover Commission meeting attended by Lansdale and Brueckel does not support a conclusion of actual disclosure for the reasons heretofore discussed in the statement of the facts herein.

Apart from the doctrine of vertical responsibility, the City was equally unsuccessful in supporting imputed disclosure of confidential information by Brueckel to Lansdale in light of affirmative evidence rebutting such presumption. *See, Standard Oil Co., supra* at 304.

The City having failed to carry its burden of proof as to the three elements of the "substantial relationship" test, it is manifest that disqualification of SS&D is not warranted **[**56]** under this traditional analysis.

Lastly, the Court directs its attention to the alleged conflict of interest arising from O'Loughlin's service with the City Law Department between 1952 and 1968 when he became associated with SS&D.

During his tenure with the City Law Department, O'Loughlin served as Chief Counsel for the City under Law Director Brontis Klementowicz (Klementowicz) between 1964 and 1968. In this capacity he had overall responsibility for the City's civil litigation, monitoring in varying degrees legal services required by all City departments. The evidence demonstrates that MELP affairs during this period were directly under the supervision of Klementowicz, acting on behalf of the incumbent Mayor Ralph J. Locher. O'Loughlin was, however, as Secretary to the Mayor's Board of Control privy to various discussions concerning MELP expansion. Since affiliating with SS&D, O'Loughlin has been assigned to the Public Law Section, where he has **[*212]** served in a consulting capacity with various political subdivisions of government, school boards and state universities.

The City's charge of conflict arising from O'Loughlin's employment by SS&D is founded upon Canon 9, **[**57]** "A Lawyer Should Avoid Even the Appearance of Professional Impropriety ". DR 9-101 (B) states:

> **HN25** A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

As noted in ABA Committee on Professional Ethics Formal Opinion No. 37 (May 4, 1931), the rule evolved to protect against

> the manifest possibility that his action as a public legal official might be influenced (or open to the charge that it had been influenced) by the hope of being employed privately either to uphold or upset what he had done.

Considering the issue presented, the Court is guided by Judge Kaufman's admonition articulated in his seminal article, *The Former Government Attorney and the Canons of Professional Ethics*, 70 Harv. L. Rev. 657, 668 (1957), wherein he stated:

> If the Government service will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in the practice of a technical specialty which he had devoted years in acquiring, and if that sterilization will spread to the firm with which he becomes associated, the sacrifice of entering government **[**58]** service will be too great for most men to make.

Obvious are the distinctions between legal precedent and the present case under which Canon 9 sanctions are sought. In those instances wherein disqualification was ordered pursuant to Canon 9, the challenged attorney had performed extensive services in specific matters, or litigation in the same proceeding from which he was subsequently being disqualified. *E.g., General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974); *Allied Realty of St. Paul, Inc. v. Exchange Nat'l Bank of Chicago*, 408 F.2d 1099 (8th Cir.), *cert. denied*, 396 U.S. 823, 24 L. Ed. 2d 73, 90 S. Ct. 64 (1969); *Hilo Metals Company, Ltd. v. Learner Co.*, 258 F. Supp. 23 (D. Haw. 1966).

Manifest from the record is the City's failure to factually interconnect O'Loughlin's present employment with his previous public employment. Indeed, the record is conspicuously silent as to any specific claims or matters involving O'Loughlin's participation in MELP affairs, either substantially or remotely related to the antitrust action presently before this Court. Accordingly, in the words of Judge Kaufman in *United States v. Standard Oil Co., supra* **[**59]** *at* 364 (S.D.N.Y. 1955), the failure of proof is fatal:

> [It] is hardly reasonable to hold that an appearance of evil can be found in [an attorney's] undertaking a case against the government where there is not some closer factual relationship between his former job and the case at hand than that the same vast agency is involved.

Absent the vital links required to support a Canon 9 violation, the City's Motion for Disqualification is overruled on this account.

SUMMARY OF CONCLUSIONS

For the reasons hereinbefore set forth, the Court concludes:

1. The City is estopped from asserting alleged conflict of interest against SS&D;
2. The City, with full knowledge of SS&D's legal representation of CEI over the years, waived any rights to assert alleged conflict of interest against SS&D;
3. Brueckel's services for the City in preparation of the 1972 $9.8 million MELP related bond ordinance were not adverse to Lansdale's adversary representation of CEI in this antitrust action;
4. SS&D's role as special bond counsel for the City on an ad hoc basis throughout

the years does not constitute an adverse representation to Lansdale's representation of CEI in **[*213]** **[**60]** the instant antitrust action within the intent and meaning of the Canons;

5. Lansdale received no confidential information concerning MELP as a result of Brueckel's services as special bond counsel to the City either actually or by operation of law;

6. O'Loughlin's present employment with SS&D presents no basis for disqualification of SS&D as counsel for CEI in the pending antitrust action.

Accordingly, the City's Motion to Disqualify the law firm of SS&D from continued representation of defendant CEI in this antitrust action is hereby denied.

IT IS SO ORDERED.

ROBERT B. KRUPANSKY / United States District Judge

Service: **Get by LEXSEE®**
Citation: **440 f supp 193**
View: Full
Date/Time: Wednesday, January 3, 2007 - 2:35 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◈ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®    About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.