## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation,

          Plaintiffs,

vs.

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

          Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

Craig L. John (P27146)
Thomas J. Murray (P56331)
Joseph A. Doerr (P66109)
Attorneys for Plaintiffs
DYKEMA GOSSETT, PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304-2820
Phone: (248) 203-0714
Email: cjohn@dykema.com

Sharon M. Woods (P22542)
Kevin Kalczynski (P57929(
Melonie M. Stothers (P65344)
Attorneys for Defendants
BARRIS, SOTT, DENN & DRIKER, PLLC
211 West Fort Street, 15th Floor
Detroit, Michigan 48226
Phone: (313) 965-9725
Email: kkalczynski@bsdd.com

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DYKEMA GOSSETT • A PROFESSIONAL LIMITED LIABILITY COMPANY • 39577 WOODWARD AVENUE • SUITE 300 • BLOOMFIELD HILLS, MICHIGAN 48304

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT OF ISSUES PRESENTED ............................................................ vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ................................. vii

INTRODUCTION ................................................................................................1

BACKGROUND FACTS .....................................................................................2

    A.    CenTra, Inc. And The Detroit International Bridge Company .......................2

    B.    Gowling Lafleur Henderson LLP .................................................................3

    C.    David Estrin ..............................................................................................4

    D.    Gowlings represents Plaintiffs in the FIRA Litigation (1985-1992) .............4

    E.    Gowlings Continues To Represent CenTra And Its Subsidiaries Throughout The 1980s and 1990s. ................................................................................6

    F.    Gowlings Represents Windsor With Respect To Competing Proposals To Solve Traffic Problems (Late 2002-2003).............................................7

    G.    Representation Concerning "Key Man" Life Insurance Issue (October 2003). ............8

    H.    Gowlings' Plaza Deck Expansion Representation of Windsor (June 2004).................8

    I.    Gowlings Continues Its Representation Of Centra In The L.E. Walker Litigation (February 2005).............................................................10

    J.    Gowlings Solicits Plaintiffs To Perform Tax Work In 2005 (April/May 2005)..........10

    K.    Gowlings Agrees To Represent Plaintiffs In Efforts To Finance The Second Span (2005-2006)........................................................................12

LAW AND ARGUMENT ...................................................................................14

I.    PLAINTIFFS DID NOT CONSENT TO OR OTHERWISE WAIVE THEIR RIGHT TO OBJECT TO GOWLINGS REPRESENTING WINDSOR IN OPPOSITION TO THE SECOND SPAN.........................................................14

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

ii

A.    Gowlings' National Managing Partner Admits That Plaintiffs Never Consented To Or Otherwise Waived Objecting To Gowlings Representing Windsor With Respect To The Second Span................................................15

B.    Plaintiffs Did Not Know Defendants Were Representing Windsor With Respect To The Second Span Until September 2006...................................17

C.    Defendants' Reliance Upon Ohio Law Is Misplaced And The Cases Cited By Defendants Are Readily Distinguishable From The Present Case........................18

II.    GOWLINGS' REPRESENTATION OF BOTH PLAINTIFFS AND WINDSOR WITH RESPECT TO THE SECOND SPAN PRESENTS A NON-CONSENTABLE WAIVER SITUATION. ............................................20

III.   DEFENDANTS' MOTION FAILS TO ADDRESS ANY OF THE CLAIMS IN PLAINTIFFS' FIRST AMENDED COMPLAINT......................................23

IV.    PLAINTIFFS HAVE SUFFERED REAL, TANGIBLE DAMAGES FROM THE ACTIONS OF DEFENDANTS. ........................................................25

CERTIFICATE OF SERVICE ...........................................................................28

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barkley v. Detroit*, 204 Mich. App. 194; 514 N.W.2d 242 (1994) ........................................... vi, 21

*City of Cleveland v. the Cleveland Electric Illuminating Company*,
    440 F.Supp. 193 (N.D. Ohio) ........................................................................................ 18, 19

*City of Kalamazoo v. Michigan Disposal Service Corporation, et al*,
    125 F.Supp.2d 219 (W.D. Mich. 2000) ........................................................................ 15

*Evans & Luptak, PLC v. Lizza*, 251 Mich. App. 187; 650 N.W.2d 364 (2002) ........................... vi

*In re Alumco Industries Corp.*, 12 B.R. 7 (N.D. Ohio 1981) ................................................. 19

*In re Marks & Goergens, Inc.*, 199 B.R. 922 (E.D.Mich. 1996) .................................. vi, 19, 24, 25

*Martin v. MacDonald Estate*, 1 W.W.R. 705 (1990) .......................................................... 23

*Melamed v. ITT Continental Baking Co.*, 592 F.2d 290 (6th Cir. 1979) ...................................... 22

*People v. Carines*, 460 Mich. 750; 597 NW2d 130 (1999) ......................................................... 15

*R. v. Neil*, 2002 SCC 70 (2002) ................................................................................ vi, 7, 16

*Thompson v. Paasche*, 950 F.2d 306 (6th Cir. 1991) ................................................................ 26

**Other Authorities**

1992 WL 510830 (Mich.Prof.Jud.Eth.) ................................................................................ 22

Michigan Ethics Opinion RI-108 (Dec. 3, 1991) ................................................................... 21

Michigan Ethics Opinion RI-57 (Aug. 16, 1990) .................................................................. 23

Michigan Law & Practice, Damages § 5 .............................................................................. 25

**Rules**

Canada Professional Conduct Rule 2.04(3) ....................................................................... 8, 14

DYKEMA GOSSETT-A PROFESSIONAL LIMITED LIABILITY COMPANY-39577 WOODWARD AVENUE-SUITE 300-BLOOMFIELD HILLS, MICHIGAN 48304

Fed. R. Civ. P. 56(c) ................................................................................................ 1

Fed. R. Civ. P. 56(f) ................................................................................................ 8

Michigan Rule of Professional Conduct 1.6 .......................................................... vi, 23

Michigan Rule of Professional Conduct 1.7 ................................................... vi, 15, 21, 22

Michigan Rule of Professional Conduct 1.7(a) ....................................................... 14

Michigan Rule of Professional Conduct 1.8(b) ...................................................... 23

Michigan Rule of Professional Conduct 1.9 .................................................... vi, 15, 22

Michigan Rule of Professional Conduct 1.9(a) ....................................................... 24

Michigan Rule Professional Conduct 1.9(c) .......................................................... 23

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

### STATEMENT OF ISSUES PRESENTED

1. Whether there are genuine issues of material fact precluding entry of summary judgment, including whether Plaintiffs consented to or otherwise waived objecting to Defendants representation of the City of Windsor with respect to the building of a second span at the Ambassador Bridge?

 Plaintiffs answer yes.

 Defendants answer no.

2. Whether Plaintiffs have suffered damages due to Defendants' unethical and illegal actions?

 Plaintiffs answer yes.

 Defendants answer no.

3. Whether Plaintiffs are entitled to conduct discovery as to the allegations set forth in Defendants' declarations and exhibits attached to their Motion for Summary Judgment when such declarations and exhibits are outside the scope of the pleadings and raise issues of fact that are disputed?

 Plaintiffs answer yes.

 Defendants answer no.

4. Whether, even if Plaintiffs consented to Defendants' representation of the City of Windsor, Defendants are still not entitled to summary judgment because there are still genuine issues of material fact with respect to whether Defendants breached their contract with Plaintiffs, breached their fiduciary duties or committed malpractice?

 Plaintiffs answer yes.

 Defendants answer no.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*In re Marks & Goergens, Inc.*, 199 B.R. 922 (E.D.Mich. 1996)

*Evans & Luptak, PLC v. Lizza*, 251 Mich. App. 187, 197; 650 N.W.2d 364 (2002)

*Barkley v. Detroit*, 204 Mich. App. 194, 203; 514 N.W.2d 242 (1994)

Michigan Rule of Professional Conduct 1.6

Michigan Rule of Professional Conduct 1.7

Michigan Rule of Professional Conduct 1.9

*R. v. Neil*, 2002 SCC 70 (2002)

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

**INTRODUCTION**

Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(c) should be denied because there are numerous, genuine issues of material fact. To start, Defendants admit, or cannot reasonably dispute, that (1) they were representing Plaintiffs and the City of Windsor ("Windsor") in 2005-2006 on the same or substantially same matter, that is the development of the second span of the Ambassador Bridge (the "Second Span"), and that their clients had materially adverse interests with respect to that development; (2) that they failed to obtain the consent of Plaintiffs or Windsor to engage in these and other potentially conflicting representations; (3) that they failed to meet their ethical obligations in conducting and/or amending their conflict checks; and (4) that Plaintiffs never consented to Defendants representing Windsor in opposition to Plaintiffs' efforts to develop the Second Span. Remarkably, Defendants' entire motion is premised on their claim that Plaintiffs waived any conflict or consented to such representation in 2004, *yet one day before the present lawsuit was filed Defendants' National Managing Partner was still seeking a waiver from Plaintiffs!* Of course, Defendants neglected to disclose the above letter from its National Managing Partner because they know it is devastating to their case. *See* Ex. A, 11/20/06 letter from Scott Jolliffe, National Managing Partner of Gowling Lafleur Henderson ("Gowlings").

Additionally, Defendants' motion should be denied on procedural grounds alone. Defendants rely upon four declarations and upon multiple exhibits containing factual allegations that are disputed and are outside the scope of the pleadings. Plaintiffs filed a motion to conduct discovery [15] to test the veracity of the allegations made in those declarations and exhibits. The Court denied Plaintiffs' motion. Accordingly, Plaintiffs will demonstrate below, as best they can without the benefit of discovery, certain facts in Defendants' declarations and exhibits that are already known to Plaintiffs to be untrue, self-contradictory or incomplete. Plaintiffs believe

1

discovery would reveal additional proof of the falsity of statements made in the Declarations, and that, through discovery, Plaintiffs would have been able to identify additional material issues in dispute had Plaintiffs' Motion to Conduct Discovery been granted.

Finally, Plaintiffs have suffered tangible damages as set forth in detail below, despite Defendants' speculation to the contrary. The approval of the United States Coast Guard ("Coast Guard") is necessary to build the Second Span because it will traverse the Detroit River. The Coast Guard initially advised Plaintiffs that they would not have to conduct an Environmental Assessment ("EA"). However, Defendant Estrin's conduct caused the Coast Guard to change its earlier position and require Plaintiffs to submit an EA to obtain the Coast Guard's approval. Because of Estrin's conduct, Plaintiffs will be forced to pay approximately $800,000 to engineers and environmental professionals to conduct the EA the Coast Guard earlier determined was not necessary. This damage suffered by Plaintiffs directly refutes Defendants' argument that Plaintiffs have suffered no damages.

Given the substantial genuine issues of material fact, the fact that Plaintiffs have not been permitted to conduct any discovery, and the damages already suffered by Plaintiffs, Defendants' motion for summary judgment should be denied.

## BACKGROUND FACTS

A complete background of the decades-long-attorney-client relationship between Plaintiffs and Defendants will allow the Court to appreciate just how negligently and brazenly Defendants have acted in this case.

### The Parties

#### A.   CenTra, Inc. And The Detroit International Bridge Company

Plaintiff CenTra, Inc. ("CenTra") is a Delaware corporation with its principal place of business in Michigan. CenTra is a privately held company and does not have the disclosure

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

requirements of publicly traded companies.  Gowlings represented to the Canada Revenue

Agency ("CRA"), via information it gathered as the attorneys for CenTra, that CenTra is a

diversified "holding company, [and] has a number of subsidiaries that are involved in

transportation logistics services, an international toll bridge, freight delivery services, truckload

and less than truckload motor carrier operations in the United States and Canada and holds and

leases land." (Ex. B, Stamper Decl., ¶ 13).  Gowlings also prepared, from information it

obtained while representing Plaintiffs, and provided the CRA what Gowlings described as "a full

organizational chart" of CenTra and its direct and indirect subsidiaries.  That chart demonstrates

that Gowlings knows that Central Transport International, Inc., Detroit International Bridge

Company , CenTra-McKinlay Int'l and other McKinlay corporate entities, and Canadian Transit

Company are direct or indirect current or former subsidiaries of Plaintiffs that benefited from

Gowlings' legal and other work on behalf of Plaintiffs.

     Gowlings further represented to the CRA that Detroit International Bridge Company

("DIBC") is a wholly owned subsidiary of CenTra and Canadian Transit Company ("CTC") is a

wholly owned subsidiary of DIBC.  Finally, Gowlings represented to the CRA that "[t]he

Ambassador Bridge (the 'Bridge') which spans between Windsor, Ontario and Detroit, Michigan

is owned jointly by related parties of CenTra...." *Id.*

## B.    Gowling Lafleur Henderson LLP

Defendant Gowling Lafleur Henderson LLP ("Gowlings") is one the largest law firms in

Canada – if not the largest - with over 700 attorneys.

3

### C.     David Estrin

Defendant David Estrin ("Estrin") is a partner at Gowlings, a lawyer, and has been a

licensed member of the Law Society of Upper Canada since 1971. Estrin has been a partner at

Gowlings since 1990.

## Gowlings' Simultaneous Representation of Plaintiffs and Windsor.

Defendants' Brief failed to disclose to the Court their longstanding attorney-client

relationship with Plaintiffs, and Plaintiffs' subsidiaries and related companies. Defendants

cannot dispute that from 1985 until December, 2006, when Gowlings unlawfully and unethically

dropped Plaintiffs as a client in order to "solve" the conflict caused by Gowlings' conflict check

failures, Gowlings represented CenTra and its numerous subsidiaries on a variety of matters, but

specifically as to the ownership, control, rights and authority of the Ambassador Bridge,

including development of the Second Span. Indeed, from 1985-1990, Gowlings was paid

$800,000 in legal fees by CenTra and its various subsidiaries, and in eighteen months in 2005-

2006 alone Gowlings was paid almost $720,000. (Ex. C). Defendants conveniently omit any

discussion of their decades-long representation of Plaintiffs[1] because they know such

representation, and their knowledge and use of confidential information obtained during these

prior engagements, annihilates their case.

### D.     Gowlings represents Plaintiffs in the FIRA Litigation (1985-1992)

In 1979, the Canadian government filed suit against Central Cartage Company, a CenTra

subsidiary, in the Federal Court of Canada Trial Division. The litigation involved Canada's

attempt to take possession, ownership and control of the Canadian half of the Ambassador

---

[1] Please see the timeline attached as Ex. D for a concise summary of Gowlings
simultaneous representations of Plaintiffs and Windsor.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

Bridge from CenTra without just compensation pursuant to the Foreign Investment Review Act ("FIRA Litigation"). (Ex. E, Moran Decl., ¶ 1). Goodman & Goodman ("Goodmans"), a Toronto law firm, initially defended Plaintiffs and worked extensively with employees and agents of Plaintiffs to gather and analyze general correspondence, correspondence from counsel, documents and copies of statutes and regulations relating to the ownership and control of the Bridge. *Id.* at ¶ 3. The material included documents from the files of other attorneys who had represented Plaintiffs. *Id.* at ¶ 3. Goodmans prepared a definitive memorandum (the "Goodman Memo") that compiled all of the documents, both public and private, that Goodmans believed to be proper and relevant to the defense of Plaintiffs to an encroachment by the Canadian government upon their rights, ownership and control with respect to the Bridge. *Id.* at ¶ 4. The Goodman Memo included information and analysis that could be used to support or challenge Plaintiffs' efforts to repair, maintain, improve, expand, sell, own and operate the Ambassador Bridge.

During the course of the FIRA Litigation, Plaintiffs needed to change counsel. *Id.* at ¶ 5. Plaintiffs interviewed several law firms, and hired Gowlings to replace Goodmans. Gordon Henderson, Emilio Binavince and Ron Lunau were the Gowlings attorneys handling the FIRA Litigation. *Id.* at 7.[2] After engaging Gowlings, Plaintiffs gave Gowlings the Goodman Memo and all of the documents that Goodmans had used to prepare the Goodman Memo and to reach their legal conclusions. *Id.* at ¶ 11. The Goodman Memo was discussed by Plaintiffs and other outside counsel for Plaintiffs with attorneys at Gowlings during the course of the FIRA Litigation, and those documents were referenced numerous times throughout the course of Gowlings' representation of Plaintiffs. *Id.* at ¶ 11-12.

---

[2] Gordon Henderson passed away several years ago. Emilio Binavince no longer practices at Gowlings. Ron Lunau is a partner still practicing at Gowlings. *Id.* at 9.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

Among other things, the Goodman Memo contains attorney-client communications and attorney work product that discusses the very heart of DIBC's business - the history, ownership, rights and control of the Ambassador Bridge. *Id.* at 13. The documents referred to, analyzed in and attached to the Goodman Memo, as well as other attorney-client privileged documents, were used by Gowlings' lawyers in their representation of Plaintiffs over a long course of time, and the interpretations set forth in the Goodman Memo were the starting points for the strategy used by Gowlings in representing the Bridge in the FIRA Litigation and other matters. *Id.* at ¶ 16. Gowlings representation of Plaintiffs in the FIRA Litigation ended in 1992, but Gowlings retained the Goodman Memo and its exhibits.

The FIRA litigation, while all encompassing, is not the only representation by Defendants of Plaintiffs over the years.

**E.     Gowlings Continues To Represent CenTra And Its Subsidiaries Throughout The 1980s and 1990s.**

There are numerous representations that Defendants did not disclose to this Court which demonstrate that Gowlings was counsel for Plaintiffs for decades, including the following:

In 1987, Gowlings was retained by McKinlay Transport, Ltd., a CenTra subsidiary, with respect to a claim against Pitney Bowes of Canada. (Ex. F).

In late 1992, Gowlings represented CenTra with respect to a lawsuit against Anixter for past due freight charges of approximately $57,000. (Ex. G).

In 1992 and 1993, Gowlings served as counsel to DIBC and CTC with respect to Series "C" note financing, and was paid $22,500 for, *inter alia*, reviewing financing documentation, preparing legal opinions and researching legislation pertaining to CTC.. (Ex. H)

Gowlings represented Plaintiffs in a trademark dispute that was ultimately dismissed in 1998. (Ex. I). There is correspondence as late as 2001 between Gowlings and Plaintiffs with respect to this matter.

6

**F.      Gowlings Represents Windsor With Respect To Competing Proposals To Solve Traffic Problems (Late 2002-2003).**

As is clear from the above evidence, by 2002, Gowlings had been counsel for CenTra and its subsidiaries for years.  Although additional discovery is needed on this point, it appears that Gowlings first began representing Windsor in 2002.  Estrin claims that in late 2002, Windsor engaged Gowlings to evaluate competing proposals for solving traffic problems.  (Estrin Decl., ¶ 8).  It is not clear whether Estrin's representation of Windsor at that time was adverse to Plaintiffs.  Sometime after he began representing Windsor, Estrin claims that CTC (Gowlings' client in the FIRA Litigation and Series "C" financing) proposed using an existing train/hydro-electric corridor in southwest Windsor to provide a new truck access route to the Ambassador Bridge.  Defendants seem to claim, without any supporting documentation, that they represented Windsor in opposition to CTC's proposal.[3]

Estrin's declaration regarding this representation reveals several troubling facts.  First, Estrin never ran a conflict check concerning this new matter; if he had he would have seen that Plaintiffs, and in particular CTC, were clients of Gowlings.  This failure is a clear violation of Defendants' ethical obligations.[4]  Second, because Estrin's negligent failure to run a conflict check apparently resulted in Estrin not realizing that Plaintiffs were a Gowlings client, Gowlings

---

[3] Estrin's claims with respect to the proposed use of the corridor are incorrect.  This was proposed in February of 1999 by a study group commissioned by Windsor called the Windsor Area Long Range Transportation Study ("WALTS").  (Ex. B, Stamper Decl., ¶ 4).  CTC has never opposed or proposed the use of that corridor to alleviate traffic.  Rather, CTC indicated that if Windsor preferred use of the corridor as a truck access route to the Ambassador Bridge, then it would abide by that desire.  *Id.*, ¶ 4).

[4] Defendants cite only U.S. law in their brief and apparently concede that Michigan substantive law, and likewise the Michigan Rules of Professional Conduct, apply here.  However, should this Court choose to review The Rules of Professional Conduct for the Upper Law Society of Canada, Estrin and Gowlings will find no comfort there.  If anything, the Canadian Rules are more stringent than the MRPC, and the case law from the Supreme Court of Canada is unforgiving of Gowlings' conduct.  *See R. v. Neil,* 2002 SCC 70 (2002), Ex. J.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

never consulted with Plaintiffs or sought consent to represent Windsor.  Third, Estrin admits he negligently failed to amend his initial conflict filing: "*I did not amend my initial conflict filing to add CTC as an adverse party when my general representation of Windsor gradually turned adverse to CTC.*"  (Estrin Decl., ¶ 8)(emphasis added).[5]

### G.    Representation Concerning "Key Man" Life Insurance Issue (October 2003).

Gowlings represented CenTra in 2003 with respect to collection of the life insurance proceeds regarding a "key man" who had died..  (Ex. L).  Gowlings failed to disclose to this to the Court in its Brief.  Discovery is necessary because it is unclear whether a conflict check was run by Catherine Pawluch, the attorney at Gowlings handling this matter.  If Estrin is to be believed, by this time his representation of Windsor had gradually turned "adverse" to Plaintiffs and CTC with respect to the proposed corridor matter, which raises several questions.[6]  These issues must be viewed in a light most favorable to Plaintiffs, especially considering the fact that Plaintiffs have not been permitted to conduct discovery.  These are all areas to which Plaintiffs are entitled to discovery, as previously identified in the Rule 56(f) affidavit of Craig L. John, Esq.

### H.    Gowlings' Plaza Deck Expansion Representation of Windsor (June 2004).

Estrin states in his declaration that he began representing Windsor in June of 2004 in regard to CTC's site plan application to add toll booths and expand the bridge deck in Canada

---

[5] The commentary to Rule 2.04(3) of the Code of Professional Conduct in Canada speaks directly to this: "A lawyer should examine whether a conflict of interest exists not only from the outset but throughout the duration of a retainer because new circumstances or information may establish or reveal a conflict of interest."  The relevant Canadian ethical rules are attached as Ex. K for the Court's convenience.

[6] If that is true, why did Gowlings not decline the "key man" representation?  Why did Gowlings not, at a minimum, call to CenTra's attention the fact that it was representing Windsor (a current client) adverse to CenTra (another current client)?  Did Gowlings ever advise CenTra of these concurrent representations?

8

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

("Plaza Deck Expansion").[7] (Estrin Decl., ¶ 9). *Again, Estrin did not even bother to run a conflict check or seek consent of Plaintiffs to represent Windsor in this matter.* By this point in time, Gowlings had represented CenTra on various matters for approximately 20 years, and contemporaneously represented Plaintiffs, yet Estrin never ran a conflict check or contacted Plaintiffs to advise Plaintiffs of the representation, which Estrin claims is adverse.

Estrin details several steps he took with respect to the Plaza Deck Expansion (*See* Estrin Decl., ¶¶ 12-19), but he doesn't stop there. Estrin then remarkably claims, without any evidentiary support, that he divined that the Plaza Deck Expansion, and a later Preliminary Application submitted by Plaintiffs to the Coast Guard to build a Second Span, were essentially one and the same. Consequently, he deemed the steps he took in the Plaza Deck Expansion matter as actually being steps he took in opposition to the proposed Second Span. Estrin's claims in this regard are hard to believe. First, Estrin did not share with Plaintiffs that he believed, in 2004, he was representing Windsor in opposition to the Second Span, and that Estrin considered the Plaza Deck Expansion and the Second Span to be the same matter. Second, and more importantly, Estrin made a contradictory claim in his September 2006 letter to the Coast Guard by stating that Plaintiffs "have not applied to the City of Windsor, or even discussed their second bridge proposal with the City of Windsor . . . ." (Ex. M).[8] Third, *the Plaza Deck Expansion has absolutely nothing to do with and is not part of or dependent upon the*

---

[7] Again, Estrin is factually incorrect. CTC's site plan application called for additional governmental inspection booths, not toll booths.

[8] How can both of these statements by Estrin be true? Was the proposed Second Span an issue with which Windsor had been involved as part of the Plaza Deck Extension and on which he had represented Windsor in 2004 as Estrin claims in his Declaration submitted to this Court, or was what he wrote to the Coast Guard in September 2006, when Estrin was trying to convince the Coast Guard to delay action on the Second Span proposal, true? Juxtaposing these two statements in light of their different purposes demonstrates that Estrin tailors the "facts" to fit the need and the audience. Plaintiffs are entitled to depose Estrin as to these contradictory statements to determine which one, if any, is true?

9

*development of the Second Span.* (Ex. B, Stamper Decl., ¶ 5). The Plaza Deck Expansion was a stand alone project that would proceed regardless of whether a Second Span was constructed. *Id.*

### I. Gowlings Continues Its Representation Of Centra In The L.E. Walker Litigation (February 2005)

Gowlings continued representing CenTra even though Estrin claims Gowlings was representing Windsor adverse to CenTra's interests at the same time. In February of 2005, Catherine Pawluch of Gowlings undertook a new matter which involved filing a lawsuit on behalf of a CenTra subsidiary against L.E. Walker, a freight carrier who failed to deliver a load to Ford of Canada. (Ex. N). Ms. Pawluch, in transmitting the invoice to CenTra, states as "a gesture of goodwill, and because we value the business relationship we have established with Central Transport, we have reduced our fees by Cdn$969.[9]" In addition to not disclosing this representation to the Court, this documentation also calls into question Karen Byrne's claim that "Gowlings has not invoiced CenTra, CTC, Central Cartage Co., or Detroit International Bridge Company (collectively "CenTra") since sometime before 1998." (Byrne Decl., ¶ 6). Plaintiffs have now detailed three separate representations in or after 1998 where Gowlings invoiced CenTra or its subsidiaries. *See* Invoices attached as Exs. I, L and N. At a minimum, this should call into question the other allegations made in the declarations submitted by Defendants, and definitively demonstrates there is a genuine issue of material fact as to these issues.

### J. Gowlings Solicits Plaintiffs To Perform Tax Work In 2005 (April/May 2005).

Contrary to Defendants' allegations, Gowlings solicited Plaintiffs to perform work for Plaintiffs in 2005, not the other way around. Dale Hill, now a Gowlings partner, worked for the

---

[9] This further demonstrates that Karen Byrne is incorrect when she states Gowlings never handled any matters for Centra after 1998. If Karen Byrne's Declaration in that regard is true, then to what "business relationship [Gowlings] has established" is Ms. Pawluch referring? Again, it is uncertain where the truth is found, and at a minimum discovery is necessary.

10

Canada Revenue Agency ("CRA") from 1989 until May of 2005, and during that time he represented CRA with respect to certain income tax controversies (the "Controversies") involving CenTra's subsidiaries. (Ex. O, Calderone Decl., ¶ 2). In the spring of 2005, while the Controversies were still unresolved, Mr. Hill contacted Fred Calderone, a CenTra executive, and advised Mr. Calderone that he had resigned from CRA to take a partner level position with Gowlings, where he would establish a practice assisting Gowlings' clients in matters similar to the Controversies. *Id.* at ¶ 3. Mr. Calderone asked Mr. Hill if such a representation was ethically permissible, given that Mr. Hill opposed these very positions while at CRA, and Mr. Hill advised there were no ethical impediments to representing Plaintiffs. *Id. It is not true, as Defendants now claim, that Plaintiffs sought Gowlings to perform work for Plaintiffs in 2005 as some scheme to disqualify Defendants.* Instead, Gowlings solicited Plaintiffs.

Importantly, Dale Hill states that he ran a conflict check for the new tax engagement and it revealed that CTC and DIBC "were either current or former clients." (Hill Decl., ¶ 7). Hill does not say whether he determined if CTC and DIBC were current or former clients, or whether he even tried to do so; but we now know, given the proof that Gowlings was representing Plaintiffs in the L.E. Walker matter, that DIBC was a current client. *See* Ex. N. Hill also states "the search did not reveal that Gowlings was representing any clients adverse to Stamper, CTC or DIBC." (Hill Decl., ¶ 7).[10]

---

[10] Hill's declaration raises a host of questions such as: (1) if, as Estrin claims, Gowlings was representing Windsor adverse to DIBC, why wasn't this reflected in Gowlings' conflict check results? (2) why didn't Estrin respond to Hill's conflict check to tell him that Gowlings was representing Windsor adverse to Plaintiffs at the time? (3) if, indeed, Plaintiffs "waived" the conflict in 2004 as to Gowlings representing Windsor, isn't it reasonable for Plaintiffs to assume that this 2004 representation of Windsor was now concluded since Gowlings was now soliciting work from Plaintiffs and did not mention any conflict? (4) what was disclosed to Windsor and did Windsor ever consent to the concurrent representation of both Plaintiffs and Windsor? At a minimum, Plaintiffs are entitled to discovery concerning the conflict check process at Gowlings, and why Estrin never notified Hill that Gowlings was representing Windsor adverse to Plaintiffs. The clear inference is that Estrin did not contact Hill because Estrin's representation of Windsor

**K.**   **Gowlings Agrees To Represent Plaintiffs In Efforts To Finance The Second Span (2005-2006).**

In November of 2005, Dale Hill and Tim Wach, a partner of Gowlings and a tax lawyer, met with Fred Calderone and other representatives of CenTra at CenTra's offices in Warren, Michigan. (Wach Decl., ¶¶ 2-5). At the meeting a $700-800 million bond offering on the Ambassador Bridge was discussed to finance the Second Span. *Id.* at ¶ 8. Wach states that he gave legal advice and suggested that some of the bond offering occur in Canada through CTC in order to mitigate certain Canadian tax consequences if the bond offering were done exclusively in the U.S.[11] *Id.* at 7. Wach further admits that it was not until after Estrin sent his September 14, 2006 letter to the Coast Guard opposing the Second Span that CenTra contacted him to complain that Gowlings was representing Windsor in opposing the Second Span. *Id.* at ¶¶ 10, 12. Based upon the statements of their own partner above, Gowlings cannot dispute that Gowlings was performing work for Plaintiffs in relation to financing the Second Span, while at the same time opposing the Second Span on behalf of Windsor.

**Summary of Dispute**

This lawsuit became necessary when Plaintiffs discovered in September 2006 that Gowlings was representing Windsor in opposing the Second Span while concurrently Gowlings was representing Plaintiffs in obtaining financing for the Second Span, and Gowlings refused to rectify the situation. At the same time, it was revealed that Gowlings made reference to the archival and historical documents relating to the rights of DIBC and CTC that were the subject of the Goodman Memo that was previously shared with Gowlings as Plaintiffs' counsel.

---

in 2005 was not adverse to Plaintiffs.

[11] For a complete description of the bond work being performed by Gowlings, please see the Declaration of Fred Calderone at ¶¶ 7-11.

Gowlings' own statements indisputably establish that Gowlings was representing Plaintiffs with respect to financing for the Second Span, and contemporaneously represented Windsor in opposition to the Second Span. *See* Wach Decl. and Ex. M. In developing the Second Span , there are three essential aspects: (1) government approval; (2) financing; and (3) the actual construction. (Ex. B, Stamper Decl., ¶ 6). As to the first aspect, in September 2006, Gowlings was actively representing Windsor in opposing government approval for the Second Span. (Ex. M). As to the second aspect, Gowlings was actively representing Plaintiffs in 2005 and 2006 in obtaining financing for the Second Span. (Wach Decl., ¶¶ 5, 8). As discussed below, this is a classic situation where the law firm is representing opposing clients on the same matter, which is not permitted and presents a situation where the conflict is non-consentable.[12]

Dan Stamper, President of DIBC, unequivocally states that he did not know Gowlings was representing Windsor in opposition to the Second Span until he learned of Estrin's September 14, 2006 letter to the Coast Guard. (Ex. B, Stamper Decl., ¶ 7). Until that time, while Plaintiffs were aware that Gowlings represented Windsor in matters not related to the Second Span, Plaintiffs had no knowledge, and certainly did not consent (nor were they asked to consent), that Gowlings was representing Windsor in opposition to the Second Span. *Id.* at 9. Further, Mr. Stamper will testify that neither he nor anyone else with Plaintiffs ever consented to Gowlings representing Windsor in relation to the Second Span, and Defendants have no evidence that such consent was either sought or obtained. *Id.*

However, the Court need not take Plaintiffs' word for it because Gowlings admits it did not have Plaintiffs consent to represent Windsor with respect to the Second Span. In a letter not disclosed to the Court and sent the same day as the lawsuit was filed, Gowlings admits its

---

[12] For a complete listing of all of Defendants' ethical violations, please see the Declarations of Plaintiffs' experts, Peter Henning and Bruce Hay, attached as Exs. P and Q.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

conflict checks failed miserably.  Gowlings' states "it is regrettable that the searches undertaken

by Gowlings, prior to accepting the engagement in connection with the tax and transfer pricing

services for CTC, failed to disclose any relationship between our existing representation of the

City of Windsor and CTC." (Ex. A).  Gowlings further admits, despite now claiming it already

had Plaintiffs' consent, that it did not have such consent because Gowlings in the letter is still

seeking the consent of Plaintiffs to represent Windsor, and states that Gowlings cannot continue

to represent Plaintiffs and Windsor absent mutual consent.  To be clear, this is the National

Managing Partner of Gowlings, the day the lawsuit is filed, admitting that (1) Gowlings failed to

detect a conflict due to its own negligence; and (2) Gowlings did not yet have the consent of

Plaintiffs or Windsor to continue the representation of both clients.  It is remarkable that

Defendants would have the audacity to claim the opposite now and to seek summary judgment

given this letter from their highest ranking officer.

## LAW AND ARGUMENT

I. **PLAINTIFFS DID NOT CONSENT TO OR OTHERWISE WAIVE THEIR RIGHT TO OBJECT TO GOWLINGS REPRESENTING WINDSOR IN OPPOSITION TO THE SECOND SPAN.**

Whether under Michigan or Canadian ethical rules, Gowlings cannot represent two

current clients with directly adverse interests – here Windsor and Plaintiffs - unless both clients

consent after consultation.  MRPC 1.7(a) states a lawyer shall not represent a client directly

adverse to another client unless: "(1) the lawyer reasonably believes the representation will not

adversely affect the relationship with the other client; and (2) each client consents after

consultation."[13]  Gowlings admits that (1) it failed to run conflict checks; (2) that the conflict

---

[13] Similarly, Canada's RPC 2.04(3) states "A lawyer shall not act or continue to act in a matter when there is or is likely to be a conflicting interest unless, after disclosure adequate to make an informed decision, the client or prospective client consents."

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

checks that were run were faulty because they negligently failed to amend their conflict filing;

(3) that it never consulted with Plaintiffs about any conflict until after the lawsuit was filed; and

(4) via the November 2006 Jolliffe letter they did not have the consent of Plaintiffs to represent

Windsor.

Gowlings only "defense" to its unethical behavior is that Plaintiffs waived their right to

object, but it is clear that Plaintiffs never waived their right to object to Gowlings representing

Windsor with respect to opposing the Second Span.  A waiver is defined as "the 'intentional

relinquishment or abandonment of a known right.'"  *People v. Carines*, 460 Mich. 750, 762-765;

597 NW2d 130 (1999).  The Comment to MRPC 1.9 states, "[a] waiver is effective only if there

is disclosure of the circumstances, including the lawyer's intended role in behalf of the new

client."  If Defendants sought to rely on a waiver of a direct, or even potentially direct conflict,

Defendants should have at the very least offered a writing reasonably sufficient to permit

Plaintiffs to appreciate the significance of the direct conflict in question.  *See City of Kalamazoo*

*v. Michigan Disposal Service Corporation, et al*, 125 F.Supp.2d 219 (W.D. Mich. 2000).

### A. Gowlings' National Managing Partner Admits That Plaintiffs Never Consented To Or Otherwise Waived Objecting To Gowlings Representing Windsor With Respect To The Second Span.

As set forth in detail above, Gowlings never consulted with Plaintiffs regarding its

representation of Windsor with respect to the Second Span, or any other matter.  Indeed,

Gowlings admits that when opening new matters for other clients it violated its ethical duties and

never even ran a conflict check to determine if Plaintiffs were a client.  *See* Estrin Decl.  Under

the MRPC 1.7, Gowlings (and not the client) had the duty to "adopt reasonable procedures,

appropriate for the size and type of firm and practice, [and] to determine in both litigation and

nonlitigation matters the parties and issues involved and to determine whether there are actual or

15

potential conflicts of interest." Comment, "Loyalty to a Client." This obligation makes sense, of course, because only the law firm knows the clients it represents, and the client should not be charged with determining which clients the law firm is representing at any given time.

The rules of professional conduct and law in Canada is even less forgiving, which is probably why Defendants, who are Canadian lawyers, did not cite their own rules or case law. The well known lead case in Canada with respect to conflicts with current clients is *R. v. Neil*, 2002 SCC 70 (2002)(attached as Ex. J). The *Neil* case draws a "bright line" and prohibits a law firm from representing two current clients with directly adverse interests, *even if the matters are unrelated!*

> The general prohibition is undoubtedly a major inconvenience to large law partnerships and especially to national firms with their proliferating offices in major centres across Canada. . . . Conflict search procedures are often inefficient. Nevertheless it is the firm, not just the individual lawyer, that owes a fiduciary duty to its clients, and a bright line is required. The bright line is provided by the general rule that a lawyer may not represent one client whose interests are directly adverse to the immediate interests of another client - - *even if the two mandates are unrelated* - - unless both clients consent after receiving full disclosure (and preferably independent legal advice), and the lawyer reasonably believes that he or she is able to represent each client without adversely affecting the other.

*Id.* at ¶ 29. The *Neil* Court further states that the duty of loyalty is a much broader issue than simply protecting the disclosure of confidential information: "[T]he duty of loyalty to current clients includes a much broader principle of *avoidance of conflicts of interest*, in which confidential information may or may not play a role." *Id.* at ¶ 17 (emphasis added). The *Neil* Court succinctly states the "law firm, as fiduciary could not serve two masters at the same time."[14] *Id.* at ¶ 3.

---

[14] The *Neil* Court also discusses that a law firm owes a duty of candor to its client and "[i]f a conflict emerges, the client should be among the first to hear about it." *Id.* at ¶ 19.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

Instead of admitting its mistake in not seeking or obtaining consent from Windsor and Plaintiffs, Gowlings compounds its unethical behavior by now attempting (disingenuously) to shift the blame to Plaintiffs by claiming "waiver." Unfortunately for Gowlings, its pre-litigation conduct reveals the truth. One day before this lawsuit was served on Gowlings, Scott Jolliffe, Gowlings' National Managing Partner, *admits that Gowlings never had Plaintiffs' consent to represent Windsor*. Mr. Jolliffe states "in order to continue to act on behalf of CTC with respect to the tax and transfer pricing services and the additional matter related to a bond issue . . . the mutual consent of CTC and Windsor must be obtained." (Ex. A). The bond issue Jolliffe referenced is the financing for the Second Span, as described more fully in the Declarations of Fred Calderone and Timothy Wach. Jolliffe's letter conclusively demonstrates that Gowlings current argument of "waiver" is nothing more than a legal afterthought asserted to avoid liability in this case.

**B.    Plaintiffs Did Not Know Defendants Were Representing Windsor With Respect To The Second Span Until September 2006.**

Gowlings bases its claim of consent or waiver on Estrin's allegation that Plaintiffs knew in 2004 that Gowlings was representing Windsor in opposition to the Second Span. There is no evidence of such knowledge other than Estrin's self-serving statements in his declaration. Estrin's actions prior to litigation, like Jolliffe's, demonstrate that this is yet another disingenuous position. Estrin claims that Plaintiffs knew of Gowlings' representation of Windsor in opposition to the Second Span in 2004. Despite this claim, which Plaintiffs deny, Estrin's own September 14, 2006 letter to the Coast Guard states that Plaintiffs "have not applied to the City of Windsor, or even discussed their second bridge proposal with the City of Windsor . . . ." (Ex. M, p. 13). If there were no application to the City of Windsor for a Second Span as of September, 2006, and if the Second Span proposal had not even been discussed between

17

DYKEMA GOSSETT-A PROFESSIONAL LIMITED LIABILITY COMPANY-39577 WOODWARD AVENUE-SUITE 300-BLOOMFIELD HILLS, MICHIGAN 48304

Plaintiffs and Windsor as of September, 2006, as Estrin told the Coast Guard, then how could Plaintiffs be aware that Gowlings was allegedly representing Windsor in opposition to the Second Span two years earlier?

Moreover, Dan Stamper, President of DIBC, unequivocally states in his declaration that he was unaware, until September of 2006, that Gowlings was representing Windsor in opposition to the Second Span. (Ex. B, Stamper Decl., ¶ 7). Of course, by that time, Gowlings was already representing Plaintiffs with respect to obtaining financing of the Second Span via the work being done by Dale Hill and Tim Wach as of 2005. *See* Wach Decl., ¶ 8. Fred Calderone also unequivocally states that, until the Estrin letter to the Coast Guard in September 2006, he was unaware that Gowlings was representing Windsor in opposing the Second Span. (Ex. O, Calderone Decl., ¶¶ 4-5, 11). Estrin's attempts to claim he was representing Windsor in opposition to the Second Span in 2004 is unsupported by the facts, and runs directly contrary to what Estrin told the Coast Guard in September 2006, prior to this lawsuit being filed.

## C.   Defendants' Reliance Upon Ohio Law Is Misplaced And The Cases Cited By Defendants Are Readily Distinguishable From The Present Case.

Defendants' final grasp at proving waiver resorts to relying upon a Northern District of Ohio case interpreting Ohio law. Defendants cite *City of Cleveland v. the Cleveland Electric Illuminating Company*, 440 F.Supp. 193 (N.D. Ohio) in support of their claim that Plaintiffs waived the conflict in Defendants representing Windsor. However, *Cleveland Electric* is easily distinguishable, and has already been rejected under Michigan law. In *Cleveland Electric*, the law firm, Squire, Sanders & Dempsey ("SS&D") had previously represented CEI in 49 legal actions adverse to the City's interest. *Id.* at 204. *Additionally,, SS&D "insisted upon the written assent" of the City and the City obliged by confirming their consent in a written letter. Id.* at

18

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

201, 204. Finally, SS&D's representation of CEI, which was adverse to the City, was "open, notorious and continuous" for a period of 65 years. *Id.* at 24.

The facts here are in stark contrast to those in *Cleveland Electric*. First, Gowlings did not represent Windsor adversely to Plaintiffs in 49 cases over a period of 65 years, and in fact Gowlings represented Plaintiffs (and not Windsor) openly and notoriously for decades. Gowlings did not begin representing Windsor until late 2002, and this representation was not adverse to Plaintiffs, according to Estrin, until "sometime" in 2003. (Estrin Decl., ¶ 8).[15]

Second, unlike SS&D, who identified the conflict and obtained a written consent from the City of Cleveland, Gowlings did not even bother to run a conflict check when opening a new matter for Windsor, much less consult with Plaintiffs about obtaining a written or verbal consent. Third, Plaintiffs simply did not know that Gowlings was representing Windsor in opposition to the Second Span until September of 2006, at which time Plaintiffs promptly raised the issue with Defendants. (Ex. B, Stamper Decl., ¶ 11). Fourth, at least one court in interpreting Michigan law has already declined to follow *Cleveland Electric*.[16] In sum, Gowlings cites Ohio law that has been rejected by a Michigan Court and involves a case with facts vastly different than the present dispute.[17]

---

[15] Once Estrin recognized he was representing Windsor adverse to Plaintiffs he should have run a conflict check, something he admits he failed to do. If he had run such a conflict check, he would have found that Plaintiffs were current clients of Gowlings via the life insurance matter.

[16] *In re Marks & Goergens, Inc.*, 199 B.R. 922 (E.D.Mich. 1996).

[17] Defendants' reliance on *In re Alumco Industries Corp.*, 12 B.R. 7 (N.D. Ohio 1981) is similarly unpersuasive. This short one-page opinion merely restates the inapplicable holding of *Cleveland Electric*, and denied the party's motion to disqualify because the party failed to do so promptly. Here, however, as soon as Plaintiffs were aware of Estrin's representation of Windsor with respect to the Second Span in September 2006, they raised the issue with Defendants.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

Gowlings' waiver analysis is also inapplicable because it is premised on the fact that Plaintiffs approached Gowlings in 2005 to perform tax work. In fact, the opposite is true. As described in detail in the Background Facts, Dale Hill, formerly with CRA and now a Gowlings partner, solicited Fred Calderone of CenTra to do CenTra's tax and transfer pricing work when he left CRA. Gowlings solicited Plaintiffs' work, which totally runs contrary to Defendants' implications that CenTra hired Gowlings in 2005 to conflict Gowlings out of doing work for Windsor. Moreover, this theory ignores that Gowlings was already doing work for *Plaintiffs via the L.E. Walker litigation!* (Ex. N).

Additionally, even if this Court were to assume that Plaintiffs waived a conflict as to the Second Span in 2004 (as Estrin claims and Plaintiffs dispute), Gowlings' solicitation of tax and bonding work from CenTra could only lead Plaintiffs to believe that Gowlings was no longer representing Windsor with respect to the Second Span. Otherwise, why would Gowlings be soliciting work from CenTra when it was allegedly representing Windsor on the same matter? Additionally, did Gowlings ever get consent from Windsor to represent both Plaintiffs and Windsor with respect to the Second Span? These are all issues on which Plaintiffs are entitled to discovery.

## II.  GOWLINGS' REPRESENTATION OF BOTH PLAINTIFFS AND WINDSOR WITH RESPECT TO THE SECOND SPAN PRESENTS A NON-CONSENTABLE WAIVER SITUATION.

"It is a well-established ethical principle that 'an attorney owes undivided allegiance to a client and usually may not represent parties on both sides of a dispute.'" *Evans & Luptak, PLC v. Lizza*, 251 Mich. App. 187, 197; 650 N.W.2d 364 (2002). There "are situations where concurrent representation is impermissible even with client consent, because the conflict is so intense that concurrent representation would entail an impaired relationship with one or more of

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

the clients, making it unreasonable even to ask for their consent." Michigan Ethics Opinion RI-108 (Dec. 3, 1991). As the Court recognized in *Barkley v. Detroit*, 204 Mich.App. 194, 203; 514 N.W.2d 242 (1994):

> [T]he conflict of interest rules are a frank recognition that, human nature being what it is, a dual relationship involving adverse or conflicting interests, constitutes enormous temptation to take advantage of one or both parties to such relationship and that *[t]he purpose of [the conflict of interest rules] is to condemn the creation and existence of the dual relationship instead of merely scrutinizing the results that may flow therefrom.*

*Id.* at 202-03 (emphasis in original)(internal citations omitted). Gowlings trampled on the purpose of a conflict check by brazenly creating the existence of this dual relationship without conducting any conflict checks.

Gowlings, through the declaration of Timothy Wach, acknowledges that it suggested, solicited and then represented Plaintiffs with respect to obtaining financing for the Second Span. (Wach Decl., ¶ 7). That representation involved revealing confidential development plans, tax and other information to Gowlings. (Ex. O, Calderone Decl., ¶¶ 9-10). Additionally, this representation involved issuing bonds to prospective investors and hinged on the credibility of Plaintiffs and the soundness of the development plan for a Second Span. At the same time Gowlings was assisting Plaintiffs in this respect, Gowlings was assisting Windsor in opposing the Second Span by calling Plaintiffs' proposal to build a Second Span "misleading" "erroneous" "not reliable" and "inaccurate." *See* Ex. M, pp. 17-18. These facts present a classic non-consentable waiver situation where the law firm is representing two clients with adverse interests on opposite sides of a transaction. When such a situation occurs, the client cannot be found to have consented to the other representation even if the law firm obtains express consent. *See Evans, supra.* As set forth in the Comment to MRPC 1.7:

when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.[18]

Here, a disinterested lawyer could not conclude that Plaintiffs could agree to Gowlings both representing and opposing them with respect to the Second Span. (Ex. P, Henning Decl., ¶ 20). Regardless, Gowlings admits it did not have Plaintiffs' consent, and is silent as to whether it had the consent of Windsor. *See* Jolliffe Letter, Ex. A.

Once Plaintiffs raised the conflict with Gowlings, Gowlings should have withdrawn from representing both Plaintiffs and Windsor. (Ex. P, Henning Decl., ¶¶ 32, 34). In *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290 (6th Cir. 1979), the Sixth Circuit stated that "[i]f the representation is against an existing client, not just a former one, the balance shifts even more significantly toward disqualification." *Id.* at 292. Such a violation can also be evidence of a breach of fiduciary duty and malpractice. *Id.* at 34..

Gowlings' breach and violation of ethical duties is ongoing because it has withdrawn from representing Plaintiffs but continues to represent Windsor, commonly referred to as the "hot potato" principle. Under the hot potato principle:

> [C]ourts that have considered the issue have held that a law firm will not be allowed to drop a client in order to shift resolution of the conflicts question from Rule 1.7 dealing with current clients, to the more lenient standard in Rule 1.9 dealing with former clients. To hold otherwise would allow such unethical behavior to continue unrestricted because a law firm could always convert a present client into a former client merely by seeking to withdraw after suing a present client.

1992 WL 510830 (Mich.Prof.Jud.Eth.)(internal citations omitted).

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

---

[18] Canadian RPC 2.04(2) is more to the point: "A lawyer shall not advise or represent more than one side of a dispute."

## III.   DEFENDANTS' MOTION FAILS TO ADDRESS ANY OF THE CLAIMS IN PLAINTIFFS' FIRST AMENDED COMPLAINT.

Strangely, Defendants' motion for summary judgment fails to address any of the counts in Plaintiffs' first amended complaint. Plaintiffs first amended complaint alleges breach of contract, breach of fiduciary duty and legal malpractice. Nowhere in Defendants' motion do they address the legal elements of these claims, or even argue that, if a conflict was waived (which Plaintiffs dispute), why such a waiver entitles Defendants to summary judgment.

Plaintiffs' count for breach of fiduciary duty provides the simplest example as to why summary judgment should not be granted here, even if it is assumed that Plaintiffs consented to Gowlings representation of Windsor. Defendants unquestionably had a duty to hold inviolate the secrets and confidences disclosed to them by Plaintiffs. MRPC 1.6, 1.8(b). There is no question that where a confidence or secret has been obtained during the course of the lawyer-client relationship, it must be kept confidential, even if the representation has ended.[19] *See* MRPC 1.9(c).[20] For example, Defendants could not, without the express consent of Plaintiffs, disclose or use to the disadvantage of Plaintiffs, the Goodman Memo. Patrick Moran, CenTra's U.S. counsel in the FIRA litigation, and Emilio Binavince, a former partner at Gowlings, both believe that the documents and information described at page 11 of Estrin's letter to the Coast Guard, are the same documents and information in the Goodman Memo. *See* Ex. 3, Moran Decl., ¶ 19. At a minimum, there is a genuine issue of material fact as to whether Defendants disclosed or used confidential information adverse to Plaintiffs in their representation of Windsor.

---

[19] Again, the law is even more exacting in Canada. *See Martin v. MacDonald Estate*, 1 W.W.R. 705 (1990)(attached as Ex. R) at ¶¶48, 50-1.

[20] "The duty to keep information confidential outlasts the lawyer-client relationship." Michigan Ethics Opinion RI-57 (Aug. 16, 1990). "Viewed from an *agency* perspective, the rule encompasses the duty of *loyalty* required of a *fiduciary* and serves to protect privacy interests. The rule applies to all information, whatever its source." *Id.* (emphasis in original).

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

Additionally, even if one assumes Plaintiffs were a former client, *and* that Gowlings began representing Windsor with respect to the Second Span in 2004, *and* that Plaintiffs waived the conflict to allow Gowlings to take such an engagement (none of which are true), Defendants still breached their fiduciary duties to Plaintiffs:

> Under Rule 1.9(a), when an attorney has been directly involved in a specific transaction, that attorney is prohibited from later representing another client with materially adverse interests. In moving for disqualification, the former client need only demonstrate that an attorney-client relationship previously existed between itself and the attorney appearing on behalf of an adversary, and that the subject matter of the pending proceeding is substantially related to the prior representation. A substantial relationship between the two representations exists if there are common factual questions, i.e., " 'if facts pertinent to problems for which the original legal services were sought are relevant to the subsequent litigation.' " If the court determines that a substantial relationship exists, *a presumption is created that the attorney will use information received from the former client in the ethical obligation to vigorously represent the present client, thus violating the ethical obligations of loyalty and confidence. This presumption is generally not rebuttable.*

*In re Marks*, *supra*, at 925 (emphasis added)(internal citations omitted). The *Marks* Court found that the client in that case did not have to show that the law firm actually exchanged or disclosed confidential information – the client merely had to demonstrate that the matters were substantially related.

At a minimum, Plaintiffs have established that there is a genuine issue of material facts as to whether Gowlings' representation of Plaintiffs in the FIRA Litigation, and Gowlings' representation of Plaintiffs in obtaining financing for the Second Span, are substantially related and involve common factual questions. Part of what is at issue in the Second Span is the authority and power of DIBC and CTC, and that is exactly what was at issue in the FIRA Litigation. Additionally, Gowlings' work in obtaining financing for the Second Span obviously relates to whether the Second Span will go forward. Again, whether Plaintiffs have waived a conflict is wholly irrelevant as to whether Defendants have violated the fiduciary duties owed to

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•ANTY-19577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

Plaintiffs as a current or former client. Further, pursuant to *Marks*, *supra*, it is irrelevant whether attorneys within Gowlings actually exchanged information with each other – there is a presumption that the attorney will use information received from the former client to vigorously represent the present client.

To summarize, the entire thrust of Defendants' motion is that Plaintiffs waived a conflict of interest, but Defendants never analyze how, if that is true, such a waiver affects Plaintiffs' claims against Defendants. Plaintiffs have demonstrated that, even if Plaintiffs did waive or consent to Defendants' representation of Windsor with respect to the Second Span (which Plaintiffs vehemently dispute), Defendants are still not entitled to summary disposition.

## IV.   PLAINTIFFS HAVE SUFFERED REAL, TANGIBLE DAMAGES FROM THE ACTIONS OF DEFENDANTS.

It is not true, as Defendants contend, that Plaintiffs have suffered no damages due to the conduct of Defendants. Plaintiffs can demonstrate with precision that they have suffered real, specific damages, and they can also demonstrate generally that they have been damaged by Defendants' unlawful and unethical conduct.

It should first be noted that Michigan law does not require a plaintiff to prove his or her damages with mathematical precision:

> While proof must be made of those damages that are susceptible of precise proof, and recovery is not allowed for damages that are so uncertain and speculative as to be determinable only by guesswork, damages that grow out of either a breach of contract or the commission of a tort can seldom be resolved by exact measurement. Mathematical precision in the assessment of damages is not required, where, from the nature of the circumstances, precisions is not attainable. This rule is particularly applicable where defendant's own act or neglect caused the imprecision, so the defendant cannot escape liability by making the calculation of damages impossible.

Michigan Law & Practice, Damages § 5 (citations omitted). Michigan law distinguishes between the fact of damages and the amount of damages. Once a plaintiff has established that

25

there are damages, a plaintiff will not be precluded from recovering because of inability to demonstrate with precision the exact amount of the damages. Indeed, under Michigan law, doubts as to the amount of damages are generally resolved against the wrongdoer. *Thompson v. Paasche*, 950 F.2d 306, 313 (6th Cir. 1991).

Plaintiffs can, however, prove certain of their damages now with mathematical precision. The Coast Guard's notice of public hearing concerning Plaintiffs' Application for a Second Span stated that it was not going to require an environmental assessment ("EA"). (Ex. B, Stamper Decl., ¶ 8). As only one example of damages, because of Estrin's 9/14/06 letter to the Coast Guard, the Coast Guard is now requiring an EA and it will cost Plaintiffs $500,000 on the U.S. side and $300,000 on the Canadian side of the Ambassador Bridge. *Id.*

Additionally, Gowlings is inappropriately and unethically representing Windsor, and Windsor is a competitor of Plaintiffs in that Windsor owns part of the Detroit-Windsor Tunnel, a competitor crossing. (Ex. E, Moran Decl., ¶ 20). Windsor has indicated that it intends to build an additional international crossing connecting Detroit and Windsor. Obviously, any delay in DIBC building a Second Span inures to the benefit of Windsor because it allows Windsor to push its own plans. If Windsor is the first to build a second crossing, it may obviate the need for DIBC to build a Second Span and will certainly decrease the value of building a Second Span. Indeed, in its transfer pricing report to CRA, Gowlings claimed that if a competitor builds another alternative crossing before Plaintiffs, DIBC's revenues may decrease by at least 50% with negligible opportunity for DIBC to reduce its current costs because the vast majority of DIBC's costs already are fixed.

Moreover, if representing a competitor client at the same time it was representing Plaintiffs is not sufficiently egregious, another partner at Gowlings, David McFadden, is the

26

Chairman of the Board of the Detroit & Canada Tunnel Corporation ("DCTC"), the entity that runs the Detroit-Windsor Tunnel in direct competition with the Ambassador Bridge.  It appears, and more discovery is necessary, that not only is Gowlings representing the competition, but that a member of Gowlings *is the competition* via the role Mr. McFadden serves with DCTC.

Additionally, Gowlings' actions caused delay and harm in connection with the bond/ financing work.  In representing DIBC and CTC with respect to the bond financing work, Gowlings was charged with doing all it could to move the bond/financing forward.  At the same time Gowlings was promoting the Second Span and touting its value, Gowlings was also calling the proposal to build a Second Span "misleading" "erroneous" and "not reliable."  Gowlings' actions place in serious jeopardy the ability to finance the Second Span through the issuance of bonds.  Additionally, any new law firm that replaces Gowlings with respect to the tax, transfer pricing and bond work will have to spend time that otherwise would have been unnecessary in reviewing documents and learning the documents and information relevant to those representations.  Plaintiffs have already paid Gowlings once for these services, and now Plaintiffs will have to pay another law firm again for the same services (or at least partial services).

Respectfully submitted,

s/Thomas J. Murray
Attorneys for Plaintiffs
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI  48304-5086
Phone:  (248) 203-0806
E-mail:  tmurray@dykema.com
Thomas J. Murray (P56331)

Dated:  March 9, 2007

27

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Sharon M. Woods, Kevin Kalczynski, Melonie M. Stothers, Craig L. John and Joseph A. Doerr.

s/Thomas J. Murray
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI  48304-5086
Ph:  (248) 203-0806
E-mail:  tmurray@dykema.com
Thomas J. Murray (P56331)

BH01\713570.15
ID\TJMU

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304