Supreme Court, U.S.
FILED

0 6 - 6 3 9 NOV 3 - 2006

No. 06- OFFICE OF THE CLERK

IN THE

# Supreme Court of the United States

DETROIT INTERNATIONAL BRIDGE COMPANY,
*Petitioner,*

*v.*

UNITED STATES,
*Respondent.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

PETITION FOR A WRIT OF CERTIORARI

ANNE K. SMALL
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, NY 10023
(212) 230-8800

SETH P. WAXMAN
  *Counsel of Record*
JONATHAN G. CEDARBAUM
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
(202) 663-6000

**BLANK PAGE**

## QUESTIONS PRESENTED

1. Whether requiring courts to apply the interest rate set in the Declaration of Taking Act, 40 U.S.C. § 3116, to determine the compensation due when the government delays payment of just compensation for private property taken under the Act violates the Just Compensation Clause and the separation of powers when applying the statutory interest rate would materially undercompensate the landowner.

2. Whether a court's reduction of the amount of compensation paid to a property owner based on the fact that the intended taking had been made public at the time the owner purchased the property contravenes this Court's repeated holding that the just compensation due to a landowner under the Fifth Amendment is not to be affected by the government's decision to condemn the property.

(i)

**RULE 29.6 STATEMENT**

Petitioner Detroit International Bridge Company is wholly owned by Centra, Inc., a privately held corporation. No publicly held company owns 10% or more of Detroit International Bridge Company's stock.

**TABLE OF CONTENTS**

Page

QUESTIONS PRESENTED .................................................. i

RULE 29.6 STATEMENT ...................................................... ii

TABLE OF AUTHORITIES.................................................. vi

OPINIONS BELOW ................................................................ 1

JURISDICTION .................................................................... 1

CONSTITUTIONAL AND STATUTORY PRO-
VISIONS INVOLVED ....................................................... 2

INTRODUCTION AND STATEMENT OF THE
CASE................................................................................. 3

REASONS FOR GRANTING THE WRIT ......................... 10

I.   THE HOLDING THAT, REGARDLESS OF CIR-
     CUMSTANCES, COURTS MUST INEXORABLY
     APPLY THE INTEREST RATE ESTABLISHED IN
     THE DECLARATION OF TAKING ACT CREATES
     A CIRCUIT SPLIT, IS IN TENSION WITH THIS
     COURT'S PRECEDENTS, VIOLATES THE FIFTH
     AMENDMENT AND THE CONSTITUTIONAL
     SEPARATION OF POWERS, AND FAILS TO
     PROVIDE JUST COMPENSATION IN THIS CASE............ 11

     A.   There Is A Circuit Split On The Question
          Whether Courts Must Always Apply The
          Interest Rate Set By The Declaration Of
          Taking Act................................................................. 11

     B.   The Decision Below Conflicts With This
          Court's Precedents And Fundamental
          Principles Of Separation Of Powers........................ 14

     C.   Applying The Statutory Rate Dramati-
          cally Undercompensates The Landowner
          In This Case ............................................................. 17

(iii)

iv

**TABLE OF CONTENTS—Continued**

Page

II. THE HOLDING THAT THE GOVERNMENT'S PLANNED TAKING ELIMINATES VALUATION METHODOLOGIES BASED ON A COMBINED USE OF THE LAND IS IN TENSION WITH THIS COURT'S LONGSTANDING PRECEDENTS AND THREATENS BASIC PRINCIPLES OF JUST COMPENSATION ................................................ 20

    A. The Sixth Circuit's Decision Conflicts With This Court's Repeated Holding That A Taking May Not Affect The Amount Of Compensation Due.................................................... 20

    B. The Decision Below Harms Landowners While Allowing The Government A Windfall Of Its Own Creation............................................ 24

CONCLUSION................................................................ 26

APPENDIX A: Opinion of the United States Court of Appeals for the Sixth Circuit, reported at 450 F.3d 205 (Nov. 29, 2005) ............................................ 1a

APPENDIX B: Opinion and Order of the United States District Court for the Eastern District Of Michigan, reported at 286 F. Supp. 2d 865 (Sept. 30, 2003) ................................................................ 17a

APPENDIX C: Memorandum Opinion and Order of the United States District Court for the Eastern District Of Michigan, reported at 188 F. Supp. 2d 747 (Feb. 20, 2002) .................................... 29a

APPENDIX D: Order for Briefs on Interest Calculation of the United States District Court for the Eastern District Of Michigan (Feb. 27, 2002) ................................................................................ 53a

v

**TABLE OF CONTENTS—Continued**

Page

APPENDIX E: Prospectus For Proposed Acquisition And Alteration Under The Public Buildings Act Of 1959, As Amended (June 4, 1976) .............. 55a

APPENDIX F: Complaint in Condemnation filed in the United States District Court for the Eastern District Of Michigan (Oct. 11, 1979)............... 67a

APPENDIX G: Jury Damages Award and Prejudgment Interest Summary (Exhibit 13 to Affidavit of Jonathan D. Vanderveen (Apr. 5, 2002))................................................................... 75a

APPENDIX H: Jury Damages Award and Prejudgment Interest Summary (Exhibit 20 to Affidavit of Jonathan D. Vanderveen (May 3, 2002))................................................................... 79a

APPENDIX I: Excerpts of Jury Trial Proceedings before the Honorable Gerald E. Rosen (Feb. 11, 2002)................................................. 81a

APPENDIX J: Excerpts of Jury Trial Proceedings before the Honorable Gerald E. Rosen (Feb. 12, 2002)................................................. 91a

APPENDIX K: Excerpts of Jury Trial Proceedings before the Honorable Gerald E. Rosen (Feb. 15, 2002)............................................... 115a

APPENDIX L: Excerpts of Jury Trial Proceedings before the Honorable Gerald E. Rosen (Feb. 19, 2002)............................................... 135a

vi

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Almota Farmers Elevator & Warehouse Co.* v.
  *United States*, 409 U.S. 470 (1973)................................... 17

*Armstrong* v. *United States*, 364 U.S. 40 (1960).................... 26

*Baetjer* v. *United States*, 143 F.2d 391 (1st Cir.
  1944)............................................................................... 6, 8

*Bauman* v. *Ross*, 167 U.S. 548 (1897) ........................................ 6

*Boston Chamber of Commerce* v. *City of Boston*,
  217 U.S. 189 (1910)............................................................. 18

*Brown* v. *Legal Foundation of Washington*,
  538 U.S. 216 (2003)........................................................ 5, 20

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) ........................ 16

*City of New York* v. *Sage*, 239 U.S. 57 (1915) ........................ 20

*Kimel* v. *Florida Board of Regents*, 528 U.S. 62
  (2000)................................................................................. 16

*Kirby Forest Industries, Inc.* v. *United States*,
  467 U.S. 1 (1984)................................................. 6, 8, 15, 16

*Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803) .............. 16

*Monongahela Navigation Co.* v. *United States*,
  148 U.S. 312 (1893).................................... 13, 14, 15, 16, 26

*Olson* v. *United States*, 292 U.S. 246
  (1934)...........................................................................*passim*

*Seaboard Air Line Railway Co.* v. *United States*,
  261 U.S. 299 (1923)................................................ 8, 15, 16

*Tulare Lake Basin Water Storage District* v.
  *United States*, 61 Fed. Cl. 624 (2004) ............................. 17

*United States* v. *50 Acres of Land*, 469 U.S. 24
  (1984)............................................................................ 5, 20

*United States* v. *50.50 Acres of Land*, 931 F.2d 1349
  (9th Cir. 1991)........................................................ 9, 12, 14

*United States* v. *97.19 Acres, More or Less, Located
  in Montgomery, Washington and Allegany
  Counties, Maryland*, 511 F. Supp. 565 (D. Md.
  1981)................................................................................. 13

*United States* v. *99.66 Acres of Land*, 970 F.2d 651
  (9th Cir. 1992) ................................................................. 22

vii

## TABLE OF AUTHORITIES—Continued

Page(s)

*United States* v. *125.2 Acres of Land, Situated, More or Less, in the Town and County of Nantucket, Massachusetts,* 732 F.2d 239 (1st Cir. 1984).................................................................... 12, 13

*United States* v. *319.46 Acres of Land, More or Less, Situated in Cotton and Jefferson Counties,* 508 F. Supp. 288 (W.D. Okla. 1981) ........................ 13

*United States* v. *429.59 Acres of Land,* 612 F.2d 459 (9th Cir. 1980)...................................................... 18

*United States* v. *329.73 Acres of Land, More or Less, Situated in Grenada and Yalobusha Counties, Mississippi,* 704 F.2 800 (5th Cir. 1983)............................................................ 12, 13, 15

*United States* v. *564.54 Acres of Land Situated in Monroe and Pike Counties, Pennsylvania,* 441 U.S. 506 (1979)........................................... 20

*United States* v. *Blankinship,* 543 F.2d 1272 (9th Cir. 1976) ........................................................ 12

*United States* v. *Cors,* 337 U.S. 325 (1949)...................... 17, 21

*United States* v. *Lopez,* 514 U.S. 549 (1995)........................... 16

*United States* v. *Mattox,* 375 F.2d 461 (4th Cir. 1967)........ 7, 22

*United States* v. *Miller,* 317 U.S. 369 (1973)..................... 8, 21

*United States* v. *Reynolds,* 397 U.S. 14 (1970) ........................ 7

*United States* v. *Virginia Electric & Power Co.,* 365 U.S. 624 (1961)................................................ 21, 23, 25

*Washington Metropolitan Area Transit Authority* v. *One Parcel Of Land in Montgomery County, Maryland,* 706 F.2d 1312 (4th Cir. 1983)...................... 18

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. amend. V ................................................................ 2

28 U.S.C. § 1254(1)................................................................... 1

40 U.S.C. § 3114....................................................................... 5

40 U.S.C. § 3116....................................................................... 2, 9

Act of Feb. 26, 1931, ch. 307, 46 Stat. 1421 ............................... 9

Fed. R. Civ. P. 71A ................................................................... 7

viii

**TABLE OF AUTHORITIES—Continued**

Page(s)

**OTHER AUTHORITIES**

Brealey, Richard A., et al., *Principles Of Corporate
  Finance* (8th ed. 2006) ......................................................... 19

Kansas, Dave, *The Wall Street Journal: Complete
  Money and Investing Guidebook* (2005) .......................... 18

1 Orgel, Lewis, *Valuation Under Eminent Domain*
  (2d ed. 1953) ...................................................................... 21

4A Sackman, Julius L. & Rohan, Philip, *Nichols on
  Eminent Domain* (1995) ...................................................... 6

IN THE

# Supreme Court of the United States

---

No. 06-

---

DETROIT INTERNATIONAL BRIDGE COMPANY,

*Petitioner,*

*v.*

UNITED STATES,

*Respondent.*

---

**ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**PETITION FOR A WRIT OF CERTIORARI**

---

### OPINIONS BELOW

The opinion of the court of appeals (App. 1a-15a) is reported at 450 F.3d 205. The district court's decisions (App. 17a-27a and 29a-53a) are reported at 286 F. Supp. 2d 865 and 188 F. Supp. 2d 747.

### JURISDICTION

The Sixth Circuit's judgment was entered on June 8, 2006. On August 24, 2006, Petitioner timely filed an application to extend the time to file a petition for a writ of certiorari to November 5, 2006. Justice Stevens granted the application on August 31, 2006. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

2

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

1.     The Fifth Amendment to the United States Constitution provides in relevant part: "nor shall private property be taken for public use, without just compensation."

2.     The Declaration of Taking Act provides in relevant part:

Interest as part of just compensation

(a) Calculation.  The district court shall calculate interest required to be paid under this subchapter as follows:

(1) Period of not more than one year.  Where the period for which interest is owed is not more than one year, interest shall be calculated from the date of taking at an annual rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of taking.

(2) Period of more than one year.  Where the period for which interest is owed is more than one year, interest for the first year shall be calculated in accordance with paragraph (1) and interest for each additional year shall be calculated on the amount by which the award of compensation is more than the deposit referred to in section 3114 of this title, plus accrued interest, at an annual rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the beginning of each additional year.

40 U.S.C. § 3116.[1]

---

[1] This provision was previously codified at 40 U.S.C. § 258e-1.

3

### INTRODUCTION AND STATEMENT OF THE CASE

This case concerns petitioner Detroit International Bridge Company's (DIBCO) longstanding pursuit of just compensation for the federal government's 1979 condemnation of two parcels of DIBCO's property. The petition implicates not only the Fifth Amendment's Just Compensation Clause but also basic principles of separation of powers. It asks both which branch of government bears responsibility for determining just compensation and how that determination is to be made.

When payment of just compensation is delayed, interest is constitutionally required. This Court has long held that the courts, not Congress, must have the final say in determining just compensation. Contrary to that established principle and decisions in three other circuits, the Sixth Circuit here held that Congress may, through the Declaration of Taking Act, dictate to the courts the amount of the interest portion of just compensation. This Court should grant the petition to resolve the split among the courts of appeals created by the Sixth Circuit on this fundamental and recurring legal question.

The petition also asks this Court to correct the Sixth Circuit's determination that courts may use the fact that the government had made its planned taking public at the time the property owner acquired the property to reduce the valuation of the taken property. This Court has long made clear that a taking itself may not be considered in determining valuation for purposes of just compensation. The decision below directly contravenes this longstanding principle and creates a regime in which property owners are harmed and the government is improperly given a windfall.

The rule established by the court below would provide the government with the means to deny landowners just compensation whenever the government condemns private property under the Declaration of Taking Act. Under the Sixth Circuit's holding, the government can undervalue land at the time of the condemnation and then put off payment of the deficiency. No matter how many years (or decades, as in

4

this case) the government delays payment, its interest exposure will be limited to the rate on a one-year Treasury bond. The government can also drive down the valuation of the taken property in certain circumstances by making its plans known in advance. These two tools, which the decision below would place in the government's hands, would enable the government to escape its constitutional obligation to pay just compensation, as it has done in this case.

1. DIBCO owns the Ambassador Bridge connecting the United States with Canada, as well as the bridge plaza on the U.S. side. By 1970 the plaza, built in 1929, had become too small to accommodate the bridge traffic, producing long delays that reduced DIBCO's revenues. The traffic conditions were caused in large part by the Customs Service, which required, depending on circumstances, that 80 percent of the trucks on the bridge park and submit to secondary inspections. App. 113a-114a. An employee parking lot, duty-free shops, and duty-free warehouses located on the bridge added to the congestion.

To increase the value of its bridge operations, DIBCO sought to alleviate the crowding by purchasing additional plots of land nearby. Additional land would permit DIBCO to expand its bridge activities, shifting some operations to the new parcels and thus providing more space on the plaza and increasing traffic flow. In the early 1970s, as part of its ongoing efforts to acquire additional property, DIBCO commenced negotiations to acquire two parcels of land. It alerted the General Services Administration (GSA) of its plans and GSA reacted favorably. App. 88a, 99a-100a, 119a-122a. GSA and DIBCO entered negotiations over a plan under which the Customs Service would lease the new property for secondary truck inspections. App. 88a.

In June 1976 GSA submitted a prospectus to Congress seeking authorization and funding for the condemnation of three parcels of land, including the two being purchased by DIBCO. App. 55a-65a. Congress had taken no action on the prospectus and condemnation was not inevitable when DIBCO purchased the land in 1976 and took possession of it

5

in July 1977. App. 93a-99a, 120a. Even after Congress approved the plan in the fall of 1977 and as late as January 1979, GSA was considering alternate plans that would not have required condemnation of DIBCO's land. App. 84a-85a, 102a-104a, 106a-110a. In late 1979 GSA, acting for the Customs Service, initiated a condemnation action pursuant to the Declaration of Taking Act that included DIBCO's two parcels. App. 67a-73a.

2. The Declaration of Taking Act, enacted in 1931, provides one means by which the federal government may condemn private property for public use. Under the Act, the government files a declaration of taking for the use of the United States. 40 U.S.C. § 3114. The land is deemed taken and title vests immediately with the government, which is required to deposit with the court an amount of money estimated to equal the value of the land. *Id.* The landowner may challenge that amount in court and, if successful, will be awarded the difference between the adjudicated value and the amount already paid. *Id.* The government relies on the Act frequently. For example, in the last year alone, the government initiated at least 35 actions under the Act.

When the GSA took possession of DIBCO's two parcels of land, it valued them together at $828,000—despite the fact that three years earlier DIBCO had paid approximately $1.2 million to acquire the larger parcel alone. App. 120a. The government deposited $828,000 with the court and this was disbursed to DIBCO in 1980. A protracted attempt to settle the condemnation action failed, and in 2002 the condemnation action went to trial.

3. a. At trial the parties disputed how to determine the just compensation guaranteed by the Fifth Amendment. With limited exceptions, just compensation is the "amount of the market value of the property on the date it is appropriated." *Brown* v. *Legal Found.*, 538 U.S. 216, 243 (2003) (citing *United States* v. *50 Acres of Land*, 469 U.S. 24, 29

6

(1984)).[2]  The value of the land is determined by considering all uses for which the land is "suitable." *Olson* v. *United States*, 292 U.S. 246, 255 (1934).  A use of the land in combination with other land may be considered so long as "the possibility of combination is reasonably sufficient to affect market value." *Id.* at 256.  In cases involving "partial takings," the landowner is entitled to additional compensation based on the reduction in value caused by the taking to the landowner's remaining land. *See Bauman* v. *Ross*, 167 U.S. 548, 574 (1897).[3]  For such "partial takings" damages, it must be the case that "in the reasonably foreseeable future there is a reasonable probability that the lands in question would be dedicated to their highest and best use in combination with the main tract so as to affect their market value." 4A Julius L. Sackman & Philip Rohan, *Nichols on Eminent Domain*, § 14B.03[4][b] (1995); *see also Baetjer* v. *United States*, 143 F.2d 391, 394-395 (1st Cir. 1944).

DIBCO attempted to introduce a variety of valuation theories, under which compensation, before interest, ranged from $8-$16 million.  App. 129a-131a, 132a-133a.  Among other methods, DIBCO sought to value the taken parcels based on their highest and most profitable use in combination with the bridge operations—the purpose behind the purchase of the parcels.  DIBCO also sought to present evidence regarding damages for a partial taking and thus to receive compensation for the decrease in value to the bridge and plaza resulting from the taking.

---

[2] "Other measures of 'just compensation' are employed only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public . . . .'" *Kirby Forest Indus., Inc.* v. *United States*, 467 U.S. 1, 10 n.14 (1984) (alterations in original) (citation omitted).

[3] *See also* 4A Julius L. Sackman & Philip Rohan, *Nichols on Eminent Domain*, § 14.02[1][a] (1995) ("[I]t is a touchstone of all taking procedure that the just compensation required by the Fifth Amendment of the Constitution of the United States requires that an owner in a partial taking case be compensated not only for the land taken, but for the incidental injury to the part not taken.").

7

The district court refused to permit evidence regarding either of these valuation theories to go to the jury.[4]  App. 40a-48a.  The court found that DIBCO would need to satisfy the same standard under either valuation theory: a "reasonable probability of [the] condemned property being combined with other tracts in the reasonably near future for some unitary use."  App. 40a, 44a.  Relying on *United States v. Mattox*, 375 F.2d 461 (4th Cir. 1967), the court found no reasonable probability of joint use because, in its view, "the Government's intention to take the property was made public prior to the time that DIBCO purchased the parcels of property at issue."  App. 47a.[5]

The court did allow DIBCO to adduce for the jury some valuation evidence based on the proximity of the taken parcels to the bridge, but precluded any evidence regarding value of the property as part of the bridge operations.  App. 52a.  Based on the limited theories the jury was permitted to consider, it valued DIBCO's parcels at $4,098,174.[6]

---

[4] Citing *United States v. Reynolds*, 397 U.S. 14 (1970), and Fed. R. Civ. P. 71A, the court concluded "that, except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual that may be presented."  App. 40a-41a.

[5] Furthermore, according to the court, the proposed combined use required a street currently used by the city and the sale of another parcel of land to DIBCO.  App. 40a-41a.; *see infra* n.13.

[6] The district court incorrectly resolved several other issues that were appealed to, but not ruled upon by, the Sixth Circuit, and therefore are not properly before this Court.

The court determined, for example, that the combined-use valuation theory could rest only on the use of the taken parcels for secondary truck inspections by the Customs Service, and it disallowed that valuation because, in the court's view, the value was created by the government.  App. 48a-49a.  That value-from-the-government holding neglected the other combined uses proposed by DIBCO, such as using the parcels for duty-free shopping or warehouses.  The court rejected DIBCO's highest-and-best-use and partial-taking valuation on the alternate ground that the proposed combined use was "special" or "unique" to DIBCO and thus non-compensable.  App. 49a-52a.  But that holding rested on a fundamental misapprehension of the unique-use doctrine, which bars only values that

8

b. Following trial, the court requested briefing on the question of the interest due on the deficiency—the difference between the jury award and the amount the government had already paid. App. 53a-54a. Because the Constitution's requirement for just compensation is "comprehensive and includes all elements," "no specific command to include interest is necessary when interest or its equivalent is a part of such compensation." *Seaboard Air Line Ry. Co.* v. *United States*, 261 U.S. 299, 306 (1923). Thus, interest is constitutionally required when payment of just compensation is delayed. *Kirby Forest Indus., Inc.* v. *United States*, 467 U.S. 1, 10 (1984) ("[T]he owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.").

The parties disputed whether, in the circumstances of this exceptional case, the court was required to apply the

---

are relevant solely to a particular landowner, such as sentimental uses that the market would not value. *See, e.g., United States* v. *Miller*, 317 U.S. 369, 375 (1943). The combined use DIBCO proposed does not fit in this category—*any* potential owner of the bridge and the taken parcels would value the parcels' use in combination as a way of increasing the bridge revenues. *Cf. Olson*, 292 U.S. at 256-257 ("There must be a reasonable possibility that the owner could use [the taken tract] together with the other [lands] *or that another could acquire all lands or easements necessary for that use.*" (emphasis added)).

Separately, the district court rejected DIBCO's request for additional compensation under a severance damages theory (which the court distinguished from partial-taking damages) on the grounds that severance damages require unity of use at the time of the taking (rather than a reasonable probability of unity of use in the reasonably near future) and that unity of use did not exist here. App. 30a-38a. The court's requirement of unity of use at the time of the taking was legally erroneous. *See, e.g., Baetjer*, 143 F.2d at 394 (for purposes of determining severance damages, land constitutes a single tract "if put to an integrated unitary use or even if the possibility of their being so combined in use 'in the reasonably near future' . . . is reasonably sufficient to affect market value." (citation omitted)). This point too was not addressed by the Sixth Circuit and, in any event, is not an alternative ground for the holdings challenged in the questions presented.

9

interest rate established in the Declaration of Taking Act, 40 U.S.C. § 3116. The Act originally provided for interest at six percent. *See* Act of Feb. 26, 1931, ch. 307, 46 Stat. 1421. In 1986 the Act was amended to tie the interest rate to the rate on one-year Treasury bonds. For the first year, the rate is the "annual rate equal to the weekly average one-year constant maturity Treasury yield . . . for the calendar week preceding the date of taking." 40 U.S.C. § 3116. For each additional year, the interest rate is likewise tied to the weekly average one-year constant maturity Treasury yield, but the relevant date for determining the relevant rate is the last week of the preceding year. That rate is applied to the deficiency plus accrued interest. *Id.*

The government argued that the court should apply the statutory rate, regardless of the amount of time that had passed and the magnitude of the deficiency in the government's initial payment. That rate provided interest of approximately $12.8 million. DIBCO argued that the statutory rate was not constitutionally sufficient and proposed several alternatives. These alternate rates ranged from longer-term government bonds to indices of corporate bonds and yielded interest payments above $20 million. App. 75a-77a, 79a-80a.

The district court determined that the Declaration of Taking Act's interest rate represented Congress's conclusive determination—binding on the courts—as to the just compensation due. App. 24a-25a. The court acknowledged a contrary holding by the Ninth Circuit in *United States* v. *50.50 Acres of Land*, 931 F.2d 1349 (9th Cir. 1991). But it concluded that the Ninth Circuit had incorrectly relied on earlier decisions concerning the former flat six-percent rate. App. 24a. The court also asserted that the statutory rate "provides DIBCO with what a reasonable and prudent investor would earn while investing though guaranteeing the safety of the principal." App. 26a.

The government ultimately paid DIBCO $15,683,327 to satisfy the judgment. This amount included the deficiency—the difference between what the government had paid and

10

the jury's valuation amount—and the interest due on that amount.

4. The court of appeals affirmed, addressing only some of the issues raised on appeal. App. 1a-15a.

After outlining the dispute over the highest-and-best-use valuation method and partial-taking damages, the Sixth Circuit "acknowledge[d] that this is a close question," but held that "it is for the judge to tell the jury the criteria it must follow in determining what amounts will constitute just compensation." App. 11a. It found no error either in the district court's "factual findings or in their application to the subsequent jury instructions." *Id.* On the interest-rate question, the court discerned no "clear error" in the "district court's adoption of the statutorily required rate." App. 15a. Accordingly, the court explained, "in light of the 'reasonably prudent investor' standard, we decline to reverse the district court's decision with respect to interest rates." *Id.*

## REASONS FOR GRANTING THE WRIT

This petition presents the fundamental question whether the Constitution assigns to federal courts or Congress the determination of just compensation. The courts of appeals are clearly divided over the question in the context of whether courts, regardless of circumstances, must inexorably apply the interest rate set by Congress in the Declaration of Taking Act. The Sixth Circuit's decision brings it into conflict with three other courts of appeals and this Court's longstanding precedents concerning the courts' controlling role in determining what compensation is "just." The circumstances of this case make it a good vehicle to resolve the disagreement. The large size of the deficiency in the initial government payment and the more than 20-year delay in resolution dramatically demonstrate that a congressionally-mandated one-size-fits-all approach to interest will not provide the constitutionally guaranteed just compensation in every case. Indeed, the Sixth Circuit's holding provides the government a powerful means to game the system by ten-

11

dering an inadequate payment upon condemnation and then delaying ultimate adjudication.

This petition also asks the Court to reaffirm that the government's own condemnation plans may not be used to reduce a property's valuation for just compensation purposes. This Court has repeatedly held that just compensation is measured by the market value of the property, that market value assumes the property has not been taken, and that therefore the government's taking may not affect the valuation. The decision below is part of a trend among lower courts that deviates from these basic propositions and permits property owners to receive less than the just compensation to which they are constitutionally entitled, while providing the government with a windfall of its own creation. The Court should grant the petition in order to correct this development in the lower courts.

I.   THE HOLDING THAT, REGARDLESS OF CIRCUMSTANCES, COURTS MUST INEXORABLY APPLY THE INTEREST RATE ESTABLISHED IN THE DECLARATION OF TAKING ACT CREATES A CIRCUIT SPLIT, IS IN TENSION WITH THIS COURT'S PRECEDENTS, VIOLATES THE FIFTH AMENDMENT AND THE CONSTITUTIONAL SEPARATION OF POWERS, AND FAILS TO PROVIDE JUST COMPENSATION IN THIS CASE

A.   There Is A Circuit Split On The Question Whether Courts Must Always Apply The Interest Rate Set By The Declaration Of Taking Act

Since 1931 the Declaration of Taking Act has purported to set the interest rate applicable when payment of just compensation is delayed. In the ensuing 75 years, every circuit but one to consider the question whether courts are bound to apply the statutory rate regardless of the circumstances has said "no." Three circuits addressed the question under the Act as originally enacted, which provided for a flat

12

six-percent rate.[7]  Two have addressed the question based on the amended Act, which ties the rate to the rate on one-year Treasury bonds.[8]  Only the court below has concluded that courts must defer to Congress in calculating the interest due as just compensation for a taking.

In *United States* v. *Blankinship*, 543 F.2d 1272 (9th Cir. 1976), the Ninth Circuit considered whether courts must apply the interest rate set in the Declaration of Taking Act. Following this Court's precedents, the court noted that the Fifth Amendment's just-compensation requirement means that the "owner shall be put in as good position pecuniarily as he would have been if his property had not been taken." *Id.* at 1275 (citation omitted).  Again abiding by this Court's holdings, it found that " '[j]ust compensation' requires that the owners of the land be compensated for the delay" in payment of compensation. *Id.*  Thus, the court concluded (*id.* at 1276) that the

> figure employed by Congress in the Declaration of Taking Act cannot be viewed as a ceiling on the rate of interest allowable in computing just compensation with respect to a deficiency.  It will, of course, operate as a floor.  No lesser rate than 6 percent is consistent with the intent of Congress; a rate no greater than 6 percent in some instances will contravene the Fifth Amendment.

Other circuits followed suit.  The First Circuit, citing *Blankinship*, held that the rate in the Declaration of Taking Act "cannot . . . constitute a ceiling, although it constitutes a floor." *United States* v. *125.2 Acres of Land, More or Less,*

---

[7]  *United States* v. *125.2 Acres of Land, More or Less, Situated in the Town and County of Nantucket, Mass.,* 732 F.2d 239, 244-245 (1st Cir. 1984); *United States* v. *329.73 Acres of Land Situated in Grenada and Yalobusha Counties, Miss.,* 704 F.2d 800, 812 (5th Cir. 1983) (en banc); *Blankinship,* 543 F.2d at 1274 .

[8]  These circuit courts are the Sixth Circuit in this case (App. 11a-15a) and the Ninth Circuit in *United States* v. *50.50 Acres of Land,* 931 F.2d 1349, 1355-1356 (9th Cir. 1991).

13

*Situated in the Town and County of Nantucket, Mass.*, 732 F.2d 239, 245 (1st Cir. 1984). That court remanded for consideration of the appropriate interest rate and expressly noted that the rate "may exceed the six percent statutory rate." *Id.* Addressing this question en banc, the Fifth Circuit likewise held that "[w]e agree with the decisions of other federal appellate courts that the 6% delay damages provided by the Declaration of Taking Act, . . . and by other federal condemnation statutes, sets a floor, rather than a ceiling, on the rate of interest payable on the deficiency." *United States* v. *329.73 Acres of Land Situated in Grenada and Yalobusha Counties, Miss.*, 704 F.2d 800, 812 (5th Cir. 1983) (en banc).

Other lower courts have reached like conclusions. For example, in *United States* v. *319.46 Acres of Land, More or Less, Situate in Cotton and Jefferson Counties*, 508 F. Supp. 288 (W.D. Okla. 1981), the court explained that because the "obligation of the United States to pay just compensation for a taking arises not from [the Act]" but rather from the Fifth Amendment, the "statutory right" under the Act "cannot be used to divest the landowner of his right to just compensation as provided by the Constitution." *Id.* at 289-290; *see also United States* v. *97.19 Acres, More or Less, Located in Montgomery, Washington, and Allegany Counties, Md.*, 511 F. Supp. 565, 567 (D. Md. 1981) ("This Court has consistently followed *Blankinship* in declaration of taking cases. *See, e.g., WMATA* v. *One Parcel of Land in Montgomery County, Md., David R. Shaub, et al.*, No. K-78-140 (D. Md. 1979).").

Since the Declaration of Taking Act was amended in 1986, two circuit courts have addressed whether the courts are always required to apply the statutory rate. In *United States* v. *50.50 Acres of Land*, 931 F.2d 1349, 1355 (9th Cir. 1991), the Ninth Circuit reassessed the statutory interest-rate question in light of the 1986 amendments. Quoting this Court's decision in *Monongahela Navigation Co.* v. *United States*, 148 U.S. 312, 327 (1893), the Ninth Circuit explained that just compensation " 'is a judicial, and not a legislative

14

question. . . . [W]hen the taking has been ordered, then the question of compensation is judicial. . . . The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.' " *50.50 Acres of Land*, 931 F.2d at 1355 (alteration added).  And the court concluded that "nothing in the new statute can change the Supreme Court's determination that just compensation 'is a judicial[,] not a legislative[,]' function."  *Id.* at 1355-1356 (quoting *Monongahela Navigation Co.*, 148 U.S. at 327 (alterations in original)).  Furthermore, the court found, although "the new statute attempts to create a variable interest rate reflective of market changes, it is based only on one-year Treasury bill rates."  *Id.* at 1356.  The Ninth Circuit held that courts must determine first "whether the new statutory formula provides a 'proper and reasonable' interest rate."  *Id.*  If it does not, then courts must apply an "interest rate based on evidence of a diverse group of securities, including Treasury bills."  *Id.*

That holding, like the earlier decisions of the First, Fifth, and Ninth Circuits, directly conflicts with the Sixth Circuit's decision in this case (App. 15a) that the statutory rate is mandatory.  For those earlier decisions rejecting the mandatory character of the statutory rate in no way turned on the particular rate selected by Congress.  This Court should grant the petition to resolve the division in the lower courts over the fundamental and recurring issue of whether the Constitution assigns to the federal courts or Congress the final say in determining the interest component of just compensation.

### B. The Decision Below Conflicts With This Court's Precedents And Fundamental Principles Of Separation Of Powers

Review is particularly warranted because the Sixth Circuit's holding contravenes this Court's longstanding precedents about the Constitution's allocation of authority to the courts and Congress.  This Court has made clear that the Constitution requires the courts, not the legislature, to de-

15

termine what constitutes "just compensation" in any particular case.

Although this Court has not previously decided the precise question presented here, it has expressed approval for the position taken by several courts of appeals and repudiated by the Sixth Circuit here. In *Kirby Forest Indus., Inc.* v. *United States*, 467 U.S. 1, 10 (1984), the Court cited the "principle" that in cases where "disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.'" [9] The Court noted that this "principle underlies the provision in [the Declaration of Taking Act] for the payment of interest on any difference between the estimated value of land appropriated through a declaration of taking and its subsequently adjudicated actual value as of that date." *Id.* n.16. Furthermore, the Court explained, "[t]he principle also underlies several decisions by Courts of Appeals, holding that the six-percent rate of interest prescribed by [the Declaration of Taking Act] is not a ceiling on the amount that can and must be paid by the Government." *Id.* (citing *329.73 Acres of Land*, 704 F.2d at 812 & n.18)).

The Court's apparent approval in *Kirby Forest Industries* of the principle that Congress may not dictate to the courts the measure of just compensation accords with older precedents and flows directly from the role of the courts as the ultimate arbiters of the Constitution's meaning. More than 100 years ago, in *Monongahela Navigation Co.*, 148 U.S. at 327, this Court emphatically explained that it is the role of courts rather than Congress to determine just com-

---

[9] *See also Seaboard Air Line Ry. Co.* v. *United States*, 261 U.S. 299, 306 (1923) ("Where the United States condemns and takes possession of land before ascertaining or paying compensation, the owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added.").

16

pensation. At issue in that case was a federal statute that provided for the condemnation of a lock and dam and specified the amount of compensation that would be offered. This Court invalidated the statute and explained (*id.*):

> By this legislation congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question. The legislature may determine what private property is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

The holding in *Monongahela Navigation Co.* rests on the constitutional axiom that "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The authority of the federal courts extends to all cases arising under the Constitution and presupposes the ability of the courts to "look[] into" and "examin[e]" the Constitution. *Id.* at 179. The Constitution requires "just compensation" when the government takes private property for public use. Interest, as this Court held in *Seaboard Air Line Ry. Co.* v. *United States*, 261 U.S. 299, 306 (1923), and confirmed in *Kirby Forest Industries*, 467 U.S. at 10, is a component of just compensation. Just as courts need not defer to Congress's attempts to "alter the meaning of the Free Exercise Clause," *City of Boerne* v. *Flores*, 521 U.S. 507, 519 (1997), determine the scope of congressional authority under the Commerce Clause, *see United States* v. *Lopez*, 514 U.S. 549, 562-563 (1995), or define the "substantive meaning" of the Fourteenth Amendment, *Kimel* v. *Florida Bd. of Re-*

17

*gents*, 528 U.S. 62, 81 (2000), so too courts are not required to accede to Congress's determination of the interest component of just compensation when doing so would fail to provide just compensation. This Court should grant the petition in order to reaffirm the judiciary's ultimate authority and obligation to determine just compensation.

### C. Applying The Statutory Rate Dramatically Undercompensates The Landowner In This Case

If one could be assured that the rate set by Congress would necessarily provide just compensation in every case, then the question presented could perhaps be regarded as purely theoretical. And under the paradigm contemplated by the Declaration of Taking Act, the interest component of a just compensation award is often fairly incidental—a rate applied on a presumably small portion of the total valuation for a relatively short period of time.[10] Here, however, the amount of the deficiency—more than $3 million—is more than three times the government's original valuation amount. And payment of that amount was delayed for more than 20 years. The interest rate in this case will therefore determine the bulk of the compensation that DIBCO receives.

This Court has always considered just compensation based on the circumstances of the case—the property at issue, the date of the taking, and other factors. *See, e.g., United States* v. *Cors*, 337 U.S. 325, 332 (1949) ("The Court in its construction of the constitutional provision has been careful not to reduce the concept of 'just compensation' to a formula."); *cf. Almota Farmers Elevator & Warehouse Co.* v. *United States*, 409 U.S. 470, 483 (1973) ("The notion of 'fair

---

[10] *Cf. Tulare Lake Basin Water Storage Dist.* v. *United States*, 61 Fed. Cl. 624, 629-630 (2004) ("The purpose of the act, in other words, is to provide compensation to the property owner in situations where the government exercises its power of eminent domain and payment is expected to follow quickly from the taking, rather than in situations where, as here, a significant amount of time has elapsed between the taking of the property and the payment of just compensation.").

18

market value' is not a universal formula for determining just compensation under the Fifth Amendment."). The interest payment is meant to make the landowner whole—to return him to the position he would have been in if the payment had been received on time. Thus, courts have looked to what "a reasonably prudent person investing in funds so as to produce a reasonable return while maintaining safety of principal would receive." *United States* v. *429.59 Acres of Land*, 612 F.2d 459, 465 (9th Cir. 1980) (citation omitted); *see Washington Metro. Area Transit Auth.* v. *One Parcel Of Land in Montgomery County, Md.*, 706 F.2d 1312, 1322 (4th Cir. 1983). More specifically, courts have found that "[b]ecause a reasonably prudent investor would diversify his risk, it is proper to consider the rate of interest paid on different types of securities with different maturities." *429.59 Acres of Land*, 612 F.2d at 465.

A one-year Treasury rate is not what a "reasonably prudent investor" would receive on an investment exceeding 20 years. The Treasury rate reflects the government's cost of borrowing for a year. *Cf. Boston Chamber of Commerce* v. *City of Boston*, 217 U.S. 189, 195 (1910) ("[T]he question is, What has the owner lost? not, What has the taker gained?"). As a gauge of return on investment, the one-year Treasury bond constitutes a conservative, virtually risk-free, short-term investment. Its yield is thus quite low relative to investments with longer maturities, lesser liquidity, or higher risk. Even assuming, *arguendo*, that the one-year Treasury bond rate might be an acceptable proxy for a reasonably prudent investor's one-year investment, it is not sufficient to provide a rate of return on a 20-year investment. The yields on other government bonds reveal why this is so; a 20-year bond, which ties up capital for longer, typically commands higher yields. An investor with a 20-year time horizon is, by definition, less interested in liquidity and has greater flexibility to invest in securities of different maturities. Because of these considerations, even keeping risk low, it is unlikely that short-term, low-yield bonds would provide adequate

19

returns over an extended period for a reasonably prudent investor.[11]  Accordingly, if the government delays payment for many years, the property owner will not be made whole if interest is inexorably tied to short-term rates.

Here, DIBCO sought to present evidence regarding the impact of different interest rates and the propriety of a rate higher than the statutory rate.  All of the rates it proposed would have yielded payments at least 50% higher than that based on the statutory rate (which yielded approximately $13 million).  For example, in light of the more than 20-year delay, DIBCO proposed the rate on a 20-year or 30-year Treasury bond.  These rates would have yielded approximately $37 million and $41 million in interest payments respectively.  App. 75a-77a, 79a-80a.  DIBCO also presented evidence based on several Moody's corporate bond indices. These indices would have yielded between $ 20.5 million and $27 million.  App. 75a-77a.

The district court refused to conduct a hearing on the interest-rate question.  Instead, it held that it was bound by the statutory rate.  Although the court announced blankly that the statutory rate was constitutionally sufficient in this case, it offered no relevant analysis to support that assertion, which was clearly erroneous for the reasons just given. The court of appeals agreed that the statutory rate was binding.  Like the district court, it asserted that the statu-

---

[11]  *See, e.g.,* Dave Kansas, *The Wall Street Journal: Complete Money and Investing Guidebook* 73 (2005) ("The interest rates paid by Treasur[ies] (and other nongovernment bonds) tend to be higher for longer-duration bonds and lower for shorter-duration bonds.  This is because the longer you hold an investment, the greater the implied risk, and thus the investor demand for higher returns."); Richard A. Brealey et al., *Principles of Corporate Finance* 632, 638 (8th ed. 2006) (observing that "since 1900 long-term government bonds have provided a higher average return than short-term bills" and explaining the "liquidity-preference theory" under which investors demand "the compensation of a higher expected return" in exchange for the risk implicated by a longer-term investment).

tory rate was constitutionally sufficient in this case, but offered no support for that conclusion. App. 15a.

Because of the large deficiency in compensation proffered and the extremely long delay in payment of the balance, the rate mandated by Congress plainly fails to provide DIBCO with just compensation. Remand would provide the opportunity for the full consideration of the interest component of the just compensation DIBCO is due.

## II. THE HOLDING THAT THE GOVERNMENT'S PLANNED TAKING ELIMINATES VALUATION METHODOLOGIES BASED ON A COMBINED USE OF THE LAND IS IN TENSION WITH THIS COURT'S LONGSTANDING PRECEDENTS AND THREATENS BASIC PRINCIPLES OF JUST COMPENSATION

This Court has long held that the compensation required by the Fifth Amendment is not affected by the government's decision to condemn the property. The Sixth Circuit's holding contravenes that principle because it permits the government's taking to constrain the valuation options for the property, thus reducing the compensation the owner receives. This Court's decisions were by and large ones in which allowing the taking to influence valuation would have benefited the property owner. It is particularly troubling and unfair that the Sixth Circuit violated this principle in a case where factoring in the taking harms the property owner by reducing the valuation of the taken property.

### A. The Sixth Circuit's Decision Conflicts With This Court's Repeated Holding That A Taking May Not Affect The Amount Of Compensation Due

"In giving content to the just compensation requirement of the Fifth Amendment, this Court has sought to put the owner of condemned property 'in as good a position pecuniarily as if his property had not been taken.'" *United States v. 564.54 Acres of Land, More or Less, Situated in Monroe and Pike Counties, Pa.*, 441 U.S. 506, 510 (1979) (quoting *Olson*, 292 U.S. at 255). Thus, the landowner must be paid the "amount of the market value of the property on the date it is appropriated." *Brown v. Legal Found.*, 538 U.S. 216,

21

243 (2003) (citing *United States* v. *50 Acres of Land*, 469 U.S. 24, 29 (1984)).

That approach assumes that the property is *not* being taken. In *City of New York* v. *Sage*, 239 U.S. 57, 61 (1915), for example, the Court explained that for purposes of determining market value a proposed use may be considered "only so far as the public would have considered it if the land had been offered for sale in the absence of the city's exercise of the power of eminent domain." *See also Olson* v. *United States*, 292 U.S. 246, 256 (1934). What the public *would have paid* is the measure of what the government must pay.

Consistent with the principle that market valuation assumes there is no taking, the Court has repeatedly held that any increase in value resulting from the taking may not be considered in determining just compensation. In *Olson*, for example, the Court explained that "the value to be ascertained does not include, and the owner is not entitled to compensation for, any element resulting subsequently to or because of the taking." 292 U.S. at 256; *see also Cors*, 337 U.S. at 332 ("[W]here the government lays out a project involving the taking of lands, no increment of value arising by virtue of the fact that a particular tract is clearly or probably within the project may be added."); *United States* v. *Miller*, 317 U.S. 369, 377 (1943) ("[T]he Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities").

Just as courts must exclude appreciation in value that may result from a taking, so too they must also exclude depreciation. As this Court explained in *United States* v. *Virginia Elec. & Power Co.*, 365 U.S. 624 (1961):

The court must exclude any depreciation in value caused by the prospective taking once the Government "was committed" to the project. . . . As one writer has pointed out, "(i)t would be manifestly unjust to permit a public authority to depreciate property values by a threat . . . (of the construction

22

of a government project) and then to take advan-
tage of this depression in the price which it must
pay for the property' when eventually condemned."
*Id.* at 636 (quoting 1 Orgel, Lewis, *Valuation Under Emi-
nent Domain*, § 105, at 447 (2d ed. 1953) (citations omitted)).

Contrary to these precedents, the courts below held
that the fact of the taking *does* shape the valuation of the
taken property by eliminating certain potential valuation
methodologies. The court of appeals affirmed the district
court's preclusion of DIBCO's evidence of valuation based on
combined use of the taken parcels with the bridge property
because it found that the combined use was not reasonably
probable. App. 11a; *see* App. 47a-48a.[12] That conclusion
rested primarily on the court's finding that the government's
plans to condemn the two parcels had been made public be-
fore DIBCO acquired the parcels; the impending taking
meant that any combined use was not going to happen.[13]

---

[12] The Sixth Circuit is not alone in taking this approach. *See United
States* v. *99.66 Acres of Land*, 970 F.2d 651, 657 (9th Cir. 1992) ("[W]here a
landowner purchases with notice of the intended taking, he may not claim
severance damages in a condemnation proceeding."); *United States* v.
*Mattox*, 375 F.2d 461, 463-464 (4th Cir. 1967) (finding the integrated use
"if not actually impossible at least highly improbable" because the gov-
ernment project was "well under way" at the time the landowner pur-
chased the land in question).

[13] The district court also cited other factors in determining that com-
bined use was not reasonably probable. App. 47a-48a. But the court
clearly relied on the fact of the taking as the primary factor in assessing
the reasonable probability of the combined use.

Moreover, the other factors cited—the need for two additional par-
cels, one owned by Detroit and the other by another landowner—affected
only one particular combined use. The court's analysis assumed that the
combined use would employ the parcels as secondary truck inspection
facilities for the Customs Service. App. 47a-48a. But bridge operations
could have been extended to the parcels in ways that would not have used
them for truck inspections and thus would not have required the addi-
tional pieces of land. Although the jury was not permitted to consider this
evidence, an expert testified regarding the value of the land as providing
additional flexibility for DIBCO to expand or rearrange any of the bridge
activities as the circumstances warranted. App. 123a-131a, 139a.

23

The Sixth Circuit's reliance on the fact of the taking in determining the method of valuation of the taken parcels conflicts with this Court's unwavering direction that the taking is irrelevant to market value and thus must not influence the valuation of property for purposes of just compensation.

By allowing the taking to affect valuation, the Sixth Circuit's approach improperly "permit[s] a public authority to depreciate property values by a threat." *Virginia Elec.*, 365 U.S. at 636 (citation omitted). Under that approach, the fact of the taking eliminated consideration of the parcels' highest and best use and partial-takings damages and thus reduced the amount of compensation. That runs directly counter to *Virginia Electric*'s admonition that courts must exclude "depreciation in value caused by the prospective taking." *Id.*

*Olson* teaches the same lesson. That case raised the question whether certain potential uses of the condemned property (for power generation) could be considered in determining the property's highest and best use for valuation purposes. The government argued that those uses should be excluded because the taking would eliminate their availability. The Court rejected that argument, observing that "the fact that [the property] may be or is being acquired by eminent domain" is not "negative consideration of availability" of other uses. 292 U.S. at 256. In other words, in valuing the property for compensation purposes, the property's availability for other uses—such as the potential for a combined use—should not be affected by the taking itself.

Accordingly, in valuing the property, the Sixth Circuit should not have considered the fact of the taking, whether directly or indirectly, by allowing the taking to affect the available valuation methodologies. The Court should grant the petition to correct this deviation from the longstanding rule established in its precedents that the fact of a taking may not influence the valuation of property for just compensation.

24

### B. The Decision Below Harms Landowners While Allowing The Government A Windfall Of Its Own Creation

The rule endorsed by the Sixth Circuit allows the government to provide itself a windfall at property owners' expense. The court of appeals may well have been empirically correct to say that, once the government announces an intent to take a piece of land, the impending taking makes the property owner's proposed combined uses not reasonably probable.[14] But the same could be said of every proposed use that a property owner might seek to rely on for valuation purposes. The eventual fact of the taking necessarily renders improbable the property owner's proposed use. In that respect, it makes no difference whether or not the owner was aware of the planned condemnation at the time of the purchase. Under the logical extension of the Sixth Circuit's approach, then—contrary to this Court's precedent—valuation based on possible combined uses would never be possible.

The courts below appear to have been concerned that DIBCO would be overcompensated if full market value were paid as just compensation. Their theory, unstated, appears to have been that because DIBCO purchased the property aware of the potential taking, it would not have paid full market value and thus should not be compensated at that value. But this Court long ago rejected that theory and made clear that the circumstances of the property owner's acquisition of the property are not to be considered. In *Olson*, 292 U.S. at 255, this court explained that valuation, for purposes of just compensation,

> may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exor-

---

[14] Ironically, in this case a leading proposed combined use—secondary truck inspections as part of bridge operations—is the precise use to which the government ultimately put the taken parcels. App. 105a.

25

bitant price. Its value may have changed substantially while held by him. . . . The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain.

The government's windfall under the Sixth Circuit's approach becomes particularly evident in a scenario in which two identical pieces of land are being condemned. Assume Parcel A has been owned by the same owner for many years, whereas Parcel B changed hands soon after the government's condemnation intentions became public. The highest and best use of both parcels is in combination with each landowner's other land, and each landowner—barring the taking—would have used the parcels in combination with his other land. For Parcel A, the landowner could seek to value the land based on its highest and best use in combination and could seek partial-takings damages. For Parcel B, however, because it was acquired after the intent to condemn was announced, these valuation methods are not available to the landowner. The government will only be required to compensate the owner for some lesser value of the taken parcels. This means that the government is relieved of its obligation to provide just compensation on Parcel B simply because the property was transferred at a time when the planned taking had been made public. In effect, the government is permitted to diminish Parcel B's value merely by announcing its intent to condemn the land.

Under that rule, the recent purchaser of Parcel B would not be expected to pay full market value for the property; he would discount the value based on the impossibility of the combined use. But that merely means that the government receives a windfall at the expense of the prior owner rather than the purchaser. That prior owner could only avoid shouldering this burden on behalf of the public good by holding the property until the time of the taking. Under the rule established in this Court's precedents, these consequences are avoided. The prior owner will sell the land, and the buyer will pay full value, secure in the knowledge that market value will be paid should the property be condemned.

26

The government is required to pay market value upon eventual condemnation undiminished by "depreciation in value caused the prospective taking." *Virginia Elec.*, 365 U.S. at 636. Neither burden nor windfall results.

Just compensation is one means by which the government protects the "fullness and sufficiency of the securities which surround the individual in the use and enjoyment of his property." *Olson*, 292 U.S. at 255 (quoting *Monongahela Navigation Co.*, 148 U.S. at 324). This Court has held that just compensation is "'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Armstrong* v. *United States*, 364 U.S. 40, 49 (1960). The results of the Sixth Circuit's approach—tying the hands of private property owners or forcing them to bear the burdens while the government receives a windfall—are precisely the kinds of harms the Just Compensation Clause was meant to prevent. This Court should grant review to correct this deviation from its longstanding precedents.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

ANNE K. SMALL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, NY 10023
(212) 230-8800

SETH P. WAXMAN
   *Counsel of Record*
JONATHAN G. CEDARBAUM
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
(202) 663-6000

NOVEMBER 2006