# EXHIBIT 3

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation,

    Plaintiffs,

vs.

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

    Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

| | |
|---|---|
| Craig L. John (P27146) | Sharon M. Woods (P22542) |
| Thomas J. Murray (P56331) | Kevin Kalczynski (P57929( |
| Joseph A. Doerr (P66109) | Melonie M. Stothers (P65344) |
| Attorneys for Plaintiffs | Attorneys for Defendants |
| DYKEMA GOSSETT, PLLC | BARRIS, SOTT, DENN & DRIKER, PLLC |
| 39577 Woodward Avenue, Suite 300 | 211 West Fort Street, 15th Floor |
| Bloomfield Hills, Michigan 48304-2820 | Detroit, Michigan 48226 |
| Phone: (248) 203-0714 | Phone: (313) 965-9725 |
| Email: cjohn@dykema.com | Email: kkalczynski@bsdd.com |

---

## DECLARATION OF FRED CALDERONE

Fred Calderone, under penalty of perjury, declares as follows:

1. I am the Vice President of Corporate Planning for Centra, Inc., ("Centra") and have been employed by Centra since May of 1984. I have personal knowledge and if called upon can testify competently to the facts recited in this Declaration.

2. I first recall meeting Dale Hill in April, 2002 while he was employed by Canada Revenue Agency ("CRA"). Mr. Hill represented CRA with respect to certain income tax

controversies (the "Controversies") involving CenTra's Detroit International Bridge Company ("DIBC") and Canadian Transit Company ("CTC") subsidiaries. The Controversies involved, among other things, the proper division of toll revenues and operating expenses generated in the operation of the Ambassador Bridge for purposes of determining the U.S. and Canadian income tax liabilities of DIBC and CTC, respectively. CRA was adverse to the positions of DIBC and CTC in the Controversies, and I was involved in defending these positions on behalf of CenTra and all of its subsidiaries (collectively, the "Companies").

3. In the spring of 2005, while the Controversies were still unresolved, Mr. Hill telephoned me to advise me that he had resigned from CRA to take a partner level position with Gowlings where he would establish a practice assisting Gowlings' clients in matters similar to the Controversies. Mr. Hill advised me that after starting with Gowlings, he would be available to represent the Companies before CRA in the still ongoing Controversies. I asked Mr. Hill if there were any CRA imposed ethical impediments to his representation of the Companies as a result of his prior duties as an advocate for CRA in the Controversies. Mr. Hill assured me there were no such impediments. I therefore expressed an interest in retaining Gowlings to serve as Canadian tax counsel in defending the Companies' position in the Controversies. Gowlings was retained shortly thereafter at my suggestion.

4. At no time during the discussions I had with Mr. Hill leading up to the engagement of Gowlings in 2005 to serve as tax counsel in the Controversies did Mr. Hill inform me that Gowlings was representing Windsor in opposition to CenTra's proposed second span at the Ambassador Bridge (the "Second Span"). Neither did Mr. Hill or any other Gowlings representative ever advise me of that fact at any time during the subsequent discussions that resulted in Gowlings being engaged to perform services in connection with the financing of the

Second Span. I learned about Gowlings role in opposing the Second Span after that role became public knowledge in the fall of 2006 as the result of Gowlings Partner David Estrin submitting a letter to the United States Coast Guard (the "Coast Guard") on behalf of Windsor opposing the granting by the Coast Guard of a necessary permit to build the Second Span. Neither did Mr. Hill ever acknowledge to me that he was aware of Mr. Estrin's activities in opposition to the Second Span before those activities became public knowledge as a result of Mr. Estrin's submissions to the Coast Guard.

5. At no time did I ever become aware that any employee, shareholder or other representative of the Companies had any knowledge of Mr. Estrin's activities opposing the Second Span before those activities became public as a result of Mr. Estrin's submission to the Coast Guard.

6. In the course of Gowlings serving as the Companies' representative before CRA with respect to the Controversies, the Companies revealed detailed, confidential financial and operational information about the Ambassador Bridge and shared other confidential information about the Companies efforts to preserve and enhance the value of their franchise to own and operate the Ambassador Bridge and be in a position to expand and/or replace that Bridge when necessary to meet competitive threats posed by other border crossing facilities.

7. In the fall of 2005, in a climate of historically low interest rates, the Companies began to study the issuance of bonds (the "Bond Project") secured by Ambassador Bridge toll revenues to raise funds for a variety of corporate purposes, including improvements to and/or replacement of the existing Ambassador Bridge when the Companies' management determined to commence such improvements and/or replacement. The Companies retained Citigroup Capital Markets, Inc. ("Citigroup") as their financial advisor on the Bond Project and were

advised by Citigroup that certain restructuring steps involving the DIBC and CTC were necessary to enhance the attractiveness of bonds to investors. These steps involved substantial tax and general corporate law complications that required the assistance of outside counsel both in the U.S and Canada.

8. I retained Mr. Hill and Gowlings as key members of the team of professional advisors I assembled to accomplish the restructuring steps and prepare the documents necessary to accomplish the bond offering.

9. Gowlings began providing services on the Bond Project in early 2006 and in the course of such services obtained further confidential financial, operational and legal knowledge of the Ambassador Bridge and the Companies.

10. No less than 9 professionals from Gowlings were involved in the Controversies and the Bond Project, all of whom received confidential financial and operational documents and information from the Companies.

11. In mid-summer of 2006, as a result of competitive developments, the goals of the Bond Project were altered to focus entirely and solely on raising the funds necessary to construct the Second Span at the earliest opportunity. Dale Hill and other Gowlings representatives were promptly made aware of this development and again, no Gowlings representative ever mentioned to me that Gowlings was representing the City of Windsor in opposition to the Second Span. Nor am I aware that any Gowlings representative advised any other representative of the Companies of such representation.

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

_____
Fred Calderone

3/7/07