# EXHIBIT 11

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation,

        Plaintiffs,

vs.

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

        Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

| | |
|---|---|
| Craig L. John (P27146)<br>Thomas J. Murray (P56331)<br>Joseph A. Doerr (P66109)<br>Attorneys for Plaintiffs<br>DYKEMA GOSSETT, PLLC<br>39577 Woodward Avenue, Suite 300<br>Bloomfield Hills, Michigan 48304-2820<br>Phone: (248) 203-0714<br>Email: cjohn@dykema.com | Sharon M. Woods (P22542)<br>Kevin Kalczynski (P57929(<br>Melonie M. Stothers (P65344)<br>Attorneys for Defendants<br>BARRIS, SOTT, DENN & DRIKER, PLLC<br>211 West Fort Street, 15th Floor<br>Detroit, Michigan 48226<br>Phone: (313) 965-9725<br>Email: kkalczynski@bsdd.com |

---

## DECLARATION OF DANNIE STAMPER

Dannie Stamper, under penalty of perjury, declare as follows:

1.    I have been employed by the Detroit International Bridge Company ("DIBC") since 1986 and have served as President of DIBC since 1990. I have personal knowledge and if called upon can testify competently to the facts recited in this Declaration.

2.    I have reviewed the Motion and Brief for Summary Judgment and the accompanying exhibits to those pleadings, filed by Defendants. As set forth in greater detail

1

below, and in our brief in opposition to the motion, many of the statements made by Defendants in their Brief are untrue, incomplete and self-contradictory.

3.   For example, in his declaration, Defendant David Estrin states that in 2002 that Canadian Transit Company ("CTC"), a subsidiary of DIBC, proposed using an existing train/hydro-electric corridor to alleviate truck traffic in the City of Windsor ("Windsor"). That claim by Mr. Estrin is untrue, as set forth in more detail below.

4.   The use of the train/hydro-electric corridor was proposed by a study group commissioned by Windsor in the 1990s called the Windsor Long Range Traffic Study ("WALTS") to study the traffic problems facing Windsor. In February of 1999, WALTS issued their 243 page final report. I have reviewed the 243 page study that confirms the train/hydro-electric corridor was one of the proposals put forward by WALTS to alleviate truck traffic in Windsor. CTC never proposed the use of that corridor to alleviate traffic. Rather, CTC indicated that if Windsor preferred use of the corridor as a truck access route to the Ambassador Bridge, then it would abide by that desire. Since CTC did not propose the use of the corridor in 2002, it is a mystery to me why Mr. Estrin believes he was opposing the interests of CTC in 2002.

5.   I have read Mr. Estrin's declaration in which he states the Plaza Deck Expansion was a central component to the Second Span. *That statement is absolutely false.* The Plaza Deck Expansion has absolutely nothing to do with and is not part of or dependent upon the development of DIBC's proposal to build a second span at the Ambassador Bridge ("the Second Span"). The Plaza Deck Expansion was a stand alone project that would proceed regardless of whether a Second Span was constructed.

2

6. In developing the Second Span, there are three essential aspects: (1) government approval; (2) financing; and (3) the actual construction. DIBC had engaged the services of Gowling Lafleur Henderson LLP ("Gowlings") since the mid-1980s and did so again in the fall of 2005, when Gowlings represented DIBC and CTC with respect to issuing bonds to finance the construction of the Second Span. This representation continued until Gowlings dropped DIBC and CTC as a client in December of 2006.

7. I was not aware that Gowlings was representing Windsor in opposition to the Second Span until September, 2006, when I saw Mr. Estrin's letter to the U.S. Coast Guard ("Coast Guard") opposing the Second Span. Gowlings representation of Windsor is essentially attacking aspect (1) outlined above related to governmental approval of the Second Span.

8. When DIBC applied to the Coast Guard to build a Second Span, the Coast Guard's notice of public hearing stated that it was not going to require an environmental assessment ("EA"). However, after the Coast Guard received Estrin's letter, the Coast Guard is now requiring an EA, and it will cost Plaintiffs approximately $500,000 on the U.S. side and $300,000 on the Canadian side of the Ambassador Bridge to conduct such assessments.

9. I did not, nor am I aware of anyone else at Plaintiffs, consent to Gowlings representing Windsor in opposing the Second Span. No attorney or other professional from Gowlings ever approached me or otherwise inform me that Gowlings was representing Windsor in opposition to the Second Span. Nor did any attorney or other professional from Gowlings ever seek my consent to engage in such a representation until after the lawsuit was filed when Scott Joliffe, the National Managing Partner of Gowlings, visited my offices in Warren, Michigan.

10. I became aware of Gowlings' representation when I received a copy of Mr. Estrin's September 14, 2006 letter to the Coast Guard opposing the Second Span. Until that time, I was unaware that Gowlings was representing Windsor opposing the Second Span.

11. When I learned of Gowlings representation of Windsor with respect to the Second Span, I had representatives of CenTra promptly raise the issue with Gowlings.

12. Only after DIBC filed the lawsuit did Gowlings suggest a resolution. Scott Jolliffe, the National Managing Partner of Gowlings, along with Dale Hill visited me and others at my offices in Warren, Michigan. We discussed the conflict situation that had arisen due to Gowlings failure to run proper conflicts check. Mr. Jolliffe suggested to me as a solution to the problem that Mr. Estrin, who was representing Windsor adverse to DIBC, could "ease up" or "lighten up" on DIBC. That proposed "solution" was unacceptable to me, and I was concerned that Gowlings was so easily ready to compromise a client's interest.

13. It is clear to me that Gowlings has obtained information regarding CenTra and its subsidiaries and understands the organizational structure of CenTra. For example, I have reviewed the "Canadian Transit Company Transfer Pricing Report" 2001-2003 prepared by Gowling Lafleur Henderson LLP ("Gowlings") in which Gowlings describes on page 2 that CenTra as "essentially a holding company, [and] has a number of subsidiaries that are involved in transportation logistic services, and international toll bridge, freight delivery services, truckload and less than truckload motor carrier operations in the United States and Canada and holds and leases land." That same report states that DIBC is a wholly owned subsidiary of CenTra and Canadian Transit Company ("CTC") is a wholly owned subsidiary of DIBC. Finally, Gowlings represented to the CRA that "[t]he Ambassador Bridge (the 'Bridge') which

spans between Windsor, Ontario and Detroit, Michigan is owned jointly by related parties of CenTra.

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

March 9, 2007

_____
Dannie Stamper