# EXHIBIT 12

## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY , a Michigan Corporation,

           Plaintiffs,

v.

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

           Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

## DECLARATION OF BRUCE L. HAY

**BRUCE L. HAY**, under penalty of perjury, states as follows for his Declaration:

## INTRODUCTION

1.     I am over the age of twenty-one, am of sound mind, and am fully competent to make this Declaration and to testify if necessary.

2.     This Declaration addresses questions of legal ethics and professional responsibility presented by *Centra, Inc.. et al. v. David Estrin et al.*, Case No. 06-15185. I have reviewed the documents referenced below that are relevant to this matter.

1

3.      I am Professor of Law at Harvard Law School, where I have served on the faculty since 1992. Prior to that I clerked for the Hon. Antonin Scalia of the United States Supreme Court and practiced law in Washington, D.C. for two years. I am a graduate of Harvard Law School.

4.      I teach various courses on legal ethics, including the basic course called Legal Profession, which examines lawyers' ethical duties as well as their obligations under applicable Rules and/or Codes of Professional Responsibility. The central focus of the course is the body of rules, doctrines and policies concerning conflicts of interest and confidentiality. I have also written extensively on legal ethics and professional responsibility, with particular attention to conflicts of interest in litigation settings. My articles on the subject have been published in various peer-reviewed journals as well as conventional law reviews.

5.      Throughout my time in academe, I have maintained contacts with the bar in order to understand the duties and professional roles of lawyers and the actual operation of the legal system. I am frequently consulted by lawyers and by clients on matters of professional responsibility, and have represented, on appeal, lawyers accused of professional misconduct.

6.      I have been engaged by counsel to Centra and its subsidiary Detroit International Bridge Company (hereafter "Centra" and "DIBC") to offer my opinion as to whether Gowling Lafleur Henderson LLP ("Gowlings"), a law firm, has acted contrary to its obligation to avoid impermissible conflicts of interest, as defined by relevant legal authorities as well as by the conventional understandings of the bench and bar. In

2

preparing my opinion, I have been provided with and have reviewed the following documents:

- The pleadings;

- The Defendants' Brief in Support of its Motion for Summary Judgment, and the declarations and other exhibits attached thereto;

- Invoices from Gowlings to DIBC subsidiary Canada Transit Company for legal services rendered during the period 2003-2005;

- The declarations of Dan Stamper, Patrick Moran, and Fred Calderone.

## BACKGROUND

### Gowlings' Representation of Centra, DIBC and CTC in the Earlier Ambassador Bridge Litigation and Thereafter

7.      It is a matter of public record that from the late 1970s until about 1992, DIBC, together with its parent Centra and its subsidiary Canadian Transit Company ("CTC"), was engaged in litigation against governmental bodies of Canada concerning the Ambassador Bridge, which spans the Detroit River from Windsor, Ontario to Detroit, Michigan.  DIBC, Centra's wholly-owned subsidiary, owns and operates the American side of the bridge, while CTC, a wholly-owned subsidary of DIBC, owns and operates the Canadian side.  For convenience, I will generally use the term "DIBC" to refer collectively to Centra, DIBC, and CTC.

8.      DIBC's opponents in the litigation were the City of Windsor, the Province of Ontario, and the Dominion of Canada.  As I understand the case, the litigation concerned the attempt of Canada, Ontario and Windsor to take control of the Canadian portion of the bridge.  The case was settled in approximately 1992, with DIBC retaining ownership and control over the bridge.

3

9.    Until 1988, DIBC was represented in the litigation by the American firm Simpson & Moran and the Canadian firm Goodman & Goodman.  These firms developed the position that DIBC had the legal right under various constitutional provisions, statutes and treaties to own and operate the bridge.

10.    I understand that in 1985, Gowlings was engaged by DIBC to work on the case, and that this representation continued until about 1992, when the case was settled.

11.    I believe it is undisputed that, as counsel for DIBC, Gowlings had access to the confidential information connected with the case.  This would have included a memorandum written by the Goodman firm ("the Goodman memo") that critically analyzed and documented DIBC's legal right to own and operate the Bridge.

12.    During the period 1992-2006, Gowlings continued to work for DIBC on a variety of matters.  I believe it is undisputed that Gowlings represented DIBC in the period 1992-1998, and again from 2005 through 2006.  Gowlings apparently has not been able to locate records of work done for DIB from 1998 through 2005.  However, there are invoices dated 2003 and 2005 for legal services Gowlings performed for DIBC during the 2003-2005 period.

13.    In 2005, Gowlings began assisting DIBC on matters concerning construction of a second bridge adjacent to the existing Ambassador Bridge.  The work involved issuing about $700 million in bonds to finance the bridge, as well as various matters of corporate structuring and tax planning. (Declaration of Timothy Wach, Ex. 10 to Defendants' Brief in Support of Motion for Summary Judgment.)  Gowlings continued this work until the present action was filed in approximately November 2006.

4

**Gowlings' Representation of the City of Windsor in the Period 2002-2006**

14.    In 2002, the City of Windsor engaged Gowlings for the purpose of assisting the city in evaluating competing proposals for solving the city's traffic problems.[1] DIBC made a proposal to provide additional booths and a deck expansion for the Ambassador Bridge. The latter proposal was approved by Windsor in 2005. David Estrin, a Gowlings lawyer, negotiated the agreement on the city's behalf. Mr. Estrin indicated to DIBC that he and his fellow Gowlings lawyers were acting as the city's lawyers. DIBC was represented by lawyers from a different firm.

15.    In July 2004, DIBC applied to the United States Coast Guard for approval of a plan to build a second bridge adjacent to the existing Ambassador Bridge. The city mayor told the local newspaper that Mr. Estrin would be reviewing the proposal to determine whether the construction of a second bridge would be in the city's best interests. In 2004, Mr. Estrin informed DIBC that if the city approved the booth and deck expansion plan, such approval would not constitute the city's "endorsement" of the construction of a second bridge. The 2005 booth/deck expansion agreement stated that the agreement did not constitute an endorsement of a second bridge, and that the city reserved the right to deny approval of a second bridge.

16.    So far as I can tell from the parties' submissions, at no time before 2006 did the city of Windsor or Gowlings state that the city would seek to block Coast Guard approval of DIBC's application to build a second bridge. Nor have I found any evidence in the submissions that, before 2006, Gowlings indicated to any representative of DIBC

---

[1] The factual assertions in this and the next paragraph are taken from the Defendants' Brief in Support of Summary Judgment, at 6-8, and are assumed true for purposes of this opinion.

that Gowlings would participate in any proceedings to prevent construction of a second bridge.

17.     Detroit & Canada Tunnel Corporation ("DCTC") is the principal competitor of the DIBC for traffic between Detroit and Windsor.  (Moran Declaration at 6.)  David McFadden, a partner at Gowlings, is a director of DCTC.[2]  I have seen no evidence that Mr. McFadden's relationship to DCTC was disclosed to any DIBC representative.

### Gowlings' Opposition to Centra and its Subsidiaries in the Pending Ambassador Bridge Proceeding

18.     In early 2006, DIBC filed with the Coast Guard an amended application for approval of a plan to build a second bridge on the Ambassador Bridge site.  My understanding is that the application is still pending before the Coast Guard.  In addition to seeking approval for construction of a second bridge, the application requests expedited processing under a "categorical exclusion" from the procedural requirements of the National Environmental Policy Act (NEPA).   Among the grounds the application asserts for expedited processing is the contention, as I understand it, that DIBC already has licenses and rights-of-way to operate a second bridge on the site of the Ambassador Bridge.

19.     On September 14, 2006, Windsor filed a letter with the Coast Guard in opposition to approval of the plan.  The 35-page letter, written by Mr. Estrin on Gowlings letterhead, argues both that the plan should be rejected and that a full-scale NEPA review process should be employed.  (Windsor Submission to the Coast Guard, Sepember 14,

---

[2] See http://www.gowlings.com/professionals/professional.asp?profid=720.

6

2006, Ex. A to Complaint.)  In the letter, Gowlings repeatedly accuses "the proponent" (DIBC) of "misleading" the Coast Guard, and states that Gowlings has "provided as much documentation, reports, and other information as well as legal analysis as it could in the time available." (Id. at 17, 35.)

20.     In particular, the Gowlings' letter warns the Coast Guard not to credit "the assertion of the proponent ... that there is an alleged 'existing corridor' in which the second bridge would be built, thereby supposedly substantiating the conclusion that the second bridge would be 'on essentially the same alignment or location.'" (Id. at 10.) The letter argues that the proposed second bridge is legally not in the same location as the first, i.e., that existing easements and rights-of-way do not authorize a second bridge. (See id. at 11-14.)  In support of its argument, Gowlings makes a detailed review of a long series of documents – licenses, plans, drawings, statutes, and other items – that, Gowlings claims, establish DIBC's rights to operate the bridge.  These are the same materials, as I understand it, that were used in the earlier litigation precisely for the purpose of establishing DIBC's right to operate the bridge.  In this litigation, they are being used against DIBC to argue that it has the right to operate *no more* than one bridge.

21.     In addition to contradicting DIBC's specific arguments, the Gowlings letter generally implies that the owners and operators of the Ambassador Bridge cannot be trusted.  The letter strongly suggests that, because DIBC has misstated the scope of its legal rights, the Coast Guard should be wary of accepting any of the information supplied in the application.  (See id. at 16.)

7

### Gowlings' Communications Concerning the Dual Representation of Windsor and Centra/Centra Subsidiaries

22.    As noted above, I can find nothing in the submissions suggesting that, prior to the September 14, 2006 letter to the Coast Guard, Gowlings had communicated to any DIBC representative that Gowlings planned to work in opposition to the construction of a second bridge. For the period prior to that date, the only information in the record that I can find concerning Gowlings' involvement in the second bridge matter is a 2004 newspaper article that states Mr. Estrin would be reviewing the application on behalf of the city. (8/6/04 *Windsor Star* article, Ex. 6 to Defendants' Brief in Support of Motion for Summary Judgment.)

23.    Gowlings' submissions in the present case state that until late September 2006, the firm's own lawyers were unaware that they were simultaneously working for and against the construction of the second bridge. Gowlings partners Dale Hill and Timothy Wach were working in 2005 and 2006 for DIBC to do the financing, tax and restructuring preparation for construction of the bridge. Mr. Hill and Mr. Wach both state that they did not know that any Gowlings lawyer was working for Windsor to oppose the second bridge. (Hill and Wach Declarations, Ex. 8 and 10 to Defendants' Brief in Support of Motion for Summary Judgment, at 4 and 4, respectively.) They state that they learned of Gowlings' work in opposition to the second bridge from *Centra representatives* after the filing of the September 14, 2006 letter to the Coast Guard. (Id.)

24.    Mr. Estrin, the Gowlings lawyer working for Windsor, states that until a few weeks before the present action was filed, he was "completely unaware that Centra, DIBC, or CTC had retained Gowlings on any other matter." (Hill and Wach Declarations, Ex. 8 and 10 to Defendants' Brief in Support of Motion for Summary Judgment, at 4 and

8

4, respectively.)  I understand this to mean he was unaware not only of Gowlings' work in support of the financing of the second bridge, but also of all of Gowlings' earlier work for DIBC, including the work in the earlier Ambassador Bridge litigation against Windsor and the other Canadian governmental bodies.

25.    This remarkable state of affairs appears to have come about because Mr. Estrin never did a conflict filing with respect to DIBC or its subsidiary CTC on the firm's client-matter database.  He states, "I did not amend my initial conflict filing to add CTC as an adverse party when my general representation of Windsor gradually turned adverse to CTC."  (Estrin Declaration, Ex. 2 to Defendants' Brief in Support of Motion for Summary Judgment, at 3.)   If he had done so, he would have learned that DIBC was a current and/or former client of Gowlings.  In addition, by listing DIBC as an adverse party, he would have alerted his colleagues who in 2005 began work for DIBC on the bond issuance and tax work for the second bridge.  Mr. Hill's conflict search, done when he began work on the tax and transfer pricing matter, "did not reveal that Gowlings was representing any clients adverse to Stamper, CTC or DIBC." (Hill Declaration at 3.)

26.    It appears that matters came to a head after Mr. Estrin's filing of the September 14, 2006 letter in opposition to the second bridge application.  I gather from the submissions that DIBC representatives complained to Gowlings about the letter. Scott Joliffe, Gowlings' managing partner, informed DIBC that it could not continue with the bond work unless DIBC expressly consented to the ongoing representation of Windsor, after obtaining independent legal advice.  (Letter of David Ross to Fred Calderone, Ex. 12 to Defendants' Brief in Support of Motion for Summary Judgment, at 1.)  The plaintiffs evidently refused to give such consent, and filed the present action.

disclosed to, or employed on behalf of, a party with interests opposed to them. Client reluctance to confide in their lawyers harms not only the lawyer-client relation, but also courts and other tribunals, whose ability to render informed decisions is impaired.

30.     The prohibition on representation of conflicting interests applies without regard to whether the lawyer is a law firm or a solo practitioner. If the conflict of interest rules prohibit a given individual from taking on a matter, then the matter may not be taken on by anyone in that individual's firm. See, e.g., Model Rules 1.10; Restatement § 123; Canada Rules § 2.04(5); Michigan Rules § 1.10(a). The reason for this is also simple and obvious: lawyers in the same firm share information with one another. That of course is one of the purposes of creating a firm of lawyers in the first place.

31.     Gowlings' representation of Windsor in opposition to the second-bridge proposal constitutes an extraordinary conflict of interest. Gowlings has literally been on both sides of the matter of the disputed bridge proposal: from mid-2005 until the commencement of this case, it was working on financing, tax and corporate restructuring for DIBC's plan to build the second bridge; and during the same time it has been working on, and continues to work on, Windsor's effort to defeat the second-bridge project.

32.     This state of affairs constitutes such a direct and unresolvable conflict that, in my opinion, it would be unethical and unprofessional to be representing Windsor in this matter even with explicit client consent. I cannot imagine that a client, informed of the conflict, would actually give consent under such circumstances. Moreover, as I will discuss below, there is no evidence that DIBC *was* informed or gave its consent to (or "waived") the conflict. But in any event, it is well settled that, regardless of client consent, a lawyer may not represent conflicting interests under circumstances that make

11

effective representation of a client unlikely. See, e.g., Model Rule § 1.7(b)(1); Restatement § 122(2); Michigan Rules § 1.7(b)(1).[4]

33.    I simply do not see how a law firm can offer sound professional service *simultaneously* to a client it is helping to build a bridge *and* to a client it is helping to block or delay construction of the bridge. This is not even a close question. Moreover, by virtue of the financing/tax/restructuring work for the second-bridge project, Gowlings must be in possession of extensive confidential information about DIBC's finances. Such information would be of great interest to those, like Windsor, who would like to kill the second-bridge project. The information now sits in the files of the firm that is spearheading – *continues* to spearhead, so far as I am aware – Windsor's opposition to the project. I am surprised that a firm of Gowlings' size and stature would see nothing wrong in this state of affairs.

34.    To be sure, the Gowlings lawyers working *for* the bridge project until recently may have known nothing of the activities of the Gowlings lawyers working *against* the bridge project, and vice versa. But this can hardly excuse the firm's continued representation of Windsor *after* its lawyers learned of the conflict. As noted, Gowlings was presumably given sensitive information and data by DIBC for purposes of pursuing the project. A client in DIBC's position would now have reason to fear that the information may, at some undetermined time in the future, be used against it.

35.    I have not seen any evidence that the information DIBC confided to Gowlings in connection with the financing/tax/restructuring for the bridge has been shared with Windsor or the Gowlings attorney working for Windsor in opposition to the

---

[4] Canada law may differ from American law on this point. As I read them, informed consent is enough to excuse an otherwise permissible conflict. However, as discussed below, I think there is no evidence of informed consent in this case.

bridge. However, there is no need for such evidence. The rules are quite clear that an impermissible conflict exists if there is the possibility that such information might be shared in the future. A client in DIBC's position cannot monitor the flow of information within the law firm, and therefore has no way of knowing what becomes of the confidences it has vested in the law firm. Alleviating such doubts is precisely the purpose of the conflicts of interest prohibition.

36.     Moreover, the failure of Gowlings' conflict-checking system in this case gives reason to doubt the firm can effectively safeguard DIBC's confidences or prevent them from being put to adverse use. The Gowlings lawyers say they did not know of the conflict; here I take them at their word. The reason that they did not know of the conflict is that their own system for revealing conflicts broke down. That being so, Gowlings is hardly in a position to guarantee that DIBC's confidences will never reach the hands of Gowlings lawyers who work for DIBC's opponent. Nor should DIBC have to take the firm's word for it, now that the firm no longer works for DIBC. If DIBC could not rely on Gowlings' internal record-management system while Gowlings was its lawyer, it should not be forced to rely on that system now.

37.     Further doubt here is cast by another apparent failure of Gowlings' internal record management in this case: I refer to the firm's evident difficultt determining when it worked for DIBC and in locating invoices from years as recent as 2003 and 2005. The firm's CFO can find no record of any work done by Gowlings for DIBC in those years, aside from the financing/tax/restructuring work. (Byrne Declaration at 2.) DIBC has produced invoices for such work done in 2003 and 2005.

Again, taking the Gowling CFO at her word that she could not find these invoices, it is rather evident that the firm's record management system is rather porous, to say the least.

38.     Further, in my opinion the record does not support the assertion that DIBC consented to, or "waived" its objections to, the conflicting representation of Windsor. I can find no indication in the parties submissions' that – prior to the letter filed with the Coast Guard in September 2006 – DIBC knew, or even could have known, that Gowlings would be representing Windsor in proceedings to block construction of the second bridge. The burden of proof on the question of consent or waiver rests on the lawyer. See, e.g., *Glidden Co. v. Jandernoa*, 173 F.R.D 459 (W.D. Mich. 1997) (when lawyers represent conflicting interests, "theirs is the burden of proving full disclosure and the fact and scope of consent") (citing cases).

39.     The record shows that in the 2002-2005 period, Gowlings represented Windsor in the negotiations over DIBC's plan to put new booths and deck expansions on the existing bridge. It shows that Windsor expressly told DIBC that its agreement in those negotiations did not constitute "endorsement" of or willingness to approve a second bridge. I do not see any indication in the record, however, that Windsor would be participating in proceedings to block the bridge, or that Gowlings would be representing them in such proceedings.

40.     Gowlings asserts that DIBC's decision to use Gowlings attorneys in the financing/tax/restructuring work on the bridge reveals its consent to Gowlings' work for Windsor to prevent the bridge's construction. I find this mystifying. Far from implying consent, DIBC's decision suggests that it had no idea that Gowlings was seeking to block the bridge. It is incomprehensible why DIBC – if it had known of Gowlings' intentions –

14

would have entrusted to Gowlings the task of handling the financial aspects of the bridge project, and would have made known to Gowlings the confidences that must have accompanied that representation. I am unaware of any case or other authority inferring "waiver" or consent to such a severe conflict from such evidence.

41.     I also cannot understand Gowlings' apparent position that DIBC should have informed Gowlings of the conflict. (Br. In Support of Motion for Summary Judgment, at i.) Mr. Estrin says he did not run a conflicts check on DIBC because, as I understand it, his representation of Windsor only "gradually" became adverse to DIBC. If it was not adverse enough for him to run a conflicts check, I do not see how it can simultaneously be claimed that it *was* sufficiently adverse for DIBC representatives, not privy to his plans, to have objected. So far as I can tell from the record, DIBC officials were surprised and outraged in September 2006 when Gowlings filed the letter with the Coast Guard. I do not see how Gowlings can maintain on this record that DIBC had known for years what Gowlings was up to, but somehow kept their objections to themselves. In my opinion, under the circumstances disclosed by the record, Gowlings' continued representation of Windsor falls well short of professional standards.

### Successive Conflicting Representations in Ambassador Bridge Matters

42.     It is also my opinion that Gowlings' representation of Windsor in opposition to CTC's proposal to build a second bridge at the Ambassador Bridge site constitutes an impermissible conflict of interest because of its former representation of DIBC in the earlier Ambassador Bridge litigation. Here also I rest this conclusion on

what I understand to be the undisputed facts or, where the facts are in dispute, on the factual representations of Gowlings' own representatives.

43.   In the earlier Ambassador Bridge litigation, Gowlings represented DIBC in litigation against Windsor concerning its right to own and operate the Ambassador Bridge. Now it has in effect switched sides and is representing Windsor in its attempt to *defeat* DIBC's claims of right concerning ownership and operation of the bridge. The rules are quite clear that such successive representations of adverse interests on related matters are impermissible. More precisely, a conflict of interest exists when a firm represents someone whose interests are adverse to a current or former client, on a matter substantially related to the representation of that current or former client. See, e.g., Restatement § 132; Model Rule 1.9; Michigan Rules § 1.9.

44.   The purpose of this rule, once again, is to encourage clients to trust their lawyers with confidences. If a client knows that today's confidence may, at some point in the future, be used against the client, obviously the client will be reluctant to confide in the lawyer. Accordingly, the rules prohibit the lawyer from later representing an interest adverse to the client on any "substantially related" matter – that is, on any matter in which information originally supplied by the client in the previous matter might now be relevant. See, e.g., *Analytica, Inc. v. NPD Research, Inc.* 708 F.2d 1263, 1266 (7th Cir. 1983) (matters are "substantially related" for purposes of the successive-conflicts rule "if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second").

45.   I believe this to be uncontested: In the proceedings before the Coast Guard, Gowlings is arguing for Windsor against DIBC the same issue that it once argued

16

for DIBC against Windsor – namely, the scope of DIBC's legal right, under a series of licenses and the like, to own and operate bridge facilities on the site of the Ambassador Bridge. In the earlier litigation, Gowlings sought to establish DIBC's right to own and operate a bridge; now it seeks to establish, on behalf of DIBC's opponent, that DIBC's right is to own and operate *only* one bridge. Precisely the same factual and legal questions – i.e., the scope of DIBC's rights – are being put in issue now that were in issue before.

46.     For purposes of this prohibition, it does not matter whether the lawyer is in fact now making adverse use of client confidences obtained during the previous representation. See *Analytica*, 708 F.2d at 1266 ("It is irrelevant whether [the lawyer] actually obtained such information and used it against his former client, or whether – if the lawyer is a firm rather than an individual practitioner – different people in the firm handled the two matters and scrupulously avoided discussing them.") Again, the client has no way of monitoring the later use of confidences; it may be impossible to tell how, and whether, earlier confidences are now being deployed against the client. For the reason, the rules do not put on the client the impossible burden of showing that confidences are now being used adversely. The prohibition applies to successive representations on related matters, without regard to whether or how information from the previous matter is being used.

47.     The danger that the rules are designed to avert is on vivid display in this case. The lawyers in the earlier Ambassador Bridge litigation presumably gathered information, discussed legal theories, weighed the strengths and weaknesses of DIBC's claim of right, and so on. When Gowlings joined the representation of DIBC in the

17

middle of those proceedings, it presumably was given access to all of the relevant confidential information and lawyer work product that had been put together on DIBC's behalf. No one knows what became of that material after the case was settled. Now DIBC finds itself opposed by the same firm, on a matter in which those confidences and work product might be very useful to weaken its claim of legal right with respect to the bridge.

48.     Mr. Estrin states that he knew nothing of Gowlings' involvement in the earlier case, and has not seen any documents from the earlier case. Taking this as true, it appears to be pure accident that he did *not* come into contact with the materials from the previous litigation. Why they never reached his desk is unaddressed by the submissions; perhaps they were destroyed long ago, perhaps they are in a file cabinet somewhere. The whole point of the rules against successive conflicts is that clients should not have to make guesses about such issues, or to worry that – depending on the state of the information sharing system in the firm – their confidences may or may not land on the desk of the lawyer who is now representing their opponent.

### Undisclosed Financial Interest in a Principal Competitor

49.     In my opinion, a separate violation of conflict of interest principles may be posed by the fact – if it is a fact – that Gowlings partner David McFadden serves as a director of DCTC, and did not disclose this to DIBC during the representation of DIBC. It is well settled that a lawyer with financial interests adverse to a client may not represent the client, without the client's informed consent. See, e.g., Restatement § 125 comment c. "Perhaps the clearest case of a conflict is where the lawyer has a significant

18

adverse interest in the object of the representation." Id. Counsel for DIBC have represented to me that DCTC is DIBC's principal competitor, and that DIBC representatives did not know of Mr. McFadden's leadership role in that company.

49.     The reason for concern here is obvious. If a member of the firm has a financial stake in the client's competitor, this creates incentives for the firm to work against the client's interests, and perhaps to use client confidences in a manner that harms the client. Clients need to be assured that they will know of any such financial stake, so that they can seek representation elsewhere. If clients fear that their lawyers may have undisclosed financial interests adverse to them, clients will understandably be nervous about fully confiding in their lawyers. These professional precepts are not controversial. Further, it is the responsibility of the lawyer to inform the client of the adverse financial stake. This is literally hornbook law. See, e.g., Wolfram, Modern Legal Ethics 484 (1986). The lawyer may not wash his hands of the problem by leaving it up to the client to check up on the lawyer's financial interests, or to assume the client somehow knows of the lawyer's financial interests.

50.     Mr. McFadden's undisclosed interest – again, assuming it was undisclosed – in Detroit & Canada makes even more troubling Gowlings' continued work on behalf of Windsor on the second-bridge matter. It means the firm has a financial interest, over and above its duty to zealously represent Windsor, in ensuring the second bridge is blocked. DIBC will naturally fear that whatever financial information it confided to the Gowlings lawyers who helped on the bridge project may now find its way into the campaign to kill the bridge project. In my opinion, it is contrary to professional standards

19

for Gowlings to continue work in opposition to the second bridge under these circumstances.

## Use of Information Relating to First Ambassador Bridge Litigation

51.     As I understand the pleadings, DIBC alleges that certain information obtained by Gowlings in the first Ambassador Bridge litigation has found its way into the letter Gowlings filed with the Coast Guard. This information includes material from the "Goodman memo," created by counsel in the first Ambassador Bridge litigation to document, critically analyze, and discuss the strengths and weaknesses of DIBC's claim of right with respect to the bridge. The Gowlings submissions deny this, and I am of course in no position to decide who is right on the facts. I merely note two things.

52.     First, if DIBC turns out to be correct in its allegation, then this would constitute a separate violation of the rules and standards of professional responsibility. It is a firmly established principle that a lawyer may not use information relating to the representation of a current or former client to the disadvantage of that client. See, e.g., Model Rule 1.9(c); Restatement § 60; Michigan Rules § 1.9(c). This includes, but is not limited to, client secrets. It also includes attorney work product and any other information that has not become "generally known." Model Rule 1.9(c); Restatement § 59; Mich. Rules § 1.9(c).

53.     Second, I reiterate that my analysis of the conflicts of interest discussed above is not dependent on the factual issue of whether information from the first litigation has been used by Gowlings in the present dispute before the Coast Guard. My

analysis of the conflict of interest issues has assumed that no such information has been used.

## CONCLUSION

54.　In sum, it is my opinion that Gowlings has an impermissible conflict of interest concerning DIBC's second-bridge application, and must withdraw from further representation of Windsor on the matter. I reach this conclusion based on what I understand to be the undisputed facts, or (where facts are disputed) on the representations of Gowlings representatives. In particular, I conclude that:

a.　Gowlings' representation of Windsor creates a conflict of interest because of its 2005-2006 role as DIBC's lawyer working on financing/taxation/corporate restructuring matters connected with the second-bridge project.

b.　In addition, Gowlings' representation of Windsor creates a conflict of interest because of its work in approximately 1985-1992 as DIBC's lawyer in litigation against Windsor and other governmental bodies concerning the scope of DIBC's right to own and operate the Ambassador Bridge.

c.　There is no evidence that DIBC consented to or waived its right to object to either conflict.

55.　In addition, it is my opinion that:

a.　Gowlings' representation of Windsor is further barred if, as has been represented to me, (i) Gowlings partner David McFadden is a director of Detroit & Canada Tunnel Corporation, (ii) Detroit & Canada is a principal

competitor of DIBC, and (iii) his interest in Detroit & Canada was not disclosed to DIBC.

     b.    Gowlings' representation of Windsor is further barred if, as has been alleged, Gowlings has made use of information obtained in its representation of DIBC in the earlier Ambassador Bridge litigation.

56.    I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, opinion, and belief.

Pursuant 28 U.S.C. § 1746(1), I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on March 9, 2007 in Cambridge, Massachusetts.

Bruce L. Hay