UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation

          Plaintiffs,

-vs-

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP, a
Canadian Limited Liability Partnership,

          Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION TO ENJOIN
GOWLINGS FROM REPRESENTING THE CITY OF WINDSOR WITH
RESPECT TO THE DEVELOPMENT OF A SECOND SPAN
OF THE AMBASSADOR BRIDGE**

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.
By:    Sharon M. Woods (P22542)
       Todd R. Mendel (P55447)
       Kevin Kalczynski (P57929)
       Melonie L. M. Stothers (P65344)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725

# TABLE OF CONTENTS

STATEMENT OF ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MOST APPROPRIATE AUTHORITIES CITED FOR RELIEF SOUGHT . . . . . . . . . . . . . . iii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PLAINTIFFS ARE NOT ENTITLED TO AN INJUNCTION . . . . . . . . . . . . . . . . . . . . 2

    A.   There Is No Irreparable Harm to Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   An Injunction Will Cause Substantial Harm to Others and the Public . . . . . . . . 8

    C.   The Sixth Circuit Did Not Foreclose Defendants' Consent Defense . . . . . . . . . . 10

    D.   Plaintiffs Cannot Establish a Substantial Likelihood of Success on the
         Merits Because They Consented to the Alleged Concurrent Conflict . . . . . . . . 15

    E.   Gowlings Did Not Drop Plaintiffs Like a "Hot Potato" . . . . . . . . . . . . . . . . . . 18

    F.   There Is No Former Client Conflict Warranting Gowlings' Disqualification . . . 19

         1.   The standards to be applied regarding former clients . . . . . . . . . . . . . . 19

         2.   The *FIRA* litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         3.   The tax and bond advice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         4.   Plaintiffs have waived any former-client conflict . . . . . . . . . . . . . . . . . 24

    G.   Neither David McFadden's Relationship to the Detroit-Windsor Tunnel
         Nor Windsor's Interest in that Tunnel or Another Border Crossing
         Raise a Disqualifying Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III. THE INJUNCTION SOUGHT WOULD BE UNENFORCEABLE IN CANADA . . . . 27

IV.  PLAINTIFFS SHOULD BE REQUIRED TO POST A SUBSTANTIAL SECURITY BOND
     IF AN INJUNCTION IS ENTERED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

## STATEMENT OF ISSUE PRESENTED

Should this Court project its injunctive power into a foreign country and enjoin Canadian lawyers from representing a Canadian municipality in Canada when:

- Plaintiffs have not suffered irreparable harm nor is there any threat of irreparable harm, because no confidential information of plaintiffs has been used or disclosed nor is there an imminent danger of it being used or disclosed, plaintiffs have substantially delayed making any claim of irreparable harm, and, as plaintiffs' first amended complaint recognizes, any potential harm caused by the alleged conflict is compensable with money damages.

- The attached declaration submitted by the City of Windsor demonstrates that the actual harm to the public, Windsor and its citizens, from such an injunction far outweighs any theoretical harm to plaintiffs in the absence of an injunction.

- Plaintiffs cannot show a substantial likelihood of success on the merits.

- There is no disqualifying conflict of interest warranting any injunctive relief.

- Under Canadian law, such an injunction would be unenforceable.  Canadian courts will not recognize judgments from the courts of foreign countries applying professional responsibility standards to Canadian lawyers in Canada, because foreign jurisdictions do not have the requisite real and substantial connections to support such an order under Canadian law.

Defendants answer:   "No."

Plaintiffs answer:   "Yes."

## MOST APPROPRIATE AUTHORITIES CITED FOR RELIEF SOUGHT

### Unless This Case is Decided on Summary Judgment, a Permanent Injunction Must Await a Trial on the Merits

*Banks v United States*, 614 F.2d 95 (6th Cir. 1980)

### Irreparable, Actual and Imminent Harm, and Actual Prejudice Are Required for the Injunction Being Sought, None of Which Plaintiffs Have Shown

*Eberspaecher North American, Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592 (E.D. Mich. 2008)

*Smith, et. al. v. William J. Coleman and BC Sportsman Club, Inc.*, 2004 Mich. App. LEXIS 1730

### Plaintiffs' Substantial Delay in Seeking an Injunction is Incompatible With Irreparable Harm and Entering an Injunction

*Sequa Corp. v. Gelmin*, 1995 U.S. Dist. LEXIS 9338 (S.D.N.Y.)

### The Factors to be Considered as to Whether Attorneys in Large Firms Shared Information Do Not Support the Finding of Any Irreparable Harm Here

*City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193 (N.D. Oh. 1976), aff'd, 573 F.2d 1310 (6th Cir. 1977)

### Windsor's Right to the Counsel of Its Choice is Substantial and Disqualification of Windsor's Counsel Is a Drastic Sanction That Should Not Be Imposed Unless Absolutely Necessary

*United States v. Kryzyske*, 836 F.2d 1013 (6th Cir. 1988)

*SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d, 863 (S.D. Oh. 2002)

*In re Valley-Vulcan Mold Co.*, 237 B.R. 322 (B.A.P. 6th Cir. 1999), aff'd 5 Fed. Appx. 396 (6th Cir. 2001)

*Quicken Loans v. Jolly*, 2008 U.S. Dist. LEXIS 48266 (E.D. Mich.)

**The Consequences to the Public - - Windsor and Its Citizens - - of the
<u>Requested Injunction Are Particularly Important to Consider</u>**

*Charter Township of Huron v. Richards*, 997 F.2d 1168 (6th Cir. 1993)

**The Sixth Circuit's Denial of the Motion for Summary Judgment
Against Plaintiffs Decided One Thing—That the Case Should Proceed
<u>Because of Disputed Factual Issues Concerning, Among Other Things, Plaintiffs' Consent</u>**

*Switzerland Cheese Assn. v. Horne's Market*, 385 US 23 (1966)

*CenTra, Inc. v. Estrin*, 538 F.3d 402 (6th Cir. 2008)

**Plaintiffs Are Estopped From Withdrawing, and Have Waived Any Opportunity
<u>to Withdraw, Their Consent to Gowlings' Representation of Windsor</u>**

Rule 2.04 of the Law Society of Upper Canada's Rules of Professional Conduct

*R. v. Neil*, 2002 SCC 70

Mich. R. Prof. Conduct 1.7

*City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193 (N.D. Oh. 1976),
aff'd, 573 F.2d 1310 (6th Cir. 1977)

**There Is No "Hot Potato" Issue Because Gowlings Was Required to
<u>Withdraw From Representing Only Plaintiffs</u>**

Rule 2.09 of the Law Society of Upper Canada's Rules of Professional Conduct

*City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193 (N.D. Oh. 1976),
aff'd, 573 F.2d 1310 (6th Cir. 1977)

*McGehee v. Johnson*, 2006 WL 3019823 (Mich. App.)

Mich. R. Prof. Conduct 1.6(b)(6)

**<u>Gowlings Does Not Have a Former-Client Conflict</u>**

Rule 2.04 of the Law Society of Upper Canada's Rules of Professional Conduct

Mich. R. Prof. Conduct 1.9

*In re Valley-Vulcan Mold Co.*, 237 B.R. 322 (B.A.P. 6th Cir. 1999)

*S.D. Warren Co. v. Duff-Norton*, 302 F. Supp.2d 752 (W.D. Mich. 2004)

*Quicken Loans v. Jolly*, 2008 U.S. Dist. LEXIS 48266 (E.D. Mich.)

*Attorney General of Canada v. Central Cartage Company*, 63 N.R. 17 (1985)

*Attorney General of Canada v. Central Cartage Company*, 10 F.T.R. 225 (1987)

*Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (9th Cir. 1983)

**<u>Gowlings Does Not Have a Conflict Arising From McFadden's Prior Tunnel<br>Board Membership Or From Windsor Being a General Competitor of Plaintiffs</u>**

*Strother v. 346492 Canada, Inc.*, [2007], 2 S.C.R. 177

Mich. R. Prof. Conduct 1.7

**<u>The Injunction Sought by Plaintiffs is Unenforceable in Canada and<br>the Court Should Not Issue an Unenforceable Injunction</u>**

*Cook v. Parcel, Mauro, Hultin & Spaanstra, P.C.*, [1997] B.C.J. No. 428

*Kuchocki v. Fasken Martineau Dumoulin*, [2005] O.J. No. 1515

*Global Copper Inc. v Mortenson*, [2002] B.C.J. No. 880

*In re Estate of Ferdinand Marcos Human Rights Litigation*, 94 F.3d 539 (9th Cir. 1996)

**<u>A Substantial Security Bond is Required From Plaintiffs If an Injunction is Entered</u>**

Fed. R. Civ. P. 65(c)

# I.      INTRODUCTION

Plaintiffs' motion for an injunction should be denied for several independent reasons. First, there is no showing of irreparable or imminent harm. As shown below, it is abundantly clear that none of plaintiffs' confidential information has migrated from them to Windsor through Gowlings and no danger exists that it ever will. Plaintiffs also never pled irreparable harm, and state in their pleadings that any alleged harm is fully compensable through money damages.

Second, the balance of harm militates strongly against injunctive relief. The public interest of non-party Windsor and its citizens, who since 2002 have spent millions of public dollars to retain Gowlings on bridge matters pertaining to health, safety, displacement of citizens, traffic and the environment, will be substantially harmed if this Court effectively enjoins Windsor from continuing the use of its long-time counsel. That harm will be real and concrete, while the harm to plaintiffs is purely theoretical.

Third, plaintiffs' motion is incorrectly premised upon the conclusion that the Sixth Circuit has eliminated Gowlings' defense that plaintiffs consented to the alleged conflict. But the Sixth Circuit remanded the case for discovery on consent and other defenses. Further, the standard of review that the Sixth Circuit was required to apply is not applicable on plaintiffs' injunction motion. Substantial evidence shows that plaintiffs provided informed and implied consent to the alleged conflict. Fourth, plaintiffs cannot show a likelihood of success on the merits because there is no disqualifying conflict. Fifth, plaintiffs are seeking an unprecedented injunction from an American court for the purpose of enjoining a Canadian law firm from representing a Canadian municipality on legal matters in Canada. Under Canadian law, such an injunction would not be enforceable in Canada. United States federal courts do not issue non-enforceable injunctions.

## II.   PLAINTIFFS ARE NOT ENTITLED TO AN INJUNCTION

### A.   There Is No Irreparable Harm to Plaintiffs

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," as to all four prerequisites. *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (emphasis in original); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978) (Substantial likelihood of success on the merits, irreparable harm to plaintiffs, harm to others, public interest).[1] "A showing of 'probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" [citations omitted]. *Eberspaecher North American, Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008). "The potential harm 'must be 'actual and imminent,' and not merely remote or speculative.' [citations omitted]. To justify injunctive relief, there must be a 'substantial threat of impending injury.' [citations omitted].  Preliminary injunctive relief is thus inappropriate where monetary relief is sufficient." [citations omitted]. *The Romantics v. Activision Publishing, Inc.*, 532 F. Supp. 2d 884, 889 (E.D. Mich. 2008).  To disqualify counsel because of a conflict of interest, there must be a demonstration of actual prejudice, not just the presumed use of confidential information upon which plaintiffs here are trying to obtain an injunction. (Pl. br., p. 13). *See, Smith, et. al. v. William J. Coleman and BC Sportsman Club, Inc.*, 2004 Mich. App. LEXIS 1730 (Ex. 30).

In assessing whether an attorney acquired or shared confidential information from the party seeking disqualification, "recent prevailing legal precedent has rejected the harsh, hard-line approach

---

[1]Notwithstanding the title of their motion, plaintiffs are seeking a <u>permanent</u> injunction, which may be granted only after a full adjudication on the merits or after summary judgment is decided in plaintiffs' favor. *Banks v United States*, 614 F.2d 95, 96 n. 4 (6th Cir. 1980).  In light of the Sixth Circuit's remand due to disputed factual issues, plaintiffs' permanent injunction motion must be denied on this basis alone.

of irrebuttably imputing confidential disclosures, actual or presumed, received by one member of a law firm to all members of that law firm in favor of more realistically equitable logic, attuned to contemporary legal practices common to emerging law firms of substantial size." *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193, 210 (N.D. Oh. 1976), aff'd 573 F.2d 1310 (6th Cir. 1977). Factors appropriate for consideration by the trial court include the size and structural divisions of the law firm involved, the likelihood of contact between the "infected" attorney and the specific attorneys responsible for the present representation, and the existence of rules which prevent the "infected" attorney from access to relevant files or other information pertaining to the present litigation. *Id.* at 209-11.

Plaintiffs make unsubstantiated, broad-sweeping allegations in their brief that Gowlings used plaintiffs' confidential information on behalf of Windsor, that Gowlings obtained during the *FIRA* litigation and tax and bond advice representations. But there simply is no support for these allegations in the record.

As to the tax and bond advice, the evidence shows that Estrin never spoke to, heard of, or even knew about any Gowlings' professionals providing tax and bond advice to plaintiffs. (Exs. 3-5). Once Gowlings became aware of the situation, screens were put in place, and not a shred of evidence exists that any actual information plaintiffs may have provided to Gowlings has ever been or will ever be used by or disclosed to any Gowlings attorney representing Windsor on any bridge-related issues. (Exs. 3-6). To the contrary, the declarations of Hill, Wach and Estrin all show that no confidential information was exchanged. (Exs. 3-5). Moreover, attached as Exhibit 6 are the declarations of all relevant Gowlings' professionals and support staff, and related screening memoranda, attesting that no information of plaintiffs has been or will be exchanged, used or disclosed, and that the Gowlings attorneys and staff working for Windsor have never received or

used any of plaintiffs' information, and will not do so in the future. <u>The only claimed "confidential"</u>

<u>information of plaintiffs used by Gowlings relating to the tax and bond advice is described in Dan</u>

<u>Stamper's declaration</u>, where he states:

> It is clear to me that Gowlings has obtained information regarding CenTra and its subsidiaries and understands the organizational structure of CenTra. For example, I have reviewed the "Canadian Transit Company Transfer Pricing Report" 2001-2003 prepared by [Gowlings] in which Gowlings describes on page 2 that CenTra as [sic] "essentially a holding company, [and] has a number of subsidiaries that are involved in transportation logistic services, and international toll bridge, freight delivery services, truckload and less than truckload motor carrier operations in the United States and Canada and holds and leases land." The same report states that DIBC is a wholly owned subsidiary of CenTra and [CTC] is wholly owned subsidiary of DIBC. Finally, Gowlings represented to the CRA that "the Ambassador Bridge, which spans between Windsor, Ontario and Detroit, Michigan is owned jointly by related parties of CenTra." (Ex. 6, ¶13 to Pl. br.)

But all of this information is public, not confidential. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 422 (6th

Cir. 2008) ("documents or information that are public or published are not considered confidential

under Michigan's Rules of Professional Conduct").

A <u>public</u> 2003 Surface Transportation Board decision states that "CenTra is a holding

company that owns several transportation companies, including a trucking company . . ." (Ex. 7, p.

1). A <u>public</u> 2007 Proxy Statement filed with the SEC on behalf of an entity owned by CenTra states

that CenTra is "a transportation holding company . . . with subsidiaries engaged in real estate, toll

bridge and 'less than truckload' motor carrier activities." (Ex. 8, p. 4). The <u>public</u> first amended

complaint filed in this case alleges that "DIBC owns, operates and maintains the Ambassador Bridge

. . . and that DIBC is owned by CenTra, a diversified holding company." (Ex. 2, ¶¶7-8). Paroian's

Affidavit filed by CenTra in the <u>public</u> OPA proceeding states that "CTC is the Canadian owner and

operator of the Ambassador Bridge." (Ex. 9, ¶2). The <u>public</u> April 2007 Environmental Assessment

that DIBC submitted to the U.S. Coast Guard states that "the new span would be constructed by

DIBC in coordination with its commonly-owned Canadian counterpart, [CTC], an Ontario

4

corporation. Both DIBC and CTC are owned by CenTra, Inc., a Michigan corporation." (Ex. 10, 3rd page of Exhibit).

Likewise, the Gowlings attorneys and personnel working for Windsor have never seen, used or even known about any of the plaintiffs' information from the 15-year old *FIRA* litigation. (Exs. 3, 6, 11). Plaintiffs submit the declarations of Moran and Binavince, and point to one paragraph in Estrin's letter to the Coast Guard, as the entirety of their evidence to show that: Gowlings received from the *FIRA* litigation the "Goodman Memo," and that Estrin's letter to the Coast Guard is "consistent" with that memo, so there must be a "high probability" that Estrin used the Goodman Memo to aid in his representation of Windsor. (Pl. br., p. 6). Plaintiffs then argue that "Gowlings presumably continues to use and share such confidential information with Windsor, at a minimum, and perhaps with other parties." (Pl. br., p. 10).

First, the primary attorneys that worked at Gowlings on the *FIRA* litigation are deceased (Henderson), or departed Gowlings 15 years ago (Binavince). (Ex. 3, ¶2 and Ex. 2, ¶9 to Pl. br.; Ex. 11). Second, the only other attorney who remains at Gowlings and who was involved in the *FIRA* litigation (Lunau) was an associate at that time, and he has not seen the *FIRA* litigation files for approximately 15 years, does not remember ever seeing the Goodman Memo or anything similar, and has had no professional contact whatsoever, nor will he, with any Gowlings attorneys relating to Windsor or the Ambassador Bridge. (Ex. 11). Third, Estrin did not see, use or have access to this file, including the Goodman Memo, in his representation of Windsor. (Ex. 3). Fourth, the fact that both Estrin's letter and the 20-year old Goodman Memo (which, significantly, plaintiffs have never shown to this Court) both described publicly available documents does not mean that Estrin used or saw the Goodman Memo. The only paragraph about which plaintiffs complain in Estrin's 36-page letter to the Coast Guard written on Windsor's behalf, was <u>developed from publicly-available</u>

5

information gathered by an independent consultant having no connection whatsoever to plaintiffs. (Ex. 12).[2]

Plaintiffs also pretend that an e-mail from Gowlings' tax professional Hill is somehow inconsistent with the declaration from Gowlings' CFO Karen Byrne. (*See*, Pl. br., p. 5). Based upon that false premise, they then argue that Gowlings should not be believed when its professionals say they have not seen or used any of plaintiffs' confidential information for Windsor. (Pl. br., pp. 5-6). However, Byrne's declaration is entirely consistent with Hill's e-mail. Hill's e-mail indicates that in August 2006, at the request of plaintiffs, he found some old *FIRA* files which were in "permanent storage," and which plaintiffs wanted transported to plaintiffs. (Ex. 9 to Pl. br.). Five months later, in January 2007, Byrne's Declaration states that "other than the files related to the Tax and Bond Work, Gowlings does not have any files in its possession or control related to its prior representation of CenTra." (Ex. 8, ¶7 to Pl. br.). As attested by Hill, he fulfilled plaintiffs' August 2006 request and sent the files to plaintiffs, so that when Byrne looked for them in January 2007, many months later, there were no files to be found. (Ex. 13). As it turns out, none of these files were even *FIRA* files at all. (Ex. 13).

---

[2]This complained-about paragraph states that Gowlings commissioned historical and archival research of Congressional and Parliamentary statutory, executive, plans, drawings and rights-of-way approvals. (Pl. br., p. 6). By definition, these are public documents. Plaintiffs also failed to read the next few pages of Estrin's letter to the Coast Guard, in which Estrin specifically cites to and encloses certified copies of the public documents he obtained from the U.S. and Canadian governments and on which his letter is based. (Ex. 5 to Pl. br., pp. 11-14). These are on their face documents filed with public bodies and agencies in every instance. *Id.* Moreover, attached to Estrin's letter is a letter from the archivist that Gowlings hired, where he describes his independent research of the public archives concerning the Ambassador Bridge. (*Id.*; Ex. 12). Plaintiffs' allegation that Estrin's letter relied on or used the Goodman Memo is false. Indeed, the Sixth Circuit noted that "Estrin's letter appears to contain only generally known material." *CenTra, Inc. v. Estrin*, 538 F.3d at 423. At a minimum, plaintiffs should have, but did not provide the Goodman Memo to the Court for its in camera review, and to Gowlings' counsel, so that plaintiffs' bald allegations can be tested and shown to be false.

In short, with respect to the tax and bond advice and *FIRA*, there is no evidence at all of any irreparable harm to plaintiffs due to their confidential information having been used or disclosed or any imminent danger of that happening.

In addition, plaintiffs' first amended complaint alleges three counts seeking money damages. Neither the words "irreparable harm" nor the concept of such harm are alleged in that pleading. (Ex. 2). Plaintiffs' brief also highlights that the breaches they allege "magnifies the damages to plaintiffs" and "decreases the value of building a second span." (Pl. br., pp. 9, 11). It is axiomatic that where monetary relief is sufficient, an injunction must be denied.

Plaintiffs filed this action in November 2006, and waited five months, until April 2007, to file their initial motion to disqualify Gowlings from representing Windsor (Docket #34), which was later denied as moot. Plaintiffs could also have filed, but did not, a motion for an injunction pending the appeal of summary judgment against them, under Fed. R. App. P. 8(a). In short, almost two years have elapsed since plaintiffs filed this action, but the first time they ever mentioned irreparable harm was three weeks ago on September 25, 2008, when they filed their present motion. Their motion relies on the exact same "evidence" that they submitted 19 months ago. If imminent irreparable harm was real, plaintiffs would have mentioned it immediately in their complaint, or when they first sought disqualification, or while their appeal was pending, or immediately after appeal. At each point in time, they failed to do so. "The very fact of substantial delay has long been recognized as a factor favoring denial of preliminary injunctive relief, on the premise that such delay is incompatible with a claim of irreparable injury . . . Also, delay may reflect tactical maneuvering by the movant with the goal of maximizing the burden on his adversary." *Sequa Corp. v. Gelmin*, 1995 U.S. Dist. LEXIS 9338 *27-8 (S.D.N.Y.) (Ex. 29) (citations omitted) (emphasis added).

**B.     An Injunction Will Cause Substantial Harm to Others and the Public**

"There is a clear public interest in permitting attorneys to practice law without unreasonable restrictions." *Earnings Performance Group, Inc. v. Quigley*, 2003 U.S. Dist. LEXIS 26294 *28 (E.D. Mich.) (Ex. 31), aff'd 124 F. Appx. 350 (6th Cir. 2005). *See also, United States v. Kryzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988) (although the right to counsel of one's choice is not absolute, the right is an important one). The extreme sanction of disqualification should only be utilized when there is a reasonable possibility that some "specifically identifiable impropriety" actually occurred. *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d, 863 865 (S.D. Oh. 2002); *Moses v. Sterling Commerce (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005). "Motions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.' [citation omitted]. The party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof before a lawyer is disqualified,' because . . . a party's choice of counsel is entitled to substantial deference." *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), *aff'd* 5 Fed. App'x 396 (6th Cir. 2001). Even a violation of the rules of professional ethics does not automatically necessitate disqualification of an attorney, as the Court may choose a remedy other than disqualification. *Quicken Loans v. Jolly*, 2008 U.S. Dist. LEXIS 48266 at *9-10 (E.D. Mich.) (Ex. 32).

As explained, plaintiffs have never asserted any harm except, at most, that which is theoretical and speculative. On the other hand, the City of Windsor, a municipality, and its citizens (the public) will be substantially harmed by any order depriving it of its long-time counsel. The attached Declaration of George Wilkki, Windsor's City Solicitor, which was approved by a resolution of the Windsor City Council, sets forth in detail the harm to Windsor and its citizens if they lose Gowlings as their counsel. Windsor chose Estrin because he is one of Canada's foremost

8

practitioners in environmental law. (Ex. 14, ¶7). Windsor chose Gowlings because of its reputation, knowledge, experience and expertise in dealing with the various legal issues surrounding border crossings in general and related environmental issues in particular. (*Id.*, ¶6). Estrin and Gowlings are not fungible lawyers or interchangeable with other lawyers or firms. (*Id.*, ¶8). Gowlings' representation of Windsor concerning the second span impacts matters of the public health and safety, pollution, historical preservation, traffic, noise, land use, displacement of Windsor's citizens and the environment, all of which have been for years carefully evaluated and managed by Gowlings. (*Id.*, ¶¶9-12, 16-18). Gowlings has also played, and continues to play, an essential role in Windsor's selection, retention, instruction and coordination of expert consultants assisting Gowlings in providing legal advice to Windsor. (*Id.*, ¶¶22-24). These experts have been retained in numerous disciplines, including traffic modeling, highway construction, economic impact, social impact and environmental impact assessments. (*Id.*). These retainers have been in place for years and Gowlings has unique knowledge of how these consultants can best be utilized in connection with giving legal advice to Windsor. (*Id.*).

Gowlings has also worked closely with and gained the confidence of senior Windsor staff, and with key government officials in Canadian federal and provincial governments. (*Id.*, ¶¶25-26). These important relationships and the knowledge base developed over years would be lost if Gowlings cannot continue as Windsor's chosen counsel. (*Id.*). Windsor would also lose Gowlings' important counsel on other potential border crossing projects that are currently being proposed. This would leave Windsor extremely vulnerable for a long time, possibly years, until another firm could fully understand the unique, complex and important public issues that border crossings create in Windsor. (*Id.*, ¶¶28-37). Moreover, Windsor and its citizens have made a significant investment

of public funds (more than $4.5 million) and of time and effort in Gowlings as their counsel on these and other issues of vital importance.  (*Id.*, ¶¶18-21).

The negative impact of an injunction on Windsor, a public entity, is paramount and particularly important in the Court's assessment of this factor.  *Charter Township of Huron v. Richards*, 997 F.2d 1168, 1175 (6th Cir. 1993) (Before resorting to the extraordinary remedy of an injunction, "[a] court must balance the interests of the parties <u>giving particular attention to the public consequences of a decree</u>.") (emphasis added).  Plaintiffs' argument that Windsor assumed the risk of retaining Gowlings is belied by the facts.  (Pl. br., p. 14).  Windsor hired Gowlings in 2002, ten years after the *FIRA* litigation concluded and years before plaintiffs hired Gowlings for tax and bond advice (when plaintiffs already knew that Gowlings represented Windsor adverse to the Bridge Plan).  There is no contest here in weighing the serious, existing actual harm to Windsor compared with, at most, entirely speculative harm to plaintiffs.[3]

## C.      The Sixth Circuit Did Not Foreclose Defendants' Consent Defense

Plaintiffs argue that the Sixth Circuit has finally decided in favor of plaintiffs on the defense that plaintiffs consented to the alleged conflict.  That assertion is a far cry from what the Court in fact decided.  The Sixth Circuit effectively denied the summary judgment previously granted in favor of Gowlings because it found disputed issues of fact.  The "denial of a motion for summary judgment because of unresolved issues of fact does not settle, or even tentatively decide, anything about the merits of the claim.  It is strictly a pretrial order that decides only one thing—that the case should

---

[3]The case cited by plaintiffs is inapposite.  *In re: Karabatian's Estate*, 17 Mich. App. 541 (1969) (Michigan court cited its duty to exercise control over a Michigan attorneys' professional conduct where he named himself as a beneficiary in a will he drafted for his client).  Here, plaintiffs are without legal basis seeking an unprecedented injunction from an American Court enjoining Canadian lawyers from practicing law in Canada for a Canadian municipality that will suffer devastating harm from such an injunction.

go to trial." *Switzerland Cheese Assn. v. Horne's Market*, 385 US 23, 25 (1966). As noted in the concurrence of Judge Merritt, this case requires discovery on all disputed fact issues, and the Sixth Circuit reached "no conclusion about the scope of liability, causation, damages, or whether there is in fact a plausible or valid breach of contract or other legal duties. In the absence of a complete record, it would be premature for us to make any findings or conclusions with regard to the underlying causes of action." *CenTra v. Estrin*, 538 F.3d at 424.

In reaching its decision, the Sixth Circuit gave plaintiffs "the benefit of the doubt" as long as plaintiffs' statements were "not totally implausible." *CenTra, Inc. v. Estrin*, 538 F.3d at 419. That one-sided favorable presumption for plaintiffs, which the Sixth Circuit was required to apply under its standard of review, does not apply to plaintiffs' injunction motion. The Sixth Circuit specifically found that:

> [T]here is clearly a genuine issue of material fact as to whether CenTra's retention of Gowlings after learning of Gowlings's work for parties adverse to CenTra on other matters served as implicit consent to Gowlings's simultaneous and adverse work on the Bridge Plan for both CenTra and Windsor. Taking the evidence in the light most favorable to the nonmoving party, we are compelled to conclude that the district court improperly granted summary judgment in favor of Gowlings. CenTra has established genuine issue of material facts as to whether the conflict was consentable, whether CenTra was properly informed of the conflict, and whether CenTra's actions indicated implied consent. *Id*. at 419. (emphasis added).

The Sixth Circuit also noted conflicting evidence that:

> Estrin believed that the Bridge Plan and the Site Plan were directly related; therefore Estrin claims that his opposition to the Site Plan also served as opposition to the Bridge Plan. Stamper, however, viewed the Site Plan as a matter totally separate from the Bridge Plan . . ." *Id*. at 406-07.

These conflicting declarations create an issue of fact regarding whether the Site Plan and Bridge Plan were related. *Griffith v. Coburn*, 473 F.3d 650, 660 (6th Cir. 2007) (conflicting testimony created issue of fact). The Sixth Circuit also stated that the Site Plan Agreement

"disentangled" the Site Plan and Bridge Plan, citing to a provision of the Site Plan Agreement providing that Windsor's approval of the site plan improvements would not be construed as a waiver of Windsor's right to object to the Bridge Plan.  Under an equally plausible view, the Site Plan Agreement put plaintiffs on notice that Windsor, represented by Gowlings, was opposed to the Bridge Plan.

By at least September 2004, Estrin, and Windsor's own personnel made absolutely clear to Stamper and plaintiffs' attorneys in face-to-face meetings that Windsor, represented by Gowlings, was opposed to the Bridge Plan.  (Ex. 3, ¶¶10-17; Ex. 16, ¶18, Tofflemire Decl.  ("Estrin and I unambiguously communicated to CTC's representatives, including Dan Stamper, that Windsor was opposed to the second span and that both Estrin and I were there on behalf of Windsor to convey that message to them"); Ex. 15, ¶¶3, 5, Estrin Decl.  (It was clear that Stamper and plaintiffs were aware at least as of September 2004 of Gowlings representation of Windsor adverse to plaintiffs concerning the Bridge Plan, and that Windsor was opposed to a second span or twinning of the Ambassador Bridge.)).  In addition, in September 2004, Estrin provided Stamper with a draft agreement, the importance of which cannot be overstated.  This draft was not part of the prior summary judgment record in this case.  The draft contained the following provisions, which leave no doubt at all that Stamper knew that Gowlings represented Windsor in opposition to the Bridge Plan, long before Stamper later hired other Gowlings professionals for the tax and bond advice:

> 3.      The developers [plaintiffs]
>
>      (a) acknowledge their expenditure of money in connection with this development is at their risk having regard to the current position of the City as opposed to a second bridge at this location;
>
> * * *
>
>      (c) agree that should they in the future proceed with an application to construct a second or twinned bridge in this location they will provide an environmental impact assessment . . . (Ex. 15 attachment) (emphasis added).

12

1.   The developers [plaintiffs] will . . . submit a modified application which . . . (i) eliminates from the proposed development the north-western portion of the area now labeled "Bridge Deck Extension," i.e. <u>that area which would only be required in connection with a second bridge crossing;</u>" (Ex. 15, attachment) (emphasis added).

WHEREAS,

(f)  the CTC and the DIBC on July 14, 2004, made a "Preliminary Review Permit Application" for <u>twinning of the Ambassador Bridge which application indicates the second bridge would be served by an expanded plaza on the Canadian side consisting</u> in part of the plaza development on the west side of Huron Church Road <u>which is the subject of the site plan approval application;</u> and

(g)  <u>City Council has previously expressed its concern about the twinning of the Ambassador Bridge at the location proposed</u> because it will exacerbate the substantial pollution and safety problems being caused by international truck traffic infiltrating core residential, institutional and business areas of the City. (Ex. 15, ¶6, attachment) (emphasis added).

A picture is also worth a thousand words. Attached is an overhead photo of the site plan plaza deck extension and the "bridge to nowhere." (Ex. 17). This "bridge to nowhere" is the pink-colored portion of the site plan that has no use but to be part of a second span of the Ambassador Bridge. (*Id.*). While Windsor was agreeing to the site plan improvements for the existing bridge plaza (where the cars are in the photo), <u>the entire point of reserving its objections to the "bridge to nowhere" portion was to make clear that Windsor opposed the second span and the portion of the site plan designed to be part of the second span.</u> (Exs. 15-16).

In addition and tellingly, in April 2007, after Gowlings' summary judgment motion was fully briefed and argued, plaintiffs submitted their environmental assessment of the Bridge Plan to the U.S. Coast Guard. (Ex. 10). <u>Significantly, that document, which lists Dan Stamper as a "preparer," specifically represented that the Canadian plaza expansion approved in the Site Plan Agreement is related to the Bridge Plan:</u>

• *"Projects that are related to the [Bridge Plan] are the . . . Canadian Plaza Expansion . . ."*

13

- "No modifications will be required in the [Canadian and U.S. plazas] <u>which have been designed to accept this [Second] Span</u>."

- "The [Bridge Plan] compliments and enhances . . . the Windsor Plaza Expansion Project." [The Plaza Expansion Project] "<u>anticipated the addition of an adjacent span to the existing Ambassador Bridge and were planned to accommodate such a new span</u>." (Ex. 10, pp. 5, 11, 26, 101) (emphasis added).

Plaintiffs made these statements to the U.S. Government just a month after Stamper submitted his declaration telling this Court that the bridge deck extension was completely unrelated to the second span. Plaintiffs also submitted to the Canadian Environmental Assessment Agency in March 2006 a request for a categorical exclusion for the twinned bridge, which highlighted that the Canadian plaza expansion was related to the Bridge Plan. (Ex. 23, GLHW 43663, 43671-3, 43742). This document was submitted by plaintiffs before Stamper submitted his declaration to this Court that the "plaza deck expansion has nothing to do with the Bridge Plan." (Ex. 6 to Pl. br.). None of this evidence was part of the record or considered by the Sixth Circuit, and goes directly to the factually disputed issue on which the Sixth Circuit stated discovery and a determination by this Court must now be made: Was CenTra "properly informed" and did CenTra's actions indicate "implied consent"?[4]

In light of this evidence, this Court should not credit Stamper's deceptive declaration that "[t]he Plaza Deck Expansion has absolutely nothing to do with and is not part of or dependent upon the development of DIBC's proposal to build a second span . . ." (Ex. 6, ¶5 to Pl. br.). The evidence

---

[4]More evidence that plaintiffs knew of Gowlings' representation of Windsor adverse to plaintiffs concerning the bridge is the Affidavit of Leon Paroian, who is one of plaintiffs' lawyers, and his invoices to CTC, plaintiffs' affiliate. (Ex. 9). CTC retained Paroian to appeal the passage of OPA 43 to Ontario's Municipal Board, which would have regulated aspects of CTC's operation of the Ambassador Bridge. That proceeding began in April 2005 (two months before Stamper and plaintiffs retained Gowlings) and concluded in early 2007. **Paroian's Affidavit identifies Estrin and Denise Baker (a former Gowlings associate) as "the lawyers for the City of Windsor" and the "City's Lawyers" who were actively opposing CTC. (Ex. 9, ¶11).**

strongly and overwhelmingly supports Gowlings' contention that plaintiffs were informed and consented to Gowlings' representation of Windsor against the Bridge Plan.

**D.  Plaintiffs Cannot Establish a Substantial Likelihood of Success on the Merits Because They Consented to the Alleged Concurrent Conflict**

Attached are the declarations of three legal ethics experts, one Canadian and two American, opining that the concurrent conflict alleged here was consentable, and that plaintiffs gave informed and implied consent. (Exs. 18-20).[5]  In its opinion, the Sixth Circuit heavily relied upon the Restatement of the Law Governing Lawyers.  One of the attached declarations is from Charles Wolfram, the Chief Reporter for that Restatement for 13 years. (Ex. 19, pp. 3-4).

Under Rule 2.04 of the Law Society of Upper Canada's Rules of Professional Conduct and *R v. Neil*, 2002 SCC 70, and under MRPC 1.7(a) and (b), clients can consent to a lawyer's concurrent representation of two clients that have interests directly adverse to one another. (Exs. 18-20, 36). This is especially so for sophisticated clients—like plaintiffs—who regularly use lawyers. (*Id.*); *Glover v. Libman*, 578 F. Supp. 748, 758 (N.D. Ga. 1983). As explained in much detail in the attached expert declarations, there is no question that the alleged concurrent conflict was consentable for many reasons, including the following:

- The tax and bond work that Gowlings performed for plaintiffs was not adverse to Windsor at all;

- The Gowlings' personnel working on the tax and bond advice were adverse to the Canadian Revenue Authority, not Windsor, in their efforts to obtain the best tax treatment for

---

[5] These ethical issues should be decided under Canadian ethics principles. Gowlings is a Canadian law firm, with Canadian lawyers who are subject only to Canadian standards of professional responsibility. At issue is Gowlings' representation of a Canadian municipality in Canada. Yet, plaintiffs have not presented any experts on Canadian standards of professional responsibility. In this brief and in the declarations of the attached Canadian and American legal ethics experts, Gowlings has provided the applicable Canadian and U.S. law and expert opinions on both. Under either country's law, the result is the same—the alleged conflict was consentable and plaintiffs gave informed and implied consent. (Exs. 18-20).

plaintiffs.  (Exs. 4-5).  The engagement letter from Gowlings in fact provides that <u>a portion of Gowlings' compensation is contingent on the amount of tax savings achieved</u>.  (Ex. 24, pp. 3, Appx. A);

- Likewise, Gowlings' representation of Windsor concerning environmental and related matters pertaining to the Bridge Plan was not relevant nor adverse to the tax treatment of any bonds that plaintiffs might be able to issue.

- Gowlings lawyers representing Windsor on the one hand, and Gowlings' professionals representing plaintiffs on the other, had no limitations whatsoever in handling these representations, as they did not even know about each other's representations of these different clients;

- The Gowlings professionals were in different divisions of the firm and never spoke to one another about the matters, had no contact concerning them, and had no need to know about one another to do their work.

As for being informed about Gowlings' multi-year representation of Windsor on bridge-related matters, including the Bridge Plan, Section II.C above overwhelmingly shows that plaintiffs were informed and knew exactly what they were doing when plaintiffs later hired Gowlings for the tax and bond advice.  The attached declarations from the Canadian and American legal ethics experts also elaborate that plaintiffs were more than adequately informed to be able to consent and that plaintiffs did impliedly consent.  (Exs. 18-20).

The *City of Cleveland* case is also instructive.  There, the court held that the City was equitably estopped from bringing a disqualification motion directed at a law firm, because the "alleged conflict of interest, if any in fact exists, arises as a result of actions induced by the party seeking disqualification." *Id*. at 203, 205.  Given their previous conduct, plaintiffs cannot now be allowed to object to Gowlings' representation of Windsor. "[E]stoppel is any conduct, express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law.  It is grounded not on subjective intent but rather on the objective impression created by the actor's conduct." *Id*. at 205.  Here, plaintiffs hired Gowlings for

16

tax and bond advice, when objectively plaintiffs knew that Gowlings was already representing Windsor generally and on the Bridge Plan adverse to plaintiffs. Plaintiffs also did not object in 2004 to Gowlings' representation of Windsor on bridge matters, and on the Bridge Plan in particular, on the basis that Gowlings had years earlier represented plaintiffs in the *FIRA* litigation. The <u>objective</u> impression created by plaintiffs' actions is that plaintiffs had no objection to Gowlings' adverse representation of Windsor, and would not some time years later suddenly object to such representation.

If the <u>subjective</u> intent of plaintiffs is considered, then plaintiffs waived any objection to Gowlings continued representation of Windsor. "Waiver refers to the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor." *Id.* at 205. The court in *City of Cleveland* found that the same evidence that equitably estopped the City from raising a disqualification motion also amounted to an implied waiver of such motion. *Id.* at 205. So, too here, plaintiffs' conduct amounts to waiver.[6]

---

[6]Plaintiffs have previously argued that the November 20, 2006 letter of the National Managing Partner of Gowlings, Scott Jolliffe, to Stamper shows that Gowlings did not believe it had plaintiffs' consent. But Jolliffe wrote that "in order to **continue** to act on behalf of CTC . . . the mutual consent of the City of Windsor and CTC must be obtained." (Ex. 21) (emphasis added). After years of having consented, plaintiffs suddenly reversed position, were attempting to withdraw their consent, and were for the first time claiming a conflict. In light of that claim, Jolliffe simply requested an <u>express</u> consent to continue the representation. Up to that point, <u>implied</u> consent had been provided by plaintiffs. Stamper's declaration (Ex. 6 to Pl. br.) also alleges that Jolliffe suggested to Stamper that Gowlings could "ease up" or "lighten up" on its representation of Windsor adverse to plaintiffs as a possible solution. Like the other assertions in Stamper's declaration already shown to be false, this too is completely false. Jolliffe never said anything to that effect. (Ex. 22). Plaintiffs also cite a case arguing that they need not show a likelihood of success to obtain an injunction. *Avedisian v. Holcomb*, 853 F. Supp. 185, 187 (E.D. Va. 1994). That case applies Fourth Circuit standards, not the Sixth Circuit standards described in Section II.A. above. The case also requires "grave or serious" consequences in the absence of an injunction. As explained, no such consequences to plaintiffs exist here.

Under Canadian and American law, the alleged conflict here was consentable, and plaintiffs provided informed and implied consent. (Exs. 18-20). They cannot now object to Gowlings' representation of Windsor.

### E.  Gowlings Did Not Drop Plaintiffs Like a "Hot Potato"

In *City of Cleveland*, due to mounting tension, the law firm withdrew as bond counsel for the City and continued to represent CEI in the antitrust litigation filed by the City against CEI. The court found such a withdrawal from the representation of only one of the clients perfectly appropriate. Plaintiffs here argue that when Gowlings did the same thing, it violated the law by dropping plaintiffs like a "hot potato" so Gowlings could continue to serve Windsor. But as confirmed and elaborated upon by Canadian and American legal ethics experts, Gowlings' actions were entirely appropriate. (Exs. 18-20).

As already explained, plaintiffs' failure to object to Gowlings' representation of Windsor in and after 2004 constituted an effective consent to Gowlings' continued representation of Windsor. *Id*. Plaintiffs did not object based upon Gowlings prior representation of plaintiffs in the *FIRA* litigation, and plaintiffs hired Gowlings in 2005 knowing of Gowlings' representation of Windsor. Years later, in late 2006, plaintiffs tactically changed their mind, and attempted to withdraw their consent to Gowlings' representation of Windsor. Plaintiffs then sued Gowlings in the present litigation. Once a client sues its lawyer, the attorney-client relationship ends and the client becomes a former client. *McGehee v. Johnson*, 2006 WL 3019823 at *3 (Mich. App.) (Ex. 33) ("the attorney-client relationship arguably continued until she sued defendant for legal malpractice"); Rule 2.09(2) of the Law Society of Upper Canada's Rules of Professional Conduct (Ex. 18, Ex. B) (Where there has been a serious loss of confidence between the lawyer and the client, the lawyer may withdraw); MRPC 1.16(b)(6) (A lawyer may withdraw from representing a client if good cause for withdrawal

exists).  Gowlings did not drop plaintiffs like a "hot potato."  Rather, plaintiffs withdrew their

consent and sued Gowlings, thereby terminating the attorney-client relationship.  (Exs. 18-20).

"Regardless of the belief of a lawyer that he may properly represent multiple clients, he must defer

to a client who holds the contrary belief and withdraw from representation of <u>that</u> client."  *City of*

*Cleveland* at 208 (emphasis in original); *see* Rule 2.09(2) Canada Rules Prof. Conduct (Ex. 18, Ex.

B).  Canadian and American law required that Gowlings had to withdraw <u>only from representing</u>

<u>plaintiffs</u>, and not Windsor.  (Exs. 18-20).

**F.      There Is No Former Client Conflict Warranting Gowlings' Disqualification**

Plaintiffs posit two former client disqualification arguments under MRPC 1.9(a).  First, that

Gowlings could not represent Windsor in light of Gowlings' former representation of plaintiffs in

the *FIRA* litigation.  Second, that once plaintiffs became former clients of Gowlings after the tax and

bond advice representation terminated, Gowlings could not represent Windsor.  As shown below and

in the attached legal expert declarations, neither argument has merit.  (Ex. 18-20).

**1.      The standards to be applied regarding former clients**

Disqualification based on a former client conflict of interest requires "that the subject matter

of [the] relationships was/is substantially related" and "the attorney acquired confidential

information from the party seeking disqualification."  *Dana Corp. v. Blue Cross & Blue Shield*

*Mutual of Northern Ohio*, 900 F.2d 882, 889 (6th Cir. 1990); Rule 2.04(4), (5) Canada Rules Prof.

Conduct; (Ex. 18, ¶¶28-34, Ex. B).[7]

---

[7]Plaintiffs rely on the opinion from bankruptcy court Judge Steven Rhodes in *In re Marks*
*& Goergens, Inc.*, 199 B.R. 922 (Bankr. E.D. Mich. 1996).  There, Judge Rhodes distinguished the
facts and uniquely analyzed *Dana* and the *City of Cleveland* case so as to avoid applying their
requirements that: (1) a former client must prove that his prior lawyer acquired confidential
information from the former client; (2) the presumption of shared confidences among lawyers in a
firm is rebuttable in cases involving matters of public record and very large law firms; and (3) absent
(continued...)

In assessing whether matters are substantially related, "this element is 'not one whose dimensions are delineated with mathematical precision' [citation omitted]." *City of Cleveland* at 208. Even one of plaintiffs' former experts, Peter Henning, recognizes that ethics rules are often subject to inconsistent results. *Henning*, 20 N.D. J.L. Ethics & Pub. Pol'y. 209, fn. 19 quoting Terrell, *Turmoil at the Normative Core of Lawyering: Uncomfortable Lessons from the "Metaethics" of Legal Ethics*, 49 Emory L.J. 87, 91 (2000) ("Research often reveals that case law around the country on various ambiguous points in ethics rules is remarkably inconsistent, and the scholarly literature can present even more disagreement. . . . who are the knuckleheads who have led the profession to this pitiable condition?").

"The term 'substantially related' is nowhere defined in the MRPC." *S.D. Warren Co. v. Duff-Norton*, 302 F. Supp.2d 762, 768 (W.D. Mich. 2004). "In addition, 'the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client.'" *Id.* quoting MRPC 1.9, comment. Moreover, simply because there may be some relationship among matters, that is not necessarily enough to make two matters substantially related. *Id.* at 774. Likewise, the mere fact that two representations involve the same piece of property (i.e. a bridge) does not make them substantially related. *See, Quicken Loans v. Jolly*, 2008 U.S. Dist. LEXIS 48266 at *12-13 (E.D. Mich.) (Ex. 32).

---

[7](...continued)
direct proof to the contrary, the attorneys are not deemed to have shared confidential information relating to matters and services exclusively within the sphere of representation of another department or section of his firm. *Id.* at 928. But three years after that decision, as part of the Sixth Circuit Bankruptcy Appellate Panel, Judge Rhodes decided that *Dana's* requirements (as adopted from the *City of Cleveland* case) do apply in the Sixth Circuit. *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), aff'd 5 Fed. Appx. 396, 401 (6th Cir. 2001). Judge Rhodes also broadly applied the doctrines of waiver and estoppel in denying a motion to disqualify counsel. *Id.*

The Restatement defines "substantial relationship" as the following: (1) the current matter involves the work the lawyer performed for the former client; or (2) there is a substantial risk that representation of the present client will involve the use of information acquired in the course of representing the former client, unless that information has become generally known. *Restatement*, §132.  Courts should not "allow their imaginations to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information might have been disclosed which would be relevant to the present suit." *Integrated Health Services of Cliff Manor, Inc. v. THCI Co. LLC*, 327 B.R. 200, 209 (D. Del. 2005).  A lawyer knowing about how a former client thinks or approaches litigation is not enough to fall within the substantial relationship test. *S.D. Warren Co. v. Yale Industrial Products, Inc.*, 302 F. Supp. 2d 762, 768 (W.D. Mich. 2004).

Plaintiffs argue that Gowlings' <u>representation of plaintiffs</u> in both the *FIRA* litigation and in the tax and bond matter are substantially related. (Pl. br., p. 13).  <u>That is the wrong comparison and is irrelevant here</u> (it also happens to be wrong factually).  The relevant inquiry is whether Gowlings' <u>representation of Windsor</u> is substantially related to the *FIRA* litigation that ended 16 years ago or to the tax and bond matter.  The answer to that question is indisputably "no."

### 2.    The *FIRA* litigation

Canada had a law known as the Foreign Investment Review Act ("FIRA").  The purposes of FIRA included ensuring that acquisitions resulting in a change of control of a Canadian business enterprise were reviewable in Canada, so that if control of the Canadian business were to leave Canada, then the acquisition had to be shown to significantly benefit Canada. *Attorney General of Canada v. Central Cartage Company*, 63 N.R. 17, 27 (1985) (Ex. 34).  The *FIRA* litigation arose from the Canadian government's claimed right to review transactions proposed by CenTra and others in the late 1970's and early 1980's that would have changed the ownership structure of Canadian

21

Transit Company, which was a Canadian business enterprise. *Attorney General of Canada v. Central Cartage Company*, 10 F.T.R. 225, 225-227 (1987) (Ex. 35). Initially, the Canadian government disallowed the proposed transactions (*Id.*), but eventually the *FIRA* litigation was settled. (Ex. 2, ¶1 to Pl. br.).

The *FIRA* court decisions show that the issues raised in the *FIRA* litigation included: "whether or not the transaction was reviewable by the Foreign Investment Review Agency; whether the parties were part of a 'group of persons' who were acting 'in concert' to acquire control of a Canadian business enterprise; whether the parties were noneligible persons by virtue of the fact that one of the members of the group, [CenTra], was a noneligible person; whether or not the merger transaction was outside the application of the Foreign Investment Review Act because the merger occurred outside the territorial boundaries of Canada; whether or not the incorporation statute of CTC precluded the operation of the Foreign Investment Review procedure." *Attorney General of Canada v. Central Cartage Company*, 10 F.T.R. 225, 229-230 (1987) (Ex. 35).

The *FIRA* litigation did not involve the operation, expansion, configuration or infrastructure of the Ambassador Bridge. (Ex. 11). Nor did it in any way involve a proposed twin or second bridge span (which did not exist nor was even conceived of 16-23 years ago during the *FIRA* litigation, and which does not now exist), or the environmental and related impacts of a proposed second bridge on the citizens of Windsor. (*Id.*). Yes, both deal with a bridge over the Detroit River, but under even the most liberal application of "substantial relationship," much more is required. *See, Quicken Loans* at *12-13 (Ex. 32). Gowlings' prior representation of plaintiffs in the *FIRA* litigation does not disqualify Gowlings from now representing Windsor. (Exs. 18-20).

The only specific item to which plaintiffs have pointed to argue that a substantial relationship exists between the Windsor and *FIRA* representations is the Goodman Memo, and Estrin's purported

use of it in his September 2006 letter to the U.S. Coast Guard. As already proven above in Section II.A, the attempt to link Estrin's letter and the Goodman Memo is on its face baseless. There is thus not a shred of evidence that Gowlings' representation of Windsor has any relationship at all with the *FIRA* litigation, let alone a substantial relationship. (*See*, Ex. 11).

Moreover, Dan Stamper, DIBC's President, now contends that expansion relating to the existing Ambassador Bridge "has absolutely nothing to do with and is not part of or dependent upon the development of DIBC's proposal to build a second span at the Ambassador Bridge." (Ex. 6, ¶5 to Pl. br.). How can plaintiffs contend that the existing bridge has nothing to do with a second span, yet at the same time contend that the second span is substantially related to the *FIRA* litigation that ended 16 years ago involving the existing bridge? There is no former client conflict under Canadian or American law arising out of the *FIRA* litigation that disqualifies Gowlings from representing Windsor. (Exs. 18-20)

### 3.     The tax and bond advice

The tax and later bond representation of plaintiffs in 2005 and 2006 is not substantially related to Gowlings' representation of Windsor. First, the tax advice was to obtain improved tax treatment for the existing bridge. (Exs. 4-5). The adversary was the Canadian Revenue Authority, not Windsor. (Exs. 4-5). In fact, a portion of Gowlings' contingency fees were based upon the amount of Canadian tax savings that might be achieved. (Ex. 24, p. 3, Appx. A). Likewise, the corporate reorganization bond advice was to maximize the tax benefits for plaintiffs should they be able to raise money from bonds for the existing bridge, a second span or some other purpose. (Ex. 5). This related to potential tax treatment and financing. Again, the adversary, if any, was the Canadian Revenue Authority, not Windsor. (*Id.*). Windsor has no say in and no connection with how plaintiffs might reorganize themselves to maximize their tax benefits and bonds vis-a-vis the

Canadian Revenue Authority. Gowlings' representation of Windsor is not related to and is not, as

plaintiffs state, "the same matter" as plaintiffs' tax and bond matters (p. 15 of Pl. br.). While both

representations have something to do with the Ambassador Bridge and/or a second span, that does

not make the two matters substantially related. *Quicken Loans* at *12-13 (Ex. 32) (the fact that two

representations involve the same piece of property does not make them substantially related); (*See

also*, Exs. 18-20). There is no former client conflict under American or Canadian law arising out

of the tax and bond advice that would disqualify Gowlings from representing Windsor. (Exs. 18-20).

### 4.  Plaintiffs have waived any former-client conflict

In any event, plaintiffs consented to Gowlings' representation of Windsor relating to the

Bridge Plan. Under Rule 2.04(4), (5) of Canada's Rules Prof. Cond., and under MRPC 1.9(a), even

if a former-client conflict exists, a former client (like plaintiffs here) can consent to it, and can do

so by waiver. (Exs. 18-20).

> Waiver is a valid basis for the denial of a motion to disqualify. . . [A] finding [of waiver] is
> justified . . . when a former client was concededly aware of the former attorney's
> representation of an adversary but failed to raise an objection promptly when he had the
> opportunity. In [this] circumstance, the person whose confidences and secrets are at risk of
> disclosure or misuse is held to have waived his right to protection from that risk.

> In determining whether the moving party has waived its right to object to the opposing
> party's counsel, consideration must be given to (1) the length of the delay in bringing the
> motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant
> was represented by counsel during the delay, (4) why the delay occurred and (5) whether
> disqualification would result in prejudice to the non-moving party. In particular,
> consideration should be given and inquiry made as to whether the motion was delayed for
> tactical reasons. *Primerica*, 822 F. Supp. at 1115 (internal citations and footnotes omitted).
> *In re Valley Vulcan Mold Co.*., 237 B.R. 322, 337-38 (B.A.P. 6th Cir. 1999), affirmed, 5 Fed.
> Appx. 396, 401 (6th Cir. 2001).

As shown above, plaintiffs here: delayed more than two years to raise any disqualification issue

concerning Gowlings' representation of Windsor; knew about Gowlings' adverse representations

since at least 2004; were represented by several lawyers in the representations adverse to Gowlings

during the several-year delay period; have given no reason for their delay; have only now raised the issue for purely tactical advantage; and seek to significantly prejudice Gowlings (and Windsor) by trying to disqualify Gowlings after a six-year relationship.  Plaintiffs' injunction motion should be denied on the basis of delay alone.  *See, Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87-88 (9th Cir. 1983) (motion made more than two years after discovery of potential grounds for disqualification was denied because of substantial prejudice to the opposing party); *Central Milk Producers Coop v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir. 1978) (same, delay of over two years).  Even if a former-client conflict existed (which it does not), plaintiffs have waived the right to raise any such conflict by their failure to move with diligence.

### G.   Neither David McFadden's Relationship to the Detroit-Windsor Tunnel Nor Windsor's Interest in that Tunnel or Another Border Crossing Raise a Disqualifying Conflict

While Gowlings represented plaintiffs on the tax and bond advice, one of Gowlings' partners, David McFadden, was a board member of the Detroit and Canada Tunnel Corporation (the "Tunnel"), a competitor of plaintiffs.  McFadden has not been a board member of the Tunnel since October 2006. (Ex. 25).  There cannot now be any imminent or irreparable harm to plaintiffs from McFadden's prior Tunnel board membership and this cannot be the basis for an injunction.  Nevertheless, plaintiffs argue that McFadden's prior Tunnel board membership was not disclosed to them, they did not consent to it, and that somehow this should now prevent Gowlings from representing Windsor.  Plaintiffs also argue that since Windsor is a general border-crossing competitor of plaintiffs, Gowlings should be enjoined from representing Windsor.  However, these relationships are not conflicts under either Canadian or American law.  (Exs. 18-20).

By being on its board, McFadden was not representing the Tunnel as a lawyer. (Ex. 25).  But even if he had been, under Canadian and American law, "simultaneous representation in unrelated

25

matters of clients whose interests are only generally adverse, <u>such as competing economic enterprises, does not require consent of the respective clients.</u>" (MRPC 1.7, Comment) (emphasis added); *Strother v. 346492 Canada, Inc.*, [2007], 2 S.C.R. 177, 217, 222, 243-44; (Exs. 18-20). Moreover, there was no substantive contact whatsoever between McFadden or Gowlings attorneys working on Windsor matters, on the one hand, and the Gowlings professionals working on plaintiffs' tax and bond advice on the other. (Exs. 3-6, 25). Nor was there any exchange of any of plaintiffs' information between them. (*Id.*). There is also not a shred of evidence that the Gowlings professionals providing tax and bond advice had any limitations whatsoever on their independent professional judgment on behalf of plaintiffs. Tellingly, plaintiffs do not complain that their current counsel, Dykema Gossett, regularly represented the Tunnel while McFadden was on the Tunnel board and Dykema was representing plaintiffs. (Ex. 25).

In addition, plaintiffs' President, Stamper attended and presented at a board meeting of the Tunnel at which McFadden was present. (Ex. 25).   Matty Moroun, one of the primary owners of plaintiffs, also knew that McFadden was chairman of the Tunnel board, which was public information. (Ex. 25). Plaintiffs also knew that Gowlings represented Windsor.  Nevertheless, Stamper still engaged Gowlings for the tax and bond advice.  McFadden's position as a board member of the Tunnel was never a conflict.  But even if it could have been, the same estoppel, waiver and consent discussed earlier in this brief would apply.  Under American and Canadian law, neither a board member acting in a non-lawyer capacity (McFadden) for a general competitor of a client, nor the representation of a competitor (Windsor) generally are conflicts of interest, let alone disqualifying conflicts. (Exs. 18-20).

III.     **THE INJUNCTION SOUGHT WOULD BE UNENFORCEABLE IN CANADA**

Under Canadian law, this Court's entry of an injunction enjoining a Canadian law firm from representing a Canadian municipality in Canada would not meet the Canadian "real and substantial connection" test, making any such injunction unenforceable in Canada. Attached is the detailed supporting declaration of Professor Janet Walker, an expert on Canadian Conflict of Laws. (Ex. 1). Several Canadian cases are also on point. *See, Cook v. Parcel, Mauro, Hultin & Spaanstra, P.C.*, [1997] B.C.J. No. 428 (Ex. 26); *Kuchocki v. Fasken Martineau Dumoulin*, [2005] O.J. No. 1515 (Ex. 27); *Global Copper Inc. v Mortenson*, 2002 B.C.S.C. 431 (Ex. 28).

In *Cook*, the Canadian court found it had no real and substantial connection to a dispute concerning privileged communications from a Colorado law firm, advising on matters of American law, where the law firm was subject to American laws and American professional and ethical obligations. (Ex. 26). It is one thing to find a court has jurisdiction based on the situs of a tort, but it is another thing for a court to find it has a real and substantial connection in a proceeding seeking to compel lawyers who are "residents and practicing in another jurisdiction to submit to an order affecting their ethical and legal duties in the foreign jurisdiction." *Id.* In *Kuchocki*, the Ontario court held that there was no real and substantial connection to Ontario where an attorney was alleged to have committed legal malpractice in, and was subject to the professional responsibility standards and law of, British Columbia. (Ex. 27). In *Global Copper, Inc.*, the British Columbia court held that there was no real and substantial connection to British Columbia where the underlying issues involved a Montana lawyer subject to the professional responsibility standards of Montana. (Ex. 28). The court held that where the professional duty of an attorney is put in issue, "the appropriate jurisdiction to deal with that responsibility would be the jurisdiction that governs his professional conduct." (*Id.*).

Thus, under Canadian law, the injunction being sought by plaintiffs from this Court enjoining a Canadian law firm on a matter that is subject to Canadian professional responsibility standards, from representing a Canadian municipality in Canada, would be unenforceable in Canada. (Ex. 1). "A court should not issue an unenforceable injunction." *In re Estate of Ferdinand Marcos Human Rights Litigation*, 94 F.3d 539, 545 (9th Cir. 1996) *citing Hamilton v. McDonald*, 503 F.2d 1138, 1146 (9th Cir. 1974). An injunction is futile if the court would be powerless to enforce its injunction, and it is an abuse of discretion for a district court to issue a futile injunction. *In re Estate of Marcos*, 94 F.3d at 545, 548. Plaintiffs' motion should be denied for this reason alone.

## IV.   PLAINTIFFS SHOULD BE REQUIRED TO POST A SUBSTANTIAL SECURITY BOND IF AN INJUNCTION IS ENTERED

If an injunction is entered, plaintiffs must post a security bond, the amount of which rests in the sound discretion of this Court. Fed. R. Civ. P. 65(c). *Roth v. Bank of Commonwealth*, 583 F.2d 527 (6th Cir. 1978). If Gowlings is disqualified, six years of legal work for Windsor and its citizens concerning their health, safety and well-being will be lost or severely prejudiced. The time and effort, and concomitant cost, of bringing new counsel in and up to speed will be extraordinary and will take years to truly replace. (Ex. 14). In the past six years, Windsor has paid approximately $4,650,000 of public funds to Gowlings concerning bridge-related and other issues. (Ex. 14, ¶19). Plaintiffs should be required to post a security bond in at least that amount should the Court enter the injunction sought by plaintiffs to protect Gowlings' interests during an appeal of that injunction.

## V.   CONCLUSION

Plaintiffs have not remotely met their heavy burden for an order enjoining defendants from continuing to represent Windsor in opposition to the development of a second span of the Ambassador Bridge. Likewise, plaintiffs' have shown no basis for this Court entering an order for

the other relief they request, prohibiting defendants from disclosing plaintiffs' confidential information and "compelling defendants to request the return of any confidential information that has already been disclosed." There is no evidence that Gowlings disclosed or will disclose any of plaintiffs' confidential information, assuming that they ever had any. Since no actual or imminent disclosure has been shown, there is no basis for this order and its issuance is wholly unjustified. Plaintiffs' motion should be denied in its entirety.

Respectfully Submitted,

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By:    /s/ Todd R. Mendel
         Sharon M. Woods (P22542)
         Todd R. Mendel (P55447)
         Kevin Kalczynski (P57929)
         Melonie L. M. Stothers (P65344)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725

Date: October 20, 2008

f:\docsopen\tmendel\l-resp\0352941.01

29

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation

           Plaintiffs,

-vs-

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP, a
Canadian Limited Liability Partnership,

           Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

_____

### CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2008, I electronically filed *Defendants' Response to Plaintiffs' Motion for Preliminary Injunction to Enjoin Gowlings from Representing the City of Windsor with Respect to the Development of a Second Span of the Ambassador Bridge* with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Joseph A. Doerr (doerr@dykema.com); Craig L. John (cjohn@dykema.com); and Thomas J. Murray (tmurray@dykema.com).  There are no manual recipients.

Parties may access this filing through the Court's system.

/s/ Todd R. Mendel
Sharon M. Woods (P22542)
Todd R. Mendel (P55447)
Kevin Kalczynski (P57929)
Melonie L. M. Stothers (P65344)
Barris, Sott, Denn & Driker, PLLC
Attorneys for Gowling Lafleur Henderson LLP
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725
Email: tmendel@bsdd.com

f:\docsopen\tmendel\l-prf\0364061.03