# EXHIBIT A

# In the Court of Appeal of Alberta

**Citation: Alberta Union of Provincial Employees v. United Nurses of Alberta, Local 168, 2009 ABCA 33**

**Date:** 20090123
**Docket:** 0803-0221-AC
**Registry:** Edmonton

**Between:**

## Alberta Union of Provincial Employees

Appellant (Applicant)

- and -

### United Nurses of Alberta, Local 168 and Labour Relations Board

Respondent (Respondent)

**The Court:**

**The Honourable Madam Justice Carole Conrad**
**The Honourable Mr. Justice Ronald Berger**
**The Honourable Mr. Justice Frans Slatter**

**Reasons for Judgment of**
**The Honourable Mr. Justice Slatter**
**Concurred in by The Honourable Madam Justice Conrad**

**Dissenting Reasons for Judgment of**
**The Honourable Mr. Justice Berger**

Appeal from the Order by
The Honourable Madam Justice D.C. Read
Dated the 8th day of July, 2008
Filed on the 14th day of August, 2008
(2008 ABQB 421; Docket: 0703 09296; 0803 02206)

**Reasons for Judgment Reserved of the**
**Honourable Mr. Justice Slatter**

[1]     The issue on this appeal is whether a law firm's previous retainer by the appellant union prevents it from continuing to act for the respondent union. The appellant had previously consented to the firm acting for both clients.

Facts

[2]     The law firm of Chivers Carpenter has been practicing in the field of labour law for many years. The respondent United Nurses of Alberta is one of its long-standing clients.

[3]     In 2000 Ms. Kirkwood, a senior manager of the appellant Alberta Union of Provincial Employees, became aware of the expertise of Chivers Carpenter and approached the firm to see whether it would accept retainers from AUPE. Mr. Kanee, the managing partner of Chivers Carpenter, was concerned that any retainers by AUPE might jeopardize the firm's relationship with the United Nurses. However, after consulting with the United Nurses, Chivers Carpenter agreed to act for AUPE, subject to conditions.

[4]     After hearing *viva voce* evidence, and considering an agreed statement of facts, the Alberta Labour Relations Board made the following findings of fact about the agreement between Chivers Carpenter and AUPE, which was never reduced to writing:

> [20]     In this case, the uncontradicted evidence of Ms. Kirkwood and Mr. Kanee is they met in 2000 to discuss the basis on which Chivers Carpenter might be prepared to accept work from AUPE. It was made clear by Mr. Kanee that his firm did not want to take on any work that might have an adverse impact upon his firm's long standing relationship with UNA. He explained the only basis on which work could be accepted from AUPE was if it was clearly understood that UNA was the primary client and any suggestion of AUPE wanting to take a position adverse to that of UNA's interest would mean AUPE would have to retain other lawyers. Although we do not believe Mr. Kanee went so far as to expressly state that *Chivers Carpenter would remain free to act for UNA in regard to any matter that might adversely affect AUPE, we are satisfied that was the understanding that Ms. Kirkwood came away with.*
>
> . . .
>
> [22]     The AUPE/Chivers arrangement constituted a retainer by AUPE of the Chivers Carpenter firm to provide such legal services as AUPE may from time to time choose to refer to that firm. One of the terms of that retainer was that Chivers Carpenter would not agree to provide any legal services to AUPE in which AUPE was seeking to take a position contrary to the interests of UNA. This retainer was also subject to an understanding by AUPE that Chivers Carpenter *could continue to act for UNA even if it involved a matter in respect of which the position being taken by UNA was adverse to the interests of AUPE.* (emphasis added)

See *Extendicare (Canada) Inc. (Re)*, [2007] Alta. L.R.B.R. LD-052, [2007] A.L.R.B.D. No. 55 (the "First Decision"). In the years that followed, Chivers Carpenter accepted a number of *ad hoc* retainers from AUPE, while continuing to act as general counsel for the United Nurses. At the time of the events that gave rise to this appeal, Chivers Carpenter had 14 open files for AUPE, although some of them were inactive.

[5]    Both AUPE and the United Nurses represent workers in the healthcare sector. After the passage of the *Labour Relations (Regional Health Authorities Restructuring) Amendment Act*, S.A. 2003, c. 6, all healthcare workers in hospitals were aligned into four bargaining units: direct nursing care or nursing instruction, auxiliary nursing care, general support services, and paramedical professional or technical. Inevitably issues arose as to whether particular workers fell into one of the four bargaining unit categories or another.

[6]    One such bargaining unit dispute arose in *Health Sciences Association of Alberta (Re)*, [2006] Alta. L.R.B.R. 70, [2006] A.L.R.B.D. No. 29, 151 C.L.R.B.R. (2d) 233, a decision that the parties referred to as *Capital Health #1*. The issue was the representation of certain dental assistants, registered dental assistants, physical therapy assistants, rehabilitation assistants, and speech language pathology assistants. The applicants were the Health Sciences Association of Alberta and AUPE, and Capital Health Authority was the respondent; the United Nurses was not a party. Before the Board AUPE was represented by in-house staff.

[7]    In its reasons in *Capital Health #1*, the Board made the following statements:

> 64.. . . We consider that this is an appropriate occasion to review the jurisprudence, to review the history of the auxiliary nursing care bargaining unit and to try to reach some general conclusions about it that may be of some assistance to employers, employees and their bargaining agents in the health care industry.
>
> . . .
>
> 88.    We restate the applicable principles [for defining the "auxiliary nursing care" bargaining unit] as follows:
>
> *    The central idea of the auxiliary nursing care unit is to recognize the community of interest among employees performing a support nursing function as their prime function.
>
> *    "Support nursing" involves providing medical or personal care through a high degree of direct contact with the patient.
>
> *    *This care is generally provided under the supervision, direct or remote, of a registered nurse.*
>
> *    This care tends to involve some continuity.

        \*      The auxiliary nursing care unit does not include employees whose prime function is to assist in the provision of health services by a practitioner of another recognized health discipline who is considered to fall into the paramedical professional and technical bargaining unit.

    89.     The application of these principles leads to the conclusion that none of the employees at issue in this case are in the auxiliary nursing care bargaining unit. . . . (emphasis added)

[8]     AUPE was concerned with the implications of the finding that members of the auxiliary nursing care bargaining unit generally work "under the supervision, direct or remote, of a registered nurse". In April, 2006 it retained Mr. Williams of Chivers Carpenter with respect to the decision. Mr. Williams, assisted by Ms. Gray and Ms. Cosco, began working on the file. On May 15th, 2006 Chivers Carpenter filed an application on behalf of AUPE asking the Board to re-consider *Capital Health #1*, and on May 18th, 2006 it commenced judicial review proceedings to have the decision set aside. That same day, Chivers Carpenter, with AUPE's consent, sent the United Nurses copies of the reconsideration application. In reply the United Nurses confirmed it saw no conflict with Chivers Carpenter acting for AUPE on that matter.

[9]     The application to the Board to re-consider *Capital Health #1* was dismissed on November 7th, 2006: *Capital Health (Re),* [2006] A.L.R.B.D. No. 64, [2006] Alta. L.R.B.R. LD-051, 151 C.L.R.B.R. (2d) 272 (*Capital Health #2*). Chivers Carpenter continued to work for AUPE on the judicial review applications to set aside *Capital Health #1* and *Capital Health #2*.

[10]     Meanwhile, the United Nurses retained Ms. Khullar of Chivers Carpenter to commence a bargaining unit application. On behalf of the United Nurses she applied to the Board on April 19th, 2007, seeking a determination that three licensed practical nurses in the "auxiliary nursing" bargaining unit at Extendicare Holyrood, then represented by AUPE, should instead be included in the "direct nursing" bargaining unit represented by the United Nurses.

[11]     On about March 15th, 2007, the United Nurses advised AUPE that it intended to bring the Extendicare Holyrood bargaining unit application. In response, AUPE took the position with Ms. Gray that Chivers Carpenter had placed itself in a conflict by representing the United Nurses on the bargaining unit application, and that it had no alternative but to cease to act for the United Nurses on that and "any other matter in which UNA or any other person . . . may take a position contrary to AUPE". AUPE took the position that the principles set out in *Capital Health #1*, which Ms. Gray of Chivers Carpenter was trying to overturn on behalf of AUPE, would be used by Ms. Khullar of Chivers Carpenter in support of the Extendicare Holyrood application against AUPE.

[12]     Ms. Gray replied by referring to the agreement under which Chivers Carpenter had started representing AUPE. In accordance with that agreement, she indicated that Chivers Carpenter would continue to act for the United Nurses (as the "primary" client), and would cease to act for AUPE. In April of 2007, Chivers Carpenter ceased to play any role in the applications to set aside *Capital*

Page: 4

*Health #1* and *Capital Health #2*. AUPE did not agree with the position taken by Chivers Carpenter. It withdrew any consent it had previously given to the arrangement. It also applied to the Board for an order disqualifying Chivers Carpenter from acting for the United Nurses on the Extendicare Holyrood bargaining unit application.

## The Decisions Below

[13]    By agreement, the Board heard the disqualification application in two parts. First the Board considered whether Chivers Carpenter was prevented from continuing to act because of the fiduciary duties of lawyers, set out in *R. v. Neil*, [2002] 3 S.C.R. 631, 2002 SCC 70. When the First Decision did not resolve the dispute, the Board went on to consider whether Chivers Carpenter was prevented from continuing to act because of the receipt of confidential information, contrary to the rules set out in *MacDonald Estate v. Martin*, [1990] 3 S.C.R. 1235.

[14]    In its First Decision, the Board made findings of fact about the exact terms of the retainer between AUPE and Chivers Carpenter. Those findings are reproduced, *supra*, para. 4. The Board then went on to distinguish between the obligations of a firm to former clients and to existing clients. Relying on the *Code of Professional Conduct*, the Board concluded that a lawyer's duty to former clients is primarily concerned with protecting confidential information. The duty to existing clients is wider, encompassing a broader fiduciary duty of loyalty that extends beyond the disclosure of confidential information. The Board concluded that, in light of the express agreement between AUPE and Chivers Carpenter, the firm was not in breach of any fiduciary duty of loyalty.

[15]    The Board went on to consider in its Second Decision whether Chivers Carpenter was in possession of confidential information that prevented it from acting: *Alberta Union of Provincial Employees (Re)*, [2008] Alta. L.R.B.R. 59, [2008] A.L.R.B.D. No. 8. The Board framed the issue before it as follows:

>    42.    Returning to the questions posed by the Supreme Court of Canada in *MacDonald Estate v. Martin*, we first need to ascertain if AUPE has satisfied the onus that Chivers Carpenter received confidential information from it that is relevant to the UNA determination application. Or, to phrase this aspect of the matter along the lines expressed by our Court of Appeal in the *Atco Gas* decision, AUPE needs to show a sufficient relationship between the two retainers to raise a rebuttable presumption that relevant confidential information has passed. That is, AUPE needs to show it is "reasonably possible" Chivers Carpenter acquired confidential information that "could be relevant" to the UNA matter.

While the Board was prepared to rely on a rebuttable presumption (arising from the retainer) that confidential information had passed, it held the presumption was limited in this case. Chivers Carpenter had only been retained by AUPE after the Board's decision in *Capital Health #1*. Since the retainer was only for the reconsideration application and the judicial review application, the

presumption would only apply to confidential information incidental to those purposes: Second Decision at para. 43. Absent institutional measures to protect the confidential information, the Board imputed to Ms. Khullar any information that had been given to Ms. Gray: Second Decision at para. 44.

[16]    The Board then considered whether the confidential information it assumed had been given to Chivers Carpenter by AUPE was relevant to the Extendicare Holyrood bargaining unit application. It concluded that the issue in the Extendicare Holyrood application primarily related to the "specific job duties being performed by the three individuals" who were the subject of that application: Second Decision at para. 44. This was largely a question of fact. The Board concluded that there was not "a sufficient relationship between the two retainers to raise a rebuttable presumption that relevant confidential information has passed". While the Extendicare Holyrood application referred to *Capital Health #1*, that reference was nothing more than a reference to "arguably relevant jurisprudence of the Board": Second Decision at para. 46. Since the Board concluded that no relevant confidential information was involved, it dismissed the application to disqualify Chivers Carpenter.

[17]    The Board dismissed a reconsideration application of the First Decision and the Second Decision: *Alberta Union of Provincial Employees (Re)*, [2008] Alta. L.R.B.R. LD-028, [2008] A.L.R.B.D. No. 32 . The Board found no error, and stated:

> As to preserving the integrity of our system of Justice this panel is of the opinion that not only are the original decisions correct but they make labour relations sense. There can be no more than a handful of Union side lawyers, from six to eight Alberta law firms who regularly appear before the Board. Such a small practice group is bound to result in more conflicts but also results in a more understanding cliental which are fairly sophisticated in the utilization of legal services [sic]. To strictly construe conflict rules in such a scenario, is of little benefit and does little to enhance the reputation of the legal profession but rather invites mischief.

[18]    AUPE applied unsuccessfully for judicial review of the First Decision and the Second Decision: *Alberta Union of Provincial Employees v. United Nurses of Alberta, Local 168*, 2008 ABQB 421. The chambers judge concluded that the standard of review on all issues is reasonableness. She concluded that the Board's factual decision on the terms of Chivers Carpenter's retainer was reasonable: QB Reasons at paras. 62-3. She determined that AUPE could not withdraw its consent in a way that interrupted the relationship between the United Nurses and Chivers Carpenter: QB Reasons at para. 70. The conclusion in the First Decision, that there was no disabling conflict, was also reasonable: QB Reasons at paras. 71-2.

[19]    As to the Second Decision, the chambers judge held that the Board acted reasonably a) in determining that the Extendicare Holyrood application focused on the functions of the three employees concerned, and b) in concluding that the two retainers were not sufficiently linked to raise an inference that confidential information was compromised. The chambers judge noted that

these were factually based findings involving issues of labour law within the particular expertise of the Board: QB Reasons at paras. 82-3. Since it was never established that relevant confidential information was involved, the onus never shifted to the law firm to demonstrate that the information was not at risk: QB Reasons at para. 85. AUPE then launched the present appeal.

Standard of Review

[20]    The test for selecting the standard of review in administrative law was comprehensively set out in *Pushpanathan v. Canada (Minister of Citizenship and Immigration)*, [1998] 1 S.C.R. 982, and recently re-examined in *Dunsmuir v. New Brunswick*, [2008] 1 S.C.R. 190, 2008 SCC 9 at paras. 55, 64. It is appropriate to identify or advert to the standard of review in all cases. However, it is not necessary to perform a fresh standard of review analysis in every case if the standard of review has already been set for the type of question in issue: *Dunsmuir* at paras. 57, 62.

[21]    The appellant argued that the standard of review for a labour board's determination of conflict of interest has already been set in *Universal Workers Union, Labourers' International Union of North America, Local 183 v. Ontario (Labour Relations Board)* (2007), 222 O.A.C. 229, 59 Admin. L.R. (4th) 226 (Div. Ct.). The *Universal Workers* case, while of interest and informative, is not binding in this jurisdiction, and therefore does not set the standard of review in Alberta in the way contemplated by *Dunsmuir*.

[22]    It has long been recognized that deference is owed to the decisions of the Labour Relations Board because of its expertise, the strong privative clause protecting its decisions, and the policy driven and sensitive nature of the issues it deals with: *International Longshoremen's and Warehousemen's Union, Ship and Dock Foremen, Local 514 v. Prince Rupert Grain Ltd.*, [1996] 2 S.C.R. 432 at paras. 24-6. On questions of labour law, including the interpretation of the *Labour Relations Code*, the standard of review is reasonableness: *International Assn. of Machinists and Aerospace Workers, Local Lodge No. 99 v. Finning International Inc.*, 2007 ABCA 319, 80 Alta. L.R. (4th) 205 at para. 42; *Alberta Union of Provincial Employees v. Alberta (Provincial Health Authorities)*, 2006 ABCA 356, 67 Alta. L.R. (4th) 203 at para. 17. Where the Board has made findings of fact, especially after hearing *viva voce* evidence, deference is also called for: *Consolidated Fastfrate Inc. v. Western Canada Council of Teamsters*, 2007 ABCA 198, 79 Alta. L.R. (4th) 201 at paras. 33-4, leave to appeal granted [2008] 1 S.C.R. vii. On mixed questions of fact and law, the standard of review is likewise reasonableness: *Atco Gas and Pipelines Ltd. v. Sheard*, 2003 ABCA 61, 10 Alta. L.R. (4th) 222 at para. 5.

[23]    The Supreme Court has recognized that the correctness standard may apply if the issue is one of general law that is of central importance to the legal system as a whole and outside the tribunal's specialized area of expertise: *Dunsmuir* at para. 60. The rules respecting conflicts of interest of lawyers fall into this category: *Universal Workers* at para. 29. This is not an issue on which the Board has any expertise, nor is it an issue particularly linked to labour relations.

[24]    The courts have an inherent jurisdiction to remove from the record lawyers who have a conflict of interest: *MacDonald Estate* at para. 18. The Law Society also has jurisdiction to deal

with conflicts. There is already the potential for lawyers to be the subject of at least two inconsistent conflict regimes. It would be undesirable for there to be further rules or standards imposed. For example, assume that a particular matter engaged the jurisdiction of both the Labour Relations Board, and the Human Rights Commission. If the standard of review was reasonableness, it is possible that the lawyers involved might be subject to four separate sets of rules: the Court's, the Law Society's, the Board's and the Commission's. For this reason as well the standard of review on the underlying rules regarding conflict of interest should be correctness: *British Columbia Telephone Co. v. Shaw Cable Systems (B.C.) Ltd.*, [1995] 2 S.C.R. 739 at paras. 51, 78.

[25]   In summary, the standard of review for the setting of the rules respecting conflicts of interest of lawyers is correctness. The findings of fact of the Board underlying this issue of law are entitled to deference, and the standard of review is reasonableness. Where the basic rules have a particular application in the labour law context, raising mixed questions of fact and law, deference is also appropriate. The standard of review on all other issues is reasonableness.

[26]   Reasonableness is defined in *Dunsmuir* at para. 47 as follows:

> Reasonableness is a deferential standard animated by the principle that underlies the development of the two previous standards of reasonableness: certain questions that come before administrative tribunals do not lend themselves to one specific, particular result. Instead, they may give rise to a number of possible, reasonable conclusions. Tribunals have a margin of appreciation within the range of acceptable and rational solutions. A court conducting a review for reasonableness inquires into the qualities that make a decision reasonable, referring both to the process of articulating the reasons and to outcomes. In judicial review, reasonableness is concerned mostly with the existence of justification, transparency and intelligibility within the decision-making process. But it is also concerned with whether the decision falls within a range of possible, acceptable outcomes which are defensible in respect of the facts and law.

<u>Conflicts of Interest and Consent</u>

[27]   The leading cases on the obligations of a lawyer acting for two clients who are potentially adverse in interest are *MacDonald Estate, Neil* and *Strother v. 3464920 Canada Inc.*, [2007] 2 S.C.R. 177, 2007 SCC 24. *MacDonald Estate* arose in the context of mobility of lawyers, and examined the situation where the conflict arose because a lawyer moved from the firm representing one client to the firm representing the other. It focused on the protection of confidential information originating with the client. *Neil* arose in the context of a firm whose individual members acted both for and adversely to the client. It examined the broader fiduciary duty of loyalty owed by the lawyer, beyond merely protecting confidential information. *Strother* arose in the context of a lawyer who acted for several clients in the same industry. It analyzed the obligations of the lawyer to supply newly received information to a former client, and the ability of the lawyer to compete with his client.

[28]     Each of *MacDonald Estate, Neil* and *Strother* recognized that the consent of the client is an important factor in determining whether a lawyer can continue to act. But none of those three cases involved express consent in fact, so the Court did not have to analyze in detail the effect or limits of particular degrees of consent in particular circumstances. The general statements found in those cases about consent should not be extended further than is warranted by the context in which they were made. The only case cited by the parties involving express prior consent by the client is *Chiefs of Ontario v. Ontario* (2003), 63 O.R. (3d) 335.

[29]     In *MacDonald Estate* at para. 49 the Court recognized the "lead role" that law societies and the Canadian Bar Association play in setting ethical guidelines for lawyers. The CBA has recently released a major study on the issue: CBA Task Force on Conflicts of Interest, *Final Report*, August 2008. The Task Force at pg. 142 identifies three key components affecting the validity of waivers of conflicts: a) informed consent, based on full disclosure, b) client sophistication, and c) availability of independent legal advice. The Task Force reviewed American jurisprudence and concluded at pg. 146 that ". . . the enforceability of a client's consent to a future conflict of interest is a fact-specific inquiry". The Task Force recognized the legitimacy of advance waivers, and concluded at pg. 148: "Where an engagement letter includes this type of advance waiver in respect of unrelated matters, lawyers and their clients should expect that it will be upheld". It recognized, however, that an advance waiver cannot override all conflict situations that arise in the future. While recognizing the value of written engagement letters, the Task Force decided at pg. 147 not to recommend that writing be mandatory. The Task Force does not appear to have considered "preferred client" provisions such as exist in this appeal.

[30]     Consent can overcome many problems relating to conflicts of interests: *R. v. Parsons* (1992), 100 Nfld. & P.E.I.R. 260, 72 C.C.C. (3d) 137 (Nfld. S.C. - C.A.). There are undoubtedly limits. There are some situations where consent is simply ineffective, notwithstanding the good faith and intentions of the lawyer and the clients. There will be situations where matters unfold in such a way that the lawyer simply cannot continue to act, regardless of the consent obtained. Those situations may arise from the fiduciary duties of lawyers as set out in *Neil*, or from the passage of confidential information described in *MacDonald Estate*. The ultimate question on this appeal is whether that point was ever reached in this case.

[31]     The Board's findings of fact about the nature of the retainer between Chivers Carpenter and AUPE are supportable by the record, and are reasonable. The essential features of the retainer agreement were found to be as follows:

(a)     Chivers Carpenter could act for both AUPE and the United Nurses even though the two clients operated in the same "industry": labour representation in the healthcare sector.

(b)     The United Nurses would be the "primary" client.

(c)     If a conflict arose between AUPE and the United Nurses, Chivers Carpenter would cease to act for AUPE, but could continue to act for the United Nurses.

This third feature of the retainer appears to set this arrangement apart from any other previously considered by the Canadian courts. The American courts have been prepared to enforce similar arrangements: R.W. Painter, *Advance Waiver of Conflicts* (1999-2000), 13 Georgetown J. Legal Ethics 289 at pp. 297-305.

[32]    *Strother* noted at para. 40 that the terms of unwritten retainers may be uncertain, and that the ". . . court should not in such a case strain to resolve the ambiguities in favour of the lawyer over the client". Civil matters must be proven to a balance of probabilities, and once proven they are treated as certainties: *Athey v. Leonati*, [1996] 3 S.C.R. 458 at paras. 28, 30; *F.H. v. McDougall*, 2008 SCC 53, 297 D.L.R. (4th) 193 at para. 44. Once the Board found on a balance of probabilities what the terms of the retainer were, there is no longer any room in the analysis for ambiguity about those terms, and no place for "straining" one way or the other. The retainer must be interpreted as found by the Board. In any event, in this case the tension is as much between the two clients as it is between the lawyer and the client. The United Nurses is entitled to have its rights and expectations protected too.

Validity of the Consent

[33]    Much of the discussion about consent in the three leading cases assumed that the client's consent would be sought and obtained with respect to a discrete and presently identified file. *Strother* did recognize that consent could be more generic (and implied), as when a law firm acts for a number of clients in the same industry. A generic consent (express or by acquiescence) that a law firm can continue to act for two such clients, as exists in this appeal, is not contrary to any principle of public policy: *Strother* at paras. 54-5, 65; CBA Task Force. Choice of counsel is itself a value to be protected: *MacDonald Estate* at para. 13; *Strother* at para. 62. There is no reason to hold such a generic consent to be *ipso facto* ineffectual.

[34]    The appellant pointed to the statement in *Neil* at para. 29 that consent must be obtained after "full disclosure", and preferably after the client receives independent legal advice. The appellant argued that full disclosure could not have been made in this case, because at the time that Chivers Carpenter and AUPE reached their agreement, no one even remotely contemplated the Extendicare Holyrood bargaining unit application. The appellant argued in effect that Chivers Carpenter was not able to act unless it received the appellant's consent to bring that very application. Requiring that level of disclosure before a consent could be effective would render generic advance consents, such as exist in this case, impossible. The CBA Task Force's acceptance of the legitimacy of advance waivers is inconsistent with this level of disclosure being required. The words in *Neil* did not contemplate this type of situation. The appellant's argument that Chivers Carpenter did not have consent to act cannot prevail: *Advance Waiver of Conflicts* at pp. 305, 312-3; CBA Task Force at pp. 105-6.

[35]    There was in this case sufficient disclosure of the relevant facts: the firm had acted for the original client for many years; the two clients were in the same "business"; the firm was only prepared to act if the relationship with the original client was not jeopardized; and, it was possible that at some time in the future the clients' interests might be adverse. The fact that Chivers

Carpenter and AUPE agreed that, if a conflict arose, Chivers Carpenter would continue to act for the United Nurses, were made aware of the risk or eventuality of adversity, and were prepared to enter into the agreement regardless: First Decision at para. 23. It was an eventuality "duly disclosed by the lawyer and willingly accepted by the client": *Strother* at para. 1. One of the most obvious potential sources of a conflict would be the very type of bargaining unit dispute at issue here.

[36]   It is true that neither client involved in this appeal received independent legal advice. The clients were, however, sophisticated litigators: *Neil* at para. 28. The level of disclosure, and the circumstances under which the consent was obtained, were sufficient to make the consent valid.

[37]   When the dispute arose between AUPE and Chivers Carpenter, AUPE wrote withdrawing its consent. It now argues that the withdrawal of consent ends the ability of Chivers Carpenter to act. The chambers judge was correct in concluding that AUPE could not withdraw its consent in a way that would undermine the essential nature of the retainer agreement. AUPE had agreed that if a conflict arose, Chivers Carpenter could continue to act for the United Nurses. The withdrawal of consent cannot undermine that essential element of the consent. However, as mentioned, the continuing consent does not necessarily cure all conflict situations.

[38]   In summary, the consent given by AUPE to Chivers Carpenter was legally valid, and extended to cover the circumstances of this appeal. The withdrawal by AUPE of its consent was not itself legally sufficient to disentitle Chivers Carpenter to act.

Consent and Confidential Information

[39]   The agreement between AUPE and Chivers Carpenter, acquiesced in by the United Nurses, did not include any express provision about confidential information. It must have been known that the firm would, from time to time, possess in its collective mind confidential information of both clients. It was likely also anticipated that some of that information, at least at a general level, would have been in the mind of a single individual lawyer at the firm. Absent a particular consent to the contrary, however, it should be assumed that Chivers Carpenter agreed to take reasonable internal steps to protect the detailed confidential information of each client. It certainly could not be argued that Chivers Carpenter had a duty to pass on to each of the two clients all of the confidential information it received from the other: *Strother* at para. 47. But it also must be assumed that both clients agreed that the mere fact the firm from time to time had confidential information from both clients would not disqualify it from acting.

[40]   Ordinarily, all information given by the client to the lawyer will be considered to be privileged, and the client can enforce the lawyer's obligation to keep it all confidential. But where the client has consented to multiple representation, the client's ability to keep more generic information confidential may be reduced. The problem was noted in *Advance Waiver of Conflicts* at pg. 319:

Finally, there is the "playbook" problem in which a former client claims that a lawyer who learned information of a very general nature - such as strategies for negotiating transactions, launching hostile takeovers, or settling litigation - should be disqualified from a broad range of adverse representations in which that information might be useful. The Restatement rejects a sweeping version of the playbook argument, but leaves the door open for more narrowly tailored claims. A few courts have taken a more expansive view.

Thus the mere fact that AUPE may have discussed with Chivers Carpenter in general terms its institutional strategies would not be enough to override the consent given.

[41]    *MacDonald Estate* set out some presumptions that apply when a firm is in possession of confidential information from one client, and ends up acting for another client adverse in interest to the former. First of all, the law presumes from the existence of a prior retainer "sufficiently related" to the present retainer that confidential information was imparted: *MacDonald Estate* at para. 46. There is a "heavy burden" on the lawyer to show otherwise. While there is a "strong inference that lawyers who work together share confidences", the firm can show that confidential information possessed by one lawyer was not passed on to others: *MacDonald Estate* at para. 49. If the firm sets up suitable "ethical walls", and takes other appropriate internal procedures, it can be shown that the confidential information was protected. The onus is on the lawyer to prove that the confidential information was protected, kept confidential, and not misused. The Board applied these principles, without modification to reflect the client's consent, present in this case but absent in *MacDonald Estate*.

[42]    A law firm acting for multiple clients with express consent should still be presumed to have a duty to keep confidential information of each client confidential, and to ensure that it is not misused. However, where the clients have given a generic consent for the firm to continue to act for both of them, some of the presumptions in *MacDonald Estate* can no longer operate with full vigour. As the Court noted in *MacDonald Estate* at para. 44:

> In this regard, it must be stressed that this conclusion [respecting confidential information] is predicated on the fact that the client does not consent to but is objecting to the retainer which gives rise to the alleged conflict.

In particular, where (as here) different lawyers are acting for the different clients, the rule that information known to one lawyer is presumed to be known by the whole firm, and is presumed to be passed on, is less compelling. The clients must have consented to this state of affairs, even if they did not consent to the misuse of their confidential information. Where there is express consent to act for two clients, the mere existence of confidential information should not raise a presumption that it has been passed to another lawyer, or misused to the detriment of the client. This is particularly so where, as the Board found, there are a limited number of counsel practicing in this specialized field: *Strother* at paras. 55, 62; *O.P.C.M.I.A. U.S.A. & Can., Local 222 v. Alberta*, 2008 ABQB 225, 91 Alta. L.R. (4th) 230 at paras. 35, 41.

[43]     Likewise, the burden of proof on the lawyer set in *MacDonald Estate* is inappropriate in cases of express consent. There is no basis to presume that confidential information has been or will be misused, where all the clients have consented. The consent must at least incorporate a presumed level of trust in the integrity of the lawyer and the firm, and an acknowledgment that there is, at least, no presumption that the lawyer will misuse the confidential information. The problems of the perception of the public and the objecting client which were the basis for the rules formulated in *MacDonald Estate* (at paras. 44-9) no longer prevail in the face of express consent. As stated in *Advance Waiver of Conflicts* at pg. 328:

> The comments [to the *Model Rules of Professional Conduct*], however, should also state that, once a conflicting representation is consented to, the client giving consent (and any other complaining third party) will have the burden of showing specific facts establishing that the lawyer has misused confidential information in order for the lawyer to be disqualified or sanctioned for her conduct. Otherwise, specious claims of misuse of confidential information would eviscerate the advance conflict waiver. . .

As such, arguably the burden of proving some potential misuse of information or other prejudice should initially be on the client.

[44]     On the whole, the Board applied the presumptions in *MacDonald Estate* as if they were directly transferable to a case where the client had expressly consented to the lawyer acting. As indicated, those presumptions must be moderated to account for the consent of the clients. To the extent that the Board erred in its approach, it erred in favour of the appellant. To the extent that the Board placed some onus on AUPE to show a reasonable possibility that confidential information had been compromised, it did not err.

[45]     *MacDonald Estate* recognized the difficulty that a client might face in demonstrating that confidential information had been passed on or misused. In some cases that very proof might itself disclose the information: *MacDonald Estate* at para. 46. Where there has been express consent for the firm to act for two clients, this factor is again less compelling. The client has given the confidential information to the firm, knowing that the firm is acting for the other client. By definition, the firm already knows the confidential information, and the only need is to protect it from the other client. Given that the client has agreed that the firm can act for both clients, it must recognize the reality of the situation. In any event, mechanisms can be devised for protecting the confidentiality of the information, while still showing that relevant confidential information is involved. For example, in this case the Board concluded that AUPE did not have to reveal specifics of the confidential information, but only needed to provide "a general outline of the content of the discussions and the context in which they took place": Second Decision at para. 17.

[46]     In this case the agreed statements of facts do not acknowledge that confidential information was conveyed. No representative of the appellant testified, even in generic terms, that some pertinent confidential information was passed along. The record also shows that different lawyers were acting for the two clients on the matters in dispute. Neither one of them testified, so there is no evidence

that Ms. Gray passed on any confidential information to Ms. Khullar. Since both of them work for Chivers Carpenter, one might be inclined to draw an adverse inference against the firm for its failure to call them. Given that the parties agreed to proceed based on an agreed statement of facts, without calling any witnesses on this issue, the adverse inference is less compelling.

[47]    On this limited record the Board was nevertheless prepared to assume that some confidential information had been given to Chivers Carpenter, and shared by the two lawyers. The Board correctly understood that it therefore had to decide whether the two retainers were sufficiently connected to raise the risk that confidential information might be compromised: *Atco Gas and Pipelines Ltd. v. Sheard*, at para. 11. In order to determine the relevance of that information the Board was left with little more than the briefs that had been prepared in support of the various applications. Based on that information, it concluded that the issues on the two retainers were not sufficiently connected to raise an inference that confidential information had been compromised. It found the Extendicare Holyrood bargaining unit application was factually based. Characterizing the nature of the labour law issues arising on a particular application is directly within the expertise of the Board. Its decision on this issue is justified, transparent and intelligible and "falls within a range of possible, acceptable outcomes".

[48]    If the two retainers were not sufficiently connected, it follows that any confidential information that AUPE may have given to the firm with respect to *Capital Health #1* would not disable the firm from working on the Extendicare Holyrood bargaining unit application. As such, and given AUPE's express consent to the firm acting for both clients, the Board was correct in determining that Chivers Carpenter could continue to act for the United Nurses.

[49]    There will undoubtedly be circumstances where the conflict with one client is so pronounced that even prior consent will not save the retainer relationship with the other client. For example, it was never contemplated that Chivers Carpenter would act both for and against the two clients in the same proceeding: *MacDonald Estate* at para. 17; *Neil* at para. 29; *Chiefs of Ontario* at paras. 113, 142. Further, if AUPE had disclosed its specific tactics, strategies, or vulnerabilities to Chivers Carpenter, and that information had been passed from Ms. Gray to Ms. Khullar, Chivers Carpenter could not act for the United Nurses on a related matter: *MacDonald Estate* at paras. 47, 65; *Chiefs of Ontario* at paras. 138, 144. The express consent that United Nurses would be the preferred client would have permitted Chivers Carpenter to continue to act for the United Nurses on other files. But given the finding of the Board that the two applications were unrelated, those qualifications do not apply here.

[50]    In closing, it should be noted that even if a conflict had been found, the remedy is not necessarily a disqualification of Chivers Carpenter. As *Neil* points out at paras. 36-43, not every conflict is disabling. In light of the limited pool of labour lawyers noted by the Board, the specific agreement that the United Nurses would be the primary client, and the further agreement that in case of a conflict Chivers Carpenter could continue to represent the United Nurses, it would be inappropriate to disqualify the firm absent evidence of demonstrable prejudice to AUPE. No such prejudice is evident on this record.

Page:  14

[51]    The appeal is dismissed.

Appeal heard on November 25, 2008

Reasons filed at Edmonton, Alberta
this 23rd day of January, 2009

_____

Slatter J.A.

I concur:    _____

as authorized:    Conrad J.A.

**Dissenting Reasons for Judgment of
The Honourable Mr. Justice Berger**

[52]   I have had the advantage of reading in draft form the reasons of the majority. I regret that I cannot endorse the conclusion my colleagues have reached. I would allow the appeal for the following reasons.

[53]   In *MacDonald Estate v. Martin*, [1990] 3 S.C.R. 1235, the Supreme Court of Canada addressed the content of a solicitor's duty of loyalty to a client and the questions that need be addressed when the spectre of conflict of interest arises (per Sopinka J. at paras. 15, 45, 46 and 47):

> "... When the management, size of law firms and many of the practices of the legal profession are indistinguishable from those of business, it is important that the fundamental professional standards be maintained and indeed improved. This is essential if the confidence of the public that the law is a profession is to be preserved and hopefully strengthened. Nothing is more important to the preservation of this relationship than the confidentiality of information passing between a solicitor and his or her client. The legal profession has distinguished itself from other professions by the sanctity with which these communications are treated. The law, too, perhaps unduly, has protected solicitor and client exchanges while denying the same protection to others. This tradition assumes particular importance when a client bares his or her soul in civil or criminal litigation. Clients do this in the justifiable belief that nothing they say will be used against them and to the advantage of the adversary. Loss of this confidence would deliver a serious blow to the integrity of the profession and to the public's confidence in the administration of justice.
>
> ...
>
> Typically, [conflict of interest] cases require two questions to be answered: (1) Did the lawyer receive confidential information attributable to a solicitor and client relationship relevant to the matter at hand? (2) Is there a risk that it will be used to the prejudice of the client?
>
> ...
>
> In my opinion, once it is shown by the client that there existed a previous relationship which is sufficiently related to the retainer from which it is sought to remove the solicitor, the court should infer that

> confidential information was imparted unless the solicitor satisfies
> the court that no information was imparted which could be relevant.
> [emphasis added]
> ...
>
> A lawyer who has relevant confidential information cannot act
> against his client or former client. In such a case the disqualification
> is automatic. No assurances or undertakings not to use the
> information will avail. The lawyer cannot compartmentalize his or
> her mind so as to screen out what has been gleaned from the client
> and what was acquired elsewhere. Furthermore, there would be a
> danger that the lawyer would avoid use of information acquired
> legitimately because it might be perceived to have come from the
> client. ..."

[54]    AUPE retained Chivers Carpenter to petition the Board to reconsider *Capital Health #1* and thereafter to seek judicial review of the Board's decision precisely because it feared that it would lose members to the UNA.

[55]    In my view, the spectre of conflict would have been or should have been immediately apparent to the law firm. Indeed, in reliance upon *Capital Health #1*, Chivers Carpenter filed an application with the Board to remove the LPNs from AUPE's ANC bargaining unit. Chivers Carpenter should have declined that *ad hoc* retainer from AUPE. It did not. Having chosen to act for AUPE, the law firm, in my opinion, was thereafter precluded from acting for the UNA in respect of its application to the Board seeking a determination that three licensed practical nurses in the "auxiliary nursing" bargaining unit at Extendicare Holyrood, then represented by AUPE, should instead be included in the "direct nursing" bargaining unit represented by the United Nurses.

[56]    I am reinforced in my view of the matter in the light of the Code of Professional Conduct that governs the behaviour of solicitors. Courts have an inherent jurisdiction to remove solicitors with a conflict of interest from the record and are not bound to apply a code of ethics: *MacDonald Estate v. Martin, supra*, at para. 21. However, codes of ethics are important statements of the collective views of a self-governing profession and should be given some consideration; "an expression of a professional standard in a code of ethics relating to a matter before the court should be considered an important statement of public policy" (at para. 18).

[57]    Chapter 6 of the Law Society of Alberta's Code of Professional Conduct (Appellant's Book of Authorities, Tab 15) addresses lawyer's obligations with respect to conflicts of interest. Rules 3(a) and (b) read as follows:

> "(a)    Except with the consent of the client, a lawyer must not
> represent a person whose interests are directly adverse to the
> immediate interests of a current client.

(b) Except with the consent of the client or approval of a court pursuant to (c) [not applicable here], a lawyer must not act against a former client if the lawyer has confidential information that could be used to the former client's disadvantage in the new representation."

[58]    Sections 4(f) and (i) of the Interpretation section of the Code of Professional Conduct define "consent" and "disclosure" as follows:

"(f) 'consent' means fully informed and voluntary consent after disclosure;

...

(i) 'disclosure' means full and fair disclosure of all information relevant to a person's decision (including, where applicable, those matters referred to in commentary of this Code), in sufficient time for the person to make a genuine and independent decision, and the taking of reasonable steps to ensure understanding of the matters disclosed ..."

[59]    Consent will not invariably operate to relieve a lawyer of his ethical duty. See *Davey v. Woolley, Hames, Dale & Dingwall* (1982), 35 O.R. (2d) 599. In *McWaters v. Coke*, 2005 ONCJ 73, 16 R.F.L. (6th) 271, the Ontario Court of Justice removed a lawyer from the record on the basis of conflict despite the client's consent. The lawyer was the client's husband and the Law Society of Upper Canada's Rules of Professional Conduct identified a number of ways that such a relationship could give rise to conflict. Subrule 2.04(3) stated the following:

"A lawyer shall not act or continue to act in a matter when there is or is likely to be a conflicting interest unless, after disclosure adequate to make an informed decision, the client or prospective client consents."

The Court held that the client's consent was not relevant regardless of the above Rule. The Court stated as follows: "A lawyer's freedom of action and judgment is subject to other interests, duties, and obligations. Any counsel is an officer of the court, and he or she must fulfill his obligations as such and to the administration of justice." (*McWaters* at para. 201)

[60]    A valid consent may subsequently be vitiated or become ineffective or withdrawn. See *R. v. Moore*, 2004 ABQB 345, 45 Alta. L.R. (4th) 139; *Hudson v. Hudson* (1993), 142 A.R. 236 (Q.B.); *Merry v. Schenk*, [1995] O.J. No. 907.

[61]    In the instant case, the law firm has failed to establish that the consent which was not reduced to writing was clear and unequivocal. The Court should not in such a case strain to resolve the

ambiguities in favour of the lawyer over the client: *Strother v. 3464920 Canada Inc.*, 2007 SCC 24, [2007] 2 S.C.R. 177. Moreover, consent given seven years prior in time cannot in the circumstances of this case be characterized as informed consent. The parties could not have reasonably contemplated those unique events which gave rise to the present dispute between AUPE and the UNA. It is instructive that the CBA Task Force on Conflicts of Interest, Final Report, (August 2008) has produced a "Model Letter Confirming Consent of Clients to Proceed Despite Possible Conflict" (attached as Appendix A to this judgment) that refers specifically and repeatedly to the "Subject Matter" of the conflict or potential conflict. I suggest that the CBA appreciated that no such consent can be effective if given in a vacuum or at large and without reference to the specific "Subject Matter" as occurred in the case at bar.

[62]    If informed consent was given, it is patent on this record that it was withdrawn. The Appellant made it abundantly clear to the law firm that, in its opinion, confidential information had been imparted to the law firm that might prejudice ongoing litigation. In such circumstances, both its duty to the client and its duty to the Court required that Chivers Carpenter withdraw.

[63]    In addition, I agree with the Appellant that the firm's representation of AUPE in challenging the *Capital Health #1* decision made it privy to confidential information including AUPE's concerns about the redefinition of the ANC bargaining unit, and the possible negative impact on AUPE's ANC bargaining unit. That would have put AUPE at a disadvantage when the law firm was advising UNA respecting its application against AUPE to remove members of AUPE's ANC unit based on the Board's new redefinition. See *Skjerpen v. Johnson*, 2007 BCSC 1290, [2007] B.C.J. No. 1896 at paras. 24-28.

[64]    On the authority of *McDonald Estate v. Martin*, *supra*, and *Atco Gas and Pipelines Ltd. v. Sheard*, 2003 ABCA 61, 320 A.R. 339, AUPE has satisfied the onus that Chivers Carpenter received confidential information from AUPE that is relevant to the UNA application. AUPE has shown a sufficient relationship between the two retainers to raise a rebuttable presumption that relevant confidential information had been passed. The law firm has failed to establish that no information was imparted which could be relevant.

[65]    For these reasons, I would allow the appeal.


Appeal heard on November 25, 2008

Reasons filed at Edmonton, Alberta
this 23rd day of January, 2009

_____

Berger J.A.

**Appearances:**

S.M. Renouf, Q.C.
M.S. Desbarats
      for the Appellant (Applicant)

D.R. Cranston, Q.C.
S.A. Roberts
      for the Respondent (Respondent)

Page:  20

**APPENDIX A**

**Model Letter Confirming Consent of Clients
to Proceed Despite Possible Conflict**

*Where there is a potential conflict between two or more clients, this letter jointly
addressed to them, confirms their consent for the law firm to act.*

---

[*Date*]

[*Name and address of ABC*]

Attention: [*Name and Title*]

[*Name and address of XYZ*]

Attention: [*Name and title*]

**Re**: [*Subject*]

[*Salutation*]:

This letter confirms our recent *[add telephone conversation or e-mail exchange, if and as
appropriate]* when we advised you that [*firm or we*] have been asked to represent [*ABC Inc.*]
and/or related entities [*ABC*] in connection with [insert description of ABC mandate] (the
"Subject Matter"). We have advised [*ABC*] that our firm *[Select one of: has acted in the past,
or currently acts]* and may in the future act for [*XYZ Ltd.*] and/or related entities [*XYZ*], and
that as a result, various Firm lawyers may have acquired confidential information regarding
[*XYZ*].

[*Firm*] has not, and will not be, representing [*XYZ*] in connection with Subject Matter *[and,
where applicable, add: and, to our knowledge, we have no confidential information from
[XYZ] that is relevant to the Subject Matter*.] Having said that, in acting for [*ABC*] in the
Subject Matter, we may be required to act adverse to the interests of [*XYZ*]. That is why we
sought your consent for us to act in connection with the Subject Matter.

We confirm that each of [*ABC*] and [*XYZ*] has consented to our firm acting for the other, and
in particular, has waived any conflict of interest that could result from our firm acting as
counsel to [*ABC*] in the Subject Matter.

[emphasis added]

---

*(Continued)*

**Conflicts of Interest Toolkit**

You acknowledge and agree that all confidential information and any documents that either [*ABC*] or [*XYZ*] has provided, or may provide, to our firm relating to the Subject Matter will be treated by us as both confidential and privileged insofar as the other client is concerned. For greater certainty, any information which we may have as a result of our firm's representation of [*XYZ*] or [*ABC*] will not be disclosed to the other client or its representatives without prior authorization.

[*ABC*] and [*XYZ*] each acknowledges and confirms that our firm reserves the right to decline to continue to act for one or both of you if litigation or any other irresolvable contentious issues arise between you. Further, you each agree that if our firm exercises its right to decline to continue to act for one of you, the client for whom we have refused to continue to act will not challenge our firm's ability to continue to represent the other.

We ask that you kindly sign and return the attached duplicate copy of this letter. By doing so, you confirm your agreement of the terms set out above, and waive any claim that you might have against our firm relating to the conflict or potential conflict of interest that we have disclosed. You each also confirm that you have been advised by us to obtain independent legal advice before signing this letter, and have had a reasonable opportunity to do so.

This letter may be executed by facsimile and in counterparts, each of which so executed shall be deemed to be an original and all such counterparts together shall constitute one and the same letter.

[*In Quebec only (required by The Charter of the French language)*: This letter of agreement has been drafted in English at the express request of the parties. Cette lettre d'entente a été rédigée en anglais à la demande expresse des parties.]

Yours very truly,

[*Firm*]

**Acknowledged and Agreed**:

[*Location*], [*Date*]

**[*ABC INC.*]**                                              **[*XYZ LTD.*]**

Per: _____          Per: _____
    Authorized Representative                          Authorized Representative

Name:_____          Name: _____


Title: _____          Title: _____


                                   [emphasis added]