UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation
and DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation                    Case No. 06-15185

        Plaintiffs,                              Honorable Nancy G. Edmunds

v.

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

        Defendants.
_____/


**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [46]**

The Ambassador Bridge arches gracefully across the Detroit River, a familiar landmark to those who live or work in Detroit or Windsor. Sadly, the last decade has shown that the lovely bridge, now eighty years old, may no longer be up to the demands of North America's busiest border crossing. The increased security demands of 9-11, the volume of truck traffic, the advent of casino traffic in both directions, and the stress on the infrastructure itself, all have contributed to the pressure to expand capacity at the border, most likely through building another bridge.

CenTra, Inc. the private company which owns the Ambassador Bridge has actively pursued a plan to build a second span adjacent to the existing bridge, a project sometimes referred to as "twinning." Another group known as DRIC (Detroit River International Crossing) is also developing and pursuing plans for a new bridge down river from CenTra's proposed second span. The City of Windsor, in the meantime, has had an ongoing battle

with the bridge developers over traffic, inadequate roads and infrastructure, land use and zoning, and environmental issues.

CenTra and its owner, Matty Maroun, have moved forward aggressively with plans for a second span, despite opposition from the City of Windsor, which has been a persistent thorn in their side.  The instant case is a small part of the antagonism between CenTra and Windsor, arising out of a legal conflict which occurred when the law firm of Gowling Lafleur Henderson, LLP ("Gowlings") inadvertently represented both Windsor and CenTra for 16 months in 2005-06.  Claiming they had been unaware of Gowlings' work on behalf of Windsor, CenTra seeks a preliminary injunction, which would rid them of one of their ablest adversaries, David Estrin of Gowlings, Windsor's counsel.

For the reasons set forth below, the Court denies the motion for preliminary injunction.

# I.   FINDINGS REGARDING BACKGROUND FACTS AND PROCEDURAL HISTORY

## A.   Parties and Key Individuals

1.   Plaintiffs CenTra, Inc. and Detroit International Bridge Company ("DIBC"), together with their non-party affiliate, Canadian Transit Company ("CTC"), own the Ambassador Bridge (collectively, "CenTra" unless there is a reason to refer to them individually).  Since 1990, Dan Stamper has been the president of DIBC and CTC, where he began working in 1986.  (Prelim. Inj. Hr'g Tr., Stamper, 1/29/09, 8-11, 131).[1]  Manuel "Matty" Moroun is the primary owner of CenTra.  Fred Calderone is a vice-president of CenTra, Inc., a certified public accountant and attorney, and his office is next to Stamper's.  (Calderone, 1/13/09, 22, 25, 99-100).

---

[1]All citations to individuals are to the preliminary injunction hearing transcript.

2.   Defendant Gowling Lafleur Henderson LLP ("Gowlings") is a Canadian law firm, with approximately 750 lawyers and nine offices in Canada, as well as offices in Moscow and London.  Gowlings has no offices in the United States.  None of Gowlings' attorneys are licensed to practice law in Michigan.  (Jolliffe, 2/20/09, 3-6).

3.   Defendant David Estrin is a Gowlings partner who, since 1971, has specialized in environmental and related planning matters.  Estrin is an attorney licensed by the Law Society of Upper Canada, and is not licensed in the United States.  (Estrin, 2/3/09, 42-45).

4.   The City of Windsor (not a party to this action) is a Canadian city of approximately 216,000 residents, located in Southeastern Ontario, on the Detroit River, at the Canadian access point of the Ambassador Bridge.

5.   CenTra contends that Defendants breached contractual and fiduciary duties owed to CenTra and committed malpractice.  To support those claims, CenTra presented evidence that Defendants violated certain ethical obligations concerning the representation of clients with adverse interests.

B.   **Basic Contentions of the Parties**

6.   CenTra has an interest in building a second span across the Detroit River, adjacent to the existing Ambassador Bridge ("the Second Span").  This project is occasionally referred to as "twinning" the existing bridge.  CenTra contends that in 2005 and 2006 Estrin was representing Windsor against the Second Span adverse to CenTra's interest, at the same time Dale Hill and Tim Wach (Gowlings professionals) were representing CenTra and assisting CenTra to obtain financing to build the Second Span. CenTra contends that this was a current client conflict of interest to which it did not consent, and, as a result, Gowlings should now be enjoined from representing Windsor adverse to

3

the Second Span.  CenTra sued Gowlings and Estrin in November 2006, after which Gowlings withdrew from representing CenTra but continued and continues to represent Windsor.

7.  CenTra also contends that Gowlings represented it in the 1980's and early 1990's on matters substantially related to Estrin's current representation of Windsor.  CenTra contends that this earlier work creates a conflict with Estrin's present representation of Windsor, to which it did not consent.  CenTra contends that even if the Hill and Wach representations of CenTra are analyzed under the former client standards, such representations are substantially related to Estrin's representation of Windsor, and, as a result, Gowlings should be enjoined from representing Windsor adverse to the Second Span.

8.  Gowlings contends that CenTra impliedly consented to Gowlings' representation of Windsor, and CenTra cannot now seek to enjoin Gowlings from representing Windsor adverse to the Second Span or otherwise.  More specifically, Gowlings contends that when CenTra hired Hill and Wach in 2005, CenTra did so knowing that Estrin and Gowlings already represented Windsor adverse to CenTra on the Second Span and on other related border crossing traffic issues.  In addition, Defendants contend that even before CenTra hired Gowlings in 2005, CenTra's lack of any objection to Estrin's representation of Windsor adverse to CenTra on the Second Span (which was known to CenTra) is also implied consent and waiver to the alleged former client conflicts arising out of Gowlings' representation of CenTra in the 1980's and 1990's.  Gowlings contends that CenTra's consent was fully informed and that any conflict was in fact consentable.

4

9.   Gowlings also contends that even absent consent, under a former-client conflict analysis, neither Gowlings' representation of CenTra in the 1980's and 1990's, nor the Hill and Wach representations of CenTra in 2005-2006, is sufficiently related to Estrin's representation of Windsor to constitute a conflict.   Nor have any confidences of CenTra ever been compromised, and there is no danger they ever will.   Gowlings also contends that, even if an ethics violation were found, CenTra has made no showing of irreparable harm nor met any of the other injunction factors.

C.   **Procedural History of the Dispute**

10.   The Complaint in this matter was filed on November 20, 2006.   Gowlings immediately moved for summary judgment, which was granted by the Court on April 30, 2007.  Plaintiffs appealed and prevailed, and that case was remanded to the District Court on August 15, 2008.

11.   On September 25, 2008, Plaintiffs filed a motion for preliminary injunction seeking to enjoin Gowlings from continuing to represent Windsor in matters related to the building of a Second Span at the Ambassador Bridge.

12.   The Court held a hearing on Plaintiffs' preliminary injunction motion from January 12, 2009 to February 27, 2009, involving 14 days of testimony, 15 witnesses, and hundreds of exhibits.   In the course of that hearing, the Court sought to address the issues raised by the Sixth Circuit in its opinion and order of remand.

## II.  FINDINGS REGARDING BASES OF PLAINTIFFS' PRELIMINARY INJUNCTION MOTION

### D.  Early Chronology

13.     In the late 1970's, CenTra (DIBC and CTC) consolidated its ownership of the Ambassador Bridge.  (Moran, 2/12/09, 187-189).  The government of Canada, having been informed of CenTra's ownership aspirations in 1972, had passed the Foreign Investment Review Act (FIRA) (Moran, 2/12/09, 187), which ultimately provided that any private entity which bought the bridge would have to give it back to Canada, without payment (Moran, 2/12/09, 194).

14.     In response to the Foreign Investment Review Act, CenTra initiated litigation in both Canada and the United States to enforce its ownership rights to the bridge.  (Moran, 2/12/09, 192-194).  The Canadian lawsuit was known as the FIRA litigation.  CenTra initially engaged the firm of Goodman & Goodman to represent it in the FIRA litigation.  (Moran, 2/12/09, 190).  That firm withdrew in 1980, and CenTra retained Gowlings as successor counsel.  (Moran, 2/12/09, 197).

15.     As part of its work representing CenTra, Goodman & Goodman is alleged to have prepared a memorandum (The Goodman memorandum), which "collected in one spot the rights and privileges that one would have as the owner of DIBC, CTC, and Ambassador Bridge, and its adjoining lands."  (Moran, 2/12/09, 197).  Although Pat Moran (CenTra's counsel from 1973 to 1990, and from 2007 to the present) testified as to the existence and contents of the Goodman memorandum, the document itself could not be located and was not  produced at the hearing (for in camera inspection or otherwise).  Mr. Moran testified

6

that the Goodman memorandum and its supporting documents were used by Gowlings in its representation of CenTra.  (Moran, 2/12/09, 198).

16.    The Gowlings lawyers involved in the FIRA litigation were Gordon Henderson, who died in 1994, Emilio Binavince, who left Gowlings in 1990, and Ron Lunau, who was an associate during the FIRA matter and is now a Gowlings partner.  (Moran, 2/12/09, 198).

17.    The FIRA litigation was essentially resolved in 1990.  Final settlement papers were signed in 1992.  Mr. Binavince, who had left Gowlings in 1990, handled the final phases of the settlement.

18.    Following the conclusion of the FIRA litigation, documents were retained in an offsite storage facility by Gowlings and ultimately copied and sent to CenTra.  (Binavince, 2/12/09, 160-61, 169-70).

19.    In addition to the FIRA Litigation, Gowlings represented CenTra in the 1980's and early 1990's on other matters relating to the existing Ambassador Bridge.  (Stamper, 1/29/09, 16-20; 2/2/09, 8-9).  Pat Moran also represented CenTra and interacted with Gowlings in the 1980's until 1990, through his firm Simpson & Moran.  Moran testified that Gowlings, principally through Gordon Henderson, provided oral opinions on 79 different topics during this period.  (Moran, 2/12/09, 186-187, 194; 2/17/09, 14-17, 36-44, 91-99).  Attorneys who worked with Henderson testified that Henderson was not one to issue major or important opinions to clients orally, but would reduce them to writing.  (Jolliffe, 2/20/09, 26-28; Lunau, 2/26/09, 12-13).  Moran did not testify as to the substance of any such oral opinions.  Moran was discharged by CenTra in 1990 and subsequently rehired as general counsel in 2007, after CenTra filed this lawsuit.  (Moran, 2/12/09, 185, 200).  From 1992-2006, Moran had no interaction with Gowlings on CenTra's behalf.  (Moran, 2/17/09, 81).

7

20.     Stamper's and Moran's testimony implied that the written and oral opinions provided by Gowlings, and the confidential information provided to Gowlings by CenTra, in the 1980's and 1990's, were related and relevant to the Second Span and Estrin's work for Windsor adverse to the Second Span.  (Stamper, 1/29/09, 21-24, 129-130, 139-141; 1/30/09, 146, 148; Moran, 2/17/09, 11, 45-50, 81, 105-106).  However, with the exception of one written opinion and the FIRA settlement agreements, no specific evidence was presented as to the content of any such opinions or confidential information.[2]  From the evidence presented by CenTra, the matters Gowlings worked on for CenTra in the 1980's and 1990's do not have any relationship with the Second Span or Estrin's representation of Windsor concerning the Second Span.   The 1990 and 1992 FIRA settlement agreements, with which Gowlings was not involved, merely require CenTra to provide and maintain adequate customs facilities to handle traffic from the Ambassador Bridge.  (Defs.' Exs. 586, 587; Binavince, 2/12/09, 158; Moran, 2/12/09, 195-196; 2/17/09, 4, 7, 81, 84; Lunau, 2/26/09, 14, 18).   Those agreements have no relationship whatsoever to the Second Span or to Estrin's work for Windsor.  The same is true for the one written opinion, Pls.' Exhibit 141 from 1986, introduced by CenTra.

---

[2] CenTra argued that the purpose for seeking injunctive relief was largely to protect the disclosure of confidential information.  The Court, recognizing Plaintiffs' legitimate interest in protecting confidential information, offered the options of in camera review, protective orders, and any other appropriate procedure Plaintiffs wished to utilize to be sure their confidential information was not compromised.  Plaintiffs nevertheless did not produce or describe with particularity any document or confidential information they sought to protect (or which they believed had been inappropriately disclosed or utilized), other than the Goodman memorandum (not produced), the FIRA settlement documents and one written opinion.  (Pls.' Ex. 141).

21.     This finding is fully supported by Stamper's testimony that the Second Span was not even conceived of as an idea until <u>after</u> Gowlings stopped representing CenTra in the 1990's, and after Moran ceased representing CenTra in 1990. (Stamper, 1/29/09, 22-23, 42, 44, 138; 1/30/09, 145; Binavince, 1/12/09, 173). Stamper testified that there was no plan to build any type of second span until 1995 or after, and that the decision to locate a twin Second Span next to the existing Ambassador Bridge was not made until 2004. (Stamper, 1/29/09, 23, 42-43, 138; 1/30/09, 145). Binavince, who was called as a witness by and who is currently a consultant for CenTra, also testified that before he left Gowlings in 1990 he gave no opinions or advice relating to the Second Span or any second span of the Ambassador Bridge. (Binavince, 2/12/09, 121-122, 157, 164-165, 173-174, 177). Likewise, Lunau testified that the FIRA Litigation and the matters he worked on in the 1980's and 1990's had nothing to do with the Second Span. (Lunau, 2/26/09, 9-10, 14-15). Lunau has virtually no recollection of the specifics of any documents he may have seen in the 1980's and 1990's regarding CenTra, has not seen any such documents for almost 20 years, and had not spoken about any of these matters until this lawsuit was filed. (Lunau, 2/26/09, 9-11, 14, 18, 67, 69). The matters on which Gowlings represented CenTra in the 1980's and 1990's are not related to the Second Span or Estrin's work for Windsor.[3]

---

[3] Plaintiffs have argued that the matters are related because they both involve issues concerning the scope of Canadian governmental authority in border and bridge matters. One aspect of this dispute is whether Windsor should have control over decisions of zoning, roads, and approaches related to the border under the International Bridges and Tunnels Act. Although Mr. Moran testified that in the course of the 2005-06 representation of CenTra Gowlings advanced a position adverse to Windsor on Centra's behalf (in connection with proposed legislation known as Bill C3), it is clear from the testimony of Tim Wach that he took no active position on CenTra's behalf and merely reported back to Calderone on the status of the Canadian legislation. (Wach, 2/24/09, 42). In addition, Mr. Moran testified that Gowlings had opined in the 1980's that CTC (one of the CenTra

9

**E.      Gowlings' Retention By Windsor and the Peace Bridge in Opposition to CenTra**

22.      By May 2003, Estrin and Gowlings had been retained by the Peace Bridge Authority concerning the bridge in Fort Erie near Niagara Falls.  At that time, CenTra was considering building a bridge near the Niagara Falls border crossing which would have competed with the existing Peace Bridge.  On May 22, 2003 and September 9, 2004, Estrin sent letters on Gowlings letterhead to Stamper and the "Ambassador Bridge," which Stamper testified that he received and understood, in which Estrin threatened legal action against them on behalf of the Peace Bridge.  (Stamper, 1/30/09, 172-173; Pls.' Exs. 125, 126; Estrin, 2/12/09, 57).  When he began his work on behalf of the Peace Bridge, Estrin did a conflict check and discovered that Ambassador Bridge had been a Gowlings client in the past, but he did not explore the substance of that representation which was reflected in Gowlings' computer client base as a closed administrative matter.  (Estrin, 2/3/09, 29-30, 35).  Estrin did not list CenTra or Ambassador Bridge as an adverse party when he opened the Peace Bridge file.  Notwithstanding their receipt of the Estrin and Gowlings letters threatening suit on behalf of the Peace Bridge, CenTra and Stamper did not object to Gowlings' representation of that adverse client.

---

component companies) is a federal undertaking.  (Moran, 2/17/09, 24-28).  This characterization would suggest limitations on Windsor's ability to act on bridge and border matters.  Mr. Moran testified that Mr. Estrin had taken a contrary position on this issue on behalf of Windsor.  (Moran, 2/17/09, 28).  In support of Mr. Moran's testimony, however, the only exhibit offered was Pls.' Ex. 141, which did not purport to examine the scope of authority which could be exercised by the City of Windsor on anything other than actual bridge operations of the existing Ambassador Bridge.  Nor has Mr. Estrin's work for Windsor focused on whether or not CTC is a federal undertaking.  Moreover CenTra's active involvement concerning opposition to OPA 43, legislation which CenTra thought would impact the authority of Windsor in relation to the Second Span, suggests that CenTra did not believe that the governmental authority issues had been finally resolved even as recently as 2006.

23.     In late 2002, Windsor retained Estrin and Gowlings to represent it concerning general border crossing issues. (Defs.' Ex. 576A; Wilkki, 1/14/09, 9, 19, 30; Estrin, 2/3/09, 13-14).   At the time he began his work for Windsor, Estrin ran a conflict check but did not name CenTra or any of the bridge companies as adverse parties.  He considered that the only potential adverse parties at that time were the federal and provincial governments. (Estrin, 2/3/09, 14-15).  When the Windsor engagement later became actively adverse to CenTra, Estrin did not do a follow-up conflict check.  Although he became aware in 2003 that Gowlings had previously represented the Ambassador Bridge, he did not inquire as to the scope and substance of that earlier representation, which he understood to have ended some eleven years earlier.   (Estrin, 2/2/09, 29-35; MacKenzie, 2/18/09, 56; Wolfram, 2/20/09, 102-03).

24.     Since late 2002, Estrin has continuously represented Windsor on numerous border crossing issues, many of which were highly publicized in Windsor.  Those matters include the recommendations of the 60-Day Committee, Essex-Windsor Master Plan, Nine-Point Plan, Sam Schwartz study, DRIC, CenTra's proposal to build the Second Span, CenTra's site plan and related agreement with Windsor, and OPA 43 Windsor Bylaw litigation. (Wilkki, 1/14/09, 20-23, 125).  These matters are very complex and intertwined, some in small and others in very significant ways.  (Wilkki, 1/14/09, 15).  All of these matters address in some fashion CenTra's positions concerning its ability to direct traffic to and from the Ambassador Bridge and generally Windsor's opposition to CenTra, including with respect to the Second Span. (Stamper, 1/30/09, 35, 107; Estrin, 2/3/09, 46-56, 60-71, 73-91; Pls.' Exs. 129, 150; Defs. Exs.' 585, 575, 570A-M, O, 572, 574, 576A-H, 577, 501, 502; Estrin, 2/12/09, 3-11, 31-42, 77-86).

11

25.     Although Mr. Stamper testified that he was not really aware of the adverse positions being advanced by Windsor and its counsel, Estrin, that testimony is hard to credit given that Stamper is president of CenTra, whose primary asset is the Ambassador Bridge, and that CenTra had people working on its behalf or in its interests (Mr. Arditti; Mr. Paroian) whose responsibility appeared to include keeping CenTra informed of the oppositional activities of the City of Windsor.  (Stamper, 1/30/09, 75, 130-32, 138-39).

26.     Windsor has spent millions of public dollars on Estrin and Gowlings since 2002 on these matters.  (Wilkki, 1/14/09, 9, 18-19).  Estrin has taken the lead on all of these matters for Windsor, and he is essential to Windsor's interests with respect to all of them. These border issues are vitally important to Windsor, and Windsor takes no action with respect to them without consulting Estrin.  Estrin is not interchangeable with other lawyers. He has an exceptional level of expertise and knowledge in environmental law and process and is well recognized at senior levels of local, federal and provincial governments.  (Wilkki, 1/14/09, 8-11, 40; Estrin 2/3/09, 46-52; Pls.' Ex. 150; Defs.' Ex. 585).  There are only a handful of attorneys in Canada who could represent Windsor as Estrin has, and none that have the more than six-year history with Windsor coordinating all aspects of Windsor's strategy and its expert consultants on these complex and intertwined matters.  Windsor considers Estrin to be irreplaceable, and it would be in an untenable situation for a lengthy and crucial time period if Estrin is prevented from representing Windsor on these matters, including the matters relating to the Second Span.  (Wilkki, 1/14/09, 8, 11-13, 37, 125; Defs.' Ex. 514).

27.     As Estrin's representation of Windsor progressed, Windsor became adverse to CenTra on a number of matters.  Stamper acknowledged that he was aware of this both

12

from his own personal knowledge and from the news media in Windsor, which publicly reported Estrin's adversity to CenTra. (Defs.' Exs. 570A-M, O). CenTra specifically monitors newspaper, media coverage, and governmental actions concerning the Ambassador Bridge. (Defs.' Ex. 542, p. 24; Stamper, 1/29/09, 135-136; 1/30/09, 16). Stamper was aware, in early 2004, through news articles or Windsor City Council Minutes that Estrin was representing Windsor on disputes over the routes for international truck traffic leading to the border. (Stamper, 1/30/09, 31, 128, 130; Defs.' Ex. 570G; Pls.' Ex. 149).

28.     In September 2004, Stamper had several heated, adverse exchanges with Estrin and Gowlings. First, Stamper received Estrin's letter on Gowlings' letterhead dated September 9, 2004, in which Estrin threatened to sue on behalf of the Peace Bridge. (Pls.' Ex. 126).

29.     Estrin also sent a draft "Site Plan Agreement" to Stamper on September 14, 2004, concerning the plaza on the Canadian side of the Ambassador Bridge. (Pls.' Ex. 503; Stamper, 1/29/09, 87; 1/30/09, 72-74). Estrin's cover letter on Gowlings' letterhead stated:

> In essence, the City wishes to ensure that by processing your application it is clear that doing <u>so is not considered an endorsement by the City of your proposal to twin the existing bridge as proposed in the July 14, 2004 Preliminary Review Permit Application nor considered to</u> be any acknowledgement or acquiescence by the City that you have a statutory or other right to build <u>a second bridge from Windsor to Detroit</u>. . . . We believe this . . . serves to ensure that the interests of the City <u>with respect to your future intentions regarding a second span</u> are not in any way prejudiced.

(Pls.' Ex. 127; Defs.' Ex. 503) (emphasis added).

30.     The July 14, 2004 Preliminary Review Permit Application referred to in Estrin's letter to Stamper is CenTra's application to the U.S. Coast Guard for a permit for the Second Span ("Second Span Permit Application").  (Defs.' Ex. 502).  The draft agreement Estrin drafted and enclosed with that letter stated in pertinent part:

f)  the CTC and the DIBC on July 14, 2004 made a "Preliminary Review Permit Application" for twinning of the Ambassador Bridge which application indicates the second bridge would be served by an expanded plaza on the Canadian side . . . which is the subject of the site plan approval application; and

g)  City Council has previously expressed its concern about the twinning of the Ambassador Bridge at the location proposed because it will exacerbate the substantial pollution and safety problems being caused by international truck traffic infiltrating core residential, institutional and business areas of the City; and

1.  The developers will . . . submit a . . . modified application . . . [that]
    (i)  eliminates from the proposed development the north-western portion of the area now labelled "Bridge Deck Extension", i.e., that area which would only be required in connection with a second bridge crossing;

3.  The developers
    (a)     acknowledge their expenditure of money in connection with this development is at their risk having regard to the current position of the City as opposed to a second bridge at this location;
                                    * * *
    (c)     agree that should [they] in [sic] future proceed with an application to construct a second or twinned bridge in this location they will provide an environmental impact assessment which consider the project to be assessed as the proposed bridge and any associated road, road widenings, closings, approaches, buildings, plaza, inspection or other facilities and structures required for the working of traffic to from and over the bridge.

(Pls.' Ex. 127; Defs.' Ex. 503 (emphasis added); Estrin, 2/3/09, 104-106).

31.     Stamper received and understood this draft agreement in September 2004:

**Q.** Okay.  If you look down at Number 3(a) on Page 3, and 3(a) of Mr. Estrin's draft agreement says: "The developers (a) acknowledge their expenditure of money in connection with this development is at their risk having regard

14

      to the current position of the City as opposed to a second bridge at this location."

**A.** That's what it says, yes.

**Q.** Okay. Certainly when you read 3(a) you understood that the City was opposed to the second span, correct?

**A.** I understand the language that he used says that, yes.

\*   \*   \*

**Q.** Mr. Estrin of the Gowling firm was representing the City of Windsor in connection with its opposition to the second span of the Ambassador Bridge, correct?

**A.** I would read that into the paragraph you are talking about, yes.

(Stamper, 1/30/09, 79-80).

     32.     Estrin's letter and draft agreement led Stamper to contact the office of the Mayor of Windsor to complain about it. (Defs.' Ex. 519). This resulted in a face-to-face meeting between Estrin and Stamper at CenTra's office on September 30, 2004. At the meeting, Estrin expressly reiterated that Windsor was opposed to CenTra's plan to build the Second Span. (Estrin, 2/3/09, 112-14). Stamper admits that Estrin said Windsor was opposed to the Bridge Deck Extension and that Windsor did not want its actions to be construed in any way as an approval by Windsor of the Second Span. (Stamper, 1/30/09, 87-88). The meeting with Estrin then became so heated that the CenTra representatives, including Stamper, temporarily left the conference room. (Stamper, 1/30/09, 89; Estrin, 2/3/09, 112-14).

     33.     The meeting ended without an agreement, but negotiations between Estrin and CenTra's lawyers continued. (Stamper, 1/30/09, 89; Estrin, 2/3/09, 114, 116). The final Site Plan Agreement, completed in February 2005, expressly reserves Windsor's rights to object to CenTra's plan to twin the bridge as proposed in the Second Span Permit Application. (Defs.' Ex. 504, ¶S-21; Estrin, 2/12/09, 14-15).

15

34.     Neither Stamper nor CenTra objected at any point in this process that Gowlings had any conflict of interest because Gowlings had represented CenTra in the 1980's and 1990's on any related matters.  (Stamper, 1/30/09, 75-76; Estrin, 2/3/09, 108, 115-16).

35.     The combination of CenTra's Second Span Permit Application and the site plan caused Estrin and Windsor to conclude, rightly or wrongly, that a portion of the site plan improvements, referred to as the Bridge Deck Extension, had no other purpose but to connect to and receive the Second Span.   In Windsor's view, the two were entirely entangled. (Wilkki, 1/14/09, 104, 120-124; Estrin, 2/3/09, 90-98, 100-02; Defs.' Exs. 518, p. 26; 522A; 584, pp. 10, 11, 13, 14, 23; Stamper, 1/30/09, 54-56, 64, 69-70; Estrin, 2/12/09, 16-24; 2/3/09, 90-102).   In CenTra's view, CenTra did not seek Windsor's endorsement for the Second Span, and the two were not related.  (Stamper, 1/29/09, 77, 89; 1/30/09, 9, 11).

36.     Whether Windsor was right or wrong makes no difference to the issues in this case.  What matters is that the Second Span Permit Application and the site plan caused Windsor and Estrin to raise in writing and orally to CenTra, and to Stamper specifically, an objection and opposition to CenTra's plan to build the Second Span, and specifically to the Second Span Permit Application and environmental impact assessment issues.   (Tr., 1/14/09, 104-05; Pls.' Ex. 127; Defs.' Ex. 503).

37.     In addition, Stamper's and CenTra's adversity to Estrin and Gowlings, on Windsor's behalf, continued before, during and after CenTra hired Hill (June 2005) and Wach (November 2005) of Gowlings.  For instance, the OPA 43 proceeding was litigation in which Windsor, represented by Estrin, was adverse to CenTra concerning the expansion of the Ambassador Bridge.  This proceeding began in 2004 and continued through 2007.

(Estrin, 2/3/09, 85-91). Stamper was receiving reports and input from CenTra's lawyer, Paroian, on the matter throughout. (Defs.' Ex. 507, pp. 34, 37, 41, 45, 48-50). During the OPA proceeding, in July 2006, and during the period Hill and Wach were also working for CenTra, Paroian testified on CenTra's behalf that Windsor was publicly on record as opposing the expansion or twinning of the Ambassador Bridge and that Windsor was a competitor of the bridge. (Defs.' Ex. 507, p. 11, ¶¶ 24, 25). Paroian's testimony on CenTra's behalf was at the same time that Estrin and Gowlings were representing Windsor. (Defs.' Ex. 507, pp. 5-13, Paroian Affidavit). On Windsor's behalf, Estrin had also sent a letter to the U.S. Coast Guard on November 11, 2004, opposing the Second Span Permit Application, which generally raised the same issues that Estrin again raised in his September 2006 letter to the Coast Guard. (Defs.' Ex. 571; Estrin, 2/3/09, 107).

**F.   CenTra's Retention of Hill and Wach**

38.   From 1989 to 2005, Dale Hill worked as a tax professional (not a lawyer) for the Canadian Revenue Agency, the Canadian equivalent of the I.R.S. (Hill, 2/17/09, 113-117). Mr. Hill's expertise is in an area called "transfer pricing," which involves the allocation of revenues to U.S. and Canadian taxing authorities. (Hill, 2/17/09; 116). In the case of CenTra, transfer pricing concerns revenues generated by tolls on the Ambassador Bridge, and how much of those tolls should be allocated to U.S. and Canadian business respectively. (Hill, 2/17/09, 116).

39.   By all accounts, Mr. Hill is Canada's leading expert on transfer pricing issues. (Calderone, 1/13/09, 39-40). Prior to 2005, he was the Canadian Revenue Authority ("CRA") representative assigned to CenTra Ambassador Bridge matters. (Hill, 2/17/09; 117-118). His primary contact at CenTra was Fred Calderone. (Hill, 2/17/09; 118).

17

40.     In May of 2005, Mr. Hill informed Mr. Calderone that he was leaving the CRA to join the Gowlings firm in private practice. (Hill, 2/17/09; 118). Mr. Hill and Mr. Calderone then discussed whether Mr. Hill might be able to represent CenTra in transfer pricing matters after joining Gowlings. (Hill, 2/17/09; 119-120).

41.     In June, 2005, CenTra engaged Gowlings for transfer pricing work. Stamper mentioned to Hill that CenTra had previously retained Gowlings many years earlier. (Hill, 2/17/09, 121-122). Calderone discussed the retention of Hill with Stamper, and Matty Moroun approved Hill's retention. (Calderone, 1/13/09, 36-37; Stamper, 1/30/09, 93-94). At the time of the initial discussions with Hill, Stamper admits knowing that Estrin was representing Windsor adverse to CTC on the OPA 43 matter. (Stamper, 1/30/09, 95). This did not bother Stamper because he believed it would be a real coup to retain Hill since Hill had just been working for the CRA on CenTra's matter. (Stamper, 1/30/09, 97-98; Hill, 2/17/09, 113-17). As Calderone testified, "[T]here are other good [transfer pricing] professionals out there, but I don't think I found anybody that I would compare to Dale Hill." (Calderone, 1/13/09, 40). These discussions of hiring Hill occurred only 3-4 months after CenTra and Estrin completed the Site Plan Agreement in which Windsor again noted its objection to the Second Span. (Defs.' Ex. 504, ¶S-21).

42.     Hill prepared and himself hand delivered a draft Gowlings' engagement letter addressed to Stamper, with whom Hill at that time had specific discussions about the letter's payment arrangements. (Pls.' Ex. 130; Hill, 2/17/09, 122-23, 129-30; 2/18/09, 10-11). Stamper could not recall his involvement with the terms of the engagement letter (Stamper, 1/29/09, 102-21), although Hill contradicts this. Hill testified that he had specific telephone conversations and face-to-face meetings with Stamper and Calderone about

18

being engaged and about the terms of the engagement of Gowlings. (Hill, 2/17/09, 122-31; 2/18/09, 10-11).

43.   In July 2005, Calderone requested from Hill three changes to the draft engagement letter.  Hill could agree to two of the changes, which involved payment arrangements.  Hill could not agree to Calderone's third request, which involved changes to the waiver of Gowlings' conflict of interest provisions in the engagement letter.  The letter provided:

**Conflicts of Interest**

We wish to avoid any circumstance in which you would regard our representation of another client to be inconsistent with our duties to and understandings with you.  Because we represent a large number of clients in a wide variety of matters around the world, it is possible that we will be asked to represent a client whose interests are directly adverse to your immediate interests on other matters.

In that event, we will not undertake any representation directly adverse to your immediate interests if the subject of the other representation is related to the matter in which we currently represent you.  However, if the subject of the other representation is unrelated to the matter in which we currently represent you, we will be free to undertake such an unrelated adverse representation without obtaining further consent from you at that time provided that:

    (a)    we do not have any information that is confidential from you from this engagement that could be used to your disadvantage in the unrelated matter;

    (b)    those in this Firm acting on the other matter are effectively screened from involvement in your matter, and

    (c)    our other client has consented to our continued representation of you.

By accepting these terms of engagement, you are consenting to, and waiving any right you may have to object to, our representation of another client whose interests are directly adverse to your immediate interests in a matter unrelated to this engagement.

(Pls.' Ex. 130, p. 3). Hill had no authority from Gowlings to alter those conflict provisions, and he communicated that to Calderone. (Calderone, 1/13/09, 47-50; Hill, 2/17/09, 127). CenTra still retained Hill and Gowlings knowing that. (Hill, 2/17/09, 125-31; 2/18/09, 10-13; Pls.' Ex. 130A). The draft engagement letter was never revised or signed by the parties, although Stamper received it. (Stamper, 1/29/09, 120-21; Hill, 2/17/09, 124-28; Pls.' Exs. 130, 130A).

44.     Hill undertook private work on transfer pricing matters for CenTra in the summer of 2005, culminating in a final submission to the CRA on September 26, 2006, for the years 2001-2003. (Defs.' Ex. 535).

45.     It is undisputed that the work of Hill and Gowlings concerning the transfer pricing matters is not related to the Second Span or to Estrin's work for Windsor concerning the Second Span. (Calderone, 1/13/09, 103, 149-50; Hill, 2/17/09, 138, 142-43, 204).

46.     At around the same time that CenTra engaged Dale Hill, Calderone and Stamper became aware that an opportunity existed for leveraging existing assets for infrastructure projects. (Calderone, 1/13/09, 52-56). To take advantage of this opportunity, it was necessary for CenTra to undertake some corporate restructuring. In November 2005, Stamper and Calderone asked Hill if there was someone at Gowlings who could assist with tax issues pertaining to CenTra's corporate reorganization. (Hill, 2/17/09, 154). Calderone discussed with Stamper using Gowlings for this work. (Calderone, 1/13/09, 106). An initial meeting then occurred at CenTra attended by Hill, Calderone, CenTra's accountants from Deloitte, and Gowlings attorney Tim Wach. Stamper was briefly at the meeting. (Hill, 2/17/09, 154-55). Calderone's notes of the meeting indicate that a potential bond financing was discussed, although the specific use of the bond proceeds was not

20

mentioned other than for capital improvements generally.  (Calderone, 1/13/09, 114-16, 164-67).

47.     The reorganization involved one of CenTra's entities needing to be bankruptcy remote.  That means the entity would only own the existing Ambassador Bridge and not other assets.  So, if and when borrowing ever occurred, the security for the borrowing would only be the assets of this bankruptcy-remote entity, and none of the extraneous assets, such as land near the bridge, would be impacted by or could impact the borrowing. This reorganization process would require assets to be transferred from one CenTra entity to another.  Ordinarily, a transfer of an asset between related entities triggers a tax liability. Wach was retained by CenTra to minimize Canadian tax liability and defer Canadian tax gains as a result of these transfers by obtaining favorable tax revenue rulings from the CRA for the proposed transfers.  (Wach, 2/24/09, 12-18; Calderone, 1/13/09, 113).  Gowlings was not bond counsel for CenTra.  (Hill, 2/17/09, 158; Wach, 2/24/09, 15-16).  Bond work, which was intended to raise money for various capital improvements, was undertaken by the Canadian law firm Lang Michener, whereas Wach's responsibility was for the tax consequences of the corporate restructuring.  (Wach, 2/24/09, 58-59).

48.     To draft the revenue ruling requests and obtain this positive tax treatment for CenTra, Wach needed to advise the CRA that the proceeds of the borrowing would be used for a business purpose.  The particular business purpose was irrelevant to Wach's work.  (Hill, 2/17/09, 162-63; Wach, 2/24/09, 18-25).  Wach worked on the tax matters from November 2005 into late April 2006, when he sent a draft of one of the revenue rulings to Calderone.  In the draft, Wach stated that: "DIBC and CTC require funds for capital expenditures and related projects in connection with the Ambassador Bridge as well as for

21

general corporate purposes within the CenTra Group [**expand on non-tax reasons for the borrowing**]"; and "[**DIBC will use the funds received for general corporate purposes and we need good, strong business uses for the funds to support our interest deductibility arguments—do we have a detailed plan for the use of the funds?**]" (Defs.' Ex. 534, 5,8; GLHCTC 533, 536 (emphasis in original); Wach, 2/24/09, 18-25).

49.    The actual terms or process of pursuing any bonds was also at that time not known by anyone.  Calderone expressed concern to Wach about CenTra's inability to convey even basic details concerning the terms of the bonds to the CRA and whether that would impact the revenue ruling request.  (Defs.' Ex. 534, cover e-mail; Wach, 2/24/09, 78-80).

50.    As for the potential business purposes for which the proceeds of these potential bonds might be used, in May 2006, Calderone provided several possibilities: general corporate purposes, capital improvements, more competitive toll structures, building a bridge in Buffalo/Fort Erie, building a bridge to Harsens Island, and building a companion or replacement for the Ambassador Bridge.  (Defs.' Ex. 534, pp. 14-15; GLHCTC 542-43; Hill, 2/17/09, 161-62; Wach, 2/24/09, 18-25).  While there may have been some discussion with Wach prior to May 2006 about potentially replacing the Ambassador Bridge, this particular use or any of the particular uses of the funds proposed by Calderone were irrelevant to Wach and his tax work as long as they were for business purposes—which they all were, and any one of which would have sufficed.  (Hill, 2/17/09, 161-62; Wach, 2/24/09, 18-25, 62-64, 69, 71).  Calderone testified that there was significant uncertainty as to what use the funds might be put.  (Calderone, 1/13/09, 153, 158).

51.     The final revenue ruling requests submitted in October and November 2006 by Wach to the CRA listed the following potential uses for the funds:  capital expenditures and related projects in connection with the Ambassador Bridge as well as for general corporate purposes within the CenTra Group; building a second span, or alternatively building an additional international crossing in the Detroit-Windsor area; building a bridge in Buffalo/Fort Erie; and building a bridge to Harsens Island.  (Hill, 2/17/09, 151, 164-66; Wach, 2/24/09, 25-31).

52.     If the Second Span was never built or approved, it would not have made any difference to Wach or to the work he and Gowlings were doing for CenTra.  (Hill, 2/17/09, 151-53, 162-68; Wach, 2/24/09, 25-31).  Calderone concedes that Wach's tax work on the restructuring was required regardless of the use of the proceeds because the bankruptcy-remote structure was required to facilitate any proposed borrowing by CenTra.  (Calderone, 1/13/09, 123).  None of the work of Hill or Wach had anything to do with Windsor or the U.S. Coast Guard.  (Calderone, 1/13/09, 150, 154, 158; Wach, 2/24/09, 28; Hill, 2/17/09, 132, 142-43).

53.     None of the substantive work done by Wach, Hill, and Gowlings for CenTra related to: the Second Span; whether the approvals for the Second Span would ever be obtained; whether the Second Span would ever be built; or the work Estrin was doing for Windsor adverse to the Second Span or otherwise.  (Hill, 2/17/09, 151-53, 162-68; Wach, 2/24/09, 32, 34, 49-51).

54.     Moreover, the record here shows that none of the information provided to Hill or Wach by CenTra would be relevant or useful to Estrin in his and Gowlings' representation of Windsor adverse to the Second Span or otherwise.  (Calderone, 1/13/09,

150, 154, 158).  Calderone did not see any information in Estrin's September 14, 2006 letter to the Coast Guard that had been provided to Hill or Wach.  (Calderone, 1/13/09, 161).  Stamper testified that he was "not aware that any [confidential] information did or did not go to Mr. Estrin."  (Stamper, 1/30/09, 152).

55.    At no time was Gowlings' work or the independence and judgment of Hill and Wach for CenTra impacted by Estrin's work for Windsor, or vice-versa.  (Calderone, 1/13/09, 160-61; Hill, 2/17/09, 147, 175, 189-90; Wach, 2/24/09, 34-35).  Calderone, in particular, and CenTra were very pleased with Gowlings' work on CenTra's behalf throughout.  (Calderone, 1/13/09, 160-61).

56.    In addition, it is undisputed that Hill's and Wach's ultimate letters to the CRA on the transfer pricing and reorganization matters were approved by CenTra and sent in September, October and November 2006, after CenTra complained about Estrin's representation of Windsor adverse to the Second Span.  (Stamper, 1/30/09, 152-53; Calderone, 1/13/09, 147-56; Hill, 2/17/09, 143; Wach, 2/24/09, 25-31).  If Gowlings' representation of Windsor adverse to the Second Span was harmful to CenTra in connection with Gowlings' work for CenTra on the transfer pricing and reorganization matters, then CenTra would and should have stopped sharing information with Hill and Wach and not authorized them to send those letters to the CRA.  There was no deadline for sending the letters, and someone other than Gowlings could have signed and sent the letters to the CRA.  (Calderone, 1/13/09, 159; Hill, 2/17/09, 147-53, 164-66; Wach, 2/24/09, 25-31).

## G.    Estrin's Letter to the Coast Guard

24

57.     On September 14, 2006, Estrin submitted a letter on Windsor's behalf to the U.S. Coast Guard detailing numerous reasons why Windsor believed the U.S. Coast Guard should require an environmental assessment in connection with CenTra's Second Span Permit Application.  This is the same position and subject that Estrin wrote to Stamper about in September 2004, in the draft Site Plan Agreement.  (Pls.' Ex. 127; Defs.' Ex. 503, ¶f, 3c).  The historical records relating to the existing Ambassador Bridge attached to Estrin's 2006 letter were obtained by Estrin through an independent research archivist. (Defs.' Ex. 512; Estrin, 2/12/09, 57-60).

58.     Within approximately one week of September 14, 2006, CenTra obtained a copy of Estrin's letter and raised with Hill and Wach a complaint that Gowlings had a conflict of interest since it was already representing CenTra.  At that time, Estrin was unaware that Hill and Wach were representing CenTra.  (Estrin, 2/3/09, 34-39).  Likewise, Hill and Wach were unaware that Estrin was representing Windsor adverse to CenTra. (Wach, 2/24/09, 32-38).  Hill had never even heard of Estrin and had not met him.  Wach knew Estrin was a partner at Gowlings but had had no professional contact with him.  (Hill, 2/17/09, 170-77; Wach, 2/24/09, 34-38).

59.     None of the testimony or exhibits suggested that Estrin, Hill or Wach (or any other Gowlings professionals) exchanged confidential information.  To the contrary, the witnesses all testified that they were unaware of the work being done for the other party; in essence, this created a de facto screen.  (Wach, 2/17/09, 170-77).  Shortly after CenTra raised its complaint of an alleged conflict, Gowlings put in place a formal screen implementing numerous physical, computerized and other measures to prevent disclosure or use of any of CenTra's confidential information to Windsor and vice-versa.  (Defs.' Exs.

25

513, 532, 533).  There is no evidence that the de facto or later formal screen has ever been violated by anyone at Gowlings.

60.     CenTra filed this lawsuit on November 21, 2006, after which Gowlings withdrew from representing CenTra and orderly and timely transferred its active file to new counsel retained by CenTra.  (Jolliffe, 2/20/09, 23; Wach, 2/24/09, 34-35).  Gowlings continued and continues today to represent Windsor adverse to CenTra on the Second Span.  After this case was filed by CenTra, summary judgment was granted in favor of Gowlings.  After the case had been dismissed and pending its appeal, Estrin, on Windsor's behalf, sent a letter on June 6, 2007 to the Michigan Strategic Fund ("MSF") detailing the approvals still required by CenTra, in Windsor's view, for the Second Span.  (Pls.' Ex. 10).  Estrin's letter essentially repeats the same position and bases asserted in a June 1, 2007 letter sent by Transport Canada to the MSF before Estrin sent his letter.  (Defs.' Ex. 579; Estrin, 2/12/09, 45-48; Moran, 2/17/09, 103-04).

61.     The U.S. Coast Guard ultimately required CenTra to provide the environmental assessment that Estrin had requested.  CenTra concedes, however, that the environmental assessment was not required due to Estrin, but rather for other reasons unrelated to Estrin. (Defs.' Ex. 526; Stamper, 1/30/09, 158-59, 166-68).

62.     CenTra did not seek to disqualify, or to enjoin, Gowlings from representing Windsor until April 2007, five months after CenTra filed suit and seven months after it first raised Estrin's representation of Windsor.

## III.   CONCLUSIONS OF LAW

In deciding whether to grant a preliminary injunction, a district court must consider: "(i) whether the movant is likely to succeed on the merits; (ii) whether the movant will suffer

irreparable injury in the absence of an injunction; (iii) whether the injunction will cause substantial harm to others; and (iv) whether the injunction would serve the public interest." *Capobianco v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004). "'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations omitted) (emphasis in original); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

## A.   Choice of Law

CenTra alleges that Gowlings breached its contractual obligations by failing to represent CenTra zealously and by its use of CenTra's confidential information. (First Am. Compl. ¶¶ 41, 43, 44). CenTra further alleges that Gowlings breached its fiduciary duties and committed legal malpractice. These claims are "factually premised upon a conflict of interest" between Gowlings' representation of CenTra and its representation of Windsor and upon Gowlings' "failure 'to act as a reasonable attorney would have acted.'" *CenTra, Inc. v. Estrin*, 538 F.3d 402, 411 (6th Cir. 2008) (quoting First Am. Compl. ¶ 56). The applicable rules of professional responsibility provide evidence of the standard of care and, as such, are "probative and instructive for the instant case." *Id.* at 410.

Thus, as a threshold matter, the Court must determine whether The Law Society of Upper Canada's ("Ontario's") Rules of Professional Conduct or Michigan Rules of Professional Conduct provide evidence of the standard of care applicable to Gowlings' conduct. As a federal court sitting in diversity, the Court applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Michigan's choice-of-law rules dictates that the Court "apply Michigan law unless a 'rational

27

reason' to do otherwise exists." *Sutherland v. Kennington Truck Serv., Inc.*, 562 N.W.2d 466, 286 (Mich. 1997). We undertake a two-step inquiry to determine whether there is a rational reason to displace Michigan law in this case:

> First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

*Id.* While this analysis "most frequently favors the forum (Michigan's) law, Michigan courts nonetheless use another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter." *Hall v. Gen. Motors, Corp.*, 582 N.W.2d 866, 585 (Mich. Ct. App. 1998).[4]

Canada has a significant interest in having this Court apply its rules of professional responsibility, which outweighs Michigan's minimal interest. Estrin is licensed to practice law by The Law Society of Upper Canada, and not by the state of Michigan. (Estrin, 2/3/09, 45). In fact, Gowlings has no offices in the United States, and none of Gowlings' attorneys are licensed to practice law in Michigan. (Estrin, 2/3/09, 44; Jolliffe, 2/20/09, 6). The draft engagement letter between Gowlings and CTC was limited to dealing with CTC's tax issues, and the Wach retainer was to obtain advance tax rulings from the CRA. (Pls.' Ex. 103). Both of these retainers involved Canadian law and taxpayers. Similarly, the FIRA litigation involved litigation in Canadian courts opposing the Canadian government under

---

[4] Both parties have applied Michigan's tort choice-of-law rule even though CenTra has also alleged a breach of contract. Because there is nothing to suggest that application of Michigan's contract choice-of-law rule would yield a different result, the Court applies the rule applicable to tort claims.

Canadian law.  Moreover, CenTra seeks to enjoin a Canadian lawyer and law firm from representing a Canadian city on a matter affecting Canadian citizens.

Michigan's only connection to this suit is Plaintiff's residency and the fact that David Estrin sent one letter to the Michigan Strategic Fund after this Court granted summary judgment.  (Pls.' Ex. 10).[5]  That CenTra is a Michigan corporation does not mandate the application of Michigan rules of professional conduct.  *See Sutherland*, 562 N.W.2d at 287 (noting that "the plaintiff's residence, with nothing more, is insufficient to support the choice of a state's law").  And the one letter sent to a Michigan agency by a Canadian attorney representing a Canadian city pales in comparison to Canada's significant connections to the lawsuit.

Federal courts that have conducted choice-of-law analysis under similar circumstances have also applied the professional-conduct standards of the state in which the attorney defendant is licensed to practice.  *See, e.g.*, *Huber v. Taylor*, 469 F.3d 67, 79 (3d Cir. 2006); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 178 F.Supp.2d 9, 18-19 (D. Mass. 2001); *White Consol. Indus., Inc. v. Island Kitchens*, 884 F.Supp. 176,  179-80 (E.D. Pa. 1995); *Glenwood Farms, Inc. v. Ivey*, No. 03-CV-217-P-S, 2006 WL 521852, *1 (D. Me Mar. 2, 2006); *see also* MacKenzie, 2/18/09, 35-36, 42-43, 165 (testifying that Canadian rules of professional conduct apply to Gowlings' representation

---

[5]  Estrin's letter to the Coast Guard in Cleveland, Ohio does not establish a contact with Michigan.

of CenTra); Wolfram, 2/20/09, 90, 124 (same).[6]  To the extent there is a conflict, Canadian

rules of professional conduct provide evidence of the standard of care.[7]

## B.   Likelihood of Success on the Merits

The Court begins by assessing whether CenTra has shown that it is likely to prevail

at trial on its breach of contract, breach of fiduciary duty, and legal malpractice claims.  In

order to determine whether CenTra has met its burden on this factor, the Court addresses

CenTra's four specific allegations.

### 1.   Claim that Defendants Breached Fiduciary and Contractual Obligations by Conducting Faulty Conflict Checks

CenTra argues that it will prevail at trial because Gowlings did not perform proper

conflict checks prior to accepting retainers involving border-crossing issues.  In support,

CenTra presented evidence of David Estrin's lapses.  For example, when Estrin began

work for Windsor on border crossing issues in late 2002, he failed to include "CenTra,"

"DIBC," or "CTC" in his conflict search.  (Estrin, 2/2/09, 25).  And when Estrin began work

on the Peace Bridge matter in May of 2003, he discovered that the Ambassador Bridge had

been a former client of Gowlings but did not inquire further as to the nature or scope of the

earlier representation.  (Estrin, 2/2/09, 29-35).  CenTra may be able to convince a jury that

---

[6]  Plaintiffs rely on the Sixth Circuit's statement that "[u]nder similar circumstances we have applied the forum state's professional-conduct standards in a diversity-based malpractice action."  *Centra*, 538 F.3d at 409.  But the Sixth Circuit relied for that proposition on *Woodruff v. Tomlin*, 616 F.2d 924, 935-36 (6th Cir. 1980) (en banc), which was a diversity-based malpractice case in which the forum state *was also* the state in which the attorney defendant was licensed to practice.  *See id.* at 931 (explaining that *plaintiffs* were from out of state).

[7]  The outcome of this preliminary injunction proceeding would be the same under both Michigan and Canadian rules.  The Court cites cases interpreting both sets of rules when they do not conflict.

oversights such as these constitute an actionable breach of fiduciary duty or contract. (Mackenzie, 2/18/2009, 99-102).

### 2. Claim that Defendants Breached Duty Not to Attack Own Work

CenTra alleges that Gowlings breached its fiduciary obligations by undercutting the legal opinions it provided CenTra in the 1980's.  Specifically, CenTra contends that Gowlings opined to Plaintiffs that CTC was a "federal undertaking," not subject to Canadian provincial and municipal regulation, but now argues to the United States Coast Guard that CTC may not build the Second Span without Windsor's approval.  CenTra is unlikely to prevail on this claim.

First, the only evidence offered to support CenTra's claim is a letter sent by Emilio Binavince of Gowlings to CenTra in December of 1986.  (Pls.' Ex. 141).  While the letter opines that CTC is not subject to regulation by Windsor as a result of its operation of the Canadian portion of the Ambassador Bridge or collection of tolls, it does not address Windsor's authority over a second span.  (Pls.' Ex. 141; Binavince, 1/12/09, 173).  In fact, CenTra was not contemplating a second span of the Ambassador Bridge in 1986. (Stamper, 1/29/09, 22-23, 42, 44, 138; 1/30/09, 145).

Second, even if Gowlings were now advocating a legal position that differs from an opinion it gave CenTra in the 1980's, this would not constitute a breach of loyalty. (Wolfram, 2/20/09, 96-97).  In *In Re Credit Suisse First Boston Can., Inc.*, [2004] 2 B.L.R. 109, a firm was found to have breached its duty of loyalty to its former client, the Toronto Stock Exchange, for whom it had created a new regulatory entity, when it later challenged the authority of that entity.  *Id.* at ¶¶ 7, 70, 136.  But attacking the very legitimacy of an entity that an attorney helped create is "very different from a law firm giving opinions that

31

are different from each other many years apart." (Mackenzie, 2/18/09, 106-07; *see also* Wolfram, 2/20/09, 96-98).

### 3. Claim that Defendants Breached Fiduciary and Contractual Obligations by Engaging in Representation that Violated Current Client Conflict Rules

Under the Ontario and Michigan Rules of Professional Conduct, a lawyer may not, absent consent, represent two current clients with adverse interests, even if the clients' matters are unrelated. *R. v. Neil*, [2002] 3 S.C.R. 631, at ¶29; Mich. R. Prof'l Conduct R. 1.7 & Comment ¶3; MacKenzie, 2/18/09, 44-46; Wolfram, 2/20/09, 102; Hay, 1/12/09, 84-85; *see also Neil,* at ¶17 ("[T]he duty of loyalty to current clients includes a much broader principle of avoidance of conflicts of interest, in which confidential information may or may not play a role.").

From June 2005 until December 2006, Gowlings represented both Plaintiffs and Windsor. (Hill, 2/17/09, 125; Estrin, 2/3/09, 13). Dale Hill and Timothy Wach of Gowlings provided transfer pricing and tax services to CenTra while David Estrin represented Windsor in its opposition to the Second Span. Although it does not appear that Wach's corporate restructuring work was specific to the twinning of the Ambassador Bridge, Estrin's work was directly adverse to Plaintiffs' interests, and Plaintiffs never expressly consented. (Estrin, 2/12/09, 108; Mackenzie, 2/18/09, 112). Therefore, Plaintiffs will likely prevail on this claim at trial absent a finding of implied consent.[8]

---

[8] Plaintiffs argue that because the matters for which Gowlings was retained by CenTra and Windsor were diametrically opposed, it was a nonconsentable conflict. But under the Ontario and Michigan rules, almost all conflicts are consentable, and Plaintiffs' and Defendants' experts agreed that this was no exception. (Hay, 1/12/09, 85-86; MacKenzie, 2/18/09, 44-48; Wolfram, 2/20/09, 105-06).

"In exceptional cases, consent of the client may be inferred" by a client's failure to object despite knowledge of the dual representation.  *Neil*, at ¶ 28; Mackenzie, 2/18/09, 133.  A client may only give implied consent to a current client conflict after being provided "information sufficient to allow the client to determine whether or not to consent."  Wolfram, 2/20/09, 109; s*ee also Restatement (Third) of the Law Governing Law.* §122(1) (2000) ("[i]nformed consent requires that the client or former client have reasonably adequate information about the material risks" of the conflicted representation).   "The more sophisticated the client, the more readily the inference of implied consent may be drawn." *Canada, Inc. v. Strother*, [2007] 2 S.C.R. 177, at ¶55; *see also* ABA Model Rules of Prof'l Conduct R. 1.7, Comment 22; Model R. 1.0(e); Hay, 1/12/09, 65-66, 82-83; MacKenzie, 2/18/09, 48-49, 127-30; Wolfram, 2/20/09, 105-10; *cf. Alberta Union of Provincial Employees v. United Nurses of Alberta Local 168*, 2009 ABCA 33, ¶36.  Whether implied consent is found varies greatly with the facts and circumstances of each case.  (Hay, 1/12/09, 77; MacKenzie, 2/18/09, 48, 52, 56, 109-15; Wolfram, 2/20/09, 90-93, 102-10), and has been found in non-litigation settings.  *See, e.g.*, Famous *Players Dev. Corp. v. Capitol Life Ins.*, [1996] 17 O.T.C. 362, at ¶¶ 87-89 (finding implied consent when client knew of attorney's representation of competitor; "should have appreciated the risk"; but did not object); *In re Ferrante*, 126 B.R. 642, 649 (Bankr. D. Me. 1991) (finding implied consent to attorney's work on transaction for creditor against debtor where debtor had "been in a position to be aware of the conflict, to appreciate it and to invoke the rules for his protection" for two years).

There is much evidence from which a jury may conclude that CenTra's retention of Hill and Wach constituted implied consent to the current client conflict.  *See supra* ¶¶'s 22-

33

38, 42.  This is because many of the facts found above suggest that, in 2005, CenTra was aware that Estrin represented Windsor in opposition to the Second Span.  These facts include: Estrin's representation of Windsor since 2002 on many highly publicized border crossing issues; media reports of Estrin's representation of Windsor coupled with CenTra's monitoring of news concerning the Ambassador Bridge; Stamper's awareness in 2004 of Windsor's adversity to CenTra and Estrin's representation of Windsor on various international trucking disputes; the draft site plan agreement for the plaza on the Canadian side of the Ambassador Bridge that Estrin sent to Stamper in September 2004, in which he refers to Windsor's opposition to the twinning of the Ambassador Bridge; the face-to-face meeting between Estrin and Stamper at CenTra's office a few weeks later in which Estrin explicitly stated Windsor's opposition to the Second Span; Estrin's November 2004 letter to the U.S. Coast Guard on Windsor's behalf opposing the Second Span; and Stamper's knowledge in 2005 that Estrin was representing Windsor adverse to CTC on the OPA 43 matter.

Moreover, there is no question but that CenTra — a corporation employing attorneys throughout the United States and Canada — is a sophisticated client, capable of giving implied consent.  *See Famous Players*, at ¶¶88, 90 (finding implied consent where "sophisticated" client "should have appreciated the risk of [attorney] acting for [competitor]"); *cf. Fisons Corp. v. Atochem N. Am., Inc.*, No. 90 Civ. 1080, 1990 WL 180551, *5-6 (S.D.N.Y. Nov. 14, 1990) (finding law firm's disclosure to "knowledgeable and sophisticated client" that it represented another client with adverse interests "adequate").

Despite the evidence suggesting CenTra's awareness of the conflict, the Court declines to find implied consent as a matter of law.  The "affirmative duty" of identifying a

34

conflict "rests not with [the clients] but with [the attorneys]," and genuine issues of material fact remain as to whether CenTra and Stamper's knowledge of the underlying facts are sufficient to satisfy this duty. *Ransburg Corp. v. Champion Spark Plug Co.*, 648 F.Supp.1040, 1046 (N.D. Ill. 1986) (finding no implied consent based on allusions to dual representation in "passing conversations at cocktail parties and in hallways"); s*ee also Unified Sewerage Agency v. Jelcro, Inc.*, 646 F.2d 1339, 1345-46, 1352 (9th Cir. 1981) (finding informed consent because client continued representation after being twice alerted of conflict by attorney); *IBM Corp. v. Levin*, 579 F.2d 271, 282 (2d Cir. 1978) (noting that "[f]ull and effective disclosure of all the relevant facts must be made [by the attorney] and brought home to the prospective client").

### 4. Claim that Defendants Breached Fiduciary Duty by Engaging in Representation that Violated Former Client Conflict Rules

CenTra alleges that Gowlings has breached its fiduciary obligations to CenTra, as its former counsel.  Specifically, CenTra contends that because it retained Gowlings in connection with the FIRA litigation in the 1980's and 1990's and for transfer pricing and tax work in 2005-2006, Gowlings was prohibited from subsequently representing Windsor in opposition to the Second Span.  For the reasons set forth below, CenTra has failed to show a strong likelihood of success on this claim.

#### a. Former Client Conflict Rule

Absent the former client's consent, an attorney generally may not represent a client in a case against a former client if the two matters are sufficiently or substantially related or if confidential information was received by the attorney from the former client that would be relevant to the new matter.  Ontario Rules of Prof'l Conduct R. 2.04(4); Mich. Rule of

35

Prof'l Conduct R. 1.9(a); ABA Model Rule of Prof'l Conduct R. 1.9(a) & Comment 3; MacKenzie, 2/18/09, 45-48; Wolfram, 2/20/09, 91-92; Hay, 1/12/09, 54. Whether matters are substantially related is a fact-intensive inquiry. (Wolfram, 2/20/09, 95). "[T]here should be compelling and cogent evidence which provides a sufficient connectiveness between the retainers." *Moffat v. Wetstein*, [1996] 29 O.R. (3d) 371, ¶101. For the retainers to be sufficiently related, it also must be "reasonably possible that the lawyer acquired confidential information pursuant to the first retainer that could be relevant to the current matter." *Chapters Inc. v. Davies, Ward & Beck LLP,* [2001], 52 O.R. (3d) 566, ¶30; *Alberta Union*, at ¶15, n. 42; Wolfram, 2/20/09, 93-94, Mackenzie, 2/18/09, 59-61, 158. The onus of proving that the two retainers are sufficiently related rests with the client asserting the conflict of interest. *Chapters*, at ¶29, *Moffat*, at ¶¶84, 101.

Under Ontario Rules of Professional Conduct, once the former client demonstrates a sufficient relationship between the former and current matters, "the court should infer that confidential information was imparted [by the former client] unless the [attorney] satisfies the court that no information was imparted which could be relevant [to the current representation]." *MacDonald Estate v. Martin*, [1991] 3 S.C.R. 1235, ¶49; *Moffat*, ¶84. The attorney bears "a heavy burden" in making this showing. *MacDonald Estate*, at ¶49; *see also Moffat*, ¶84.

The traditional American rule has been that once the client establishes a substantial relationship between the two matters, there is an *irrebuttable* presumption that relevant confidential information was imparted by the former client to his attorney. *MacDonald Estate*, at ¶¶25-26. The Sixth Circuit has suggested, however, that this presumption may be rebutted by "substantial probative, material evidence affirmatively showing that no

36

confidential disclosure in fact occurred." *City of Cleveland v. Cleveland Elec. Iluminating Comp.*, 440 F.Supp. 193, 209 (6th Cir. 1977) (attorney rebutted presumption that bond counsel received confidential information by showing that "the document composite of any proposed City bond issue is, by law, a matter of public record"). *But see In re Marks & Goergens, Inc.*, 199 B.R. 922, 925 (Bankr. E.D. Mich. 1996); *Anchor Packing Comp. v. Pro-Seal, Inc.*, 688 F.Supp. 1215, 1225 (E.D. Mich. 1988) (noting that "presumption should not be rebutted" "absent exceptional circumstances").

Under Ontario rules, if the former and current matters are substantially related and an attorney received confidential information from a former client that would be relevant in representing the current client, there is "a strong inference" that the attorneys who represented the former client share the confidential information with attorneys representing the current client. *MacDonald Estate*, at ¶50. This inference may be rebutted, however, "by clear and convincing evidence, that all reasonable measures have been taken to ensure that no disclosure will occur by the 'tainted' lawyer to the member or members of the firm who are engaged against the former client" and that the attorneys did not in fact share confidences. *Id.* at ¶51; *Alberta Union*, ¶41; Mackenzie, 2/18/09, 63-66, 70.

Under American rules, "where courts have found disclosure of information by the client to one member of a law firm, such knowledge has traditionally been imputed to all members of his firm." *City of Cleveland*, 440 F.Supp. at 209-10. But "recent prevailing legal precedent has rejected the harsh hard-line approach of irrebuttably imputing confidential disclosures, actual or presumed, received by one member of a law firm to all members of that law firm in favor of a more realistically equitable logic, attuned to contemporary legal practices common to emerging law firms of substantial size." *Id.* at

37

210; *see also Manning v. Waring, et. al.*, 849 F.2d 222, 225 (6th Cir. 1988) (firm may avoid disqualification by demonstrating that, due to effective screening measures, confidences have not been disclosed to other attorneys at firm); *Onebeacon Am. Ins. Co. v. Safeco Ins. Co.*, No. C-1-07-358, 2008 WL 4059836, *7 (S.D. Ohio Aug. 25, 2008).

### b. Alleged Violation of Former Client Conflict Rule

CenTra has failed to demonstrate that Henderson, Binavince, and Lunau's work for CenTra in the 1980's and 1990's is substantially related to Estrin's representation of Windsor in opposition to the Second Span.  (MacKenzie, 2/18/09, 62, 174; Wolfram, 2/20/09, 96, 98).  Neither the FIRA litigation nor the legal opinions that Gowlings provided related to the twinning of the Ambassador Bridge, which was not conceived as an idea until decades later.  (Lunau, 2/26/09, 9-10, 14-15; Binavince, 2/12/09, 157, 164-165, 173-174, 177; Stamper, 1/29/09, 22-23, 42, 44, 138; 1/30/09, 145).  That the FIRA litigation and legal opinions may have concerned the *existing* Ambassador Bridge does not establish "sufficient connectiveness" to Estrin's work on behalf of Windsor.  *Moffat*, ¶101; *see Quicken Loans v. Jolly*, No. 07-CV-13143, 2008 WL 2566373, *4 (E.D. Mich. June 24, 2008) (finding no substantial relationship between matters even though involved same piece of property); *S.D. Warren Co. v. Duff-Norton*, 302 F. Supp. 2d 762, 774 (W.D. Mich. 2004) (finding no substantial relationship between product liability suits against same manufacturer for fires caused by same type of equipment where factual circumstances surrounding incidents differed).

And while CenTra has implied that it imparted relevant confidential information to Henderson, Binavince, and Lunau, it has failed to show that this was "reasonably possible" and "not just theoretical."  *Chapters*, at ¶30; *see Satelitte Fin. Planning Corp. v. First Nat'l*

38

*Bank of Wilmington*, 652 F.Supp. 1281, 1284 (D. Del. 1987) (internal citation omitted) ("'court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which would be relevant to the present suit.'").  CenTra alludes to the Goodman memorandum but did not produce it or adequately demonstrate that it was likely to have contained relevant confidential information.  *See Moffat*, ¶102 (noting that while a former client need not "disclose the exact specifics of the confidential information it seeks to protect," "some particulars are warranted, given the remedy sought").

CenTra has also failed to demonstrate a substantial relationship between Estrin's representation of Windsor in opposition to the Second Span and Hill and Wach's transfer pricing and tax work.  (MacKenzie, 2/18/09, 62, 174; Wolfram, 2/20/09, 96, 98).  "When considering the nature and scope of the prior [retainer], courts 'should focus upon the reasons for the retention of counsel and the tasks which the attorney [or firm] was employed to perform.'"  *Integrated Health Servs. v. THCI Co. LLC*, 327 B.R. 200, 207 (D. Del. 2005) (internal citations omitted).  Hill's work concerned the allocation of revenues from the existing Ambassador Bridge to U.S. and Canadian taxing authorities and bore no relation to the Second Span. Wach's retainer was similarly narrow: to obtain favorable tax rulings from the CRA for proposed transfers of assets from one CenTra entity to another.

That Wach learned that one of several possible purposes of these transfers was bond financing for a Second Span does not render the work sufficiently related to Estrin's representation of Windsor.  *See Integrated Health Servs.*, 327 B.R. at 207, 209 (finding no substantial relationship between regulatory work and subsequent unrelated litigation, even though regulatory filings for former client required submission of general corporate

39

information); *Chapters*, ¶¶32-36 (finding matters sufficiently related because attorney "acquired a very significant amount of confidential information" about former client's strategic plans "likely to be part of the factual context directly informing" attorney's advice to current client).  Moreover, Wach's queries to Calderone in his draft revenue ruling, *see supra* ¶48, demonstrate that rather than Wach "hav[ing] free and unlimited access to all of the information surrounding [CenTra's] business," CenTra "controlled the flow of information to [him]," and only "provided [it] on an 'as needed' basis."  *Moffat*, ¶102 (examining "dynamic of the past relationship" to find no substantial relationship based on attorney's limited retainer, giving him access to company's insurance policies, partnership agreements, and litigation philosophy).[9]

Finally, even if these matters were deemed sufficiently related *and* confidential information was assumed to have been imparted by CenTra, Defendants have rebutted the presumption that this information was or will be shared with other Gowlings attorneys. (MacKenzie, 2/18/09, 66, 70-71.)  Despite weeks of testimony, no evidence was presented that CenTra's confidential information was shared with Estrin or any other Gowlings attorney representing Windsor.  This was due, in large part, to the multi-layered, de facto screen between the matters.  *See Manning*, 849 F.2d at 225-26 (noting that courts should consider "the size and structural divisions of the law firm involved" and "the likelihood of

---

[9]Even if the matters were deemed substantially related, Defendants have arguably presented sufficient evidence to rebut the presumption that CenTra imparted relevant confidential information to Gowlings attorneys.  Lunau, Binavince, and Hill all testified that their work for CenTra was unrelated to the Second Span.  (Lunau, 2/26/09, 9-10, 14-15; Binavince, 2/12/09, 157, 164-165, 173-174, 177; Hill, 2/17/09, 138, 142-43, 204).  Similarly, Wach testified that the proposed Second Span was largely irrelevant to his work for CenTra.  (Wach, 2/24/09, 18-25, 62-64, 69, 71).  And no evidence of any confidential information was ever produced, for in camera inspection or otherwise.

contact between the 'infected' attorney and the specific attorneys responsible for the present representation" when assessing whether presumption was rebutted).   Ron Lunau — the only FIRA litigation attorney still at Gowlings when Estrin began to represent Windsor — has no recollection of the contents of any documents he may have seen in the 1980's and 1990's regarding CenTra, has not seen such documents for almost 20 years, and, prior to the lawsuit, had not spoken about any of these matters.  (Lunau, 2/26/09, 9-11, 14, 18-19, 67, 69).  Since the conclusion of the FIRA litigation, documents have been retained in an offsite facility, and the Goodman memorandum has never been located.  (Binavince, 2/12/09, 160-61, 169-70).  Estrin was unaware until CenTra's complaint that Hill and Wach were representing CenTra.  And Hill and Wach were unaware that Estrin was representing Windsor adverse to CenTra.  In fact, Hill had never even heard of Estrin, while Wach has never had any professional contact with him.  (Hill, 2/17/09, 170-77; Wach, 2/24/09, 34-38).

Most importantly, as soon as Gowlings became aware of the alleged conflict, it implemented a formal screen, including physical, computerized and other measures to prevent disclosure or use of CenTra's confidential information in the Windsor matter.  (Defs.' Exs. 513, 532, 533); *see Macdonald Estate*, at ¶51 (noting that presumption may be rebutted by showing that "reasonable measures" such as "[ethical] walls and cones of silence" were taken to prevent disclosure); *see also id. at* ¶55 (presumption not rebutted where "there [wa]s nothing . . . to indicate that any independently verifiable steps were

taken by the firm to implement any kind of screening."). There is no evidence that the de facto or formal screen has ever been violated by anyone at Gowlings.[10]

"While it is clearly desirable that conflicts be identified and security measures be put in place [at the time the conflict arises], we do not accept that *ex post facto* measures will, in *every* case imaginable, be inadequate." *Can. S. Petroleum v. Amoco Can. Petroleum Co.*, [1997] 144 D.L.R. (4th) 30, ¶¶42-44 (finding presumption rebutted despite one-and-a-half years without screen where there was no evidence of shared information and firm appropriately dealt with conflict once it was discovered). Gowlings did not become aware of the alleged conflict until CenTra raised the issue in 2006, and took steps immediately thereafter to implement extensive, formal screening measures. Moreover, Gowlings has demonstrated that an effective de facto screen existed at all times during the alleged conflict.

Finally, even if the former client conflict rule were implicated by Gowlings' representation of Windsor in opposition to the Second Span, there would be no violation if CenTra gave implied consent. There is evidence to suggest that this was the case. For example, during the entire time that Stamper negotiated with Estrin regarding the Site Plan

---

[10]CenTra argues that Defendants have not rebutted the presumption of shared confidences because Gowlings failed to implement a formal screen as soon as the conflict arose. CenTra relies on *Skye Prop. Ltd. v. Wu*, [2001] 21 B.L.R. (3d) 125, which disqualified attorneys on opposite sides of litigation because their law firms waited a month after their merger to institute an ethical wall. *Skye* is a trial court decision, however, and more authoritative case law from Canadian courts of appeal hold that screens do not have to be erected immediately in order to be sufficient. And of course Gowlings was unaware of the conflict at the time it arose and so had no impetus for erecting a screen at that time. *See* MacKenzie, 2/18/09, 65-66, 70; *Robertson v. Slater Vecchio*, [2008] 81 B.C.L.R. (4th) 46, ¶¶1-5, 14-20, 24-27.

Agreement in 2004-2005, CenTra never complained that Gowlings' representation of Windsor conflicted with its representation of CenTra in the 1980's and 1990's.[11]

CenTra has presented evidence of Estrin's incomplete conflict check and has, at least, raised questions regarding whether it was sufficiently informed of the conflict to give implied consent. Defendants have presented evidence suggesting the existence of implied consent to the alleged current and former client conflicts and the lack of a 'substantial relationship' giving rise to a former client conflict. The Court finds that the 'likelihood of success' factor weighs in favor of neither party.

**C.   Irreparable Harm**

"A showing of 'probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction,'" and the Court must next consider whether CenTra will be irreparably harmed absent issuance of an injunction. *Lucero v. Detroit Pub. Schs.*,

---

[11]  Moreover, under Ontario Rule of Professional Conduct 2.04(5):

Where a lawyer has acted for a former client and obtained confidential information relevant to a new matter, the lawyer's partner or associate may act in the new matter against the former client if . . . (b) the law firm establishes that it is in the interests of justice that it act in the new matter, having regard to all relevant circumstances, including
        (i) the adequacy and timing of the measures taken to ensure that no disclosure of the former client's confidential information to the partner or associate having carriage of the new matter will occur,
        (ii) the extent of prejudice to any party,
        (iii) the good faith of the parties,
        (iv) the availability of suitable alternative counsel, and
        (v) issues affecting the public interest.

Given Gowlings' implementation of adequate screening measures, Windsor's longstanding relationship with Gowlings, the harm to Windsor and its citizens from having to forfeit their choice of counsel, and Gowlings' good faith, Gowlings has arguably also met these requirements. (MacKenzie, 2/18/09, 68-72).

43

160 F.Supp. 2d 767, 801 (E.D. Mich. 2001) (quoting *Reuters Ltd v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).  In order to warrant injunctive relief, there must be a "substantial threat of impending injury."  *Romantics v. Activision Publishing, Inc.*, 532 F. Supp. 2d 884, 890 (E.D. Mich. 2008) (internal citations omitted).  The alleged "potential harm 'must be 'actual and imminent,' and not merely remote or speculative.'" *Id.* (internal citations omitted).  "Preliminary injunctive relief is thus inappropriate where monetary relief is sufficient."  *Id.*  While CenTra contends that it will suffer four irreparable injuries if the Court does not immediately enjoin Gowlings from representing Windsor in opposition to the Second Span, none suffices to meet its heavy burden for this extraordinary remedy.

Centra argues, first and foremost, that Gowlings possesses CenTra's confidential information, which it could share with Windsor to CenTra's detriment.  Even if the Court assumes that the matters were substantially related and that CenTra imparted relevant confidential information,  Defendants have rebutted the presumption of shared confidences between the relevant Gowlings attorneys.  *See supra*, Part III.B.4.b.

That is, Defendants have squarely demonstrated that a de facto and extensive, formal screen prevent the very harm that CenTra alleges.  *See supra*, Part III.B.4.b. Moreover, that a formal screen has not been in place since the conflict arose (because Gowlings was not aware of the conflict at that time) does not render an injunction necessary.  *See Can. S. Petroleum*, at ¶¶42-44; *Robertson*, at ¶¶1-5, 14-20, 24-27; Mackenzie, 2/18/09, 65-66.  No evidence has been presented that either the de facto or formal screen has been ineffective in the past, and any contention about future violations of the screen is purely speculative.  The comprehensive screening measures now in place

at Gowlings belie any suggestion of actual, imminent harm from the sharing of confidential information with Windsor.  (Defs.' Exs. 513, 532, 533).

CenTra next argues that, absent an injunction, Gowlings will continue to attack the legal opinions it provided CenTra.  CenTra has identified only one example of such an "attack": Estrin currently argues on Windsor's behalf that the Second Span is subject to the regulatory authority of Windsor and Ontario, while Emilio Binavince provided CenTra with a 1986 legal opinion that the Canadian portion of the Ambassador Bridge was not subject to Canadian regulatory authority.  Even if the Court assumes that Estrin's current claims regarding the Second Span undermine Binavince's advice regarding the existing Ambassador Bridge, CenTra has failed to demonstrate that it will suffer actual, imminent harm from the diminished efficacy of 23-year old legal advice.  In fact, CenTra's opposition to OPA 43, legislation it believed could affect Windsor's authority over the Second Span, suggests that CenTra did not believe that the governmental authority issues had been finally resolved as recently as 2006.

Centra also argues that Gowlings' continued representation of Windsor in opposition to the Second Span will irreparably harm CenTra's relationship with government officials.  CenTra bases this allegation on Estrin's 2006 letter to the U.S. Coast Guard, in which Estrin accuses CenTra of submitting misleading information to the Coast Guard.  (Calderone, 1/13/09, 84-89).  But Estrin's letter to the Coast Guard was not the cause of CenTra losing its financing or having to perform an environmental assessment.  (Defs.' Ex. 526; Stamper, 1/30/09, 158-59, 166-68).  And any claims about possible future harms from the letter are purely speculative.  More importantly, CenTra has failed to show how this alleged harm has resulted from Gowlings' breach of fiduciary or contractual obligations.

45

Calderone did not see any information in Estrin's letter that had been provided to Hill or Wach. (Calderone, 1/13/09, 161). CenTra may not enjoin Gowlings from representing Windsor simply because Gowlings' zealous advocacy renders Windsor a more formidable opponent.

CenTra's final claim is that it will be harmed by having to divulge confidential information to Estrin and Gowlings during this litigation, while they are representing Windsor. CenTra has failed, however, to demonstrate actual, imminent harm absent an injunction. *See Robertson*, at ¶19 (noting that given "the hardship and injustice" to the innocent client of depriving it of his chosen counsel, "an injunction should be granted only to relieve the applicant of the risk of 'real mischief,' not a mere perception.")

This Court made every effort to prevent the disclosure of confidential information during the preliminary injunction hearing by curbing the admission of confidential documents, policing testimony regarding confidential matters, and offering parties the option of in camera review, or a protective order, or both, for confidential materials. Despite these protections, CenTra submitted no alleged confidential materials, save one opinion letter. Moreover, CenTra has failed to show why a protective order would not suffice to prevent the transmission of relevant confidential information to Windsor or to attorneys representing Windsor.

CenTra did not seek to disqualify Gowlings from representing Windsor until seven months after first raising the issue of Estrin's representation of Windsor, and five months after filing suit. And even after CenTra became aware of the alleged conflict, it still authorized Hill and Wach to send letters to the CRA on its behalf for another two months. (Stamper, 1/30/09, 153; Calderone, 1/13/09, 147-156; Hill, 2/17/09, 143; Wach, 2/24/09,

25-31.)  This delay is "incompatible with [CenTra's] claim of irreparable injury" absent an injunction.  *Sequa Corp. v. Gelmin*, No. 91-8675, 1995 WL 404726, *9 (S.D.N.Y. July 7, 1995); *see also Moffat*, at ¶¶119-30 (considering delay in seeking disqualification in assessing whether to remove attorney).

CenTra has not demonstrated that it will suffer irreparable harm absent an injunction. The Court finds that this factor weighs against granting an injunction.

## D.   Harm to Others

The third factor the Court must consider is the degree of harm that the adverse party or third parties would suffer if a preliminary injunction is granted.  *See Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994).  In contrast to the speculative harms claimed by CenTra, Defendants presented ample evidence that enjoining Gowlings from representing Windsor on matters concerning the Second Span would cause actual, substantial harm to the City of Windsor.

George Wilkki, Windsor's city solicitor, testified to the detrimental impact of depriving Windsor of David Estrin's representation.  (Wilkki, 1/14/09, 8-13; Ex. 514.)  Estrin has been Windsor's counsel for more than six years, and Windsor has spent over five million public dollars on Estrin and the experts he has retained.  (Wilkki, 1/14/09, 9, 18-19).  During that time, Windsor has depended on Estrin's representation on all border crossing matters — matters that are deeply important to Windsor and its citizens.  (Defs.' Ex. 514).  Moreover, Estrin is not interchangeable with other lawyers.  He is one of very few lawyers in Canada with his level of expertise and knowledge of environmental law.  In addition, he is recognized at the senior levels of Canadian government.  (Wilkki, 1/14/09, 8-11, 40; Estrin 2/3/09, 46-52; Pls.' Ex. 150; Defs.' Ex. 585).  Even if another attorney could be found with

47

sufficient expertise, the new attorney would lack the six-year history with Windsor, coordinating all aspects of its strategy on these complex and intertwined issues. For these reasons, Windsor considers Estrin to be irreplaceable, and it would be "in a panic situation" if Estrin is prevented from representing Windsor on matters relating to the Second Span. (Wilkki, 1/14/09, 8, 11-13, 37, 125; Defs.' Ex. 514).

Courts have recognized that "an order depriving a litigant of the services of the lawyers it ha[s] chosen and who might have represented it for years, [i]s a drastic measure that in many cases could work an injustice on the innocent client." *Robertson*, at ¶19; *see also In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), *aff'd* 5 F. App'x 396 (6th Cir. 2001) (internal citations omitted) (noting that "'a party's choice of counsel is entitled to substantial deference'"); *Capachione v. Charlotte-Mecklenburg Bd. of Educ.*, 9 F.Supp. 2d 572, 582 (W.D.N.C. 1998) (noting that "disqualifying a party's chosen representative is a very serious matter"). Moreover, any harm is compounded for Windsor because of the complexity and history of the border crossing issues. *See e.g.*, *Strother*, at ¶62 (client's access to counsel of choice on complex matter "important consideration" where attorneys' "special expertise was available from few other firms" and "[client] had worked successfully with [the attorneys] for years"); *Capachione*, 9 F.Supp. 2d at 582 (describing prejudice to client if deprived of attorney with "enhanced ability to be [client's] zealous advocate" given attorney's past involvement with the intertwined matters); *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F.Supp.2d 863, 869 (S.D. Ohio 2002) (denying disqualification motion because it would be "patently unfair" to deprive client of attorney of three years).

48

The harm to Windsor would be severe if Gowlings is enjoined from representing it, compared with no actual and imminent harm to CenTra absent an injunction. Moreover, harm to Windsor, as a public entity, has the potential to affect hundreds of thousands of people. *See Charter Twp. of Huron, Mich. v. Richards*, 997 F.2d 1168, 1175 (6th Cir. 1993) (noting that when "balanc[ing] the interests of the parties" a court should "giv[e] particular attention to the public consequences of a decree"); *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 376 (2008) (internal citations omitted) ("'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'").

The Court finds that this factor weighs against granting an injunction.

## E.    The Public Interest

The final factor the Court must consider is whether a preliminary injunction would serve the public interest. *See Washington*, 35 F.3d at 1099. The Court recognizes that the public has an interest in "maintaining the highest standards of professional conduct" and in "[t]he preservation of public trust" "in the integrity of the bar." *Hull v. Celanese Corp.*, 513 F.2d 568, 569, 572 (2d Cir. 1975); *see also Kitchen v. Aristech Chem.*, 769 F.Supp. 254, 256-57 (S.D. Ohio 1991).

At the same time, however, "there is a clear public interest in permitting attorneys to practice law without unreasonable restrictions," *Earnings Performance Group, Inc. v. Quigley*, 2003 U.S. Dist. LEXIS 26294, *28 (E.D. Mich.), *aff'd* 124 F. App'x. 350 (6th Cir. 2005), as well as a public interest in protecting the right to choose one's counsel. *See, e.g.*, *Alberta Union*, ¶33 (noting that "[c]hoice of counsel is itself a value to be protected"); *Moffat*, at ¶123 (noting that "[t]he right of a party to be represented by counsel of his or her

49

choice is one which is fundamental to the adversarial process"); *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D. N.J. 1993) (same); *Kitchen*, 769 F.Supp. at 256-57 (same).

Given these competing public interests, the Court finds that this factor weighs in favor of neither party.[12]

## IV.   CONCLUSION

The Court holds that the balance of the relevant factors weighs in favor of Defendants.  Whatever its ultimate remedy might be should CenTra prevail at trial, it has not demonstrated that the immediate disqualification of Gowlings is warranted.[13] Accordingly, CenTra's motion for a preliminary injunction is DENIED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  June 3, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 3, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

---

[12] The Court does note that Gowlings' implementation of extensive screening measures arguably mitigates any harmful effects on public confidence in the bar absent an injunction.

[13] It should be noted that even if Gowlings is found at trial to have breached its contractual or fiduciary obligations, disqualification would not necessarily be the remedy. *See, e.g.*, *Alberta Union*, at ¶50 ("even if a conflict had been found, the remedy is not necessarily a disqualification"); *Neil*, at ¶36 ("It is one thing to demonstrate a breach of loyalty.  It is quite another to arrive at an appropriate remedy."); *Quicken Loans*, 2008 WL 2566373, at *3 ("[E]ven if a violation is found, the Court may choose a remedy other than disqualification.").