UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation

        Plaintiffs,

-vs-

DAVID ESTRIN, Individually, and
GOWLING LAFLEUR HENDERSON LLP,
a Canadian Limited Liability Partnership,

        Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

## DEFENDANTS' MOTION TO QUASH SUBPOENAS SERVED BY PLAINTIFFS ON SAM SCHWARTZ ENGINEERING AND SAM SCHWARTZ OF CANADA, LTD

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By:    Sharon M. Woods (P22542)
        Todd R. Mendel (P55447)
        Kevin Kalczynski (P57929)
        Melonie L. M. Stothers (P65344)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725

Pursuant to Fed. R. Civ. P. 45(c), and for the reasons stated in the accompanying brief, defendants move to quash the subpoenas served by plaintiffs on Sam Schwartz Engineering and Sam Schwartz of Canada, Ltd.

Pursuant to L.R. 7.1, defendants' counsel sought concurrence from plaintiffs' counsel in this motion, and explained the nature of this motion and its legal basis. Plaintiffs' counsel did not concur in the relief sought.

Respectfully Submitted,

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By:   /s/ Todd R. Mendel
      Todd R. Mendel (P55447)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725
Email: tmendel@bsdd.com

Date: June 16, 2009

trm/motion/376504.1

2

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CENTRA, INC., a Delaware Corporation and
DETROIT INTERNATIONAL BRIDGE
COMPANY, a Michigan Corporation

        Plaintiffs,

-vs-

DAVID ESTRIN, Individually, and GOWLING
LAFLEUR HENDERSON LLP, a Canadian
Limited Liability Partnership,

        Defendants.

Case No. 06-15185

Hon. Nancy G. Edmunds

Magistrate Judge Steven R. Whalen

---

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO
QUASH SUBPOENAS SERVED BY PLAINTIFFS ON
SAM SCHWARTZ ENGINEERING AND
SAM SCHWARTZ OF CANADA, LTD**

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By:    Sharon M. Woods (P22542)
        Todd R. Mendel (P55447)
        Kevin Kalczynski (P57929)
        Melonie L. M. Stothers (P65344)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725

## TABLE CONTENTS

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

MOST APPROPRIATE AUTHORITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.  INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  BACKGROUND OF CAUSES OF ACTION AND RELATED ISSUES TO DETERMINE
    RELEVANCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  FACTUAL BACKGROUND REGARDING SCHWARTZ . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  THE SCHWARTZ SUBPOENAS SEEK IRRELEVANT, CONFIDENTIAL AND
    PRIVILEGED INFORMATION AND SHOULD BE QUASHED . . . . . . . . . . . . . . . . . 11

V.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## **STATEMENT OF ISSUES**

Should the Court quash two subpoenas served by plaintiffs on an engineering consultant to

the City of Windsor, neither of which are parties, where those subpoenas:

- do not seek any relevant information and are not reasonably calculated to lead to the discovery of admissible evidence in this legal malpractice case;

- seek confidential information that would only be useful to plaintiffs in plaintiffs' efforts to thwart the City of Windsor's opposition to plaintiffs' proposal to build a Second Span of the Ambassador Bridge; and

- seek documents protected from disclosure by the Canadian solicitor-client and litigation privileges belonging to the City of Windsor.

Defendants answer:   Yes.

Plaintiffs answer:   No.

## MOST APPROPRIATE AUTHORITY

Fed. R. Civ. P. 26(b)(1), 45(c)

*CenTra v. Estrin*—Order Denying Plaintiffs' Motion for Preliminary Injunction entered June 3, 2009

*Bank Leu Ag v. Gaming Lottery Corp.*, [1999] O.J. No. 3949 at ¶4)

*Bell Canada v. Olympia & York Developments Ltd.*, 68 O.R. (2d) 103 (1989)

*Cason-Merenda v. Detroit Medical Center*, 2008 U.S. Dist. LEXIS 17623 at *8 (March 7, 2008, E.D. Mich))

*Deseret Mgmt. Corp. v. U.S.*, 76 Fed. Cl. 88, 93 (Fed. Cl. 2007)

*General Accident Assurance Company v. Shrusz*, [1999] O.J. NO. 3291, p. 7)

*LAC Minerals Ltd. v. International Corona Resources, Ltd.* (1989), 61 D.L.R. (4th)

*Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990)

Mallen & Smith, *Legal Malpractice*, §17.28, p. 1079-81 (2007 ed.)

## I.   **INTRODUCTION**

Centra, Inc. and Detroit International Bridge Company (collectively "CenTra") sued Gowling
Lafleur Henderson LLP ("Gowlings"), a 750-lawyer Canadian law firm, and one of its partners,
David Estrin, based on a conflict of interest.  CenTra proposes to build a second bridge (the "Second
Span") near the existing Ambassador Bridge and alleges that, while Estrin was representing the City
of Windsor ("Windsor") against the Second Span, other Gowlings professionals were representing
CenTra in obtaining financing for the Second Span.   (Order Denying Plaintiffs' Motion for
Preliminary Injunction, Docket #115, pp. 1-3, hereafter "Order").

Plaintiffs have now served two identical subpoenas on non-parties Sam Schwartz
Engineering and Sam Schwartz of Canada, Ltd. (collectively "Schwartz").   The subpoenas are
attached as Exhibits 1 and 2.  Schwartz is an engineering consultant who is currently (and since at
least 2004 has been) working with Estrin on behalf of Windsor adverse to CenTra concerning border
crossing issues and concerning CenTra's environmental submissions to the Coast Guard for the
Second Span.  The subpoenas seek work papers, drafts and communications of every kind among
Windsor, Gowlings and Schwartz from 2000 to the present.  These subpoenas should be quashed for
three reasons.  First, they seek completely irrelevant documents that are not reasonably calculated
to lead to the discovery of admissible evidence in this case.  Second, they inappropriately seek
documents that are confidential research and commercial information, so that CenTra can attempt
to thwart Windsor's opposition to the Second Span and not for any legitimate uses in this litigation.
Third, they seek documents protected from disclosure by the Canadian solicitor-client and litigation
privileges.

Even CenTra recognizes that its subpoenas seek documents of Windsor's lawyer (Gowlings)
and Windsor's consultant (Schwartz) that are privileged and not discoverable.   At the recent

preliminary injunction evidentiary hearing, when the shoe was on the other foot, CenTra's counsel

successfully objected on privilege grounds to written communications among CenTra's engineering

consultant (who has submitted written reports to the Coast Guard—*see,* e.g., Tr. Ex. 151/502 ),

CenTra, and CenTra's counsel:

> [Mr. Corby—sic Korpi] was a consultant that was working with David Coburn, the lawyer, and the bridge company in front of the Coast Guard so I think he's protected by the privilege as well.  He's working - he's not a testifying expert or anything like that.  The bridge company uses consultants through their lawyers just like Windsor does.  The same protections that protect Windsor protect him.  The same protections that protect Mr. Estrin and his experts protect him.  The whole point is I think this all attorney / client privileged information and I would appreciate protection for it.  (Tr., 1/30/09, Stamper, pp. 164-166)

The Court responded:  "I think he's right Ms. Woods.  You will have to move on."  *Id.*[1]  In other

words, CenTra now seeks the precise information that it successfully asserted privilege over at the

evidentiary hearing.

    The Court would normally make determinations of what is or may be relevant for discovery

purposes, such as this motion, based upon the Complaint and responsive pleadings.  However, this

Court has much more information after the lengthy evidentiary hearing on CenTra's preliminary

injunction motion upon which to assess CenTra's claims of relevancy for discovery purposes.

Likewise, the Court made numerous rulings on privilege protections during the evidentiary hearing

that are instructive and determinative of the privilege issues raised in this motion.

    Simultaneous with the filing of this motion, Gowlings is filing a motion for protective order

seeking an order that discovery proceed in a certain phased order and manner.  Those issues raised

in that motion also apply to this motion in the event that the subpoenas to Schwartz are not quashed

in their entirety.  In that event, Gowlings' motion for protective order is incorporated here, and

---

[1]The document that was subject to this ruling (Ex. 526) was later admitted into evidence because a different witness testified to having received the document from CenTra, which waived the privilege concerning it.  (Tr., 2/17/09, pp. 175-76).

should be considered in conjunction with this motion.

## II.    BACKGROUND OF CAUSES OF ACTION AND RELATED ISSUES TO DETERMINE RELEVANCY

After the evidentiary hearing, the Court made the following findings, among others. CenTra has an interest in building a Second Span across the Detroit River, adjacent to the existing Ambassador Bridge. CenTra contends that in 2005 and 2006 Estrin was representing Windsor against the Second Span adverse to CenTra's interest, at the same time Dale Hill and Tim Wach (Gowlings professionals) were representing CenTra and assisting CenTra to obtain financing to build the Second Span. CenTra contends that this was a current client conflict of interest to which it did not consent. CenTra sued Gowlings and Estrin in November 2006, after which Gowlings withdrew from representing CenTra but continued and continues to represent Windsor. (Order, pp. 3-4, ¶6).

CenTra also contends that Gowlings represented it in the 1980's and early 1990's on matters substantially related to Estrin's current representation of Windsor. CenTra contends that this earlier work creates a conflict with Estrin's present representation of Windsor, to which it did not consent. CenTra contends that even if the Hill and Wach representations of CenTra are analyzed under the former client standards, such representations are substantially related to Estrin's representation of Windsor. (Order, p. 4, ¶7).

Gowlings contends that CenTra impliedly consented to Gowlings' representation of Windsor, and CenTra cannot now complain of Gowlings representation of Windsor adverse to the Second Span or otherwise. More specifically, Gowlings contends that when CenTra hired Hill and Wach in 2005, CenTra did so knowing that Estrin and Gowlings already represented Windsor adverse to CenTra on the Second Span and on other related border crossing traffic issues. In addition, Gowlings contends that even before CenTra hired Gowlings in 2005, CenTra's lack of objection to Estrin's representation of Windsor adverse to CenTra on the Second Span (which was known to

CenTra) is also implied consent and waiver to the alleged former client conflicts arising out of Gowlings' representation of CenTra in the 1980's and 1990's. Gowlings contends that CenTra's consent was fully informed and that any conflict was in fact consentable. (Order, p. 4, ¶8).

Gowlings also contends that even absent consent, under a former-client conflict analysis, neither Gowlings' representation of CenTra in the 1980's and 1990's, nor the Hill and Wach representations of CenTra in 2005-2006, is sufficiently related to Estrin's representation of Windsor to constitute a conflict. Gowlings contends that no confidences of CenTra have ever been compromised by Gowlings, and there is no danger they ever will. (Order, p. 5, ¶9).

The Court has determined, among other things, that:

> None of the testimony or exhibits suggested that Estrin, Hill or Wach (or any other Gowlings professionals) exchanged confidential information. To the contrary, the witnesses all testified that they were unaware of the work being done for the other party; in essence, this created a de facto screen. (Wach, 2/17/09, 170-77). Shortly after CenTra raised its complaint of an alleged conflict, Gowlings put in place a formal screen implementing numerous physical, computerized and other measures to prevent disclosure or use of any of CenTra's confidential information to Windsor and vice-versa. (Defs.' Exs. 513, 532, 533). There is no evidence that the de facto or later formal screen has ever been violated by anyone at Gowlings. (Order, pp. 25-26, ¶59).

The Court also determined that CenTra has failed to demonstrate that Gowlings' work for CenTra in the 1980's and 1990's is substantially related to Estrin's representation of Windsor in opposition to the Second Span. Neither the FIRA litigation nor the legal opinions that Gowlings provided in the 1980's related to the Second Span, which was not conceived as an idea until decades later. (Order, p. 38). The Court also determined that CenTra has failed to demonstrate a substantial relationship between Estrin's representation of Windsor in opposition to the Second Span and Gowlings' transfer pricing and tax work for CenTra in 2005-2006. (Order, p. 39). As for Gowlings' contention that CenTra gave implied consent to any alleged conflict in any event, the Court stated the following:

4

There is much evidence from which a jury may conclude that CenTra's retention of Hill and Wach constituted implied consent to the current client conflict. *See supra* ¶¶ 22-38, 42. This is because many of the facts found above suggest that, in 2005, CenTra was aware that Estrin represented Windsor in opposition to the Second Span.   These facts include: Estrin's representation of Windsor since 2002 on many highly publicized border crossing issues; media reports of Estrin's representation of Windsor coupled with CenTra's monitoring of news concerning the Ambassador Bridge; Stamper's awareness in 2004 of Windsor's adversity to CenTra and Estrin's representation of Windsor on various international trucking disputes; the draft site plan agreement for the plaza on the Canadian side of the Ambassador Bridge that Estrin sent to Stamper in September 2004, in which he refers to Windsor's opposition to the twinning of the Ambassador Bridge; the face-to-face meeting between Estrin and Stamper at CenTra's office a few weeks later in which Estrin explicitly stated Windsor's opposition to the Second Span; Estrin's November 2004 letter to the U.S. Coast Guard on Windsor's behalf opposing the Second Span; and Stamper's knowledge in 2005 that Estrin was representing Windsor adverse to CTC on the OPA 43 matter. (Order, pp. 33-34).

The Court is unusually familiar with the parties' claims and defenses and what is or may be relevant.  CenTra's three-count complaint essentially contains two claims against Gowlings.  First, that Gowlings breached a duty of confidentiality by using CenTra's confidential information against CenTra (the "Gowlings Confidentiality Claim"). (Ex. 3—Am. Complt., ¶ 30).  Second, Gowlings breached a duty of loyalty by representing Windsor against CenTra with respect to the Second Span (the "Loyalty Claim"). (Ex. 3—Am. Complt., ¶ 38).  These two claims underlie the three causes of action pled in the first amended complaint.  For example, each of those counts relies on allegations that Gowlings breached a duty of confidentiality. (*Id.*, ¶¶ 44, 51.a, 52.c, 57).  Likewise, each of those counts relies on an allegation that Gowlings breached a duty of loyalty. (*Id.*, ¶¶ 43, 51.b, 52.a and b, 57).

The primary damages CenTra seeks are (1) damages incurred as a result of alleged delay in building a Second Span arising from Gowlings' representation of Windsor, and (2) damages allegedly caused by Estrin's September 14, 2006 letter to the Coast Guard. (Ex. 4, CenTra's Rule

26(a) Disclosures, p. 14).[2] The Court has already found that CenTra concedes that the environmental assessment required by the Coast Guard, which Estrin's 2006 letter sought, was not required due to Estrin, but rather for other reasons unrelated to Estrin. (Order, p. 26, ¶61).

CenTra's Confidentiality Claim, seeking the damages described above, requires a showing that: (1) CenTra conveyed confidential information to Gowlings; (2) Gowlings used that confidential information against CenTra, and (3) as a result, CenTra was damaged. The leading commentators on lawyer liability have explained that:

> A cause of action [for breach of a duty of confidentiality] is not established merely by showing that the attorney had access to confidential information or that the representation was adverse. **The former client must establish not only that the attorney possessed and misused the client's confidences, but also that the fiduciary breach was a proximate cause of the injury**. (Ex. 5, Mallen & Smith, *Legal Malpractice*, § 17.28, p. 1079 (2007 ed.)) (Emphasis added).[3]

*See also, State ex rel Long v. Petree Stockton, L.L.P.*, 499 S.E. 2d. 790, 800 (N.C. Ct. App. 1998) (same). Therefore, the only information that is relevant to CenTra's Confidentiality Claim is information showing that: (1) CenTra conveyed potentially damaging confidential information to Gowlings; and (2) Gowlings used that confidential information on behalf of Windsor against CenTra.

Likewise, CenTra's claim for damages arising from alleged delay to the Second Span or from Estrin's letter based on allegations that Gowlings breached a duty of loyalty (*i.e.*, the Loyalty Claim)

---

[2]CenTra seeks damages for delay on the financing work on the Second Span and the costs associated with obtaining new counsel for that work. (Ex. 4, p. 14). However, Gowlings' (and Schwartz's) work for Windsor is irrelevant to claims seeking those damages.

[3]In Canada, there is an action for "breach of confidence." (*LAC Minerals Ltd. v. International Corona Resources, Ltd.* (1989), 61 D.L.R. (4th) 14 at 74). The elements of the claim are: (1) the information conveyed was confidential; (2) the information conveyed was communicated in confidence; and (3) the confidential information was misused by the party to whom it was communicated.

requires the same showing above.[4]  Indeed, in the context of the preliminary injunction proceedings, this Court recognized that the disclosure of confidential information was a critical element of plaintiffs' claim:

THE COURT:  Well, when you talk about irreparable harm, though, you can't categorize the zealous advocacy on behalf of Windsor as irreparable harm.  I mean, no matter who is going to be representing the City of Windsor, they're going to be zealous advocates for Windsor's position.  In you're talking about irreparable harm, you have to show that the harm flowed from the breach you're alleging, and so it has to have something to do with the use of confidential information or something along those lines, not the fact that Mr. Estrin has been a continuing thorn in your side because he's advocating a position which is adverse to you.  That can't be irreparable harm.

                                         ***

THE COURT:  Oh, I didn't say that any lawyer could do what Mr. Estrin was doing.  I said that zealous advocacy of a client is not in and of itself irreparable harm because any lawyer presumably would do his best to advocate his client's position . . . (Tr., 4/16/09, pp. 17-20).

The Court's conclusion that the mere fact that Gowlings is representing Windsor against the Second Span could not constitute irreparable harm was correct.  The same conclusion applies to any harm, not just irreparable harm.  Indeed, the use of confidential information is a fundamental element of a damage claim based on the breach of the duty of loyalty:

> **. . . unless confidential information is used, the lawyer has done nothing that another lawyer would not have done and there is no special advantage attributable to the prior relationship.  Thus, there is a fundamental issue of causation, which is a requirement in a civil damage action.**  (Ex. 5, p. 1081) (Emphasis added).

The Court previously recognized this principle:

---

[4]Alternatively, CenTra could show that Gowlings' representation of CenTra fell below the standard of care due to the conflict, and as a result, CenTra was damaged.  (*E.g.*, if the Gowlings lawyer working for CenTra missed a filing deadline for CenTra).  Hazard & Hodes, *The Law of Lawyering*, § 4.4, p. 4-11 (2008).  But such a theory, which has not even been alleged, does not require any discovery of Gowlings' or Schwartz's work for Windsor.  Moreover, the Court has found that at no time was Gowlings' work or the independence and judgment of Gowlings for CenTra impacted by Estrin's work for Windsor or vice-versa, and that CenTra was very pleased with Gowlings' work on CenTra's behalf throughout.  (Order, p. 24, ¶55).

> CenTra has failed to show how this alleged harm has resulted from Gowlings' breach of fiduciary or contractual obligations.  Calderone did not see any information in Estrin's [9/14/06] letter that has been provided to Hill or Wach.  CenTra may not enjoin Gowlings from representing Windsor simply because Gowlings' zealous advocacy renders Windsor a more formidable opponent.  (Order, p. 45-46).

The Court further stated that the mere fact that Estrin is zealously representing Windsor against the Second Span is not irreparable harm; to show irreparable harm, CenTra would have to prove its confidences were disclosed to Estrin.  (Tr., 1/14/09, p. 17-18).  But the Court found that no confidential information from Gowlings' representation of CenTra was ever disclosed to Estrin or the other lawyers working for Windsor.  (Order, p. 25, ¶59, p. 40).  In short, without the special advantage of CenTra's confidential information, Gowlings did nothing that any other lawyer would have done in the same situation and CenTra cannot prove that the breach of the duty of loyalty caused compensatory damages.  *Id*.  In addition, the Court has already found that none of the information provided to Gowlings by CenTra would be relevant or useful to Estrin in Gowlings' representation of Windsor adverse to the Second Span or otherwise.  (Order, p. 23, ¶54).

The documents sought by CenTra in the two Schwartz subpoenas have no bearing on any of the confidentiality, loyalty, consent, substantial relationship, proximate cause, damage, fiduciary duty, contract or legal malpractice issues in this case, nor could the documents sought reasonably lead to the discovery of admissible evidence in this case.  CenTra is improperly and transparently seeking these documents to attempt to obtain an advantage in thwarting Windsor's opposition to the Second Span.

## III.    FACTUAL BACKGROUND REGARDING SCHWARTZ

Schwartz has issued three written public reports on behalf of Windsor, dated January 2005, July 2007, and April 2009, all of which were submitted to the Coast Guard by Estrin in opposition to the Second Span.  The 2005 Report analyzed traffic issues related to the Detroit-Windsor border

crossings, and various proposals concerning such crossings including, among others, CenTra's proposed Second Span. The 2005 Report was critical of the Second Span. (Ex. 6, p. 17). This 2005 Report was issued after numerous adverse interactions between Estrin (Windsor) and Stamper (CenTra) concerning the Second Span, after the OPA 43 litigation began between Windsor (represented by Estrin) and CenTra, and after Windsor and Estrin had submitted a November 2004 letter of opposition to the Coast Guard concerning the Second Span. (Order, pp. 33-34; pp. 16-17, ¶37). The 2007 Report was submitted to the Coast Guard by Estrin and criticized CenTra's draft Environmental Assessment for the Second Span. (Ex. 7). The 2009 Report reviewed and identified deficiencies and was critical of CenTra's Final Environmental Assessment submitted to the Coast Guard for the Second Span. (Ex. 8).

These 2005, 2007 and 2009 Schwartz Reports are public documents and are attached as Exhibits 6, 7 and 8, respectively. The 2005 Report was admitted during the evidentiary hearing as Exhibit 572 and was also admitted as part of Joint Exhibit 9, Vol. 1, Tab 20 (Estrin's 2006 Letter to the Coast Guard). These three Reports came about because Estrin and Gowlings retained Schwartz as a consultant for Windsor and have worked closely with Schwartz in connection with the preparation of these Reports. (Tr., 2/12/09, Estrin, pp. 40-42; Ex. 7, p. 1—Schwartz "was retained by Gowling Lafleur Henderson, LLP on behalf of the City of Windsor, Ontario to perform a preliminary traffic impact analysis of the Ambassador Bridge Enhancement Project for roadways leading up to the bridge through the City. . . . [Schwartz] has been providing professional services related to Windsor border traffic issues since 2003, including technical analyses and modelling of border-related traffic on Windsor roads and reviews of major traffic studies carried out by others . . ."). CenTra has known of Estrin's retention of and work with Schwartz on Windsor's behalf since at least January 2005. (*Id.*; Tr., 1/30/09, Stamper, pp. 103-107). The Schwartz Reports are relevant

to the present litigation for one and only one reason. They are evidence that Windsor, as represented by Estrin (and Schwartz) is opposed to the Second Span, and that CenTra has known that since at least January 2005—the date of the first Report. *Id.* There is much evidence, that CenTra knew this well before January 2005 as well. (Order, pp. 33-34). Windsor's 2007 and 2009 Schwartz Reports are just later criticisms by Schwartz of the Second Span but directed more specifically at the Environmental Assessments submitted by CenTra to the Coast Guard. (Exs. 7, 8).

Because the Schwartz Reports are only relevant to the present litigation to show notice to CenTra of Windsor/Gowlings/Schwartz's adversity to the Second Span, only the final public reports and the date on which they were received by CenTra are relevant. Of course, CenTra already has the three final reports and knows perfectly well when it received them. These reports were attached to Estrin's 2006, 2007 and 2009 submissions to the Coast Guard. There has never been any claim during the evidentiary hearing or otherwise, nor could there be, that the 2005, 2007 or 2009 Schwartz Reports contain any confidential information at all of CenTra's. In fact, the January 2005 Schwartz Report was issued before CenTra even retained Gowlings (Hill) in June 2005, so it is impossible that Gowlings even had or could have used any CenTra confidential information in connection with the 2005 Schwartz Report. The Court also heard evidence during the evidentiary hearing, and found that Gowlings has at all times had an effective screen in place and no sharing of CenTra's confidential information has ever occurred in any event. (Order, pp. 25-26, ¶59). Thus, there is no evidence that Estrin obtained at any time, let alone used and then shared with Schwartz, any of CenTra's confidential information. CenTra's subpoenas to Schwartz are pure fishing expeditions to obtain information that CenTra can use to its competitive advantage in its efforts to thwart Windsor's opposition to the Second Span.

10

## IV.   THE SCHWARTZ SUBPOENAS SEEK IRRELEVANT, CONFIDENTIAL AND PRIVILEGED INFORMATION AND SHOULD BE QUASHED

Under Fed. R. Civ. P. 45(d)(1), once an objection to a subpoena is interposed such discovery is foreclosed except pursuant to an order of court. *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990). Discovery may not be had regarding a matter which is not "relevant to the subject matter involved in the pending action." *Id.*, citing Fed. R. Civ. P. 26(b)(1). "*Even if relevant*, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." *Id.* citing Fed. R. Civ. P. 26(b)(1).

Requested information is not relevant to the "subject matter involved" in the pending action if the inquiry is based on the party's mere suspicion or speculation. *Micro Motion*, 894 F.2d at 1326, citing Fed. R. Civ. P. 26(b)(1) ("Rule 26(b)(1) contains the provision: 'It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.' That provision does not justify wholly speculative discovery. Rather it defines the scope of an inquiry, freeing discovery from the rules of evidence on admissibility. This subsidiary provision does not override the basic requirement of Rule 26(b)(1) that the discovery must be directed to 'subject matter involved in the pending action.'"). The "discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim." *Micro Motion*, 894 F.2d at 1327 (emphasis in original), citing *Isaac v. Shell Oil Co.*, 83 F.R.D. 428 (E.D. Mich. 1979).

The right to discovery is not unlimited, and does have "ultimate and necessary boundaries."

11

*Hickman v. Taylor*, 329 U.S. 495, 497, 67 S.Ct. 385, 91 L.Ed. 451 (1947).  Discovery may be denied "where, in the court's judgment, the inquiry lies in a speculative area." *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1326 (Fed. Cir. 1990).  Where proof of either relevance *or* need is not established, discovery is properly denied. *American Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 743 (Fed. Cir. 1987).  Once an objection to the relevance of the information sought is raised, the burden shifts to the party seeking the information to demonstrate that the requests are relevant to the subject matter involved in the pending action. *Allen v. Howmedica Leibinger*, 190 F.R.D. 518, 522 (W.D. Tenn. 1999).  The party seeking discovery must be able to "articulate the possible linkage between the discovery sought and admissible evidence." *Id.*, quoting 7 Moore's Federal Practice §37.22[2][B].

The subpoenas to Schwartz do not seek relevant information or information that could reasonably lead to admissible evidence in this case.  The subpoenas contain five requests that seek work papers, drafts and communications of every kind among Windsor, Gowlings and Schwartz from 2000 to the present.  (Exs. 1, 2).

As a threshold matter, other than the final 2005 Schwartz Report and its receipt by CenTra, why would anything relating to Schwartz concerning the years 2000 until June 2005 (when CenTra hired Hill) be of any relevance to the present litigation?  It simply is not.  This information would only be relevant for CenTra's battle in the Coast Guard proceedings against Windsor on the Second Span, which is an improper purpose to seek discovery in this case.  Drafts, work papers and communications among Windsor and its attorneys and expert consultant are all confidential research information under Fed. R. Civ. P. 26(c)(7) and 45(c). *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990) (Confidential commercial information warrants special protection

under Rule 26(c)(7)).

Moreover, these subpoenas unabashedly ask for privileged communications between or among Windsor, Gowlings and Schwartz. Other than the final and public Schwartz Reports (which CenTra has and which are attached), all of that information is privileged. This is Windsor's privilege, a non-party. *See, Bell Canada v. Olympia & York Developments Ltd.*, 68 O.R. (2d) 103 (1989). Schwartz is an expert retained by Windsor, through Windsor's attorneys, to assist Windsor in CenTra's administrative proceedings pending with the Coast Guard. (*See*, Ex. 7, p. 1). Thus, all drafts and communications between and among Windsor, Gowlings and Schwartz are privileged. (Ex. 10, ¶¶21, 34-35; *Bell Canada, supra*).[5]

It is incredible that CenTra would even try to subpoena this type of privileged information given the extremely strict positions that CenTra has asserted in this case concerning attorney-client and work product privileges for its information. The Court has very carefully insured that CenTra's legitimate attorney-client and work product information is not disclosed or discovered. Windsor, which is not even a party to this case, is certainly entitled to at least the same degree of protection, if not more due to its status as a non-party. *Allen v. Howmedica Leibinger*, 190 F.R.D. 518, 521 (W.D. Tenn. 1999), citing *Katz v. Batavia Marine*, 984 F.2d 422, 424 (Fed. Cir. 1993) (some courts have considered nonparty status as one factor when weighing the burden that discovery may impose). In addition to the crystal clear privilege ruling on page 2 of this brief, the Court has also already made numerous rulings on privileged communications which plainly indicate the privileged and protected nature of the documents sought by CenTra in the Schwartz subpoenas. During the

---

[5]Schwartz is <u>not</u> Gowlings' expert in <u>this</u> federal court action, so Fed. R. Civ. P. 26(a)(2) or 26(b)(4)(A) does not apply to Schwartz as if he was a testifying expert for Gowlings in <u>this</u> proceeding.

testimony of Mr. Willki, the Windsor City Solicitor, the Court ruled that communications between Estrin and Windsor regarding any alleged conflict with CenTra are privileged. (Tr., 1/14/09; Willki, p. 72). Mr. Willki was also asked by CenTra's counsel:

Q.    Did you ever talk to Mr. Estrin about this litigation?

MR. KALCZYNSKI:    Same objection.

THE COURT:    I don't think you can separate Mr. Estrin's representation of the City of Windsor from the fact of this lawsuit.  I mean, it's underlying his representation of the City of Windsor generally.  Sustained.

MR. JOHN:    But he's not representing Windsor here.

THE COURT:    Sustained.  (Tr., 1/14/09, Willki, p. 82-83);

    Right after that, Mr. Willki was asked by CenTra's counsel:

Q.    Are you paying Mr. Estrin to give you advice concerning this litigation?

MR. KALCZYNSKI:    And to be clear, I'm objecting again on the basis of the solicitor-client privilege.

THE COURT:    And I'm going to make it really clear that even though Windsor is not a named party in this litigation, they are certainly a party with a stake in it, Gowlings is their lawyer with respect to matters that you [Centra] have vociferously articulated as adverse to CenTra in this case, **and I will sustain communications between Gowlings and Windsor as privileged.**  (Tr., 1/14/09, Willki, p. 87) (emphasis added);

    A few minutes later, CenTra's counsel tried a slightly different approach:

Q.    Who were the ministers with which there were meetings?

A.    As I understand, the previous minister for - -

MR. KALCYNSKI:    Your Honor, I'm going to object again.  Who he's [Mr. Estrin] meeting with on behalf of his client to advance his client's interest is subject to the litigation privilege in Canada.  These are the efforts of Mr. Estrin to advance the position of Windsor against the second span.  Mr. John is not entitled to get into this, and he's not entitled to get in this here, and he

14

won't be entitled to get into this in discovery. It's privileged. It's an ongoing matter where Windsor is adverse to CTC and DIBC, and there should not be any discovery allowed of it here.

THE COURT: I believe that that's correct, Mr. John. **Just like you don't want confidential information made available to your fierce adversary, Windsor, I don't think Windsor has to disclose confidential information to you.** (Tr., 1/14/09, Willki, p. 107) (emphasis added);

The Court applied these types of privilege rulings to both sides, as seen during Mr. Stamper's testimony:

Q.      If you look down in the July 21, '05 entry, it says "Receive and peruse letter from Ed Arditti regarding Estrin memo." Do you know what memo was being discussed by you and Mr. Arditti and Mr. Hewitt and Mr. Paroian back in the summer of 2005?

MR. JOHN:      Objection, Your Honor, attorney-client privilege. They're all attorneys. That's been established. She's asking for a communication between client and its lawyers.

THE COURT: Sustained. (Tr., 1/30/09, Stamper, p. 139).

Communications that are privileged where made are not subject to discovery in a United States court. (Ex. 9—Restatement of Foreign Relations Law, 3d, §442, comment d). Here, the subpoenas to Schwartz seek information that is subject to Canadian (and American) privileges, and are designed to discover Gowlings' and Windsor's strategies for opposing the Second Span. This information is simply not discoverable.

The litigation privilege applies to communications "between the client or his solicitor and third parties if made for the solicitor's information for the purpose of pending or contemplated litigation." *General Accident Assurance Company v. Chrusz*, [1999] O.J. No. 3291, p. 7; Ex. 10, MacKenzie Decl., ¶¶ 18-19. The purpose of this privilege is to create a "zone of privacy to facilitate adversarial preparation . . ." *General Accident Assurance Company*. at p. 8. Courts have recognized two broad categories of documents that are protected by litigation privilege. In the first category are

15

documents that set out the lawyer's mental impressions, strategies, legal theories, or draft questions. These documents do not have to be from or sent to the client. They are protected from disclosure as part of the lawyer's brief. In the second category are documents, records, and communications by the lawyer, client or third party, brought into existence for the purpose of litigation. Examples of such documents include witness statements, expert opinions, and other documents from third parties. (Ex. 10, ¶21).

Drafts and communications exchanged between and among experts (testifying and consultants), attorneys and clients, the exact documents sought in the Schwartz subpoenas, are specifically privileged and are not subject to disclosure. *See, Bell Canada v. Olympia & York Developments Ltd.*, 68 O.R. (2d) 103 (1989). In *Bell Canada*, a litigant was denied discovery of its adversary's communications and drafts between the adversary's solicitors and experts, who were testifying and giving opinions, on the grounds of privilege. The Court held that it is the client's privilege not that of the expert or solicitor. It held that a party's right to obtain legal advice, "including the obtaining of expert opinions on technical matters," are privileged as part of "the interest of the client to be able to discuss, not only personally but through experts, in the most open and frank terms, with the legal advisers involved, all aspects of the client's rights and liabilities, and of the issues arising in the litigation. The client's right to free and untrammelled legal advice and discussion of his interests with his solicitors has long been viewed as one of the essential underpinnings of our system of administration of justice and as an essential feature of a party's right to independent legal advice and assistance in legal matters in court." *Id.* An "'obligatory disclosure would deter any solicitor from carrying out that 'in-depth' preparation necessary for him to assess all aspects of his client's case—the favourable and unfavourable—which analysis is essential if the

16

solicitor is to advise his client in a responsible and professional manner.'" *Id.* quoting *Ocean Falls Corp. v. Worthington (Canada) Inc.* (1985), 69 B.C.L.R. 124, 126. The *Bell Canada* Court also held that facts upon which expert opinions are based are normally to be found in the report itself. The Court held that communications and drafts not in the final report are not relevant, and also did not need to be produced for that reason as well. *Bell Canada*, 68 O.R. (2d) 103 (1989).

Here, litigation between Windsor and CenTra has been contemplated or pending since at least 2004. This is clear from Estrin's November 2004 letter to the Coast Guard opposing CenTra's July 2004 permit application for the Second Span. (Order, p. 17, ¶37). It is also clear from Estrin's September 14, 2004 letter sent on behalf of Windsor to Dan Stamper regarding objections to CenTra's Site Plan Approval Application, environmental issues, and their adversarial meeting concerning these items. (Order, pp. 13-17, ¶¶28-37; Tr. Ex. 127/503). That letter was marked "without prejudice" and enclosed a proposed agreement in an attempt to resolve "what otherwise may be a protracted legal conflict" between CenTra on the one hand and Windsor on the other. Estrin's September 14, 2004 letter culminated in the final February 2005 Site Plan Agreement between Windsor and CenTra, which specifically reserved Windsor's right to "object to or deny" a second bridge, and further indicates that Windsor's approval of CenTra's site plan would not "be pleaded as an estoppel" against Windsor's right to object to the Second Span. (Order, p. 15, ¶33; Tr. Ex. 504). So, the final Site Plan Agreement is further evidence that litigation over the Second Span was anticipated throughout 2004 and 2005 and since. The Site Plan Agreement specifically reserved Windsor's rights to object to the Coast Guard concerning CenTra's 2004 application for the Second Span and concerning related environmental issues. (Order, pp. 13-17). The OPA 43 Litigation between Windsor and CenTra was also ongoing from 2004 through 2007. (Order, p. 16,

17

¶37),  The January 2005 Schwartz Report and public meeting with Estrin and Schwartz relating to it, which Stamper and others from CenTra attended, and which were adverse to the Second Span, were known to CenTra as well.  (Tr., 2/12/09, Estrin, pp. 40-42; Tr., 2/12/09, Stamper, pp. 103-107).

In 2006, Estrin submitted another letter to the U.S. Coast Guard regarding the environmental aspects of CenTra's plan for the Second Span which addressed CenTra's 2004 submission to the Coast Guard, among other things.  (Joint Ex. 9 at evidentiary hearing).  Under both Canadian and U.S. law, administrative proceedings such as the one before the Coast Guard are considered to be litigation for purposes of the litigation privilege and the work-product doctrine. (Ex. 10, ¶ 35; *Bank Leu Ag v. Gaming Lottery Corp.,* [1999] O.J. No. 3949 at ¶ 4) (litigation privilege extends to proceedings before administrative agencies), *Deseret Mgmt. Corp. v. U.S.*, 76 Fed. Cl. 88, 93 (Fed. Cl. 2007) (litigation includes administrative proceedings, "when evidence or legal argument is presented by parties contending against each other with respect to legally significant factual issues"), *quoting* Restatement 3d Law Governing Lawyers § 87 cmt. h (2000); *Galvin v. Hoblock*, 2003 WL 22208370, at *3 (S.D.N.Y. Sept. 24, 2003) ("the term 'litigation' encompasses not only litigation in court, but also quasi-judicial proceedings before a government agency").  So, Gowlings' and Schwartz's work before, during, and after 2004 for Windsor regarding the Second Span was done in anticipation of litigation.

Under Canadian law, notes, memoranda and correspondence relating to persons contacted by counsel in preparation for litigation are protected from disclosure by litigation privilege.  Ex. 10, ¶34;  *General Accident Assurance Company v. Chrusz*, [1999] O.J. No. 3291, p. 13;  *Cason-Merenda v. Detroit Medical Center*, 2008 U.S. Dist. LEXIS 17623 at *8 (March 7, 2008, E.D. Mich.) (Discovery requests that seek information regarding whom a lawyer interviews as part of a

pre-suit investigation implicate "the work product doctrine as it would threaten to disclose the thought processes and strategic assessments of CenTra's counsel in deciding who to interview."). Similarly, CenTra's requests for information regarding the contents of communications among Gowlings, Schwartz and Windsor concerning the Second Span intrude upon Gowlings thought processes and strategic assessments. *See, Id.; Bell Canada, supra.* The two subpoenas seek to discover all documents showing what Gowlings and Schwartz have done in the course of Gowlings' representation of Windsor against the Second Span. The subpoenas impermissibly seek information subject to the work-product doctrine and/or the litigation privilege.

The subpoenas also seek communications between Gowlings and Windsor. However, all communications between Gowlings and its client Windsor regarding legal matters are subject to the solicitor-client privilege. (Ex. 10, ¶¶ 13-17). While solicitor-client privilege is not absolute, it is the privilege that is as close to absolute as possible. It will yield only in certain clearly defined circumstances, and does not involve a balancing of interests on a case-by-case basis. It is one of the few blanket or class privileges known in Canadian law, which means that communications protected by solicitor-client privilege enjoy a *prima facie* presumption that they are not to be disclosed or admitted into evidence. (Ex. 10, ¶15). This solicitor-client privilege extends to communications among the solicitor, client and expert as well. *Bell Canada*, 68 O.R. (2d) 103 ("It is the privilege of the client. It is perhaps an extension of the privilege which has traditionally been applied rigorously to the client himself, but it is not an independent privilege and remains the privilege of the client, not of the expert and not of the solicitor.").

The sensitivity of the information CenTra seeks from Gowlings is confirmed by CenTra's own vehement objections to producing documents relating to their plans for the Second Span to

Gowlings. (Docket No. 57, pp. 2, 10-11) ("In effect, Gowlings is asking CenTra to turn over their play book as to their plans to build a Second Span to the lawyers (Gowlings) who continue to represent Windsor in opposing the very same Second Span"). The same is true for CenTra's subpoenas to Schwartz because those requests seek the same information regarding Windsor's and Gowlings' opposition to the Second Span.[6] (*See*, Tr., 1/30/09, Stamper, pp. 164-166). The subpoenas to Schwartz should be quashed. The subpoenas improperly seek irrelevant, confidential and privileged information of Windsor's, and have been propounded by CenTra to improperly gain a competitive advantage.

## V.   **CONCLUSION**

The Court should quash CenTra's two subpoenas to Schwartz. In the event that the Court does not do so, Gowlings' motion for protective order should be considered before any discovery from Schwartz is allowed.

Respectfully Submitted,

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By: /s/ Todd R. Mendel
      Todd R. Mendel (P55447)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725
Dated: June 16, 2009      Email: tmendel@bsdd.com

---

[6] There is also a very important distinction. CenTra put its plans at issue by suing Gowlings and claiming the Second Span has been delayed, thereby making CenTra's plans for the Second Span directly relevant. On the other hand, Windsor is a third party to this dispute. Therefore, information regarding Gowlings' representation (with Schwartz's assistance) of Windsor against CenTra should not be discoverable.

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2009, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Joseph A. Doerr (jdoerr@dykema.com); Craig L. John (cljohn@cljohn.com);Thomas J. Murray (tmurray@dykema.com); and Tricia L. Roeloefs (troelofs@dykema.com).  There are no manual recipients.  Parties may access this filing through the Court's system.

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.


By:   /s/ Todd R. Mendel
        Todd R. Mendel (P55447)
Attorneys for Defendants
211 West Fort St., 15th Floor
Detroit, Michigan 48226
(313) 965-9725
Email:  tmendel@bsdd.com

trm/brief/376428.1